Luke W. Reese, OSB No. 076129
lreese@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
1011 Commercial Street N.E.
Salem, Oregon 97301-1049
Tel: (503) 581-1501
Fax: (503) 581-5891
      Of Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual | No.     6:19-cv-00283-MK |
|           Plaintiff, | |
| vs. | **DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | **Oral Argument Requested** |
|           Defendants. | |

## ORAL ARGUMENT REQUEST INFORMATION

| | | |
|---|---|---|
| 1. | Time estimated for oral argument: | 1 Hour |
| 2. | Official court reporting services requested: | Yes |
| 3. | Appearance by telecommunication requested: | Yes |

/ / / /

/ / / /

/ / / /

## LOCAL RULE 7.1 CERTIFICATION

In compliance with this Rule, the parties made a good faith effort through telephone conferences to resolve the dispute and have been unable to do so.

## MOTION

Pursuant to Federal Rule of Civil Procedure ("FRCVP") 56, defendants, Southwestern Oregon Community College ("SWOCC"), Patty Scott, Tim Daily, Francisco Salvidar, Susan Walker, Melissa Sperry, and Pamela Wick (collectively, the "defendants"), respectfully move for summary judgment on all of plaintiff's claims against them, including her First Claim for Relief under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX"), as well as her remaining claims arising under state law.

## INTRODUCTION

There are a wide variety of laws in place to protect the rights of students at public institutions of higher education. Not only do constitutional protections apply, but federal statutes have been enacted to ensure that public colleges and universities are free from discrimination on the basis of, among other things, race, color, and national origin (Title VI of the Civil Rights Act of 1964); ability (Section 504 of the Rehabilitation Act of 1973); age (Age Discrimination Act of 1975); and sex (Title IX of the Education Amendments of 1972). The purpose of statutes like Title IX is twofold: First, to "avoid the use of federal resources to support discriminatory practices" and, second, to "provide individual citizens effective protection against those practices." *Cannon v. University of Chicago*, 441 U. S. 677, 704, 99 S. Ct. 1946, 60 L. Ed. 2d 560 (1979).

At the same time, not every adverse event in a student's academic career is actionable. In the course of assessing student performance, colleges and universities frequently make legitimate

academic decisions that have no relationship to an individual's protected status. These decisions can result in adverse consequences, of varying degrees, yet they are not redressable in court, federal or otherwise.

This is precisely such a case. Plaintiff, Nicole Gililland, has come to federal court with what is essentially a grade dispute. Plaintiff was found to have committed plagiarism, a charge she does not contest. The discipline that followed was appropriate and not even particularly punitive: Plaintiff received a zero on the applicable assignment, and she was placed on academic probation. At that point, plaintiff had every opportunity to recommit to her studies and continue her nursing education. Plaintiff chose not to do so, instead becoming fixated on what she believed was uneven application of the plagiarism standard. She also became aggressive, if not hostile, to the instructors and administrators who tried to help her understand that she would be better served focusing on her own assignments. Plaintiff ultimately failed her courses.

Now, plaintiff alleges she was the victim of discrimination based on sex and/or her former career as an adult film model and actress, and that this violated her rights under Title IX. On the same apparent basis, plaintiff alleges various state-law claims. But the decision to discipline plaintiff was a purely academic one, well within her instructors' professional judgment and discretion, and it was carried out appropriately. It was also protected from administrative interference by principles of academic freedom. *See Parate v. Isibor*, 868 F.2d 821, 830 (6th Cir. 1989) (academic freedom is designed to "protect the individual professor's classroom method from the arbitrary interference of university officials"); *Berg v. Bruce*, 112 F.3d 322, 329 (8th Cir. 1997) (quoting same from *Parate*). SWOCC's actions did not deviate either from accepted academic norms or its treatment of similarly situated students, and it certainly did not treat plaintiff differently based on her sex or any other protected status.

For those reasons and the reasons that follow, the Court should enter an Order dismissing plaintiff's Complaint in its entirety.

## STATEMENT OF MATERIAL FACTS

*Plaintiff Enrolls at SWOCC*

Plaintiff, a former paramedic, began taking general education courses at SWOCC during summer term 2016.  (*Declaration of Luke Reese ("Reese Dec."), Exhibit 1*).  Plaintiff was bright and ambitious, but she immediately struggled to balance the demands of her personal and professional commitments.  Plaintiff requested (and received) frequent extensions on assignments, citing justifications ranging from technical difficulties (*Reese Dec., Exhibit 2*) to elective medical procedures (*Reese Dec., Exhibit 3*) to illness or food poisoning (*Reese Dec., Exhibit 4*) to a physical assault by a relative (*Reese Dec., Exhibit 5*).  Sometimes, she offered no justification at all (*Reese Dec., Exhibits 6 & 7*).

Even early in her academic career, plaintiff had difficulty understanding and applying citation rules.  On at least five occasions during her general education courses, plaintiff was reminded—by three different professors—of the importance of citing her sources to avoid accusations of plagiarism.  (*Reese Dec., Exhibits 8-11*).  Plagiarism is specifically prohibited by SWOCC's Policy Regarding Academic Dishonesty, which is published in the Nursing Program Student Handbook.  (*Reese Dec., Exhibit 12, pp. 5-6*).  At that time, plaintiff acknowledged that she "struggle[d] with citations" and pledged to "study it harder."  (*Reese Dec., Exhibit 13*).

When things went well, plaintiff was polite and solicitous of her professors.  But when she received negative feedback or a low grade, plaintiff sometimes became defensive.  It was not uncommon for her to complain about a professor's assigned workload (*Reese Dec., Exhibit 14*) or test questions (*Reese Dec., Exhibit 15*), or to demand a "specific explanation" of their grading techniques when she herself received an unfavorable score.  (*Reese Dec., Exhibit 16*).

*Plaintiff Accepted into Nursing Program*

In July 2017, plaintiff was accepted into the SWOCC nursing program.  (*Reese Dec., Exhibit 17*).  The program was under the direction of Susan Walker, RN, MSN, NP, and supported by full-time faculty members Melissa Sperry, MSN, RN; Pam Wick, MSN, RN; and Robin Finney, MSN, RN.  (*Reese Dec., Exhibit 12, p. 4*).  Ms. Sperry was assigned to be plaintiff's academic advisor.  (*Reese Dec., Exhibit 63, p. 2*).  Elizabeth Cooper, MSN, RN, was assigned to be plaintiff's clinical instructor at Coquille Valley Hospital.  (*Reese Dec., Exhibit 18*).

Plaintiff's early performance in the nursing program was positive, and she made the Dean's List for fall term.  (*Reese Dec., Exhibit 19, p. 2*).  At the same time, she continued to request semi-regular extensions on assignments or other accommodations due to lack of sleep (*Reese Dec., Exhibit 20*), a variety of different illnesses (*Reese Dec., Exhibits 21-25, 30*), technical difficulties (*Reese Dec., Exhibits 26-29*), a speeding ticket (*Reese Dec., Exhibit 31*), or generally feeling "just a little overwhelmed" (*Reese Dec., Exhibit 32*).  By February 2018, plaintiff explained to one of her professors that she was "really struggling to keep [her] head above water th[at] term." (*Reese Dec., Exhibit 33*).

Along with the rest of her cohort, plaintiff was enrolled in three nursing courses for the spring term:  NRS 112 (Foundations of Nursing in Acute I), NRS 231 (Clinical Pharmacology II), and NRS 233 (Pathophysiology Processes II).  (*Reese Dec., Exhibit 34*).  These courses were all team-taught by the nursing faculty, with a single instructor delivering three lectures one week and then a different instructor delivering them the following week.  (*Reese Dec., Exhibit 63, pp. 3-4*). Each week typically focused on a different organ system (*e.g.*, cardiovascular system, neurologic system, etc.) and culminated in three exams on Friday.  (*Reese Dec., Exhibit 63, pp. 5-7*).

*Plaintiff Placed on Probation to Address Plagiarism Concerns*

During the second week of spring term, plaintiff was at home recovering from a kidney infection. (*Reese Dec., Exhibit 30*). Plaintiff contacted Ms. Sperry, who was the acting instructor, by email and attempted to make arrangements to take that week's NRS 112 exams early. Ms. Sperry responded that they could "look at that next week." (*Reese Dec., Exhibit 24, p. 6*). Ms. Sperry also advised that there was an assignment available for plaintiff in the online portal for NRS 112 (Foundations of Nursing). Plaintiff completed the only assignment that she saw in the portal, titled "Kaplan Remediation," and submitted it. (*Reese Dec., Exhibit 35, p. 2*).

The following week, when plaintiff took her makeup tests, Ms. Sperry applied the standard 10% grade reduction for late work. Ms. Sperry also informed plaintiff that she had completed the incorrect assignment, and that it was a case study—not the remediation—that was due. According to plaintiff, Ms. Sperry was originally going to give her a zero on the case study, but she later allowed plaintiff to make up the assignment. Plaintiff believes that Ms. Sperry was asked to do so by Ms. Walker. (*Reese Dec., Exhibit 35, pp. 2-3*).

On April 20, 2018, also during the third week of spring term, plaintiff submitted a case study assignment for NRS 233 (Pathophysiological Processes II). (*Reese Dec., Exhibit 36*). On April 25, 2018, the acting instructor, Ms. Finney, awarded her zero points for the assignment. Ms. Finney had originally graded the assignment on the merits; however, after consulting with Ms. Sperry regarding her concern that plaintiff had copied and pasted from Internet sources without citation, determined a zero grade for plagiarism was the appropriate result. (*Reese Dec., Exhibit 37, p. 3 and Exhibit 82, pp. 2-3*). Ms. Finney asked that plaintiff make an appointment to speak with her academic advisor "as soon as possible." (*Reese Dec., Exhibit 38, p. 1*).

On receipt of that message, plaintiff presented to Ms. Sperry's office unannounced.  With Ms. Finney present, plaintiff was advised that plagiarism had been identified in her case study assignment.  Plaintiff grew very agitated.  She responded that her clinical instructor, Ms. Cooper, had told her that it was acceptable to copy and paste from reputable sources.  Ms. Sperry and Ms. Finney advised that this was not correct and reiterated that plaintiff should make an appointment to discuss the matter further.  (*Reese Dec., Exhibit 39*).

Ms. Sperry then sent plaintiff an email advising that "many of [her] pathophysiology papers ha[d] been copied directly from online resources."  (*Reese Dec., Exhibit 40, p. 1*).  Ms. Sperry identified plaintiff's papers on the subjects of general anesthesia, osteoporosis, congestive heart failure, and urinary tract infections, noting that each had been copied from uncited sources.  (*Reese Dec., Exhibit 40*).  Ms. Sperry further advised that this was "known as plagiarism and [wa]s not acceptable per policy."  (*Reese Dec., Exhibit 40, p. 1*).  She attached a "Student Deficiency Form" to her email, which provided that plaintiff would be "[p]laced on level 2 probation," to continue "through entirety of [the] nursing program."  (*Reese Dec., Exhibits 40-41*).  Additional offenses would result in "immediate dismissal."  (*Reese Dec., Exhibit 41*).  Ms. Sperry requested a meeting with plaintiff and Ms. Walker for the following Monday.  (*Reese Dec., Exhibit 40, p. 2*).

*Plaintiff Does Not Dispute Plagiarism Charges but Claims She is Being Unfairly "Targeted"*

Plaintiff did not wait for the formal meeting.  She went immediately to Ms. Walker's office and demanded to know "why she had a target on her back."  (*Reese Dec., Exhibit 42, p. 1*).  Plaintiff declared that "this program has violated HIPAA and I can prove it."  (*Reese Dec., Exhibit 42, p. 1*).  She explained that "she had asked [an admissions employee] where to go for [the required] physical, [and the employee] had told her to go to" a particular provider.  (*Reese Dec., Exhibit 42, p. 1*).  From that, plaintiff surmised that "somebody must have told [the admissions employee] that

[plaintiff] had gone to [the same provider] before." (*Reese Dec., Exhibit 42, p. 1*).  Ms. Walker redirected plaintiff to the issue at hand and recommended that she review the applicable student handbooks in anticipation of Monday's meeting. (*Reese Dec., Exhibit 42, p. 1*).

The following day, on April 26, 2018, plaintiff sent an email to Ms. Finney.  Plaintiff did not take responsibility for her actions.  Instead, she alleged that plagiarism had been committed by "every single student" in the nursing program but that she was being unfairly singled out. (*Reese Dec., Exhibit 43, p. 1*).  Specifically, she claimed that there were multiple instances of plagiarism on a recent case study in Ms. Sperry's own class (from week 2).  Plaintiff asserted that the fact that Ms. Sperry "failed to see the plagiarism on her case studies, but found it on [plaintiff's] in [Ms. Finney's] class [wa]s just further evidence of her unethical behavior" and "abus[e] of power." (*Reese Dec., Exhibit 43, p. 1*).

Plaintiff then met with Tim Dailey, Vice President of Enrollment and Student Services, and repeated these same claims.  She asserted that Ms. Sperry was punishing her for the miscommunication regarding the prior week's case study.  According to plaintiff, her relationship with Ms. Sperry had been "good" up until now, and "[t]here were no specific problems" between them before her recent illness. (*Reese Dec., Exhibit 44, p. 3*).  Plaintiff was trying to "think[ ] of reasons why she has been singled out," and she speculated that perhaps a counselor that she had seen outside of SWOCC had breached HIPAA and "made the nursing staff have negative feelings toward her." (*Reese Dec., Exhibit 44, p. 3*).  In any event, plaintiff told VP Dailey that "when the nursing staff decide they want a student gone, they look for something they can use against them." (*Reese Dec., Exhibit 44, p. 1*).

Plaintiff received the support of another student, "M," who echoed plaintiff's claim that the "entire [nursing] program . . . have committed acts of plagiarism." (*Reese Dec., Exhibit 45, p. 1*).

That student contacted SWOCC administrators and provided examples from PowerPoint presentations created by both faculty and students. (*Reese Dec., Exhibit 45*). In further support of her grievances, plaintiff forwarded VP Dailey a copy of a complaint filed by another student, "V." That student had complained of unrelated harassment by Ms. Sperry and Ms. Walker the previous academic year.[1] (*Reese Dec., Exhibit 46*).

On April 30, 2018, plaintiff and her ex-husband met with SWOCC faculty and administrators to go over the Student Deficiency Form and next steps. Again, plaintiff refused to take responsibility for her actions. Instead, she accused her professors of plagiarism, harassment, unethical behavior, and defamation, and claimed that she was being "victimize[ed]" by the faculty. (*Reese Dec., Exhibit 47*). Plaintiff did, however, sign the form and acknowledge her probation. (*Reese Dec., Exhibit 48*). At no time did plaintiff claim she was being "victimized" or otherwise scrutinized because she is a woman or because of her former work in adult films. In fact, the record is void of any evidence to suggest any defendant was aware of plaintiff's work in adult films.

*Plaintiff Becomes Increasingly Hostile Towards Faculty and Administrators*

Over the course of the next few weeks, plaintiff's anger and feelings of persecution only intensified. On May 7, 2018, plaintiff emailed Francisco Saldivar, PhD, the Dean of Technical and Workforce Education. If Dean Saldivar and SWOCC refused to act, plaintiff advised that she had "substantial evidence" to support a lawsuit for "defamation, harassment and discrimination based on age." (*Reese Dec., Exhibit 49*). If plaintiff did not hear back from Dean Saldivar before lunch, she wrote that she would be "forced to contact the board of education, media, [her] attorney . . . , the nursing board, and anyone else that [she] believe[d] c[ould] help [her]." (*Reese Dec., Exhibit 49*).

Just a few hours later, plaintiff sent another email to Dean Saldivar. This time, plaintiff demanded to know what SWOCC was doing to "protect [her] from the corruption." (*Reese Dec.,*

---

[1]     When contacted by administrators, V declined to participate. (*Reese Dec., Exhibit 52, p. 1*).

*Exhibit 50*).  She reported that she had just spoken with the Oregon Board of Nursing ("OSBN") and advised that the OSBN was "very concerned about [her] claims."  (*Reese Dec., Exhibit 50*). Plaintiff reiterated that she would also be filing lawsuit "after [that day] if no aid [wa]s offered." (*Reese Dec., Exhibit 50*).  Dean Saldivar responded that he had only just begun to look into the issue and urged plaintiff's patience.  (*Reese Dec., Exhibit 51, p. 1*).

On May 15, 2018, plaintiff met with Pam Wick, MSN, RN, to go over a recent exam.  When Ms. Wick advised that plaintiff's overall grade was low, plaintiff responded that "[t[he deans are correcting that."  (*Reese Dec., Exhibit 53, p. 2*).  Ms. Wick explained that administrators did not have the liberty to change plaintiff's grade.  In an aggressive tone, plaintiff insisted that "the deans w[ould] set [Ms. Wick] straight."  (*Reese Dec., Exhibit 53, p. 2*).  She then followed up with a threatening email that provided, in relevant part, "The formal complaints I've filed with the board of nursing are against [Ms. Walker] and [Ms. Sperry].  I'm happy to include you too if you don't stop skimming my grades."  (*Reese Dec., Exhibit 54*).  Plaintiff later reported the conflict to VP Dailey and Dean Saldivar, describing the encounter as "shocking."  (*Reese Dec., Exhibit 55, p. 1*).

SWOCC administrators were disturbed by plaintiff's belligerence.  In an email dated May 16, 2018, VP Dailey expressed concern that plaintiff was ignoring his advice to focus on her coursework.  He noted that if she kept up her behavior, plaintiff would either "fail a class or get dismissed due to disruptive behavior."  (*Reese Dec., Exhibit 56, p. 1*).

Plaintiff did not heed that advice.  Several days later, on May 18, 2018, she emailed Dean Saldivar.  Plaintiff wrote:

> "I have repeatedly given everyone the opportunity to make this go away by simply agreeing to stop harassing me and just treat me fairly.  I'm flabbergasted that the people involved aren't more interested in that path, because at the end of all of this it will be their careers that are lost, not mine.  Their only hope of getting rid of me is

> to leave me alone and let me graduate.  I will fight this all the way to
> the top."

(*Reese Dec., Exhibit 57*).

Just two days after that, on May 20, 2018, plaintiff sent a follow-up email to Dean Saldivar.

This time, she advised that she had been in touch with *The Oregonian* and that "this type of story

[wa]s their thing."  (*Reese Dec., Exhibit 58*).  Plaintiff wrote:

> "Tomorrow is the last day I will give SWOCC to do what already
> should've been done; my grades need to be reinstated, my record
> needs to be cleared, and my teachers need to stop harassing me.  If
> this doesn't happen by the close of business tomorrow, [V] and
> myself will give the interview to The Oregonian and move forward
> with a lawsuit.  If you do accomplish these things tomorrow I will
> drop all complaints with all agencies and put this situation to rest.  I
> will take this last offer for peace to the President if I don't hear a
> response from you by lunch tomorrow."

(*Reese Dec., Exhibit 58*).

The following day, VP Dailey and Dean Saldivar met with plaintiff and again urged

patience.  (*Reese Dec., Exhibit 59, p. 1*).

*Plaintiff's Grades Begin to Fall as She Obsesses Over Discipline*

The plagiarism accusation was "extremely difficult" for plaintiff to handle, and plaintiff

was, by her own admission, "failing every class" by early May.  (*Reese Dec., Exhibit 60*).  Her

grades continued to slip as the term progressed.  Plaintiff failed to complete a weekly assignment in

NRS 233, explaining to Ms. Sperry that she decided to "forgo" it in the interest of time.  (*Reese*

*Dec., Exhibit 61, p. 1*).  Plaintiff similarly failed to complete the second half of an assignment in

NRS 231.  When Ms. Sperry reached out to plaintiff about the omission, plaintiff responded angrily,

> "No Melissa, that was supposed to be completed in class on Friday
> as part of lecture.  When you were unable to attend lecture, that plan
> fell through.  We did our tests and were released at which time I
> needed to go and see about meeting with the SWOCC President and
> immediately following that I had important business with the nursing
> board that needed to by[sic] addressed before they closed for the

weekend.  By the time I was finished with these important functions, there was not enough time to complete the assignment before the 5pm deadline that hadn't been adjusted in spite of the other adjustments.  I know you can see that I attempted it after 4pm and stopped when I realized there was no way to get it done again in time (it was incredibly time consuming the first time).  So I took a zero.  If there's a problem with any of that, please let me know a good time to do it again."

(*Reese Dec., Exhibit 62, p. 1*).  Around the same time, plaintiff "added" to Ms. Sperry's negative online reviews through ratemyprofessor.com.  (*Reese Dec., Exhibit 63, p. 8*).

*Plaintiff Submits Formal Complaints and Threatens Media Exposure*

On May 23, 2018, plaintiff met with Dean Saldivar and Ms. Walker.  Following that meeting, plaintiff sent an email to Ms. Walker warning that it was "the last day [she was] willing to offer a peaceful resolution."  (*Reese Dec., Exhibit 64, p. 1*).  She threatened:

"Tell your staff to treat . . . [V] and myself fairly (Pam and Melissa), reinstate my grades and end this probation and in turn I will resend[sic] all complaints against you and members of your staff with the school and the nursing board.  I will forgive and forget and never speak of this again.  I'm not asking for special treatment, I have what it takes to get there on my own.  If you prevent that from happening, I will dedicate the rest of my life to exposing everything that[sic] wrong with this program/school.  I have a reporter I've been speaking with from the Oregonian they want to interview . . . [V] and myself, they mentioned the exposure will help us secure a legal team willing to take on the multimillion dollar lawsuit against the school and the individuals involved.  We will lobby the[sic] change the laws surrounding "academic freedom" that has allowed your staff to hurt so many students and your faces will be at the front of it.  I don't want ANY of this, but I will do whatever I have to do to make this right."

(*Reese Dec., Exhibit 64, p. 1*).

The following day, on May 24, 2018, plaintiff submitted a formal complaint to SWOCC administrators.  The complaint detailed plaintiff's conflict with Ms. Sperry during her April illness.  In addition to the dispute over the online assignment, plaintiff complained about Ms. Sperry's

examination policies.  Due to a medical conflict during the second week of classes, plaintiff alleged that she had attempted to take several tests early (specifically to avoid a late penalty).  (*Reese Dec., Exhibit 35*).  Ms. Sperry demurred, and she told plaintiff they would "worry about the tests the following week." (*Reese Dec., Exhibit 35, p. 2*).

When plaintiff took the makeup tests, however, she received a 10% deduction for being late. (*Reese Dec., Exhibit 35, p. 2*).  Plaintiff went on to outline the plagiarism allegation in detail, as well as the negative experiences of another student in the program, V.  (*Reese Dec., Exhibit 35, pp. 4-5*). Plaintiff was also critical of the ongoing investigation, claiming that VP Dailey and Dean Saldivar "will not do anything they promised they would." (*Reese Dec., Exhibit 35, p. 6*).  She wrote:

> "I'm finally having to accept that [Dean Saldivar] has no intention of looking at any evidence that will vindicate me.  It has become increasingly evident that SWOCC as a whole is participating in any attempt to make this all go away, and by 'this' I mean me.  They won't look into my claims or the claims of any of my classmates and appear to have decided it's easier to make me go away than to address the blatant corruption throughout their ranks."

(*Reese Dec., Exhibit 35, p. 6*).

Plaintiff also filed a complaint with the U.S. Department of Education.  (*Reese Dec., Exhibit 65*).

In response to plaintiff's complaint, VP Dailey requested that she complete the college's "Discrimination and Harassment" form regarding her alleged harassment by the nursing faculty. (*Reese Dec., Exhibit 66, p. 1*).  Plaintiff did not return the form.  Instead, she continued to threaten to take her story to the "national media" if administrators did not immediately conclude the investigation in her favor.  (*Reese Dec., Exhibit 67, p. 1*).  On May 31, 2018, plaintiff emailed VP Dailey and declared that he was "going to have to answer for the way [he had] handled th[e] situation." (*Reese Dec., Exhibit 68*).  The following day, on June 1, 2018, plaintiff sent another

email to VP Dailey, this time asserting that she was "not backing down until [she was] exonerated and [her] record [wa]s clear, whatever that takes." (*Reese Dec., Exhibit 69, p. 1*).

At no point did plaintiff ever allege she was being treated differently because of her sex or former work in adult films.

*Plaintiff Fails Multiple Courses*

As the end of the term neared, it appeared plaintiff would fail one or more courses. (*Reese Dec., Exhibits 70-71*). Plaintiff claimed Ms. Walker "had to manipulate which assignments go with what class to ensure" her failing grades. (*Reese Dec., Exhibit 71*). In a June 14 email to Ms. Walker, plaintiff wrote that Ms. Walker could do "whatever [she saw] fit and [they would] let the cards fall where they may afterwards. There [were] much bigger forces than [Ms. Walker] that ha[dn't] been corrupted by their power." (*Reese Dec., Exhibit 72, p. 1*). But in a follow-up email on June 16, with the subject line, "Fix my grade," plaintiff assumed a more hostile tone:

> "Put the Kaplan [assignment] where it belongs and fix all of the grades [Ms. Sperry] broke ethics to decrease . . . . . We both know that I have emails proving I asked [Ms. Sperry] to take her tests early and I was INCREDIBLY ill, I had a doctors appointment. Two weeks later [another student, J] needed to take her son to the doctor for a cold, she had no problems and didn't get her grades docked. There isn't a jury in the world that won't find that wrong. There is proof everywhere to what I'm saying and if[sic] you will not win. Only one of us is proving they shouldn't be a nurse and I promise it's not me. Stop making this bigger and uglier, fix my grades before you destroy the entire program."[2]

(*Reese Dec., Exhibit 73*).

As expected, plaintiff received failing grades in both NRS 112 and NRS 233. (*Reese Dec., Exhibit 74, p. 1*). Plaintiff's grade in NRS 112 was the result of the plagiarism accusation, as well as

---

[2]    Ms. Walker did not respond to plaintiff directly, but she assured SWOCC administrators that the nursing program had been "strictly following" the 10% reduction for late work for all students. (*Reese Dec., Exhibit 81, p. 2*).

her decision to forgo an assignment. Similarly, in NRS 233, plaintiff's grade was the result of her decision to forgo two assignments—the one in mid-May and another at the end of the term. (*Reese Dec., Exhibit 71*). Plaintiff did not accept these explanations. On July 7, 2018, she emailed Ms. Walker, VP Dailey, and Dean Saldivar with her objections:

> "Few things wrong with [the grade report]. NRS 112 was the only F at the end of the term and that was because of the grades they changed and a test [Ms. Walker] moved. I didn't fail [NRS 233], so that's a lie . . . . . You would think considering the current environment you all would at least pretend that you're not corrupt."

(*Reese Dec., Exhibit 75*).

*SWOCC is Unable to Resolve the Concern to Plaintiff's Satisfaction*

Throughout this process, Dean Saldivar and VP Dailey were working with plaintiff to review her concerns that other students had engaged in plagiarism. (*Reese Dec., Exhibit 76, p. 3*). Plaintiff seems to have been under the mistaken belief that this process would result in some sort of "hearing," when in fact SWOCC left ultimate decision-making authority on this assignment's grade to the academic faculty. (*Reese Dec., Exhibit 76, pp. 4-5, 7 and Exhibit 77, p. 9*).

Regardless, Dean Saldivar and VP Dailey asked a fellow dean with writing expertise, Dean Rod Keller, to review plaintiff's assignment and those of her classmates for plagiarism. (*Reese Dec., Exhibit 76, p. 6*). The exact scope of Dean Keller's review is a disputed fact; however, he ultimately reported to VP Dailey that he believed the probation should stand. (*Reese Dec., Exhibit 76, p. 12*). Based on this report, VP Dailey decided to not send the nursing faculty his recommendation that the probation be lifted and points restored, a written recommendation he drafted but never provided to anyone. (*Reese Dec., Exhibit 76, pp. 10-11*).

Based on plaintiff's continued threats and filing of the present suit, she was not satisfied with the outcome of the process.

*Plaintiff Alleges—For the First Time—that she is a Victim of Sex Discrimination*

As soon grades were final, plaintiff, through her attorney, provided tort claim notice to SWOCC.  That notice advised that plaintiff would be bringing claims for intentional interference with economic relations, intentional infliction of emotional distress ("IIED"), and defamation. (*Reese Dec., Exhibit 78*).  Now, in the present matter, plaintiff alleges discrimination based on sex and her former career in adult films.  But in discovery, plaintiff was unable to identify who, if anyone, informed any person associated with SWOCC of her former career.  (*Reese Dec., Exhibit 79, pp. 4-5*).

*Plaintiff Seeks Relief in Federal Court*

On February 26, 2019, plaintiff filed this lawsuit.  With regard to Title IX, plaintiff has alleged that she was subjected to a hostile educational environment because: (1) SWOCC subjected her to sexual harassment based on her former career as an adult film model and actress; (2) SWOCC subjected her to sex-based harassment; and (3) SWOCC failed to properly train its personnel and/or investigate her complaints.  In addition to her Title IX claim, plaintiff has alleged state-law claims for breach of contract, negligent supervision, intentional interference with economic relations, and IIED.

## LEGAL STANDARD

A party is entitled to summary judgment "only if, taking the evidence and all reasonable inferences in the light most favorable to the non-moving party, there are no genuine issues of material fact, and the movant is entitled to judgment as a matter of law."  *Tauscher v. Phx. Bd. of Realtors, Inc.*, 931 F.3d 959, 962 (9th Cir. 2019) (citing Fed. R. Civ. P. 56(a)).  "An issue of material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party."  *Id.* (internal quotation marks omitted).

## POINTS AND AUTHORITIES

**I.    Defendants are entitled to summary judgment on plaintiff's Title IX claim**

   *A.  Legal Framework*

Title IX provides that "no person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."   (Emphasis added.) Neither Title IX nor its regulations define the term "sex."   The term has long been understood to encompass the biological sex that one was assigned at birth, but it was recently clarified to also cover discrimination on the basis of gender identity and sexual orientation.   Exec. Order No. 13988 (Jan. 21, 2021).[3]

The term "discrimination," for purposes of Title IX, is any intentional discrimination that is animated or motivated by the victim's sex.  *See Alexander v. Sandoval*, 532 U.S. 275, 280, 121 S. Ct. 1511, 149 L. Ed. 2d 517 (2001) (holding that Title VI, upon which Title IX is based, prohibits only intentional discrimination); *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 865 (8th Cir. 2011) (court "glean[ed] from th[e] language of the statute a requirement of underlying intent, and therefore motivation, on the part of the actor to discriminate *because of*" sex).   Put another way, sex discrimination is conduct that "deprive[es] [a] student of benefits or [subjects] them to different treatment" because of their sex.  *Doe by & Through Doe v. Petaluma City Sch. Dist.*, 54 F.3d 1447, 1457 (9th Cir. 1995).

Sex discrimination under Title IX can take many different forms.  *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183, 125 S. Ct. 1497, 161 L. Ed. 2d 361 (2005).   In addition to

---

[3]     This   Order   can   be   accessed   at   https://www.whitehouse.gov/briefing-room/presidential-actions/2021/01/20/executive-order-preventing-and-combating-discrimination-on-basis-of-gender-identity-or-sexual-orientation/.

general sex-based discrimination, Title IX also encompasses sexual harassment.  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649-50, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999). Sexual harassment is not clearly defined for purposes of Title IX, but the Ninth Circuit Court of Appeals has previously quoted the workplace standard from Title VII.  *See Stanley v. Trs. of the Cal. State Univ.,* 433 F.3d 1129, 1137 (9th Cir. 2006) (quoting Title VII "sexually hostile workplace" standard when determining statute of limitations for Title IX claim); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S. Ct. 2399, 91 L. Ed. 2d 49 (1986) (quoting guidelines issued by U.S. Equal Employment Opportunity Commission that define "sexual harassment" as "unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature").

Title IX also encompasses the "hostile educational environment" created by sex-based discrimination—sexual or otherwise—inflicted by peers or faculty if the administration knowingly fails to remedy it.  *Id.* (applying theory to peer-on-peer sexual harassment).  To state a claim for a hostile educational environment under Title IX, a plaintiff must plead and prove that a school:  (1) had actual knowledge of; (2) and was deliberately indifferent to; (3) discrimination because of sex that was; (4) "so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school."  *Parents for Privacy v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020), *cert den*, 141 S. Ct. 894, 208 L. Ed. 2d 452 (2020) (citing *Davis*).

To survive summary judgment on a claim for a hostile educational environment under Title IX, plaintiff must first establish a *prima facie* case of sex discrimination.  She can do so either with direct evidence or based on circumstantial evidence by showing the following: (1) she is a member of a protected class, (2) her academic performance met the college's

legitimate expectations, (3) she experienced adverse academic actions, and (4) "similarly situated individuals outside [her] protected class were treated more favorably." *Hawn v. Exec. Jet Mgmt.*, 615 F.3d 1151, 1156 (9th Cir. 2010) (analyzing Title VII claims using the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)); *see also Austin v. Univ. of Or.*, 925 F.3d 1133, 1136 n 3 (9th Cir. 2019) ("We apply the principles of Title VII cases to Title IX claims.").[4]

When assessing academic performance, however, judges must afford deference to the academic decisions of colleges and universities. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225, 106 S. Ct. 507, 88 L. Ed. 2d 523 (1985) (reviewing constitutional claim and noting that "[w]hen judges are asked to review the substance of a genuinely academic decision, . . . they should show great respect for the faculty's professional judgment"); *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 92, 98 S. Ct. 948, 55 L. Ed. 2d 124 (1978) (reviewing constitutional claim and noting that "[c]ourts are particularly ill-equipped to evaluate academic performance"). A student's grade or other evaluation is generally not appropriate for judicial review unless it is the result of a "substantial departure from accepted academic norms." *Ewing*, 474 U.S. at 225-26.

If plaintiff successfully establishes a *prima facie* case of discrimination, then the burden of production will shift to SWOCC to "articulate some legitimate, nondiscriminatory reason for the challenged action" (*i.e.*, to show non-discriminatory intent). *Hawn*, 615 F.3d at 1155. If SWOCC does so, plaintiff "must then raise a triable issue of material fact as to whether

---

[4]      The Ninth Circuit Court of Appeals does not appear to have considered a Title IX claim involving adverse academic action (as opposed to adverse employment action). The above framework is adapted in part from *Hogan v. Ogden*, No. 06-5078, 2008 U.S. Dist. LEXIS 58359, 2008 WL 2954245, at *9 (E.D. Wash. Jul. 30, 2008), and it is also consistent with the standard articulated in *Bisong v. Univ. of Houston*, 493 F. Supp. 2d 896, 906 (S.D. Tex. 2007).

[defendants'] proffered reasons for their [actions] are mere pretext for unlawful discrimination." *Id.* at 1156 (internal quotation marks omitted). Although the evidentiary burden shifts back and forth between the parties, plaintiff has "the ultimate burden" of demonstrating that defendants intentionally discriminated against her. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000) (citations omitted).

### B. *Plaintiff's Title IX Claims against Individual SWOCC Defendants Fail as a Matter of Law*

Courts have "consistently held that Title IX does not subject school officials to liability in their individual capacities." *G.C. v. N. Clackamas Sch. Dist.*, 654 F. Supp. 2d 1226 (D. Or. 2009) (citing authorities from First, Sixth, Seventh, Eighth, and Eleventh Circuits). Rather, "it is the educational institution that must be sued for violations of Title IX." *Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1577 (N. D. Cal. 1993), *motion for reconsideration granted on other grounds*, 949 F. Supp. 1415 (N. D. Cal. 1996). There does not appear to be binding authority on this issue in the Ninth Circuit. In light of the "overwhelming authority" from other circuits, however, this Court has similarly concluded that "individuals are not subject to liability under Title IX." *Id.* at 1237.

To the extent that plaintiff has attempted to allege a Title IX claim against SWOCC officials in their individual capacities, summary judgment should be granted in favor of the individual defendants.

### C. *Plaintiff Cannot Establish Even a* Prima Facie *Case of Discrimination*

In order to establish a *prima facie* case of discrimination, plaintiff must present evidence that she is a member of a protected class under Title IX, her academic performance met SWOCC's legitimate expectations, she was the subject of adverse action, and similarly situated students outside of her protected class were treated more favorably. While that burden "is

minimal," *Hogan v. Ogden*, No. 06-5078, 2008 U.S. Dist. LEXIS 58359, 2008 WL 2954245, at *9 (E.D. Wash. Jul. 30, 2008), plaintiff cannot meet it on this record. While it is undisputed that plaintiff experienced an adverse academic action—in the form of a "zero" grade and placement on academic probation—she has not presented sufficient evidence in support of the remaining elements.

### 1. Plaintiff's Employment History is Not a Protected Status

Title IX prohibits discrimination on the basis of "sex," which includes biological sex assigned at birth, gender identity, and sexual orientation. Exec. Order No. 13988 (Jan. 21, 2021). Generally speaking, a status that is not specific to biological sex, gender identity, or sexual orientation—such as a plaintiff's employment history—is not protected for purposes of Title IX. Here, plaintiff alleges that she was discriminated against on the basis of both her "sex" and her "former career as an adult film model and actress." (*Compl. ¶ 30*). But because plaintiff's employment history is not dependent on her biological sex, gender identity, or sexual orientation, it does not qualify as a protected class under the statute.

Accordingly, plaintiff cannot establish a *prima facie* case of discrimination based on her employment history. Plaintiff's Title IX claim should be dismissed to the extent it alleges discrimination arising from her "former career as an adult film model and actress."

### 2. Plaintiff's Academic Performance Did Not Meet Legitimate Expectations

There is no dispute that plaintiff committed plagiarism. That conduct is specifically prohibited by SWOCC's Policy Regarding Academic Dishonesty, which is contained in the Nursing Program Student Handbook, and which plaintiff was specifically warned about on multiple occasions early in her academic career. The policy provides, in pertinent part, "Students who plagiarize in any of their work at [SWOCC] are subject to student disciplinary

action.  This might include but not be limited to receiving a '0' on an assignment or test after careful investigation."  (*Reese Dec., Exhibit 12, p. 6*).  In accordance with that published policy, plaintiff received a zero on her case study assignment of NRS 233 and was also placed on academic probation.  (*Exhibits 38 & 41*).

Those facts, standing alone, preclude a jury from finding that plaintiff's academic performance met her instructors' legitimate expectations.  Plagiarism is an academic offense, a type of academic dishonesty that, if left unchecked, can "have the effect of unfairly promoting or enhancing one's academic standing."  (*Reese Dec., Exhibit 12, p. 8*).  Even if plaintiff's other assignments had all been performed to her instructors' standards, the assignment in question—which is all that matters for purposes of the discipline imposed—clearly fell below the line.  Because plaintiff cannot establish even a *prima facie* case of discrimination, plaintiff's Title IX claim should be dismissed.[5]

### 3.  Similarly Situated Students Were Not Treated More Favorably

SWOCC handled plaintiff's misconduct consistent with college policy and "accepted academic norms when compared to its treatment of other students."  *Ewing*, 474 U.S. at 228 n 14.  Although a retrospective review of other students' work indicated that citation problems were, in fact, not isolated to plaintiff, that does not mean that these students were "similarly situated" with plaintiff for purposes of Title IX.  *See id.* (in due process case, evidence that some students with more incompletes, lower grades, and less experience were permitted to retake

---

[5]       Relatedly, and as discussed in more detail below, even assuming that plaintiff can meet her *prima facie* burden, she failed to present evidence from which a reasonable jury could find that SWOCC lacked a legitimate reason for assigning her a zero on her case study assignment and placing her on academic probation (or that the reason was pretextual).  It is not uncommon that "the adequate performance inquiry merges with the pretext inquiry," as both involve issues relating to the plaintiff's performance.  *Varlesi v. Wayne State Univ.*, 909 F. Supp. 2d 827, 857 (E.D. Mich. 2012) (so noting when evaluating Title IX claim brought by former graduate student).

examination was not enough to show those students were "similarly situated" with plaintiff who was denied retake opportunity).

First, there is no indication that plaintiff's instructors were aware of problems with other students' work at the time that plaintiff was disciplined. *See Jones v. Gerwens*, 874 F.2d 1534, 1542 (11th Cir. 1989) (in Title VII case, comparator's "similar acts" are relevant only if decisionmaker was aware of them). In fact, the genesis of plaintiff's frustration seems largely connected to her instructor not being interested in scrutinizing other student work as part of the plan for addressing plaintiff's undisputed plagiarism. Second, it is not enough that plaintiff include a generic allegation that SWOCC had an "accepted practice and policy of allowing plagiarism." (*Compl. ¶ 22*). Plaintiff must present specific evidence from which a factfinder could find that one or more of her peers committed a sufficiently "similar act" of plagiarism that was identified yet unpunished. *See Green v. Armstrong Rubber Co.*, 612 F.2d 967, 968 (5th Cir. 1980), *cert den*, 449 U.S. 879, 101 S. Ct. 227, 66 L. Ed. 2d 102 (1980) (*prima facie* case not established under Section 1981 where punishment resulted from dissimilar conduct rather than discriminatory intent); *Moore v. City of Charlotte*, 754 F.2d 1100, 1102 (4th Cir. 1985), *cert den*, 472 U.S. 1021, 105 S. Ct. 3489, 87 L. Ed. 2d 623 (1985) (plaintiff must demonstrate "dissimilar sanctions for similar offenses" in order to establish a *prima facie* case under Title VII). That is because in deciding whether and how to discipline plaintiff, SWOCC was permitted to consider not only the fact of the plagiarism, but also its context and severity, as well as plaintiff's response to the charge. *Ewing*, 474 U.S. at 228 n 14 (review board could consider not only statistical data but also "nature and seriousness of the individual deficiencies," and it could make a "subjective judgment" of student's prospects for success in the profession).

Because plaintiff has not shown that her peers in the nursing program were similarly situated, she cannot establish a *prima facie* case of discrimination, and her Title IX claim should be dismissed.

### D.  Plaintiff Cannot Rebut SWOCC's Nondiscriminatory Basis for the Discipline

Assuming that plaintiff can establish a *prima facie* case of discrimination, the burden shifts to SWOCC to articulate a legitimate, nondiscriminatory basis for its discipline of plaintiff. SWOCC has met this burden.  An instructor suspected that plaintiff had quoted word-for-word from sources that she had failed to cite, and this was confirmed by a subsequent Google search. Plaintiff did not, and does not, deny that she committed plagiarism.  In short, there is "overwhelming evidence" of a nondiscriminatory justification for plaintiff's discipline.  *See Bisong v. Univ. of Houston*, 493 F. Supp. 2d 896, 910 (S.D. Tex. 2007) (where it was undisputed that plaintiff had committed plagiarism and there was "overwhelming evidence" supporting the university's nondiscriminatory justification for plaintiff's expulsion, there was no genuine issue of fact for trial).

Plaintiff cannot rebut that evidence or demonstrate that it is merely pretext for unlawful discrimination.  Even assuming that plaintiff qualifies as a member of a protected class based on her former career, she has failed to present any evidence that she was targeted for discipline on that basis or on the basis of sex more generally.  It is true that, with the benefit of hindsight, we now know that other students—who are presumed not to have worked in the adult film industry—may also have submitted assignments that contained plagiarized content.  But that does not, standing alone, indicate an unlawful bias against plaintiff.

The record simply contains no evidence from which a reasonable juror could make the "logical leap" that plaintiff was the victim of sex discrimination based solely on the facts that:

(1) plaintiff committed plagiarism; (2) plaintiff was disciplined for said plagiarism consistent with college policy; and (3) in hindsight, other students may also have committed varying degrees of plagiarism without repercussions. *Kahan v. Slippery Rock Univ.*, 50 F. Supp. 3d 667, 689 (W.D. Pa. 2014), *aff'd,* 664 F. App'x 170 (3d Cir. 2016) (no evidence of reverse gender discrimination based on conclusory allegation that courses plaintiff planned to teach were assigned to a woman); *see Thompson v. Ohio State Univ.*, 639 F. App'x 333, 342 (6th Cir. 2016) (for purposes of equal-protection claim, plaintiff's evidence of statistical disparity in referrals to academic misconduct committee not enough to demonstrate that race played a factor in any *particular* referral. Indeed, there is no evidence that plaintiff's instructors were even aware of her previous career in the adult film industry, much less that they targeted her on that basis. Plaintiff can point only to a disputed comment by Ms. Sperry—that plaintiff was not sufficiently "classy" to be a nurse—and an email in which plaintiff herself refers to some nonspecific issues in her past of which she is not proud. Even if plaintiff was, as she alleges, singled out for punishment, there is simply no evidence that her federal civil rights were violated in the process.

Because SWOCC has articulated a nondiscriminatory reason for disciplining plaintiff, and because plaintiff cannot show that the reason is merely a pretext for discrimination, plaintiff's Title IX claim should be dismissed for that additional reason.

## II.    Defendants are entitled to summary judgment on plaintiff's breach-of-contract claim

As this Court has recognized, "the student-college relationship, which involves the payment of tuition for educational services, is essentially contractual in nature." *Doe v. Univ. of Oregon*, No. 6:17-CV-01103-AA, 2018 U.S. Dist. LEXIS 49431, *53-54, 2018 WL 1474531 (D. Or. Mar. 26, 2018). Assuming that this principle applies equally to public and private colleges, *see id.* at *54, SWOCC and plaintiff may have a contractual relationship "based on terms

contained in publications" provided by the college to its students. *Dauven v. George Fox Univ.*, 2010 U.S. Dist. LEXIS 142066, *49, 2010 WL 6089077 (D. Or. Dec. 3, 2010).

In her Complaint, plaintiff identifies four SWOCC publications that could "arguably comprise a contract" between the college and plaintiff, *id.* at *51, and form the basis for her breach-of-contract claim: SWOCC's "Catalog," SWOCC's non-discrimination policy, SWOCC's education records policy, and SWOCC's policy on unlawful harassment. Plaintiff does not describe these publications with any further specificity. This leaves defendants to speculate not only regarding the provisions claimed to have been violated, but even the applicable policies themselves.[6]

Regardless, the fact remains that plaintiff's state-law claims—like her Title IX claim— are largely premised on the theory that she was discriminated against or harassed on the basis of sex or another protected status. But plaintiff has presented no evidence to support that theory. To the extent that her breach-of-contract claim is based on SWOCC's breach of a discrimination or harassment policy, defendants are entitled to summary judgment. Moreover, there is no evidence whatsoever that plaintiff's educational records were ever disclosed or otherwise compromised in violation of federal or state law or institutional policy. To the extent that her breach-of-contract claim is based on SWOCC's breach of any applicable rules relating to educational records, defendants are also entitled to summary judgment.

### III. Defendants are entitled to summary judgment on plaintiff's claim for negligent supervision

To succeed on a claim for negligent training or supervision, a plaintiff must plead and prove that the employer had knowledge of the employee's harmful propensities. *Jones v. City of Hillsboro*, 2015 U.S. Dist. LEXIS 134856, 2015 WL 5737647, at *10 (D. Or. Sept. 29, 2015)

(citing *Whelan v. Albertson's, Inc.*, 129 Or. App. 501, 507, 879 P.2d 888, 892 (1994); *Carr v. U.S. West Direct Co.*, 98 Or. App. 30, 37, 779 P.2d 154, 157-58, *rev den*, 308 Or. 608, 784 P.2d 1101 (1989)).  Put another way, "[t]he key issue is whether, in light of what the employer knew or should have known about the employee, the employer could reasonably foresee that the employee, if inadequately supervised, would engage in the kind of conduct that ultimately harmed the plaintiff."  *Id.* (citing *Washa v. Dep't of Corr.*, 159 Or. App. 207, 225, 979 P.2d 273, 283 (1999), *aff'd*, 335 Or. 403, 69 P.3d 1232 (2003)).

Here, plaintiff has alleged that SWOCC was negligent in its training of defendants Scott, Daily, and Salvidar, and that this was the cause of their alleged "fail[ure] to carry out their duties and responsibilities pursuant to" various laws and policies.  (*Compl. ¶ 49*).  But defendants are entitled to summary judgment on two independent grounds.  First, a claim for negligent supervision falls within the "discretionary function" exception to the Oregon Tort Claims Act, ORS 30.260, *et seq*.  *See* ORS 30.265(6)(c) (public bodies immune for liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused"); *Nurse v. United States*, 226 F.3d 996, 1001-02 (9th Cir. 2000) (claims for   "allegedly negligent . . . employment, supervision, and training . . . fall squarely within the discretionary function exception" to the Federal Tort Claims Act).  Second, there is no evidence that SWOCC had reason to know that its training or supervisory practices created a risk of harm to plaintiff.  Plaintiff has not presented evidence (or even alleged any facts) regarding SWOCC's knowledge of the individual defendants' lack of training or harmful propensities.  *See Jones*, 2015 U.S. Dist. LEXIS 134856, *27 (granting motion to dismiss on negligent-supervision claim on same grounds).

---

[6]    Defendants assume that plaintiff is relying on "APP #7165:  Discrimination and Harassment Policy." (*Reese Dec., Exhibit 83*).

Accordingly, defendants are entitled to summary judgment on plaintiff's claim for negligent supervision.

## IV.    Defendants are entitled to summary judgment on plaintiff's claim for intentional interference with economic relations

In order to succeed on a claim for intentional interference with economic relations, a plaintiff must plead and prove the following six elements:  (1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished by improper means or for an improper purpose; (5) a causal connection between the interference and damage to the economic relationship; and  (6) damages. *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995).  In addressing the "third-party" element of the tort, the Oregon Supreme Court has explained,

> "[W]hen an employee is acting in the scope of the employee's employment, the employee is acting as the employer, and not as an independent entity.  Accordingly, when an employee is acting within the scope of the employee's employment, and the employer, as a result, breaches a contract with another party, that employee is not a third party for the tort of intentional interference with economic relations."

*Id.* at 538, 543 (affirming dismissal of plaintiff's claim for intentional interference against former supervisor on ground that supervisor could not be third party to contract between plaintiff and employer when he was acting as agent of employer).

Here, plaintiff's has alleged that she was in a contractual relationship with SWOCC, and that the individual defendants—Scott, Daily, Saldivar, Walker, Sperry, and Wick—wrongfully interfered with that relationship.  That is, plaintiff's theory is that the individual defendants are "third parties" for purposes of the tort of intentional interference.  She has also alleged, however, that the individual defendants were acting (or failing to act) within the scope of their employment with SWOCC at all relevant times.  Under *McGanty*, that admission "disposes of"

plaintiff's claim for intentional interference, because it "establishes that [they were] not third part[ies] to the contract between" SWOCC and plaintiff. *Id.* at 539.

Because plaintiff cannot satisfy the third-party element of the tort, defendants are entitled to summary judgment on plaintiff's claim for intentional interference with economic relations.

## V.    Defendants are entitled to summary judgment on plaintiff's claim for IIED

In order to succeed on a claim for IIED, a plaintiff must plead and prove the following elements:

> "(1) the defendant intended to inflict severe emotional distress on the plaintiff, (2) the defendant's acts were the cause of the plaintiff's severe emotional distress, and (3) the defendant's acts constituted an extraordinary transgression of the bounds of socially tolerable conduct."

*Id.* at 543 (internal quotation marks omitted).  To satisfy the intent element of the tort, a plaintiff must show that the defendant either acted with the "desire to inflict severe emotional distress" or that he "kn[ew] that such distress [wa]s certain, or substantially certain, to result." *Id.* at 550.

Here, plaintiff has alleged that defendants Scott, Daily, Saldivar, Walker, Sperry, and Wick "require[ed] more of [p]laintiff than other students with shorter deadlines and the constant threat of expulsion" and engaged in "comments, actions, grade changes, interrogations, and inaction" that caused plaintiff severe emotional distress.  (*Compl.* ¶ *59*).  But plaintiff has not alleged that defendants intended this outcome (the first element of the tort), nor has she presented any evidence to that effect.  Additionally, plaintiff has not presented any evidence to support her allegations that the individual defendants gave plaintiff different deadlines than other students, changed her grades without cause, or threatened her with expulsion prior to placing her on probation for admitted plagiarism (the second element of the tort).

In the absence of that evidence, defendants are entitled to summary judgment on plaintiff's claim for IIED.

## CONCLUSION

This is a grade dispute. Whatever the merit of her grievances, plaintiff has pursued them through the Oregon Board of Nursing, the U.S. Department of Education, the Internet, and even the press. She has had an opportunity to be heard in multiple venues by multiple audiences. But she is not entitled to a day in federal court.

This is not a Title IX claim, nor can it be shoehorned into any of the various state-law theories that plaintiff has alleged. The evidence is that plaintiff was disciplined for plagiarizing an assignment. Whether other students should, in hindsight, have been similarly punished remains an open question. But it is not a question to be resolved by the courts, and certainly not by the federal courts. Plaintiff has offered no evidence to suggest that she was unlawfully targeted on the basis of sex or any other protected status, or that SWOCC's handling of her plagiarism is otherwise actionable. In addition, plaintiff's state-law claims fail as a matter of law.

Accordingly, defendants are entitled to summary judgment on all of plaintiff's claims.

DATED this 28th day of May 2021.

GARRETT HEMANN ROBERTSON P.C.

_s/ Luke W. Reese_
_____
Luke W. Reese (OSB No. 076129)
lreese@ghrlawyers.com
Phone: 503-581-1501
Fax: 503-581-5891
Of Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing **Defendants' Motion for Summary Judgment** on the date indicated below,

[X]    Via First-Class Mail with postage prepaid
[X]    Via Electronic Filing
[  ]    Via Facsimile Transmission
[  ]    Via Hand Delivery
[  ]    Via Overnight Delivery

to the following person(s) a true copy thereof, contained in a sealed envelope (if other than by facsimile transmission), addressed to said person(s) at their last known addresses indicated below:

> Brandon J. Mark
> Parsons Behle & Latimer
> 201 South Main Street, Suite 1800
> Salt Lake City UT  84111
> Phone:  801-532-1234
> Fax:  801-536-6111
> Email: bmark@parsonsbehle.com
>           ecf@parsonsbehle.com

DATED May 28, 2021.

GARRETT HEMANN ROBERTSON P.C.

*s/ Luke W. Reese*
_____
Luke W. Reese (OSB No. 076129)
lreese@ghrlawyers.com
Phone:  503-581-1501
Fax:  503-581-5891
Of Attorneys for Defendants

4816-8798-3548, v. 7