Luke W. Reese, OSB No. 076129
lreese@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
1011 Commercial Street N.E.
Salem, Oregon 97301-1049
Tel: (503) 581-1501
Fax: (503) 581-5891
        Of Attorneys for Defendants

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual | No.      6:19-cv-00283-MK |
| Plaintiff, | |
| vs. | **DECLARATION OF LUKE REESE IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | |
| Defendants. | |

I, Luke W. Reese, under penalty of perjury, do hereby declare and say:

1.      I am the attorney of record for defendants and make this Declaration in support of Defendants' Motion for Summary Judgment.

2.      Attached hereto as *Exhibit 1* and incorporated herein by reference is a true and correct copy of plaintiff's post to a student forum at Southwestern Oregon Community College ("SWOCC"), dated June 22, 2016, and Bates-labeled SWOCC-003652.

3.      Attached hereto as *Exhibit 2* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Jeff Sellers, dated June 10, 2017, and Bates-labeled SWOCC-003352.

4.      Attached hereto as *Exhibit 3* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Jeff Schultz, dated February 16, 2017, and Bates-labeled SWOCC-003496.

5.      Attached hereto as *Exhibit 4* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Barb Hendee, dated May 10, 2017, and Bates-labeled SWOCC-003414.

6.      Attached hereto as *Exhibit 5* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Anny Mueller, dated May 26, 2017, and Bates-labeled SWOCC-003388.

7.      Attached hereto as *Exhibit 6* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Ron Reel, dated March 7, 2017, and Bates-labeled SWOCC-003486.

8.      Attached hereto as *Exhibit 7* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Kristina Passadore, dated August 10, 2017, and Bates-labeled SWOCC-003203.

9.      Attached hereto as *Exhibit 8* and incorporated herein by reference is a true and correct copy of an email from SWOCC professor Kelly Leavitt to plaintiff, dated July 6, 2016, reflecting feedback in the online portal and Bates-labeled SWOCC-003633.

10.     Attached hereto as *Exhibit 9* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor Kelly Leavitt, dated July 29, 2016, and Bates-labeled SWOCC-003593-003594.

11.     Attached hereto as *Exhibit 10* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor Anny Mueller, dated April 24, 2017, and Bates-labeled SWOCC-003457.

12.     Attached hereto as *Exhibit 11* and incorporated herein by reference is a true and correct copy of an email from SWOCC professor Barb Hendee to plaintiff, dated May 6, 2017, reflecting feedback in the online portal and Bates-labeled SWOCC-003443.

13.     Attached hereto as *Exhibit 12* and incorporated herein by reference is a true and correct excerpt from the SWOCC *Nursing Student Program Handbook (2017-2018)*, Bates-labeled SWOCC-000153-000156, SWOCC-000179-000181, and SWOCC-000186.

14.     Attached hereto as *Exhibit 13* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor Barb Hendee, dated May 6, 2017, reflecting both feedback in the online portal and plaintiff's response, and Bates-labeled SWOCC-003441.

15.     Attached hereto as *Exhibit 14* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Anny Mueller, dated April 13, 2017, and Bates-labeled SWOCC-003469.

16.     Attached hereto as *Exhibit 15* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Anny Mueller, dated April 27, 2017, and Bates-labeled SWOCC-003456.

17.     Attached hereto as *Exhibit 16* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor Gary Will, dated August 7-9, 2017, and Bates-labeled SWOCC-003208.

18.     Attached hereto as *Exhibit 17* and incorporated herein by reference is a true and correct copy of an email from SWOCC's Jade Stalcup to plaintiff, dated July 17, 2017, and Bates-labeled SWOCC-003278-003279.

19.      Attached hereto as *Exhibit 18* and incorporated herein by reference is a true and correct copy of the Fall 2017 clinical schedule for SWOCC's first-year nursing students, Bates-labeled SWOCC-003865.

20.      Attached hereto as *Exhibit 19* and incorporated herein by reference is a true and correct copy of SWOCC's Fall Term 2017-2018 Academic Standing Report, Bates-labeled SWOCC-002539 and SWOCC-002542.

21.      Attached hereto as *Exhibit 20* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Christina Alexander, dated October 2, 2017, and Bates-labeled SWOCC-003070.

22.      Attached hereto as *Exhibit 21* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Robin Finney, dated November 15, 2017, and Bates-labeled SWOCC-003034.

23.      Attached hereto as *Exhibit 22* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Melissa Sperry, dated February 3, 2018, and Bates-labeled SWOCC-003002.

24.      Attached hereto as *Exhibit 23* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professors and defendants Melissa Sperry and Susan Walker, dated March 20, 2018, and Bates-labeled SWOCC-002959.

25.      Attached hereto as *Exhibit 24* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and multiple SWOCC employees, dated April 16-25, 2018, and Bates-labeled SWOCC-000098-000106.

26.      Attached hereto as *Exhibit 25* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Melissa Sperry, dated April 13-16, 2018, and Bates-labeled SWOCC-002903-002905.

27.     Attached hereto as *Exhibit 26* and incorporated herein by reference is a true and correct copy of an email thread between SWOCC professors and defendants Melissa Sperry and Susan Walker and SWOCC professor Liz Cooper, dated January 26-29, 2018, and Bates-labeled SWOCC-003853.

28.     Attached hereto as *Exhibit 27* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and multiple SWOCC employees, and among the employees, dated January 26, 2018 through June 13, 2018, and Bates-labeled SWOCC-003901.

29.     Attached hereto as *Exhibit 28* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Melissa Sperry and SWOCC professor Liz Cooper dated January 28, 2018, with a letter attached, and Bates-labeled SWOCC-003769-003770.

30.     Attached hereto as *Exhibit 29* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professors and defendants Melissa Sperry and Susan Walker, dated April 13-18, 2018, and Bates-labeled SWOCC-000137-000139.

31.     Attached hereto as *Exhibit 30* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professors and defendants Melissa Sperry and Susan Walker, dated April 9-10, 2018, and Bates-labeled SWOCC-000128.

32.     Attached hereto as *Exhibit 31* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Melissa Sperry, dated March 12, 2018, and Bates-labeled SWOCC-002986.

33.     Attached hereto as *Exhibit 32* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor Christina Alexander, dated November 20, 2017, and Bates-labeled SWOCC-003032.

34.    Attached hereto as *Exhibit 33* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Melissa Sperry, dated February 22-23, 2018, reflecting both feedback in the online portal and plaintiff's response, and Bates-labeled SWOCC-002990.

35.    Attached hereto as *Exhibit 34* and incorporated herein by reference is a true and correct copy of plaintiff's academic schedule for April through June 2018, Bates-labeled SWOCC-004669-004671.

36.    Attached hereto as *Exhibit 35* and incorporated herein by reference is a true and correct copy of the complaint that plaintiff submitted to SWOCC on or around May 24, 2018, Bates-labeled SWOCC-000289-000294.

37.    Attached hereto as *Exhibit 36* and incorporated herein by reference is a true and correct copy of plaintiff's case study assignment for NRS 233 (Pathophysiological Processes II), dated April 17, 2018, and Bates-labeled SWOCC-002287-002312.

38.    Attached hereto as *Exhibit 37* and incorporated herein by reference is a true and correct excerpt from the deposition transcript of SWOCC professor Robin Finney.

39.    Attached hereto as *Exhibit 38* and incorporated herein by reference is a true and correct copy of feedback from SWOCC professor Robin Finney, dated April 25, 2018, regarding plaintiff's case study, and Bates-labeled SWOCC-001636-001637.

40.    Attached hereto as *Exhibit 39* and incorporated herein by reference is a true and correct copy of notes taken by SWOCC professor and defendant Melissa Sperry, dated April 25, 2018, and Bates-labeled SWOCC-000144.

41.    Attached hereto as *Exhibit 40* and incorporated herein by reference is an email from SWOCC professor and defendant to plaintiff, dated April 25, 2018, and Bates-labeled SWOCC-002801-002802.

42.     Attached hereto as *Exhibit 41* and incorporated herein by reference is a true and correct copy of plaintiff's Student Deficiency Form, dated April 25, 2018, and Bates-labeled SWOCC-003915.

43.     Attached hereto as *Exhibit 42* and incorporated herein by reference is a true and correct copy of notes taken by SWOCC professor and defendant Susan Walker, dated April 25, 2018 through June 7, 2018, and Bates-labeled SWOCC-001300-001304.

44.     Attached hereto as *Exhibit 43* and incorporated herein by reference is an email thread between plaintiff and SWOCC professor Robin Finney, dated April 25-26, 2018, and Bates-labeled SWOCC-002787-2788.

45.     Attached hereto as *Exhibit 44* and incorporated herein by reference is a true and correct copy of notes taken by SWOCC employee Julianna Seldon, dated April 26, 2018, and Bates-labeled SWOCC-000671-000673.

46.     Attached hereto as *Exhibit 45* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC Dean of Technical and Workforce Education and defendant Francisco Saldivar, dated April 30, 2018, and Bates-labeled SWOCC-000304-000306.

47.     Attached hereto as *Exhibit 46* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC dean and defendant Francisco Saldivar, and SWOCC Vice President of Enrollment and Student Services and defendant Tim Dailey, dated April 30, 2018, and Bates-labeled SWOCC-000300-000303.

48.     Attached hereto as *Exhibit 47* and incorporated herein by reference is a true and correct copy of notes regarding the meeting that occurred between various SWOCC employees and plaintiff, dated April 30, 2018, and Bates-labeled SWOCC-003914.

49.     Attached hereto as *Exhibit 48* and incorporated herein by reference is a true and correct copy of an email from SWOCC professor and defendant Susan Walker to plaintiff, dated April 30, 2018, and Bates-labeled SWOCC-002784-002785.

50.    Attached hereto as *Exhibit 49* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC dean and defendant Francisco Saldivar, and among Saldivar and SWOCC employees, all dated May 7, 2018, and Bates-labeled SWOCC-000540.

51.    Attached hereto as *Exhibit 50* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC dean and defendant Francisco Saldivar, dated May 7, 2018, and Bates-labeled SWOCC-000559.

52.    Attached hereto as *Exhibit 51* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC dean and defendant Francisco Saldivar, dated May 7, 2018, and Bates-labeled SWOCC-000661-000662.

53.    Attached hereto as *Exhibit 52* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC dean and defendant Francisco Saldivar, and among Saldivar and SWOCC employees, dated May 20-23, 2018, and Bates-labeled SWOCC-000656-000657.

54.    Attached hereto as *Exhibit 53* and incorporated herein by reference is a true and correct copy of an email and attachment from SWOCC professor and defendant Pam Wick to SWOCC professor and defendant Susan Walker, dated May 17, 2018, and Bates-labeled SWOCC-000124-000125.

55.    Attached hereto as *Exhibit 54* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Pam Wick, and among SWOCC employees, all dated May 16, 2018, and Bates-labeled SWOCC-000480.

56.    Attached hereto as *Exhibit 55* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Pam Wick, and among SWOCC employees, dated May 16-17, 2018, and Bates-labeled SWOCC-000526-000527.

57.    Attached hereto as *Exhibit 56* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Pam Wick, and among SWOCC employees, all dated May 16, 2018, and Bates-labeled SWOCC-000481-000482.

58.    Attached hereto as *Exhibit 57* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC dean and defendant Francisco Saldivar, dated May 18, 2018, and Bates-labeled SWOCC-000560.

59.    Attached hereto as *Exhibit 58* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC dean and defendant Francisco Saldivar, and among SWOCC employees, dated May 20, 2018, and Bates-labeled SWOCC-000539.

60.    Attached hereto as *Exhibit 59* and incorporated herein by reference is a true and correct copy of an email thread between SWOCC professor and defendant Susan Walker, SWOCC dean and defendant Francisco Saldivar, and SWOCC VP Dailey, dated May 21, 2018, and Bates-labeled SWOCC-001329-001330.

61.    Attached hereto as *Exhibit 60* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC dean and defendant Francisco Saldivar, dated May 2, 2018, and Bates-labeled SWOCC-000564.

62.    Attached hereto as *Exhibit 61* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Melissa Sperry, and among SWOCC employees, dated May 21-22, 2018, and Bates-labeled SWOCC-000519-000520.

63.    Attached hereto as *Exhibit 62* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Melissa Sperry, and among SWOCC employees, all dated May 22, 2018, and Bates-labeled SWOCC-000521-000522.

64.      Attached hereto as *Exhibit 63* and incorporated herein by reference is a true and correct excerpt from the deposition of plaintiff.

65.      Attached hereto as *Exhibit 64* and incorporated herein by reference is a true and correct copy of an email from thread between plaintiff and SWOCC professor and defendant Susan Walker, dated May 22-23, 2018, and Bates-labeled SWOCC-000120-000121.

66.      Attached hereto as *Exhibit 65* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC VP and defendant Tim Dailey, and between Dailey and SWOCC dean and defendant Francisco Saldivar, all dated May 29, 2018, and Bates-labeled SWOCC-000524-000525.

67.      Attached hereto as *Exhibit 66* and incorporated herein by reference is a true and correct copy of an email from SWOCC VP and defendant Tim Dailey and plaintiff, dated May 25, 2018, and Bates-labeled SWOCC-000551-000552.

68.      Attached hereto as *Exhibit 67* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and various SWOCC employees, and among those employees, dated May 26-29, 2018, and Bates-labeled SWOCC-000646-000648.

69.      Attached hereto as *Exhibit 68* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC VP and defendant Tim Dailey, dated May 31, 2018, and Bates-labeled SWOCC-003970.

70.      Attached hereto as *Exhibit 69* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and various SWOCC employees, all dated June 1, 2018, and Bates-labeled SWOCC-002736-002737.

71.      Attached hereto as *Exhibit 70* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC VP and defendant Tim Dailey, dated June 18, 2018, and among Dailey and other SWOCC employees, all dated June 13, 2018, and Bates-labeled SWOCC-000541.

72.     Attached hereto as *Exhibit 71* and incorporated herein by reference is a true and correct copy of an email thread between SWOCC VP and defendant Tim Dailey, SWOCC professor and defendant Susan Walker, and SWOCC dean and defendant Francisco Saldivar, dated June 20, 2018, and Bates-labeled SWOCC-001328.

73.     Attached hereto as *Exhibit 72* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Susan Walker, dated June 12-14, 2018, and Bates-labeled SWOCC-000109-000110.

74.     Attached hereto as *Exhibit 73* and incorporated herein by reference is a true and correct copy of an email from plaintiff to SWOCC professor and defendant Susan Walker, dated June 16, 2018, and Bates-labeled SWOCC-000108.

75.     Attached hereto as *Exhibit 74* and incorporated herein by reference is a true and correct copy of an email from plaintiff to various SWOCC employees, dated July 7, 2018, and Bates-labeled SWOCC-000548-000549.

76.     Attached hereto as *Exhibit 75* and incorporated herein by reference is a true and correct copy of an email from plaintiff to various SWOCC employees, dated July 7, 2018, and Bates-labeled SWOCC-000107.

77.     Attached hereto as *Exhibit 76* and incorporated herein by reference is a true and correct excerpt from the deposition of SWOCC VP and defendant Tim Dailey.

78.     Attached hereto as *Exhibit 77* and incorporated herein by reference is a true and correct excerpt from the deposition of SWOCC dean and defendant Francisco Saldivar.

79.     Attached hereto as *Exhibit 78* and incorporated herein by reference is a true and correct copy of plaintiff's tort claim notice, dated August 1, 2018.

80.     Attached hereto as *Exhibit 79* and incorporated herein by reference is a true and correct excerpt of Plaintiff's Responses to Defendants' First Set of Interrogatories, dated June 26, 2020.

81.    Attached hereto as *Exhibit 80* and incorporated herein by reference is a true and correct excerpt from the deposition of SWOCC professor and defendant Susan Walker.

82.    Attached hereto as *Exhibit 81* and incorporated herein by reference is a true and correct copy of an email thread between plaintiff and SWOCC professor and defendant Susan Walker, and among SWOCC employees, dated June 16-18, 2018, and Bates-labeled SWOCC-00500-00502.

83.    Attached hereto as *Exhibit 82* and incorporated herein by reference is a true and correct excerpt from the deposition of SWOCC professor and defendant Melissa Sperry.

84.    Attached hereto as *Exhibit 83* and incorporated herein by reference is a true and correct copy of SWOCC's "APP # 7165:  Discrimination and Harassment Policy," Bates-labeled SWOCC-000554-000557.

I HEREBY DECLARE THAT THE ABOVE STATEMENT IS TRUE TO THE BEST OF MY KNOWLEDGE AND BELIEF, AND THAT I UNDERSTAND IT IS MADE FOR USE AS EVIDENCE IN COURT AND IS SUBJECT TO PENALTY FOR PERJURY.

DATED this 28th day of May 2021.


*s/ Luke W. Reese*
Luke W. Reese, OSB No. 076129
Garrett Hemann Robertson P.C.
lreese@ghrlawyers.com
Of Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing **Declaration of Luke Reese in Support of Defendants' Motion for Summary Judgment** on the date indicated below,

[X]     Via First-Class Mail with postage prepaid
[X]     Via Electronic Filing
[  ]     Via Facsimile Transmission
[  ]     Via Hand Delivery
[  ]     Via Overnight Delivery

to the following person(s) a true copy thereof, contained in a sealed envelope (if other than by facsimile transmission), addressed to said person(s) at their last known addresses indicated below:

Brandon J. Mark
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City UT  84111
Phone:  801-532-1234
Fax:  801-536-6111
Email:  bmark@parsonsbehle.com
        ecf@parsonsbehle.com

DATED May 28, 2021

GARRETT HEMANN ROBERTSON P.C.

*s/ Luke W. Reese*
_____
Luke W. Reese (OSB No. 076129)
lreese@ghrlawyers.com
Phone:  503-581-1501
Fax:  503-581-5891
Of Attorneys for Defendants

4839-3727-5883, v. 1

**To:**      theron.fox@email.socc.edu[theron.fox@email.socc.edu]
**From:**    nicole.gililland@email.socc.edu
**Sent:**    Wed 6/22/2016 4:43:38 PM
**Subject:** New post in 2016 SU-FN   225-02D - Forums

A new post has been added to 2016 SU-FN 225-02D - Forums

**Category:** Unit 1
**Topic:** Introductions
**Title:** Introductions
**Posted by:** Gililland, Nicole Rene (mailto:nicole.gililland@email.socc.edu)

Hello Classmates,

My name is Nicole Gililland (Niki). I just moved back to Oregon from Utah, I've always bounced back and forth between the two states. I am a paramedic but have decided to head into nursing, so pre-nursing is my major. I am taking this course because it's part of my required curriculum. I eventually hope to become a nurse practitioner, possibly a midwife. I am also 8 months pregnant with my second daughter so I'm looking forward on learning a lot about nutrition so I can apply the lessons in my everyday life and with my children.

Click here to view this post:
https://mylakerlink.socc.edu/ICS/Academics/FN/FN___225/2016_SU-FN___225-02D/Discussion_Forum.jnz?portlet=Forums&screen=PostView&screenType=change&id=ebbd3f1a-f3e7-4806-b1d2-61e426befc2f

SWOCC-003652

**To:** Sellars, Jeff[jsellars@socc.edu]
**From:** Gililland, Nicole R
**Sent:** Sat 6/10/2017 12:05:33 AM
**Subject:** Position Paper

Professor,

I just wanted to apologize for my position paper not being quite long enough and getting turned in at last  second. I have been your student for a couple of terms now and I hope you know I'm more dedicated than that. I had a mishap with my laptop today and it wouldn't start. I have no idea why, but it's dead in the water.  I had 7 pages I intended to do a final edit on and submit today saved on my desktop. By the time I realized I wasn't going to get my computer working, I only had hours left. I did the best I could with the time I had left. I accept full responsibility for not backing up my work and not being ahead of schedule. I just wanted to fill you in so that you didn't think I didn't take it seriously.

I hope you have a great summer,

Nicole

SWOCC-003352

**To:**      Schultz, Jeff[jschultz@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Thur 2/16/2017 5:49:49 PM
**Subject:** Lasik

Hi Professor,


I had lasik eye surgery today. I was told it wouldn't be a big deal, but I had to do a method called PKE or something like that and the first couple days are supposed to be rough. My husband is typing this for me. Is there anyway I can submit my essay by Sunday? It's mostly complete, but I can't see and I don't want to turn in a sloppy draft. I will do whatever you say though.


Thanks, Nicole Gililland

SWOCC-003496

**To:**       Hendee, Barb X[barb.hendee@socc.edu]
**From:**     Gililland, Nicole R
**Sent:**     Wed 5/10/2017 8:59:14 PM
**Subject:**  This week

Hi Professor,


I was hoping I could possibly get an extension on this weeks work load? This week has been absolutely draining and it's not over yet. I had my interview for the nursing program, now I have some sort of flu or food poisoning. Also, my husband is finally joining me here in Oregon (he stayed behind in Utah to get our house on the market) so now I'm trying to get everything ready for his arrival on Saturday which is proving to be really difficult because I've been throwing up nonstop since yesterday. I understand if it's not okay, but I figured I might as well check in with you and ask.


Thanks,

Nicole

SWOCC-003414

**To:**       Mueller, Anny[amueller@socc.edu]
**From:**     Gililland, Nicole R
**Sent:**     Fri 5/26/2017 11:44:46 PM
**Subject:**  Chapter Outline

I'm sorry to ask or to burden you with my drama, but is there anyway I can get a short extension (like maybe 48 hours) on my chapter outline assignment? A lot has been happening and I'm a tad overwhelmed. On Tuesday I was physically attacked by a relative (apparently me trying to get a college education has classified me as "uppity" and that just doesn't stand). This week has been filled with a trip to the ER, police, and court in order to obtain a restraining order. To top it all off, I have lost my child care and am in the process of moving my family out to Lakeside. Everything will be fine soon, it's just that everything has happened all at once. I understand if it is not possible, but I am hoping it is.


Thanks,

Nicole

SWOCC-003388

**To:**       Reel, Ron X[ron.reel@socc.edu]
**From:**     Gililland, Nicole R
**Sent:**     Tue 3/7/2017 9:33:14 PM
**Subject:**  Essay questions

On the first essay question I went overboard on the 100 word limit by quite a bit. On the second and third question I was very careful not to. By the forth question, I was too focused on not typing a novel that I left out some important information in my answer such as passive aggression. I was wondering if I could add to my last answer and resubmit it or add to it via email? Is there anything I can do?

Thanks,

Nicole Gililland

SWOCC-003486

**To:**       Passadore, Kristina X[kristina.passadore@socc.edu]
**From:**     Gililland, Nicole R
**Sent:**     Thur 8/10/2017 1:23:14 PM
**Subject:**  Written critique #5

I'm sorry Professor, I didn't get the written critique done last night. Can I do it now for partial credit?

SWOCC-003203

**To:** nicole.gililland@email.socc.edu[nicole.gililland@email.socc.edu]
**From:** kelly.leavitt@socc.edu
**Sent:** Wed 7/6/2016 11:32:38 AM
**Subject:** Kelly Leavitt has given feedback on your Homework Homework

In your Nutrition course, Kelly Leavitt has given feedback on your Homework Homework, saying:


You did not link your answers to your source. For example, for #1, you should have the page number of where you found the information that you copied. Do this for every answer that you find whether it's from the book or another source.
I'll let this slide for this weeks assignment, but not anymore.
Let me know if you have any questions.

-1 for missing one part of the digestive track: anus


To view your Homework, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/FN/FN___225/2016_SU-FN___225-
02D/Coursework.jnz?portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change
&id=ce93380e-4d03-40fc-a3ff-f4adef50007f

SWOCC-003633

**To:** Gililland, Nicole[nicole.gililland@email.socc.edu]
**From:** Leavitt, Kelly
**Sent:** Fri 7/29/2016 6:09:29 PM
**Subject:** Re: Question

You can cite the book. Pls do actually. All facts must be cited and usually those facts will come from your text book.
You can use the food log and or the report too. Just refer to it as an appendices.
Professor Leavitt

Sent from my iPhone

On Jul 29, 2016, at 5:54 PM, Gililland, Nicole <nicole.gililland@email.socc.edu> wrote:

> Sorry, one last question; do I have to cite from the book. Or is it okay to use my nutrition report to show where I need more balance?

---

**From:** Leavitt, Kelly <kelly.leavitt@socc.edu>
**Sent:** Friday, July 29, 2016 4:46:45 PM
**To:** Gililland, Nicole
**Subject:** Re: Question

Nicole-
Take a step back and look at these questions as a whole.
Healthfulness of diet is discussed early in the term (chapters 1 and 2).  What I'd like to see is you guys talking about how diverse your diet it and how nutrient dense your food is. Maybe explain why this is important and then got through your food log and explain whether or not the foods you chose were/are healthy.
Send me more questions if you have any.
Professor Leavitt

Sent from my iPhone

On Jul 29, 2016, at 4:40 PM, Gililland, Nicole <nicole.gililland@email.socc.edu> wrote:

> What pages/chapters in our book are you referring to in the section about healthfulness of our diets? We've read so much at this point, I cannot recall specifically what you're requesting and I'd really hate to lose points for it.

---

**From:** Leavitt, Kelly <kelly.leavitt@socc.edu>
**Sent:** Friday, July 29, 2016 12:56:02 PM
**To:** Gililland, Nicole
**Subject:** Re: Question

Yes mam

SWOCC-003593

Sent from my iPhone

On Jul 29, 2016, at 12:36 PM, Gililland, Nicole <nicole.gililland@email.socc.edu> wrote:

Does single spacing mean no spacing? Just line directly on top of next line?

**To:**       Mueller, Anny[amueller@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Mon 4/24/2017 4:37:14 PM
**Subject:**  Re: Anny Mueller has given feedback on your Week 4, Chapter 4 discussion prompt Discussion
Forum

Thank you very much! I will cite better moving forward.

---

**From:** amueller@socc.edu <amueller@socc.edu>
**Sent:** Monday, April 24, 2017 11:26:52 AM
**To:** Gililland, Nicole R
**Subject:** Anny Mueller has given feedback on your Week 4, Chapter 4 discussion prompt Discussion Forum

In your Life Span Development course, Anny Mueller has given feedback on your Week 4, Chapter 4
discussion prompt Discussion Forum, saying:

Nicole,

A well written essay on the topic at hand. You and most of your classmates believe that a career first is
very important. There is no guarantee of course that having careers makes for good parenting. The
resources may be available but stress and demands of daily living bring about other challenges.
"Selfishness" may not disappear either. Point well taken that there are more options available these days
when women choose to have children later in life.

Your replies were insightful and pointed out that workplace issues can enhance or hinder successful
parenting including the aspect of being able to nurse while working. The only ding you are getting is the
fact that you need to add your reference in your main work (not just at the end) when you report
something factual from our book. Even if you paraphrase, you need to give credit to the concept or idea.
Keep up the good work.

Ânny Mueller


To view your Discussion Forum, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/PSY/PSY__237/2016_SP-PSY__237-
01D/Coursework.jnz?portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change
&id=ef80aba8-8728-4a4a-8eae-a4a9a526a295

SWOCC-003457

**To:**      nicole.gililland@email.socc.edu[nicole.gililland@email.socc.edu]
**From:**    barb.hendee@socc.edu
**Sent:**    Sat 5/6/2017 11:12:13 AM
**Subject:** Barbara Hendee has given feedback on your Dropbox: Essay One Paper

In your English Composition course, Barbara Hendee has given feedback on your Dropbox: Essay One Paper, saying:

Nicole, this is an interesting essay, but if you wish to avoid issues with plagiarism, you must use in-text citations. Please read the APA chapter of our textbook starting on page 300 and finishing on page 343. Read through the sample essay and note how the writer gives credit to her sources.

Please see attached essay with detailed comments.

To view your Paper, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/WR/WR___123/2016_SP-WR___123-06D/Coursework.jnz?portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change&id=12d104d9-1bb2-4428-ae03-d7f62e71ce91

SWOCC-003443

# Nursing Program Student Handbook

# 2017-2018



**Coos Campus**
**1988 Newmark**
**Coos Bay OR 97420**
**541-888-2525**

**Curry Campus**
**96082 Lone Ranch Pkwy**
**Brookings, OR 97415**
**541-813-1667**

**www.socc.edu**

SWOCC-000153

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................4
   Faculty Information .......................................................................................................4

COLLEGE VISION AND MISSION STATEMENT..............................................................4

NURSING PROGRAM PHILOSOPHY...........................................................................4-5
   Teaching/Learning ......................................................................................................5
   Critical Thinking ..........................................................................................................5
   Clinical Judgment ........................................................................................................6
   Nursing.........................................................................................................................6

NURSING PROGRAM MISSION STATEMENT ............................................................6-7

NURSING ADMINISTRATIVE STRUCTURE....................................................................8

GENERAL INFORMATION
   Academic or Testing Modifications .............................................................................9
   Advising.......................................................................................................................9
   Advisory Committee ....................................................................................................9
   Attendance ..............................................................................................................9-10
   Change of Name, Address and Phone Number ........................................................10
   Class Representatives ...............................................................................................11
   CNA Certification .......................................................................................................11
   Dress Code/Personal Appearance .......................................................................11-12
   Eligibility for NCLEX-RN & Licensure.......................................................................12
   Employment While in the Nursing Program ...............................................................12
   Faculty/Program Director Office Hours .....................................................................12
   Faculty/Student Communication...........................................................................12-13
   Grading .................................................................................................................13-14
   Injury/Illness ..............................................................................................................14
   Online Learning Site...................................................................................................15
   Pinning/Recognition Ceremony.................................................................................15
   Pregnancy ..................................................................................................................15
   Nursing Program of Study..........................................................................................15
   Student Records.........................................................................................................15
   Requests for Reentry, Readmission or Transfer ..................................................15-17
   Technical Standards..............................................................................................17-19

CAMPUS LEARNING LAB
   General Information ....................................................................................................20
   Lab Guidelines ...........................................................................................................21
   Use of Computers Located in the Campus Learning Lab...........................................21

**CLINICAL**
Assignments.............................................................................................................22
Clinical Clearance....................................................................................................22-23
Clinical Evaluation...................................................................................................23-24
Clinical Skills Clearance/Procedure.........................................................................24
Code of Conduct in Clinical Facilities ....................................................................24-26


**CONDUCT EXPECTED OF STUDENTS**
Expected Student Behaviors General Responsibilities............................................27
Policy Regarding Academic Honesty........................................................................27-29
Policy Regarding Course Outcomes.........................................................................29-30
Policy Regarding Students Suspected of Substance Use .........................................30-31


**POLICIES FOR PROGRESSION** ............................................................................32-39


**APPENDICES**
OCNE Competency Rubrics & Benchmarks .............................................................41-69
Skills Performance Rubric ......................................................................................70
Health Clearance Form ..........................................................................................71-73
Re-entry, Readmission, Transfer form.....................................................................74-75
SOCC Nursing Program Student Handbook Agreement & Signature Page ..............76
Consent for Physical Contact and Invasive Procedures .........................................77
Confidentiality Agreement......................................................................................78

## INTRODUCTION

This document contains general information about the college and nursing program, outlines expected behaviors and defines the guidelines by which student success is measured.  It describes expected student and faculty responsibilities and is binding for the current academic year.  It is reviewed and revised annually.  This handbook provides additional information specific to the nursing program and supplements the college student handbook found on the college website at:  www.socc.edu .  Please familiarize yourself with the handbook and sign the Student Handbook Agreement & Signature form.

**DIRECTOR/FACULTY INFORMATION**
- Susan Walker, RN, MSN, NP: Nursing Program Director
- Pam Wick, RN, MSN: Nursing Faculty
- Melissa Sperry, RN, MSN: Nursing Faculty
- Robin Finney, RN, MSN: Nursing Faculty

The following RN's assist either in the campus-learning lab and/or in clinical areas:

Lisa LaGesse, RN, MSN; Jenny Tausch, RN, MSN; Michelle Pringle, RN, BSN; Liz Cooper, RN, MSN, Coquille; Jacob Fasel , RN, Brookings; ; Noah Nicolle, RN, BSN; Celia Dolan, RN, MSN; Susan Sefers, RN, BSN; Susan Pedersen, RN, BSN

## COLLEGE VISION and MISSION STATEMENT

**VISION STATEMENT**
Southwestern leads and inspires lifelong learning.

**MISSION STATEMENT**
Southwestern Oregon Community College supports student achievement by providing access to lifelong learning and community engagement in a sustainable manner.   (Adopted November 19, 2012)

## NURSING PROGRAM PHILOSOPHY

The Southwestern (SOCC) nursing program provides nursing education to create competent nurses who provide high quality, evidence-based care that promotes the health of their patients in all health care settings.  The faculty at Southwestern Associate Degree Nursing (ADN) Program believe in and support the Southwestern mission and goals as written.  The nursing program follows the Oregon Consortium for Nursing Education (OCNE) curriculum based on the concepts of life-long learning and competency-based nursing education.  The nursing curriculum encourages diversity, collegiality, and professionalism.  The nursing program is accredited by the Oregon State Board of Nursing (OSBN) and meets regional accreditation requirements through Northwest Association of Schools and Colleges.

The nursing program of instruction is centered on the OCNE curriculum competencies and benchmarks which define the intended outcomes of the nursing education program and serve as the basis for clinical practice.  The curriculum is founded on the concept of a spiral pattern that encourages students to continually increase their competencies in understanding and providing competent nursing care.  The program uses rubrics to assist students to meet competencies as they progress through the curriculum.  Benchmarks are based on the competencies and are used at the end of the first and second year evaluation to evaluate student progress.  A variety of learning methods are used in the curriculum to assist students to meet their goal of becoming competent nurses.  Students are expected to be intentional learners who use program textbooks, computer-based technology and professional journals to keep their nursing knowledge current throughout the program and their career as professional nurses.

The nursing program competencies, rubrics and benchmarks are located in the Appendix of this handbook.

SWOCC-000156

# CONDUCT EXPECTED OF STUDENTS

All members of the college community must participate in the development of a climate conducive to academic honesty. Professional requirements and responsibilities are mandated to you not just as a student in the Southwestern Nursing Program but also as a member of the nursing community.  You must be familiar with the ethical and legal requirements and responsibilities addressed by Southwestern and the nursing profession. The following sites provide further information on professional ethics and legal requirements for practice www.oregon.gov/OSBN, www.ncsbn.org, www.qsen.org, www.ona.org, www.ana.org and www.nln.org.

The ANA site contains the Code for Nurses and Standards of Nursing Practice.  The Code for Nurses is introduced in the first nursing course and used as a reference throughout the nursing program and your professional career.  **Remember accountability begins with your role as a student.**

Nursing students must function in accordance with the accepted standards of practice mandated by the profession. The, Expected Student Behaviors list below exemplifies the ultimate role that the student will assume when entering the profession.  Review expected OCNE competencies in the appendix of this handbook.

## Expected Student Behaviors
### General Responsibilities
1.  All nursing students must register for all nursing courses prior to the first day of class each term.  The college's liability insurance is not in effect for students who are not registered.  There is also a late fee attached to late registration by SWOCC.
2.  Students should note any announcements posted on the LMS, and check their @email.socc and in the online course on a regular basis.  Students are expected to consistently access the online course postings.  Students access the online course through the SOCC homepage by clicking on the online link.
3.  Current names, addresses, and phone numbers are to be reported to the First Stop Center in Dellwood Hall and Administrative Assistant to the Director of Nursing if any change occurs.  A Student Contact list is updated each term in nursing classes.
4.  Students are not permitted to take infants or children to class, campus learning lab, or to clinical when engaged in any student activity.  At times you may be asked to bring a child to campus lab to take part in learning a new skill.  Childcare may be available at the Family Center but must be arranged in advance.
5.  Each student is to take responsibility for their own verbal and nonverbal behaviors.  Unprofessional or inappropriate behavior will not be tolerated in classroom, clinical, campus lab or hallways of the college.  Any behavior that sets up a hostile environment such as violating others space without permission, using inappropriate language, nonverbal gestures, slanderous or libelous statements in or out of the academic setting may be grounds for probation and/or dismissal.
6.  Students are expected to conform to appropriate etiquette including placing cell phones on vibrate, using computer and electronic devices **appropriately** for class, lab and clinically related activities (i.e.; social media).  Students may be asked to leave the classroom, lab and/or clinical area, placed on probation or dismissed from the nursing program for unprofessional use of technological devices.
7.  The student is accountable for preparation for clinical, campus learning lab and classroom.  This means that you must prepare for all of these activities by reading assignments, doing preparation for patient care including reviewing skills that might be needed to care for the patient, doing any assigned paper work, etc.  Faculty will take note of students who continually come unprepared and will recommend probation or dismissal.
8.  Students who utilize social media could be subjected to HIPAA and FERPA rules, could be held liable for any subject matter that is unclear, that may contain personal information about patients or others, including photos regarding same.  Information shared must be in compliance with all nursing expectations and behaviors to be insured that safety and behaviors are not misinterpreted.

### Policy Regarding Academic Dishonesty
The nursing faculty believe that a nursing student, in order to become a competent nurse, will conduct him/herself personally and professionally according to a set of shared core nursing values. These values include caring, advocacy, respect for self and others, collegiality, and ethical behavior. It is necessary to use ethical reasoning to explain and to justify your actions and decisions.  Nursing faculty believe that ethical behavior, honesty and integrity create the foundation for nursing practice.  Therefore it is expected that each student admitted to the nursing program will demonstrate personal

SWOCC-000179

values, attitudes and behaviors consistent with highest standards of ethical conduct.  Considering the significance of ethical behavior, the nursing faculty believe that a breach of integrity is a serious offense.

Further, the American Nurses Association (ANA) Standards of Ethical Conduct in Nursing (required reading) and the Oregon State Board of Nursing (OSBN) Nurse Practice Act state (www.oregon.gov/OSBN) that it is the ethical duty of each practitioner to report observed violations of ethical practice.  Similarly a nursing student who has observed or is knowledgeable of academic dishonesty has the moral/ethical responsibility to report such violations to their advisor or program director.  A nursing student, who violates this provision, may be subject to OSBN investigation and hearing.

The following activities are examples of behavior that may result in disciplinary action (see Policies for Progression in the Nursing Program, page 34-39):

1. **Academic Plagiarism**: All written work done by students must follow APA format. Students need to be very clear about what constitutes plagiarism and how to avoid it.  Students who plagiarize in any of their work at SOCC are subject to student disciplinary action.  This might include but not be limited to receiving a "0" on an assignment or test after careful investigation. Plagiarism is defined as the intentional submission for evaluation to a College instructor or administrator of material based in significant part, on work done by someone other than the submitter without reasonable written indication to the evaluator of material's true source.  Representing the words or ideas of another as one's own. All ideas, arguments and phrases submitted without attribution to other sources, must be the creative product of the student. Plagiarism includes copying or cutting and pasting portions of the writing of others (including other students or previous students) with only minor changes in wording, with inadequate footnotes, quotes, or other reference forms of citation or only a list of references. Paraphrasing without appropriate citation is also plagiarism.

2. **Academic Cheating**: Intentionally using or attempting to use unauthorized materials, information, or study aids in any academic exercise. Students must adhere to the guidelines provided by their instructor for completing coursework and may not present the same (or substantially the same) work for more than one course without obtaining approval from the instructor of each course.

   Faculty have the responsibility of planning and supervising all academic work in order to encourage honest and individual effort and for taking appropriate action if instances of academic dishonesty are discovered.
   The term **"cheating"** includes but is not limited to:
   - Having or using unauthorized materials for any test situation.
   - Accessing and/or distributing a test bank from a textbook manufacturer, either online or a hard copy.
   - Copying or looking at another student's work during any test situation.
   - Changing answers on a returned exam in order to claim there had been a grading error.
   - Discussing the content of any test with the individuals who have not yet taken it.
   - Turning in work that was generated by other individuals or by the same individual in a prior term.
   - Obtaining prior or current exams without the faculty's permission.
   - Doing homework assignment for another student (i.e., working with another student on an assignment that is meant to be an individual assignment).

   **Therefore:**
   - No electronic devices that access the internet or store data (pen drive, google glass, Smart Watch, calculators; calculators; books; notes or other reference materials may be used during any test situation unless authorized by the faculty.
   - No talking, signaling, texting or sharing materials with other students is allowed during any test situation unless specifically directed by the faculty.
   - Only the materials required or authorized for a test should be taken out of the student's notebook, clothes, backpack, or purse.  All other materials should be put away as instructed.
   - An act of cheating may result in a grade of "F" (0 points) for the assignment, exam or course as well as a report filed to the nursing program director.
   - If special considerations are necessary to meet individual student needs, the student is expected to go to the ADA Coordinator in Stensland Hall and bring to the faculty the accommodation prescribed.
   - If a faculty or proctor observes a student taking information from a classmate's test/exam or is observed assisting a classmate during the test/exam, the faculty will confiscate the exam(s), remove the student(s) from the test area

SWOCC-000180

and the student(s) will receive an F grade (0 points) on the exam.  Further sanctions may be applied.  The incident will be written up by the faculty and forwarded to the Nursing Program Director.

- If it is discovered that a student has utilized or plagiarized a classmate's work in the classroom or college/clinical laboratories, the students will meet with the faculty.  The student(s) may receive an F (0%) grade for the assignment.  Further sanctions may be applied.  The incident will be written up by the faculty and forwarded to the Nursing Program Director.
- Group assignments:  If a student has been a noncontributing member of a group assignment, the student will meet with the faculty.  If the student is unable to explain the conduct, the faculty may award an F (0%) for the assignment and the student will be required to make up the work.  Further sanctions may be applied.  The incident will be written up by the faculty and forwarded to the Nursing Program Director.

3. **Fabrication/Falsification:** Intentional and unauthorized falsification or invention of any information or citation in an academic exercise.  Falsification and alteration of documents (e.g., furnishing false personal information; alteration of grades; falsification and alteration of patient charts, records or care plans; fabrication of patient data and information; fabrication of any information or citation in an academic exercise.

4. **Aiding and/or Facilitating Dishonesty/Collusion:** Intentionally or knowingly helping or attempting to help another to violate the academic honesty policy.  Students may only collaborate within the limits prescribed by their instructors.  Aiding another student in any form of dishonest or unethical conduct.  Failing to report an observed breach of integrity.  Allowing another student to copy papers, tests, examinations, assignments.

**Policies regarding course outcomes: Factors that may contribute to a student's inability to meet course outcomes:**

1. Absences and tardiness
   If a student is unable to successfully complete a course, he or she may be dropped or be given an "F" grade because of:
   a. Inability to proceed due to a lack of prerequisite content
   b. Absences that impede the student's ability to meet course and clinical competencies.
   c. The amount of class/clinical/lab missed/term. Two (2) absences within the term will result in probation.  Four absences will result in dismissal.  Tardies or leaving early thrice within a term will equal one (1) absence.  Any exceptions will be decided on a case-by-case basis based on a petition submitted to the student's advisor for faculty review.
   d. A pattern of tardiness to class, lab or clinical will result in probation and/or other disciplinary action.
   e. A pattern of leaving class, lab or clinical early will also be subject to probation and/or other disciplinary action.

2. Inability to meet course outcomes:
   If a student is unable to meet any of the following criteria then he/she may be placed on probation and/or dismissed from the Nursing Program:
   a. Apply theory and nursing principles to clinical practice in patient care and written assignments, including nursing care plans.
   b. Plan, organize and fulfill the tasks assigned by the faculty.
   c. Communicate effectively with patients, faculty, peers and agency staff and inability to understand verbal and non-verbal communications.
   d. Attain technical competency in the skills required for safe clinical performance at the level the student is in the nursing program.
   e. Respond appropriately to instruction and suggestions made by those in authority.
   f. Perform safely in clinical areas.
   g. Demonstrate ability to assume responsibility for preparing and completing clinical assignments made by the faculty.
   h. Demonstrate growth in coping with stressful situations in a calm and dependable manner.
   i. Demonstrate improvement in campus learning lab performance within a period designated by the faculty.
   j. Ability to follow written and/or verbal instructions in classroom, lab and clinical settings.
   k. Take all nursing course tests at the time scheduled during the scheduled timeframe.
   l. Pass all nursing course tests with an average of C grade or better.
   m. Submit all required coursework, lab and clinical work according to due dates.
   n. Maintain a C grade in all nursing and general education courses taken any term while in the nursing program.

SWOCC-000181

◈ *Behavior in the classroom, learning lab, or clinical setting that violates the policies of the Nursing Program, and/or College.*

◈ *A student who falsifies patient records or engages in other dishonesty in patient care give the Oregon State Board of Nursing reason to suspect that he or she will continue the same dishonest acts after licensure.  The board expects to be made aware of acts committed as a student and an investigation will be conducted once the student makes application for licensure.*

DEFICIENT
PRACTICE

◈ *Behavior in providing care to patients/clients that fails to achieve previous and/or current course outcomes; and that fails to achieve the standard of care.*

ACADEMIC
DISHONESTY

◈ *Offenses against academic honesty are any acts which would have the effect of unfairly promoting or enhancing one's academic standing. Academic dishonesty also includes knowingly permitting or assisting any person in the commission of an offense against academic honesty. All academic work (e.g. homework, assignments, written and oral reports, creative projects, performances, exams, extra-credit projects, research, etc.) are subject to the following standards of academic integrity:*

◈ *Plagiarism: The intentional submission for evaluation to a College instructor or administrator of material based in significant part, on work done by someone other than the submitter without reasonable written indication to the evaluator of material's true source.   Representing the words or ideas of another as one's own. All ideas, arguments and phrases submitted without attribution to other sources, must be the creative product of the student. Plagiarism includes copying portions of the writing of others with only minor changes in wording, with inadequate footnotes, quotes, or other reference forms of citation or only a list of references. Paraphrasing without appropriate citation is also plagiarism.*

◈ *Cheating: Intentionally using or attempting to use unauthorized materials, information, or study aids in any academic exercise. Students must adhere to the guidelines provided by their instructor for completing coursework and may not present the same (or substantially the same) work for more than one course without obtaining approval from the instructor of each course.*

◈ *Fabrication: Intentional and unauthorized falsification or invention of any information or citation in an academic exercise.*

◈ *Collusion: Intentionally or knowingly helping or attempting to help another to violate the academic honesty policy.  Students may only collaborate within the limits prescribed by their instructors.*

*See Conduct Expected of Students, pages 27-29 for further information regarding Academic Dishonesty*

SWOCC-000186

**To:**      Hendee, Barb X[barb.hendee@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Sat 5/6/2017 7:22:38 PM
**Subject:** Re: Barbara Hendee has given feedback on your Dropbox: Essay One Paper

Sorry Professor! I don't know why, but I struggle with citations even though I've tried to understand their correct use a million times. I will study it harder. Thank you and sorry again!

Nicole

---

**From:** barb.hendee@socc.edu <barb.hendee@socc.edu>
**Sent:** Saturday, May 6, 2017 11:12:13 AM
**To:** Gililland, Nicole R
**Subject:** Barbara Hendee has given feedback on your Dropbox: Essay One Paper

In your English Composition course, Barbara Hendee has given feedback on your Dropbox: Essay One Paper, saying:

Nicole, this is an interesting essay, but if you wish to avoid issues with plagiarism, you must use in-text citations. Please read the APA chapter of our textbook starting on page 300 and finishing on page 343. Read through the sample essay and note how the writer gives credit to her sources.

Please see attached essay with detailed comments.

To view your Paper, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/WR/WR___123/2016_SP-WR___123-
06D/Coursework.jnz?portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change
&id=12d104d9-1bb2-4428-ae03-d7f62e71ce91

SWOCC-003441

**To:**       Mueller, Anny[amueller@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**     Thur 4/13/2017 6:06:27 PM
**Subject:**  Grading

I certainly feel like I'm giving myself enough time to do your work. Actually, I get my other 3 classes done in a day or two and then spend the rest of the week working on just your class. Ironically enough, I'm a straight A student in my other classes and in general because I do work very hard. I must confess, I am growing increasingly frustrated and unmotivated with this class because it's obviously the one class that's beyond my understanding. I will attempt to "do better" in week 3, but something isn't matching up here and I'm hoping we can have maybe a better dialogue so perhaps I can understand what you're wanting better. I know it's tough with 50 students, but a D is pretty extreme.

SWOCC-003469

**To:**      Mueller, Anny[amueller@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Thur 4/27/2017 9:02:16 PM
**Subject:** Midterm

I'm not exactly sure where to start or if it matters, but you'll notice I struggled with a couple of the essay questions on your test. I didn't feel they were specific enough for me to understand what information they were looking for. If I'm the only one that ends up having this problem, then the issue was obviously me and not the questions. I tend to be overly analytical. If however more people struggle with this, I'm hoping we can address it. Let me know, I'll understand either way. Please know that I did use the study guide you provided, read all of the chapters, then studied key term. I tried to review the old quizzes but they didn't show me the question and the answer so I didn't find them to be much help in remembering the material.

Thanks,

Nicole Gililland

SWOCC-003456

**To:**       Will, Gary D[gary.will@socc.edu]
**From:**     Gililland, Nicole R
**Sent:**     Wed 8/9/2017 4:05:33 PM
**Subject:**  Re: Grade

I'm sorry to keep bugging you, but I would like a more specific explanation as to why I still have a "C." The only thing I did differently from my other papers is that I didn't put quotations around my source statements because I realized that the book never does that, so I assumed I had been doing it wrong and this time I did it just like the book. I read and reread it quite a few times, the questions are answered.

Thanks,

Nicole

---

**From:** Gililland, Nicole R
**Sent:** Tuesday, August 8, 2017 11:37:56 AM
**To:** Will, Gary D
**Subject:** Re: Grade

I reread it, I only added a little more at the end. If that's not what you're referring to, then I'm a little lost.

---

**From:** Will, Gary D
**Sent:** Tuesday, August 8, 2017 10:06:25 AM
**To:** Gililland, Nicole R
**Subject:** Re: Grade

You didn't fully answer the questions  reread the questions and add the last part and it goes from partially answered to answered with references

Sent from my iPhone

On Aug 7, 2017, at 9:51 PM, Gililland, Nicole R <nicole.gililland@email.socc.edu> wrote:

> I'm confused about my grade. Each answer had a direct quote/example from the sources.

SWOCC-003208

**To:**     Gililland, Nicole R[nicole.gililland@email.socc.edu]
**From:**    Stalcup, Jade
**Sent:**    Mon 7/17/2017 9:03:53 AM
**Subject:**    SWOCC Nursing Notification
<u>Intent to Enroll 2017.pdf</u>
<u>Physical Exam Form for Fall 2017.pdf</u>

July 17, 2017

***Congratulations!***

Upon combining your points earned in the interview portion of the application process with the initial application points, you have been **Provisionally Accepted** into the Fall 2017 Nursing Program. To retain your place in the program, you must do the following:

1.  Submit the Intent to Enroll Form (attached) no later than July 24, 2017, 5:00 pm.

2.  Complete your portion of the Physical Examination Form that you will receive next week, then have your health care provider complete his/her portion. Physical exams must be completed and submitted by August 31, 2017. You may wish to call and schedule your appointment now, since some health care providers are booked months in advance.

3.  Complete a criminal background check, drug screen and eLearning certificates (OSHA/HIPAA) between August 14, 2017 and August 31, 2017. You will be notified of the process in a future email.

4.  Complete the remaining 50 credits that are listed on the prerequisite sheet by the end of summer term.

5.  Submit **official transcripts** no later than August 31, 2017 for any prerequisite courses completed during spring or summer **terms from schools other than SWOCC.** (Please do <u>not</u> submit SWOCC transcripts.)

6.  Submit a copy of your <u>current</u> American Heart Association's Basic Life Support Healthcare Provider CPR card by August 31, 2017.

7.  Get a Laker1Card. You will need to have your picture taken at the Coos Bay or Brookings Student First Stop Center.

8.  Attend the mandatory New Nursing Student Orientation on September 21st from 4-6pm.

9.  Check your student email regularly. You will be responsible for complying with any deadlines and information exchanged.

Documents can be submitted to Jade Stalcup (jstalcup@socc.edu) located in room 4 of Sumner Hall, SWOCC, 1988 Newmark Ave, Coos Bay OR 97420.

Your provisional acceptance status will convert to "accepted" once all the items listed above are completed and documentation is received. Failure to meet any of the above requirements will result in your name being removed from the Fall 2017 Nursing Program List. Any costs that you incur will be your responsibility.

Please notify me as soon as possible if you discover that you cannot accept your provisional admission at any time. This will allow students on the alternate list to plan accordingly.

If you have questions, please contact our office at (541) 888-7443. Again, congratulations on your acceptance into the Fall 2017 Nursing Class. We wish you success in the program.

Sincerely,

SWOCC-003278

Jade Stalcup

**Administrative Assistant to the Director Nursing & Allied Health**

Southwestern Oregon Community College

**1988 Newmark Avenue**
**Coos Bay, OR 97420**                    **Visit us online:**
**(541) 888-7443**                          www.socc.edu/nursing
**(541) 888-1520 fax**                      www.socc.edu/allied-health

*Southwestern Oregon Community College is an equal opportunity employer and educator.*

SWOCC-003279

REDACTED

SWOCC-003865

**2017 FALL TERM CLINICAL, FIRST YEAR STUDENTS**

| Section 01: Tuesday 0700-1500 Robin Finney Avamere, Coos Bay | Section 02: Tuesday 0700-1500 TBA Life Care, Coos Bay | Section 03: Thursday 0700-1500 Melissa Sperry, Susan Sefers BayCrest, Coos Bay | Section 31: Tues 07-15 0700-1500 Liz Cooper Coquille Valley Hospital |
|---|---|---|---|
| | | | Gililland, Nicole |
| ████████████ | ████████████ | ████████████ | ████████████ |
| | | | |
| | | | |
| **LAB SCHEDULE** | | | |
| Section 01: Wednesday, 9-12 Sumner 2 | Section 02: Thursday, 9-12 Sumner 2 | Section 03: Tuesday, 1-4 Sumner 2 | Section 04: Thursday, 2-5 Coquille Valley Hospital |

**Addresses**

- Avamere Rehabilitation of Coos Bay, 2625 Koos Bay Blvd, Coos Bay, OR  97420.  Park in the parking lot next to the brick building on the right of Avamere.

- Baycrest Village, 3959 Sheridan Avenue, North Bend, OR  97459

- Life Care Center of Coos Bay, 2890 Ocean Blvd SE, Coos Bay, OR  97420
  Parking is limited.  We've been asked to park across the street at Cascade Farm and Outdoor and walk to Life Care.

- Coquille Valley Hospital, 940 East 5th Street, Coquille, OR  97423

REDACTED

Southwestern Oregon Community College_x000D_Academic Standing Report - Fall Term 2017-2018

| First Name | Last Name | City | State | Academic Honor |
|---|---|---|---|---|
| | | Florence | OR | Honor Roll |
| | | Klamath Falls | OR | Honor Roll |
| | | Coos Bay | OR | Dean's List |
| | | Coquille | OR | Academic Excellence |
| | | Henderson | NV | Honor Roll |
| | | Lamoille | NV | Dean's List |
| | | Coos Bay | OR | Honor Roll |
| | | Coos Bay | OR | Academic Excellence |
| | | Coos Bay | OR | Academic Excellence |
| | | Garden Grove | CA | Dean's List |
| | | Bandon | OR | Dean's List |
| | | Brookings | OR | Academic Excellence |
| | | Keaau | HI | Honor Roll |
| | | Coos Bay | OR | Dean's List |
| | | Lahaina | HI | Honor Roll |
| | | Klamath Falls | OR | Academic Excellence |
| | | Ennis | MT | Dean's List |
| | | Mililani | HI | Academic Excellence |
| | | Newport | OR | Dean's List |
| | | Mission | BC | Academic Excellence |
| | | Sparks | NV | Honor Roll |
| | | Coos Bay | OR | Dean's List |
| | | Visalia | CA | Honor Roll |
| | | Coos Bay | OR | Honor Roll |
| | | Gold Beach | OR | Dean's List |
| | | Newport | OR | Academic Excellence |
| | | McCall | ID | Honor Roll |
| | | Twin Falls | ID | Academic Excellence |
| | | Kodiak | AK | Dean's List |
| | | North Bend | OR | Honor Roll |
| | | Coos Bay | OR | Academic Excellence |
| | | Waldport | OR | Honor Roll |
| | | Coquille | OR | Dean's List |
| | | North Bend | OR | Academic Excellence |
| | | Coos Bay | OR | Honor Roll |
| | | North Bend | OR | Honor Roll |
| | | Beaverton | OR | Honor Roll |
| | | Coos Bay | OR | Honor Roll |
| | | Coos Bay | OR | Dean's List |
| | | Coos Bay | OR | Dean's List |
| | | Portland | OR | Dean's List |
| | | Coos Bay | OR | Honor Roll |
| | | North Bend | OR | Dean's List |
| | | North Bend | OR | Academic Excellence |
| | | Brookings | OR | Dean's List |
| | | Oakhurst | CA | Honor Roll |

Southwestern Oregon Community College is an equal opportunity educator and employer.

SWOCC-002539

REDACTED
Southwestern Oregon Community College_x000D_Academic Standing Report - Fall Term 2017-2018

| | | | | |
|---|---|---|---|---|
| | | Coos Bay | OR | Academic Excellence |
| | | Coos Bay | OR | Academic Excellence |
| | | Kahuku | HI | Dean's List |
| | | Lincoln City | OR | Academic Excellence |
| | | Auburn | WA | Dean's List |
| | | Bandon | OR | Academic Excellence |
| | | Bandon | OR | Dean's List |
| | | Coos Bay | OR | Dean's List |
| | | Bandon | OR | Honor Roll |
| | | North Bend | OR | Honor Roll |
| | | Gold Beach | OR | Dean's List |
| | | Phoenix | OR | Dean's List |
| Nicole | Gililland | Coos Bay | OR | Dean's List |
| | | North Bend | OR | Honor Roll |
| | | Brookings | OR | Dean's List |
| | | North Bend | OR | Academic Excellence |
| | | Lebanon | OR | Academic Excellence |
| | | Lakeside | OR | Dean's List |
| | | Othello | WA | Honor Roll |
| | | North Bend | OR | Honor Roll |
| | | Brookings | OR | Dean's List |
| | | Myrtle Point | OR | Academic Excellence |
| | | Las Vegas | NV | Honor Roll |
| | | Port Orford | OR | Dean's List |
| | | Coquille | OR | Honor Roll |
| | | Coos Bay | OR | Honor Roll |
| | | Bandon | OR | Honor Roll |
| | | Coos Bay | OR | Academic Excellence |
| | | Coos Bay | OR | Honor Roll |
| | | Gold Beach | OR | Dean's List |
| | | Coos Bay | OR | Dean's List |
| | | Coos Bay | OR | Dean's List |
| | | Brookings | OR | Academic Excellence |
| | | North Bend | OR | Honor Roll |
| | | Coos Bay | OR | Honor Roll |
| | | Coos Bay | OR | Academic Excellence |
| | | Coos Bay | OR | Dean's List |
| | | Coos Bay | OR | Academic Excellence |
| | | Missoula | MT | Academic Excellence |
| | | Coos Bay | OR | Dean's List |
| | | North Bend | OR | Honor Roll |
| | | Coos Bay | OR | Dean's List |
| | | Klamath Falls | OR | Dean's List |
| | | North Bend | OR | Honor Roll |
| | | Tooele | UT | Honor Roll |
| | | Eugene | OR | Dean's List |
| | | Willamina | OR | Dean's List |
| | | Coos Bay | OR | Honor Roll |
| | | Coos Bay | OR | Honor Roll |
| | | North Bend | OR | Dean's List |
| | | Bakersfield | CA | Dean's List |
| | | Eugene | OR | Dean's List |

Southwestern Oregon Community College is an equal opportunity educator and employer.

SWOCC-002542

**To:**      calexander@socc.edu[calexander@socc.edu]
**From:**    Nicole Rene Gililland
**Sent:**    Mon 10/2/2017 11:25:41 AM
**Subject:** Late Work?
SOC 205 CH1 Nicole Gililland.docx

I fell asleep and wasnt able to upload my week one paper. I read on the syllabus that you will accept late work, but it won't let me upload anything now that it's passed due.

What do I need to do to turn week one in?


Thanks,

Nicole Gililland


Here it is as an attachment, just in case.

SWOCC-003070

**To:** Finney, Robin S[robin.finney@socc.edu]
**From:** Gililland, Nicole R
**Sent:** Wed 11/15/2017 10:49:44 AM
**Subject:** Lecture today

Hi Robin!

Sorry to bug you, but there's no way I can make it to lecture today. I have sickness spreading through my house like the plague �. I've already asked a few friends if they'd be willing to fill me in afterwards (although I know that's not the same thing).

Sorry and thank you,

Nicole Gililland

SWOCC-003034

**To:**    Sperry, Melissa J[melissa.sperry@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Sat 2/3/2018 10:14:10 AM
**Subject:**    Journal entry

Hi Melissa!

Sorry to bug you on the weekend, but I'm sorta freaking out. I got a migraine last night and decided to lay down for awhile, only I never got back up (until this morning) and realized that I had completely spaced my journal entry! I'm so sorry! I read the student handbook, I understand no late work is acceptable, but I'm wondering if this ruins the whole project? Or should I add it anyway? Will I be able to do the rest of the entries coming up?

Nicole

SWOCC-003002

**To:** Sperry, Melissa J[melissa.sperry@socc.edu]; Walker, Susan[swalker@socc.edu]
**From:** Gililland, Nicole R
**Sent:** Tue 3/20/2018 4:30:31 AM
**Subject:** What would you prefer?

Good morning Mentors!

Sorry, I feel like I've been an extra pain in the behind lately and unfortunately I'm not quite done yet. I'm writing this from Bay Area ER where I'm being treated by a very nice man named Dr. Davis. My daughters caught this stomach virus at daycare and I'd thought I'd dodged it but when I was cooking dinner last night the smell started bothering me and then it hit fast and HARD, I can honestly say I've never been this sick in my life. I worked on my assignments between my multiple trips to the bathroom and after I submitted it I decided to head to the ER because I couldn't keep even a sip of water down and I was showing a lot of signs of advanced dehydration. Anyway, they've given me 1000 ml of LR and Zofran and I should be out of here in about an hour. I am feeling better compared to when I arrived, but I obviously still feel pretty crappy. However, we must power through. I have my presentation ready in the form of all the questions answered from the assignment description. I can still show up at 9 and read them, I can record them and read them, or if you have any other ideas? I will do whatever you two tell me to do.

Thanks,

Nicole

SWOCC-002959

## Email Chain 1

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 25, 2018 5:06 PM
**To:** Seldon, Julianna X <julianna.seldon@socc.edu>
**Subject:** Fw: Kidney infection

**From:** Gililland, Nicole R
**Sent:** Monday, April 9, 2018 10:49:21 AM
**To:** Sperry, Melissa J
**Subject:** Re: Kidney infection

That works. I'll be staying around till after 6pm anyway to help with the TB tests for the EMT class.

**From:** Sperry, Melissa J
**Sent:** Monday, April 9, 2018 9:59:23 AM
**To:** Gililland, Nicole R
**Subject:** Re: Kidney infection

prob closer to 4 ☺

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Monday, April 9, 2018 9:45:59 AM
**To:** Sperry, Melissa J
**Subject:** Re: Kidney infection

Yes, so that would be around 3:30 for me. Is that a good time?

**From:** Sperry, Melissa J
**Sent:** Monday, April 9, 2018 9:03:45 AM
**To:** Gililland, Nicole R
**Subject:** Re: Kidney infection

Tues after lab is still open --will that work?

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

SWOCC-000098

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* – Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Monday, April 9, 2018 7:15:47 AM
**To:** Sperry, Melissa J
**Subject:** Kidney infection

Hey Melissa,

That UTI I was telling you about turned into a kidney infection and the Macrbid didn't take care of it. By Friday my back pain was ridiculous again and I went and got new antibiotics Saturday that will hopefully do the job this time. I am still experiencing a lot of pain and nausea today and can't drive. I think it's best if give myself another day in bed and hopefully the medicine will start having more of an effect. I'll reasses around lunchtime and hopefully make it to lecture. I apologize for needing to reschedule our meeting but I will find a yellow spot for this week to reschedule because I need all the help I can get.

Thanks,

Nicole Gililland

SWOCC-000099

**Email Chain 2**

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 25, 2018 5:06 PM
**To:** Seldon, Julianna X <julianna.seldon@socc.edu>
**Subject:** Fw: Assignment

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 18, 2018 12:00:34 PM
**To:** Walker, Susan
**Subject:** Fw: Assignment

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 18, 2018 12:00:08 PM
**To:** Walker, Susan
**Subject:** Fw: Assignment

**From:** Gililland, Nicole R
**Sent:** Saturday, April 14, 2018 9:05:33 PM
**To:** Sperry, Melissa J
**Subject:** Re: Assignment

Thank you ☺

**From:** Sperry, Melissa J
**Sent:** Saturday, April 14, 2018 8:00:09 PM
**To:** Gililland, Nicole R
**Subject:** Re: Assignment

The remediation instructions and form are on your handouts page

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Saturday, April 14, 2018 1:43:27 PM
**To:** Sperry, Melissa J
**Subject:** Assignment

I see an assignment titled Kaplan Remediation, but it doesn't say anything or what I need to upload.

SWOCC-000100

## Email Chain 3

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 25, 2018 5:07 PM
**To:** Seldon, Julianna X <julianna.seldon@socc.edu>
**Subject:** Fw: Appointment

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 18, 2018 11:59:48 AM
**To:** Walker, Susan
**Subject:** Fw: Appointment

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 8:43:55 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

I have an appt at 1600 already today. please check in when you get back

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 6:21:36 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Tomorrow afternoon after clinical? Also, it did say Weds at 0900, so I apologize but I quadruple checked it before I stopped work on it last night and now it's gone. I'll email it to you tonight as soon as it is complete.

**From:** Sperry, Melissa J
**Sent:** Monday, April 16, 2018 6:16:46 PM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

It was Fri assignment was due Fri at 3:) complete it as soon as possible pls-- and stop by to see me

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc

SWOCC-000101

http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* – Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 5:32:30 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Sorry Melissa,

I had planned to swing by and see you before the field trip but didn't have time after my doctors appointment. I am doing much better! The 3rd set of antibiotics finally got the upper hand over the weekend and I feel like I am waking up from a nightmare. My color has returned and the shivering has stopped, I've been on my feet all day and have been fine.

The assignment is almost complete, it has a lot of content and has taken awhile. I saw that it was due Wed at 0900, is that still okay or would you like me to finish it up tonight after my careplan?

**From:** Sperry, Melissa J
**Sent:** Monday, April 16, 2018 2:03:40 PM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

Nicole
How are you feeling? I had not heard from you and hoping things are going better.
I did not receive you assignment back from Fri. Were you able to access this ok?
Please let me know how things are going

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* – Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 12:47:49 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Ahhh, key words being "will be"

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 10:14:41 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

There will be an assignment you can work on for today posted on Laker Link also

SWOCC-000102

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 9:38:37 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

We can look at that next week

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 9:13:36 AM
**To:** Sperry, Melissa J
**Subject:** Appointment

Hi Melissa,

I'm still not doing well and I'm not sure why. I've been to the ER several times and there's not much else they can do. I don't have a regular doctor but I called my insurance and I'm assigned to Waterfall Clinic. I went in yesterday and they told me to call this morning for an appointment today. I just called and the only opening is at 2:30. I am doing worse every day and I really don't want to miss this appointment. Is there anytime before or afterwards that I can take your tests?

Nicole

SWOCC-000103

## Email Chain 4

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 25, 2018 5:07 PM
**To:** Seldon, Julianna X <julianna.seldon@socc.edu>
**Subject:** Fw: Completed Assignment

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 18, 2018 11:58:15 AM
**To:** Walker, Susan
**Subject:** Fw: Completed Assignment

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 18, 2018 11:56:03 AM
**To:** Walker, Susan
**Subject:** Fw: Completed Assignment

**From:** Gililland, Nicole R
**Sent:** Tuesday, April 17, 2018 4:40:37 PM
**To:** Sperry, Melissa J
**Subject:** Re: Completed Assignment

I'll be there :)

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 3:45:27 PM
**To:** Gililland, Nicole R
**Subject:** Re: Completed Assignment

I should be able to proctor for you tomorrow around 10 if that works

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Tuesday, April 17, 2018 10:44:13 AM
**To:** Sperry, Melissa J
**Subject:** Re: Completed Assignment

Of course. I will make anytime work so just let me know when and I will be there.

SWOCC-000104

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 10:25:51 AM
**To:** Gililland, Nicole R
**Subject:** Re: Completed Assignment

Hey Nicole
I am looking through all the assignments for weeks 1-3 and am not seeing a Kaplan remediation. There is a Kaplan in May and 1 in June so I am not sure what you were seeing on Friday. The class assignment was posted to you nursing section 111-04 at 1250 just after your email.
Susan did talk to the class about the new remediation process but there was no assignment with the instruction. You had asked about the instruction for Kaplan remediation and that was the instructions I was directing you to.
It sounds like a miscommunication which often happens with email conversations. In reviewing the thread - I had mentioned the assignment to be worked on Friday afternoon and you replied you would work on it when it opened. I opened it just before class as it was an in class assignment in your nursing section.

I am not sure if I will be in lab tomorrow at 9 -- it will depend on instructors available. So I am not sure if I will be available to proctor an exam-- can I get back to you on that?

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* – Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Tuesday, April 17, 2018 10:13:26 AM
**To:** Sperry, Melissa J
**Subject:** Re: Completed Assignment

You emailed me Friday and said there would be an assignment for me to work on, I immediately logged on and found nothing (that is when I sent the second email saying "key words will be" because there was nothing there and that was at 1247. I checked again later and an assignment had appeared titled Kaplan Remediation, and again I emailed you and you told me where to find the directions. I spent a lot of time working on it and I'm not sure why you're now saying it wasn't assigned. You didn't mention what time tomorrow so I will be there around 9 to take your tests.

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 9:25:35 AM
**To:** Gililland, Nicole R
**Subject:** Re: Completed Assignment

The case study was closed at 1500 on Friday when it was due-- it was posted on laker link after I emailed you on Friday about 1250 so you could complete it.
I am not sure what kaplan you are remediating as there have not been any kaplan tests this term.

SWOCC-000105

I am afraid my 1600 space is full today -- I will be available tomorrow -- you will need to take the tests from last week as well as a quiz.

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."  – Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Tuesday, April 17, 2018 9:19:02 AM
**To:** Sperry, Melissa J
**Subject:** Re: Completed Assignment

I didn't see any case study assignments online last week, just the clinical prep and the upcoming assignments this week. Where can I find it so I can do that for you? Also, when you say check in when I get back, do you mean tomorrow? I'll be in town early tomorrow and I can come anytime that's convenient for you. If you prefer today I can come after your 1600 appointment.

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 8:39:08 AM
**To:** Gililland, Nicole R
**Subject:** Re: Completed Assignment

Hi Nicole
I have your Kaplan remediation -- that may be the assignment that was due on Wed--
I was asking about the Case study from Fri:)

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."  – Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 10:22:47 PM
**To:** Sperry, Melissa J
**Subject:** Completed Assignment

SWOCC-000106

**To:**     Gililland, Nicole R[nicole.gililland@email.socc.edu]
**From:**  Sperry, Melissa J
**Sent:**   Mon 4/16/2018 6:16:46 PM
**Subject:** Re: Appointment

It was Fri assignment was due Fri at 3:) complete it as soon as possible pls-- and stop by to see me

Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us." ~ Ralph Waldo Emerson*

---

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 5:32:30 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Sorry Melissa,

I had planned to swing by and see you before the field trip but didn't have time after my doctors appointment. I am doing much better! The 3rd set of antibiotics finally got the upper hand over the weekend and I feel like I am waking up from a nightmare. My color has returned and the shivering has stopped, I've been on my feet all day and have been fine.

The assignment is almost complete, it has a lot of content and has taken awhile. I saw that it was due Wed at 0900, is that still okay or would you like me to finish it up tonight after my careplan?

---

**From:** Sperry, Melissa J
**Sent:** Monday, April 16, 2018 2:03:40 PM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

Nicole

How are you feeling? I had not heard from you and hoping things are going better.

I did not receive you assignment back from Fri. Were you able to access this ok?

SWOCC-002903

Please let me know how things are going

  Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

  *"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

---

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 12:47:49 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Ahhh, key words being "will be"

---

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 10:14:41 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

There will be an assignment you can work on for today posted on Laker Link also

  Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

  *"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

---

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 9:38:37 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

We can look at that next week

  Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College

SWOCC-002904

http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us." ~ Ralph Waldo Emerson*

---

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 9:13:36 AM
**To:** Sperry, Melissa J
**Subject:** Appointment

Hi Melissa,

I'm still not doing well and I'm not sure why. I've been to the ER several times and there's not much else they can do. I don't have a regular doctor but I called my insurance and I'm assigned to Waterfall Clinic. I went in yesterday and they told me to call this morning for an appointment today. I just called and the only opening is at 2:30. I am doing worse every day and I really don't want to miss this appointment. Is there anytime before or afterwards that I can take your tests?

Nicole

SWOCC-002905

**To:**       Liz Cooper[lizc@cvhospital.org]
**From:**     Walker, Susan
**Sent:**     Mon 1/29/2018 8:34:36 AM
**Subject:**  RE: Care plan

Hi Liz,
I noticed the students are not posting their care preps onto myLakerLink.  Do you know why they aren't?
Susan

**From:** Liz Cooper [mailto:lizc@cvhospital.org]
**Sent:** Friday, January 26, 2018 9:05 AM
**To:** Walker, Susan <swalker@socc.edu>
**Cc:** Sperry, Melissa J <melissa.sperry@socc.edu>
**Subject:** FW: Care plan

Hi Susan,
This is what she submitted to me the night before clinicals and brought to clinicals in an email to herself.
  Nicole and I had a very long talk last night after lab (about an hour) about the evaluation and expectations.  I told her to make sure she meets with Melissa.
Thank you,

**Liz Cooper, RN, MSN**
Quality Director/Risk Manager
Coquille Valley Hospital
lizc@cvhospital.org
P: 541-396-7981
F:541-396-6188

The information contained in this transmission may contain privileged and confidential information, including patient information protected by federal and state privacy laws. It is intended only for the use of the person(s) named above. If you are not the intended recipient, you are hereby notified that any review, dissemination, distribution, or duplication of this communication is strictly prohibited. If you are not the intended recipient, please contact the sender by reply email and destroy all copies of the original message.

**From:** Nicole Gililland [mailto:nicolegililland15@gmail.com]
**Sent:** Monday, January 22, 2018 9:55 PM
**To:** Liz Cooper <lizc@cvhospital.org>
**Subject:** Care plan

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com
_____

_____
This email has been scanned by the Symantec Email Security.cloud service.
For more information please visit http://www.symanteccloud.com
_____

SWOCC-003853

**To:**        Walker, Susan[swalker@socc.edu]
**From:**      Sperry, Melissa J
**Sent:**      Wed 6/13/2018 1:27:54 PM
**Subject:**   Fw: From last night
careplan123.docx

 Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

 *"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

---

**From:** Nicole Gililland <nicolegililland15@gmail.com>
**Sent:** Friday, January 26, 2018 12:15 PM
**To:** Sperry, Melissa J
**Subject:** Fwd: From last night


Sent from my iPhone

Begin forwarded message:

> **From:** Nicole Gililland <nicolegililland15@gmail.com>
> **Date:** January 23, 2018 at 6:18:12 PM PST
> **To:** Liz Cooper <lizc@cvhospital.org>
> **Subject: From last night**
>
>
> Figured out what I did. I sent you the one from downloads instead of desktop. The one from downloads was downloaded from the email I sent myself from the hospital, the one saved to desktop was the one same one but with hours of work. Sorry for the trouble, it won't happen again.

SWOCC-003901

**To:**       melissa.sperry@socc.edu[melissa.sperry@socc.edu]; Liz Cooper[lizc@cvhospital.org]
**From:**     Nicole Gililland
**Sent:**     Sun 1/28/2018 9:34:25 PM
**Subject:**  Letter
MelissaLiz.docx

SWOCC-003769

My name is Nicole Gililland and I am in my 1st year of the SWOCC nursing program. I am in group #4 and do my clinicals in Coquille and Liz Cooper is my instructor. On the evening of Monday January 22nd, I went to The Coquille Valley Hospital for my patient assignment. Normally I would stay at the hospital until most of my patient care plan was complete, but on this particular night I was carpooling and had someone waiting outside for me.

Once I got all of the basic information onto my care plan, I emailed it to myself from a hospital computer so I could finish my work at home. When I got home I downloaded the care plan titled careplan123 (meaning 1/23/18) from my email and worked on it for several hours. I finished with the care plan just before 2200 and saved it to the desktop of my laptop with the same title (careplan123). I then emailed it to myself and to Liz and went to bed.

The next morning when I arrived at my clinical location Liz and I noticed a lot of work was missing from my care plan. I recognized it as the version I had emailed to myself from the hospital the night before. Apparently when I emailed the care plan to myself and Liz before going to sleep, I had attached the copy from downloads instead of desktop, so the version I downloaded from the email I sent myself from the hospital instead of the one I saved on my desktop. I didn't have anyone at home that could send the correct copy, so I redid all the work before passing meds.

I understand Liz was supposed to send me home but didn't. I apologize for putting her in a difficult and probably uncomfortable position as a teacher. It was my responsibility to double check what I was turning in and I failed to do that. In the future, I will backup all of my work on an external zip drive and keep it on me. I will save the finished care plan with an "f" at the end and I will click on my attachments to verify what I am sending. Again, I sincerely apologize and I will not let it happen again.

SWOCC-003770

**Walker, Susan**

| | |
|---|---|
| **From:** | Gililland, Nicole R |
| **Sent:** | Wednesday, April 18, 2018 12:00 PM |
| **To:** | Walker, Susan |
| **Subject:** | Fw: Appointment |

**From:** Sperry, Melissa J
**Sent:** Tuesday, April 17, 2018 8:43:55 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

I have an appt at 1600 already today. please check in when you get back

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 6:21:36 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Tomorrow afternoon after clinical? Also, it did say Weds at 0900, so I apologize but I quadruple checked it before I stopped work on it last night and now it's gone. I'll email it to you tonight as soon as it is complete.

**From:** Sperry, Melissa J
**Sent:** Monday, April 16, 2018 6:16:46 PM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

It was Fri assignment was due Fri at 3:) complete it as soon as possible pls-- and stop by to see me

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Monday, April 16, 2018 5:32:30 PM

1

SWOCC-000137

**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Sorry Melissa,

I had planned to swing by and see you before the field trip but didn't have time after my doctors appointment. I am doing much better! The 3rd set of antibiotics finally got the upper hand over the weekend and I feel like I am waking up from a nightmare. My color has returned and the shivering has stopped, I've been on my feet all day and have been fine.

The assignment is almost complete, it has a lot of content and has taken awhile. I saw that it was due Wed at 0900, is that still okay or would you like me to finish it up tonight after my careplan?

**From:** Sperry, Melissa J
**Sent:** Monday, April 16, 2018 2:03:40 PM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

Nicole
How are you feeling? I had not heard from you and hoping things are going better.
I did not receive you assignment back from Fri. Were you able to access this ok?
Please let me know how things are going

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ Ralph Waldo Emerson

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 12:47:49 PM
**To:** Sperry, Melissa J
**Subject:** Re: Appointment

Ahhh, key words being "will be"

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 10:14:41 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

There will be an assignment you can work on for today posted on Laker Link also

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc

2

SWOCC-000138

http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Sperry, Melissa J
**Sent:** Friday, April 13, 2018 9:38:37 AM
**To:** Gililland, Nicole R
**Subject:** Re: Appointment

We can look at that next week

MELISSA SPERRY MSN, RNC, NC-BC,
NURSING FACULTY
T. 541.888.1533
SOUTHWESTERN OREGON COMMUNITY COLLEGE
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us."* ~ *Ralph Waldo Emerson*

**From:** Gililland, Nicole R
**Sent:** Friday, April 13, 2018 9:13:36 AM
**To:** Sperry, Melissa J
**Subject:** Appointment

Hi Melissa,

I'm still not doing well and I'm not sure why. I've been to the ER several times and there's not much else they can do. I don't have a regular doctor but I called my insurance and I'm assigned to Waterfall Clinic. I went in yesterday and they told me to call this morning for an appointment today. I just called and the only opening is at 2:30. I am doing worse every day and I really don't want to miss this appointment. Is there anytime before or afterwards that I can take your tests?

Nicole

SWOCC-000139

Exhibit 29, Page 3 of 3

**Walker, Susan**

| | |
|---|---|
| **From:** | Walker, Susan |
| **Sent:** | Tuesday, April 10, 2018 7:36 AM |
| **To:** | Gililland, Nicole R; Sperry, Melissa J |
| **Subject:** | RE: Kidney infection |

Sorry to hear you have a kidney infection.  Please take care of yourself.  Hope the new medication helps.
Susan

**From:** Gililland, Nicole R
**Sent:** Monday, April 09, 2018 9:13 PM
**To:** Walker, Susan <swalker@socc.edu>; Sperry, Melissa J <melissa.sperry@socc.edu>
**Subject:** Kidney infection

Hey Susan and Melissa,

I've been battling a kidney infection. I took Macobid and it didn't knock it out. I went back in Saturday and started cipro but I keep getting worse. I came in to get my patient assignment and ended up back in the ER instead and the doctor said I'm allergic to cipro and gave me a new prescription and a Rosephin IV treatment. He said I need more rest in bed so I already have to miss a clinical and will make it up whenever you tell me to. I'm sorry! This means I won't be able to make the meeting or help with the EMT class in the evening. Again, I'm sorry, this wasn't supposed to last this long and I hate missing anything but especially right out the gate.

Nicole Gililland

1

SWOCC-000128

**To:**      Sperry, Melissa J[melissa.sperry@socc.edu]
**From:**   Gililland, Nicole R
**Sent:**    Mon 3/12/2018 2:02:15 PM
**Subject:**  Lecture today

Hello Melissa,

I sincerely apologize for missing your lecture today, yours are my favorite. I did everything normal this morning and headed off to campus, on my way though I encountered a couple of vehicles that appeared to be having some sort of road rage altercation. They kept break-checking each other and flipping each other off, at one point they both came to a complete stop in the middle of 101! Anyways, as soon as it was safe to do so I quickly passed them and guess what? I got pulled over and ticked for speeding!!!!! I explained to the cop what happened, he didn't really seem to care. I guess the whole ordeal sent my B/P skyrocketing because I almost instantaneously got a massive migraine. I came back home, puked my guts out, and layed down for awhile. This is the first time I can handle starring at my phone screen to send an email. Again, I apologize, I guess when it rains it pours and I must've done some REALLY bad stuff in a past life. My group promised to take notes for me but if there's any makeup you'd like me to do, please let me know.

Thanks,
Nicole

SWOCC-002986

**To:** Alexander, Christina[calexander@socc.edu]
**From:** Gililland, Nicole R
**Sent:** Mon 11/20/2017 12:53:12 PM
**Subject:** Book report

I haven't submitted the report on Nickel and Dimed because I am a hot mess. I wish I had a better excuse, but I'm in the nursing program and have kids and I'm just a little overwhelmed. Is there anyway I can turn it in tonight or tomorrow for partial credit?

Thanks,
Nicole Gililland

SWOCC-003032

**To:**      Sperry, Melissa J[melissa.sperry@socc.edu]
**From:**    Gililland, Nicole R
**Sent:**    Fri 2/23/2018 10:00:59 AM
**Subject:** Re: Melissa Sperry has given feedback on your Living with Chronic Illness Journal Entry Assignment

That would explain it. I apologize, I'm not usually someone that could be described as flakey, but I'm really struggling to keep my head above water this term.

_____
From: Sperry, Melissa J
Sent: Friday, February 23, 2018 8:53:00 AM
To: Gililland, Nicole R
Subject: Re: Melissa Sperry has given feedback on your Living with Chronic Illness Journal Entry Assignment

It was due week 6 --not this week:)


Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

"What lies behind us and what lies before us are tiny matters compared to what lies within us." ~ Ralph Waldo Emerson
_____
From: Gililland, Nicole R
Sent: Friday, February 23, 2018 7:57:55 AM
To: Sperry, Melissa J
Subject: Re: Melissa Sperry has given feedback on your Living with Chronic Illness Journal Entry Assignment

I did not see it due in my coursework. Are you sure it was open to me? Maybe because I was late last time there was some sort of clitch? I checked at the beginning of the week and yesterday.

_____
From: melissa.sperry@socc.edu <melissa.sperry@socc.edu>
Sent: Thursday, February 22, 2018 11:32:18 AM
To: Gililland, Nicole R
Subject: Melissa Sperry has given feedback on your Living with Chronic Illness Journal Entry Assignment

In your Found of Nrsg in Chronic Illness IIllness I course, Melissa Sperry has given feedback on your Living with Chronic Illness Journal Entry Assignment, saying:


Hi Nicole

I do not see an entry for this week.

This is the second entry not submitted on time and will be reflected on the total score at the end of the term


To view your Assignment, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/NRS/NRS__111/2017_WI-NRS__111-
04/Coursework.jnz?portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change&id=6601e156-24d5-
4cb7-b643-24958086fcd8

SWOCC-002990

# June 2018

**Nursing 233, 231, 112**

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|-----|-----|-----|-----|-----|-----|-----|
| **Week 9 continued** | | | | | 1<br>**9-12 Faculty Mtg**<br>1-3 Maternity (KJ)<br>3:00-5:00 Exam<br>Sumner 11 | 2 |
| 3<br>**Week 10** | 4<br>1-2: Seminar:<br>2-4: Renal/GU Altera-tions (MS) | 5<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | 6<br>9-12 Lab (CB)<br>1-4 Renal/GU Altera-tions (MS)<br><br>**Portfolio due at 5 pm** | 7<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | 8<br>**9-12 Faculty Mtg**<br>1-3 STDs (MS)<br>3:00-5:00 Exam<br>Sumner 11 | 9 |
| 10<br>**Finals Week** | 11<br>Kaplan 2-4pm<br>Sumner 11<br>Pathophysiology<br>(30% of 70 points =<br>21 points) | 12<br>**ALL skills lists and<br>CET's to advisor** | 13<br>**9-12 Faculty Meeting<br>for student evalua-tions** | 14 | Graduation 15 | 16 |
| 17 | 18 | 19 | 20 | 21 | 22 | 23 |
| 24 | 25 | 26 | 27 | 28 | 29 | 30 |

SWOCC-004669

Exhibit 34, Page 1 of 3

# May 2018

## Nursing 233, 231, 112

| Sun | Mon | Tue | Wed | Thu | Fri | Sat |
|---|---|---|---|---|---|---|
| Week 5 continued<br><br>Midterm Evaluations, 5/4 All skills lists, CET in to advisor by 5/3 | | **1**<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | **2**<br>9-12 Lab (CB)<br>1-4 Autoimmune Meds (RF) | **3**<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | **4**<br>9-12 Faculty Mtg<br>Student Evaluations<br>1-3 Autoimmune Nrsg Care, NPSG, Ethics, Care Planning (RF)<br>3:00-5:00 Exam Sumner 11 | **5** |
| **6**<br>Week 6<br>Meet with Advisor week 6 or 7 after eval meeting | **7**<br>1-2: Seminar: Neuro Assessment/Sim<br>2-4: Neuro Patho (PW) | **8**<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | **9**<br>9-12 Lab (CB)<br>1-4 Neuro Pharm (PW) | **10**<br>Faculty @ OCNE Conf<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | No faculty meeting **11**<br>Faculty @ OCNE Conf<br>Neuro Case Study due to drop box by 1300<br>10-12 Kaplan Med/Surg Exam Sumner 11 (30% of 90 points = 27 points) | **12** |
| **13**<br>Week 7<br>Meet with Advisor week 6 or 7 after eval meeting | **14**<br>1-2: Seminar: Endocrine Sim<br>2-4: Endocrine (MS) | **15**<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | **16**<br>9-12 Lab (CB)<br><br>1-4 Endocrine (MS) | **17**<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | **18**<br>9-12 Faculty Mtg<br><br>1-4 Endocrine<br>3:00-5:00 Exam Sumner 11 | **19** |
| **20**<br>Week 8 | **21**<br>1-2 Seminar: Fetal monitoring, Neonate<br>2-4 Maternity (KJ) | **22**<br>11-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | **23**<br>9-12 Lab (CB)<br>1-4 Maternity (KJ) | **24**<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille | **25**<br>9-12 Faculty Mtg<br>1-3 Maternity (KJ)<br>3:00-5:00 Exam Sumner 11 | **26** |
| **27**<br>Week 9<br>Seminar info will be posted on eLearning. | *Holiday* **28**<br>HAPPY MEMORIAL DAY | **29**<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | **30**<br>9-12 Lab (CB)<br>1-4 Maternity (KJ) | **31**<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | | |

SWOCC-004670

# April 2018

## Nursing 233, 231, 112

| Sun | Mon-Patho | Tue | Wed-Pharm | Thu | Fri-Acute | Sat |
|---|---|---|---|---|---|---|
| **Week 1** 1<br><br>Non-nursing classes:<br>Philosophy 103 | 2<br>10-12 Med Calc Test (testing center)<br>1-2: Seminar: Med Admin<br>2-4: Neuropsych (RF) | 3<br>1-4 Lab<br>Med Administration Test | 4<br>9-12 Lab<br>Med Administration<br>1-4 Neuropsych meds (RF)<br>**4-5 Clinical Orientation, TBA** | 5<br>9-12 Lab Med Administration<br><br>**Med Calc test #2 prn** | No faculty meeting 6<br>**Med Cal #3 prn**<br><br>1-3 Neuropsych (RF)<br>3:00-5:00 Exam Sumner 11 | <u>Clinical Instructors:</u> 7<br>Sec 1:  Robin Finney (RF)<br>Sec 2:  Kerry Joyce (KJ)<br>Sec 3:  Melissa Sperry (MS)<br>Sec 4:  Liz Cooper (LC) |
| **Week 2** 8 | 9<br>1-2: Seminar: Enteral tubes, colostomy<br>2-4:  Gastrointestinal patho (MS) | 10<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | 11<br>9-12 Lab (CB)<br>1-4 Gastrointestinal, pharm (MS) | 12<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | No faculty meeting 13<br><br>1-3 GI (MS)<br>3:00-5:00 Exam Sumner 11 | 14 |
| **Week 3** 15 | 16<br>Seminar: Online Orthopedic equipment<br>1-4 Periop Nursing (RF) - Field Trip | 17<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | 18<br>9-12 Lab (CB)<br>1-4 Musculoskeletal Meds (RF) | 19<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | 20<br>**9-12:00 Faculty Meeting**<br>1-3 Musculoskeletal (RF)  - Field Trip<br>No exam, case study due at 5 pm | 21 |
| **Week 4** 22 | 23<br>1-2: Seminar: Cardiac Simulation<br>2-4: Cardiovascular (PW) | 24<br>1-4 Lab<br>7-3 Clinical BAH (RF)<br>7-3 Clinical CVH (LC)<br>3-11 Clinical BAH (KJ) | 25<br>9-12 Lab (CB)<br>1-4 Cardiovascular medications (PW) | 26<br>9-12 Lab (Coos Bay)<br>7-3 Clinical (MS)<br>2-5 Lab (Coquille) | **No Faculty Meeting** 27<br>**Faculty OOT at OCAP Conference**<br>Cardiovascular Case Study due at 1600 (PW)<br>Test in testing center | 28 |
| **Week 5** 29 | 30<br>1-2: Seminar: Sterile technique, catheterization<br>2-4:  Autoimmune disorders (RF) | | | | | |

SWOCC-004671

To Whom It May Concern,

My name is Nicole Rene Gililland, I am a 30-year-old former paramedic and current nursing student at Southwestern Oregon Community College (SWOCC). I enrolled at SWOCC two years ago following my divorce. At the time of my enrollment I was 6 months pregnant as well as the mother of a 2-year-old little girl. Being a paramedic was no longer realistic as a single mother due to the long hours (24-72 hour shifts) and the pay is usually minimal. I decided to switch into nursing so I could continue to pursue my passion of caring for others while also addressing my demands as a single parent.

Admission to the SWOCC Nursing Program is incredibly competitive, every year there 100-150 applicants for 25 spots. I worked incredibly hard throughout my prerequisites, often doing schoolwork from a hospital bed due to the high-risk nature of my pregnancy. I got straight A's and my hard work paid off when I was the very last person accepted into the nursing program last fall. I was warned by various people in this small community to keep my head down and avoid the "politics" of the nursing program at all costs, and that is exactly what I intended to do.

Once a student starts the nursing program, almost everything about their education from that point forward is handled within the program, it is very much its own school within a school. My academic advisor was changed to a teacher within the program by the name of Melissa Sperry. I was warned that Melissa was very ego driven and vindictive person and based off of her student reviews on ratemyprofessor.com, that appeared to be true. I had no plans of doing anything to cross her and for the first couple of terms I actually found her to be quite pleasant to me.

At the end of the second term I contracted a stomach virus and ended up going to the local emergency room for IV fluids and antiemetics. I believe while I was there I picked up a bacteria in the ER bathroom facilities which resulted in a urinary tract infection. This shouldn't have been a big deal, but through a series of unfortunate misdiagnosis and mishandlings from some medical providers, this simple UTI became a rather intense kidney infection and I ended up almost fully septic. I started spring term incredibly ill (and have ample medical records to show for it).

Despite my worsening condition I returned to school and started out spring term strong. By the second week however my condition had become serious and I had to miss a couple of lectures that week, those lectures were taught by Melissa Sperry. I stayed in constant contact that week via email with Melissa (see emails). She seemed genuinely concerned as did the program director Susan Walker. Despite my condition I kept up on all my school work so that I didn't fall behind, and I did not request any special treatment. I still showed up to my clinical and lab days because those are important not to miss, however on each of those days I was promptly sent away due to my sickly appearance (incredibly pale, sweaty, unsteady gait, shivering).

By Friday of the second week of term I was still sick and had a doctor's appointment scheduled for 1430. That timeframe is usually the time we are given our weekly exams which are 90% of our final grade. As per the student handbook, a student can arrange to take these tests early if they have a good reason (like a doctor's appointment). Several of my classmates have taken their tests early both prior to and following this event. The handbook states if you take the tests late you'll be docked 10% on your tests. Despite my near-septic condition and low-pressure headache (from having a spinal tap preformed) I emailed Melissa to arrange a time to take my tests early since 1430 was the only available time for the medical appointment and I didn't want to risk having my grade docked. Melissa emailed me back and

SWOCC-000289

told me we would worry about the tests the following week and I assumed she was being flexible and compassionate because of my condition.

Shortly after her email telling me not to worry about coming in for the tests, she sent an additional email telling me that she would be uploading an assignment to our online portal "for me to work on." She didn't specify any details beyond that. I assumed it was some sort of makeup work and was happy for the opportunity to redeem myself after being so ill. I immediately logged on to the portal and there was nothing. I emailed Melissa about not seeing it and continued to check throughout the afternoon into the evening. Finally, that night an assignment appeared titled *Kaplan Remediation*. There were no instructions with it though, it was simply an empty assignment due the following Wednesday at 0900.

The following morning (Saturday) I emailed Melissa again telling her that I could see the assignment but that it had no instructions. Melissa emailed me back and told me where to find the assignment instructions and I immediately got to work. The assignment was a big one that involved remediating a prior Kaplan exam we had taken, this made sense to me though because this Kaplan exam had been the topic of conversation at my last advisory appointment with Melissa just the week prior. I spent all weekend working on it and fortunately was beginning to feel much better on the new (3rd set, 5th round) antibiotics, I was finally on the mend.

By Monday morning I had almost completed the assignment (the due date was still Wednesday) and I returned to school. Robin Finney was the instructor for the week and I had a lot of work to do to catch up since I had been sick and spent all of my weekend on Melissa's assignment (typically weekends are supposed to be spent preparing for upcoming week). At some point on Monday Melissa emailed me and wanted to know where her assignment was. I responded that I was just finishing it up but thought I had until Wednesday. She sent a reply stating that it had been due Friday by 1500. I said that didn't make any sense since I didn't get it until Friday night and I had quadruple checked the due date throughout the weekend. I told her I would hurry and get it to her that night though and that's what I did, I pulled an all-nighter and got my normal workload and her assignment finished. When I went to turn it in on the online portal the entire assignment had vanished, it was very strange and off-putting, but I went ahead and emailed it to her which is not an uncommon way of also submitting assignments.

The next day I received an email from Melissa saying that she had received this 8-page assignment titled Kaplan Remediation but what she had assigned me was a case study that had been due Friday. None of that made any sense, especially since I had emailed her Saturday and received confirmation and she even told me where to find the instructions for it. We went back and forth a bit and finally she told me it was probably all a misunderstanding and we would sort it out the following day when I came in to take her tests from the previous week.

The next morning I arrived at the scheduled time and Melissa put me in a private office to complete the 3 exams and 1 quiz from week two. When I was finished I brought them back to Melissa and sat down to discuss everything. This is when Melissa informed me that she would be docking all of the tests 10% for being late. Although I felt this to be unfair since I had indeed attempted to take these tests early, I decided in that moment not to argue about it and that I could come back from a 10% deficit. She actually appeared disappointed when I didn't argue with her and then proceeded to tell me she was also giving me a 0% on the "case study" she assigned because I didn't do it. This is when I knew something bad was happening. I reminded Melissa that all of our exchanges were in email format and that if she was confused on what had actually occurred, she should review the written exchange for

SWOCC-000290

clarification. She told me she wasn't going to argue about it and if I didn't agree with her decision, I should take it up with Susan Walker (program director).

I immediately got up and walked straight to Susan's office. I explained everything to Susan and she asked for me to forward her all the emails and she would review them and get back to me. I forwarded all of the emails and continued about my week. Robin had a lot of assignments that week including a 26-page case study that was due Friday night that I barely submitted on time in a rush with only a couple of minutes to spare. Overall though, I was very pleased with what I had been able to accomplish that week considering I was rebounding from the most serious illness of my life, somehow I had managed to keep up. I tried to keep a positive attitude and just keep moving forward.

The following week things seemed to be looking up when Melissa emailed me and told me she was going to allow me two hours to complete her case study assignment for partial credit (minus 10%). Apparently after reviewing our email exchange, Susan had ordered Melissa to allow me a chance to complete her real assignment.  Although I was upset that I had worked for *days* on a bogus assignment and the grading was less than fair, I just wanted to put it all behind me and not make trouble for myself. I showed up to campus at the scheduled time and completed Melissa's assignment and then headed to the nursing building for lecture.

I checked my grades for the previous week on my phone and saw that Robin had graded my big case study with a 77%. This seemed a little low to me and I swung by Robins office and she said I did a good job but that I had added the wrong pathophysiology to the end of the assignment. I checked, and I did indeed make some mistakes in my rush to get submitted on time. I thanked Robin and went to lecture. Sometime during lecture I checked my grades again to get a closer look and saw that I was suddenly failing every class. The 77% from Robins big case study had been changed to a zero divided among my 3 classes.

I rushed to Robins class and asked what was happening, she told me I needed to speak to Melissa. I went to Melissa's office and asked her, and she told me she was "conducting an investigation and would tell me when she was finishes." I rushed down to Susan's office and asked her and she said she didn't know what was going on. At that point Robin came out of her office and said she would take me to Melissa's office for an explanation. When we got to Melissa's office Robin told me that Melissa had taken my case study assignment from her and "discovered" plagiarism on it. Melissa looked at me with a big grin and told me she had found improper citations on my assignment for Robin and that made me guilty of plagiarism. I explained that I rushed my reference page but most certainly didn't mean to plagiarize anything, proper citations are NOT something that the nursing program has enforced in anyway. The overall attitude is all of the work within the nursing program stays within the nursing program, so strict citation guidelines simply aren't enforced. We have actually been *instructed* to cut corners by copying things from textbooks and websites on a regular basis without citations. However, I could see by Melissa's demeanor (and my grades being changes) that Melissa intended to use this against me to the fullest extent.

I was told to go back to class, which I did. After class I went to Susan's office to explain myself. Susan was very cold and told me I was to have a hearing on Monday morning. She told me I could bring a "support person" but that person couldn't be associated with the nursing program (so basically nobody who could point out that this "plagiarism" is a program-wide occurrence). I asked if I could bring an attorney and Susan told me if I brought a lawyer that there wouldn't be a hearing. I could see that Susan

SWOCC-000291

was not going to help me and I left her office and walked straight to the administration building where I was pointed to the office of the Vice President of Enrollment and Student Services, Tim Dailey.

When I entered Tim's office I was greeted by his assistant Julianna Seldon. I was sobbing at this point and I explained everything that was going on. She set me an appointment Tim for the following morning so that I could launch a formal complaint against Melissa and asked that I forward all of the emails to her so that she could get Tim up to speed prior to our meeting, which I did. The next morning, I arrived and sat down with Julianna and Tim. I gave a complete account of everything in chronological order (like now), Tim listened, and Julianna recorded. Tim asked some clarification questions and repeated back his understanding. He told me he was going to take my statement to Dean Francisco Saldivar and they needed me to return the following day to meet with Francisco and himself (Tim) again, he said they would call me with a time. I was absolutely under the impression when I left Tim's office that I had just filed a formal complaint with the college about my situation.

The next day (Friday, April 27th) I went to my classes and went all day without hearing anything. When I was finished with my exams I swung back by Tim's office to see if they still needed to meet with me. Tim said Francisco ended up not being available but that one or both of them would be present in my meeting the following Monday and to update him via email over the weekend of any changes or evidence in the case.

Throughout the weekend I had several classmates contact me to discuss the situation, only one of them said she would help clear my name, everyone else said they couldn't risk being next. The classmate that agreed to speak on my behalf wrote an email that included several instances of class-wide plagiarism. Actually, every single case study that Melissa had assigned in week 2 contained word-for-word sentences from our textbooks and not a single person cited any of it. The following week in Robins class, the whole class made slideshow presentations and on every single slide there was word-for-word information from our textbooks and again, no citation slide. These instances were just from the last two previous weeks, imagine if we looked at the whole school year. Again, it's not like any student was intentionally trying to be a plagiarist. We all came into the program properly educated on citations, but once in the actual program citations seemed to be implied since all of the work was strictly internal. If Melissa could do this to me, she could do it to anyone.

I emailed all of that information to Tim as well as my classmates statement and examples of the class-wide plagiarism. I fully expected a reply telling me that my hearing had been canceled; I mean, why would we have a hearing to punish me for plagiarism if it was being committed by everyone? Wouldn't singling me out be unethical? I didn't hear back from Tim though and so Monday morning myself and my ex-husband, Daymon Gililland (acting as a character witness and my support person) headed to SWOCC for the hearing.

Before we went into the meeting, Daymon and I decided to call a fellow classmate by the name of Victoria Kalmykova. Victoria had joined our class just a few weeks prior at the beginning of spring term. I had introduced myself and shook her hand the first week back, but that was the only interaction I had had with her at that point. However, I was told by a classmate that Victoria was Melissa's victim from last year and that she had been expelled but was just allowed back into the program and that I should speak with her, that classmate also provided her number. I decided it was probably a good time to hear about Victoria's situation. Victoria is from Ukraine and has an accent, apparently something Melissa and Pamela Wick like to make fun of her for. Victoria's husband is on dialysis and is very ill. She is finally

SWOCC-000292

fulfilling her dream of becoming nurse because she loves to help others but also because she has to become the bread winner now.

Victoria answered her phone and I told her what was happening and asked if she would like to give me any information. Victoria told me that the previous year she had somehow ended up in Melissa's crosshairs and Melissa bullied her incessantly and messed with her grades like she had begun to do with mine. She said tried to get help from the school and even went to a
Dean for help, which she was promised would be kept confidential, but that Dean immediately called Susan and informed her that one of her students was complaining about them. After Susan found out about Victoria complaining about her harassment, she (Susan) and Melissa expelled Victoria and claimed she was "a very angry person" and they were concerned about her patient's safety. Victoria said she had never had any problems with any patients and asked for evidence which they refused to provide. Victoria "filed" a complaint with Tim Dailey and he didn't do anything to help her. She was let back in with my class because she spent the next year asking. She said she would stand with me because she didn't want to see what happened to her happen to anyone else.

I entered the hearing and along with Daymon and myself were Tim Dailey, Francisco Saldivar, Melissa Sperry, Susan Walker and Robin Finney. Apparently, they had just finished a meeting together where Francisco listened to all of their concerns and determined that they shouldn't expel me. They informed me that I was being placed on academic probation and being given a zero on Robin's assignment. I disputed this as all a form of defamation of character and harassment. I was clearly being singled out and I had already provided evidence to prove that. I said even continuing to have this "hearing" was harassment. Melissa does this to students year after year and continuing to blame her victims and cover up for her was wrong. Francisco promised that he would look into my claims (apparently Tim hadn't given him the information that I had provided over the weekend) and if what I was saying was true he would help me fix everything. Francisco asked for time and patience while he investigated, and I agreed. It was also agreed that Melissa would no longer serve as my advisor.

It was after that exchange that it seemed the meeting was over. We were all getting ready to stand when Susan started muttering about needing to call the nursing board and talk to Liz (my clinical instructor). I asked Susan what she was saying, she looked at me from across the table (she was visibly upset) and said, "You're a very angry person!" I replied "I feel I've conducted myself quite well considering you're trying to destroy my life. I'm not angry, I'm upset." Susan then stammered "You're a very angry person and I have reason to believe you're unsafe with your patients!" This is when Daymon (my ex-husband) spoke up and told her that we had just spoken with Victoria and everything she's alleging is verbatim what she said about Victoria last year. As soon as Daymon pointed this out everyone seemed frozen in place for a moment and finally Francisco asked Daymon and I to wait outside, which we did. We heard raised voices and after a few minutes they all emerged, Francisco and Tim asked Daymon and I to join them for a private meeting with just us four.

We all walked to Tim's office and sat down. Both of them assured me that they believed I was a good student with an excellent record and they would do everything they could to get to the bottom of my complaint and clear my name. I believed them and felt satisfied that this entire situation would be resolved quickly.

Susan showed up at Coquille Valley Hospital the following Tuesday during my clinical and took my instructor, Liz, away for almost two hours for a "private chat." When Liz returned she was upset and told me she didn't want to be put in the middle. I told her that I understood and all I was asking that she

SWOCC-000293

tell the truth, she promised she would. She spoke with Francisco on the phone shortly afterwards and assured him that I am in no way unsafe with my patients. Susan had lied during a formal hearing about something as serious as my patient care in an attempt to have me expelled and this wasn't the first time she had done it.

Today is 5/24/18 and it has now been a month since this whole situation began. I have been harassed by Susan and members of her staff every week and SWOCC has done absolutely nothing to protect me. I trusted Francisco and Tim to keep their word and get to the bottom of this and they simply will not do anything they promised they would. Francisco still has not met with my classmate so she can point out her (and everyone else's) plagiarism. According to Francisco they seem to be having difficulty locating this plagiarism despite us repeatedly telling them where to find it and even what books it came from. He was supposed to sit down with my classmate so she could help them with their struggles on seeing it, something that could be cleared up in minutes, but he refuses to have us show him and I'm finally having to accept that he has no intention of looking at any evidence that will vindicate me. It has become increasingly evident that SWOCC as a whole is participating in an attempt to make this all go away, and by "this" I mean me. They won't look into my claims or the claims of any of my classmates and appear to have decided it's easier to make me go away than to address the blatant corruption throughout their ranks. My grades have not been reinstated and that appears to be the avenue they're attempting to use to get me out. By not investigating they're still able to justify changing my grades to zeros. Despite their failure to help me, I still managed to get my grades back up and that's when I caught Pamela Wick skimming points from my tests and when confronted she laughed and told me they had "academic freedom" to skim my grades and nobody was going to be able to help me.

Yesterday I finally spoke with the SWOCC president, Peggy M. Scott. I felt I had given Francisco and Tim ample time to investigate, but it is now beyond apparent that they're trying to run out the term clock. I pleaded with the president to help me and told her all of the current details, just in case she wasn't fully aware. Unfortunately, Peggy made it very clear that she is the one calling the shots and will defend the corruption to the fullest extent. I told her I would go to the press and file a lawsuit, she told me to go ahead and to her knowledge I don't even have any formal complaints on record at SWOCC. What that means is this entire "investigation" was a hoax to pacify me, Tim never filed or formalized my complaint against the nursing staff! I have emailed Tim twice for an explanation and instructions on launching a *real* complaint, but he won't respond. They know that this community is secluded and rural, there aren't any checks and balances to prevent this type of corruption from occurring, they're convinced they're going to get away with this. I am begging for help. There is evidence to support everything I have said in this statement. Please, do not allow innocent and hard-working students like myself to continue to have their entire life's work destroyed simply to cover up the actions of their teaching staff.

We as students should have rights and protection from this kind of environment and these horrible actions. We looked up to these women as our mentors and we are devastated at what they've done to us. Victoria and myself have agreed we will dedicate the rest of our lives to making this right for ourselves and for others, although hopefully it doesn't take that long. We are filing formal complaints with the Nursing Board, the U.S. Department of Education Inspector General and the ACCSC. We are hoping that someone will look into this and see our evidence and help us find a resolution to these events.


Thank you,

Nicole R. Gililland

SWOCC-000294

Nicole Gililland

NRS 112-04

4/17/18



## Montana Geriatric Education Center

### Musculoskeletal Case Study
### Osteoporosis

**Gayle Hudgins, Pharm. D.**

**Montana Geriatric Workforce Enhancement Program**

A Consortium of
University of Montana, Missoula
MountainPacific Quality Health, Helena
RiverStone Health, Billings
St. Vincent Healthcare, Billings

MONTANA GERIATRIC EDUCATION CENTER

Copyright 2016
Montana Geriatric Education Center

SWOCC-002287

## Geriatric Case Studies

The Montana Geriatric Education Center's goal is to improve health outcomes for older adults in rural Montana via increased knowledge of older adult care and treatment of health problems by health professionals.

This case study is one in a series that presents a geriatric patient with health concerns. The case studies are written from the perspective of a variety of professionals including nurses, pharmacists, social workers and physical therapists. Each case is designed to provide in depth background and information from one of these disciplines. The interprofessional team perspectives have been approached to some degree, but are not comprehensive. It is the expectation that these case studies provide a good basis or starting point to be used in a classroom or training situation in which an interprofessional team will come together to determine how this patient could be managed. Local resources and team member should be utilized in determining a care plan for the patient. Focus should be placed on patient outcomes with the patient and caregivers as members of care team.

## Osteoporosis Case Study Content:

This is a case study of an older woman with osteoporosis. The case will present issues associated with drug therapy, diet, exercise, complications, psychosocial problems, and rehabilitation.

This is a fictional patient; any resemblance to an actual patient is a coincidence.

## Learning Objectives

At the completion of the case study, the learner will be able to:

1. Discuss the need for an interdisciplinary approach to the care of this person with osteoporosis.
2. Describe the roles of the members of the interprofessional team in the care of the person with osteoporosis.
3. Participate in the development a care plan, identifying possible issues/problems and possible solutions in the care of the person with osteoporosis.

### Please Note:

A chart of normal laboratory/test ranges and a glossary are available for download as a reference for all case studies.

SWOCC-002288

# Collaborative Case Study Activity – Setting 1

## Introduction and Hospital Record

| | |
|---|---|
| Patient Name: | Helen Davis |
| Date of Birth: | 12/25/39 |
| Gender: | Female |
| Address: | Anytown, MT |
| Occupation: | Retired librarian |
| Race: | Caucasian |
| Marital Status: | Married |
| Living Arrangement: | Lives with husband in a small city; has two grown children in area. Home has 2 stories, 2 steps to entrance, full bath on second floor only. |
| Insurance: | Medicare |
| Person to Notify: | Husband, John Davis |
| Advance Directive: | Yes |
| Allergies: | NKDA |
| Physician: | Dr. Brown |
| Primary Medical Diagnosis: | Osteoporosis |
| Other Medical Diagnoses: | 1) Mild hyperlipidemia<br>2) Mild hypertension<br>3) Coronary artery disease<br>4) Tendonitis of R. shoulder |
| Previous Procedures: | PTCA, 2006, without recurrence |
| Medications & Treatments: | 1) Simvastatin (Zocor) 20 mg. daily<br>2) ASA daily<br>3) Furosemide (Lasix) 10 mg. daily<br>4) Alendronate (Fosamax) 10 mg. daily<br>5) Calcium + Vit. D 600 mg. daily<br>6) Vit. E, Vit. C, Mg |

SWOCC-002289

## History of Present Illness:

Mrs. Davis presented to the clinic in December of 2010 with some concerns about osteoporosis. She was becoming more stooped and had already lost 1" in height over the last few years. She was 20 years postmenopausal and had never taken hormone replacement therapy. She subsequently received a DEXA scan at that time and was placed on Fosamax 10 mg daily. Over the next year, this seemed to be working well for her and she did not experience any side effects from the medication. In the fall of 2011, she sustained a fracture to her 4th metacarpal on her left hand that she suffered during a fall. She received another DEXA scan in late 2011 with no change. She seemed fairly stable and was only seen yearly after that time. During a repeat exam in 2013, DEXA scores continued to show progression and she was subsequently referred to an endocrinologist to eliminate secondary causes. After a thorough work-up, no cause was found for her worsening osteoporosis. Thyroid studies were normal as well as serum phosphorus, PTH and urine calcium.   A suggestion was made to switch to weekly Fosamax; however, this was not tolerated well and she remains on Fosamax 10 mg q.d.

## Family and Social History:

Mother died at age 40 (CA); Father died at age 57 (CAD); Brother w/ CAD, age 79; Twin sister with osteoporosis and depression. Patient is very active; she walks 1-2 miles/day. She stopped smoking 30 years ago, has an occasional drink. She also drinks a cup of coffee a day. She reports diarrhea and gas with dairy products so avoids them.

## Current Health Status/Summary of Current Problems:

Mrs. Davis is in the clinic today for a follow up visit for her osteoporosis. She reports increased pain in her back and ribs at times, for which she takes additional aspirin. She also reports feeling weak at times with occasional muscle cramps in her legs. She is 5'2" (2010 height 5'4") and 113 lbs.

## Discussion Questions:

1. **Identify and discuss at least 6 risk factors in Mrs. Davis' history that predispose her to osteoporosis.**
   - Age
   - Gender
   - Postmenopausal
   - No hormone replacement therapy
   - Low calcium diet due to lactose intolerance
   - Possible genetic predisposition
   - Petite
   - Caucasian

SWOCC-002290

2. **Which of those risk factors are intrinsic and not amenable to change? Which are extrinsic and can be modified?**

Intrinsic factors would be age, gender, genetics, postmenopausal, race. Although being petite can technically be changed, I'm going to keep it under intrinsic because it is naturally the way Mrs. Davis is.

Extrinsic factors would be her diet and hormone replacement therapy.

3. **Evaluate her calcium intake from her diet and supplements; is it adequate for her age and menopausal status?**

No, not at all.  She lacks adequate calcium intake from her diet and only takes 600 mg of calcium a day. The recommended amount of daily calcium for postmenopausal women is between 1,000-1,500 mg daily depending on the source.

4. **What supplementation would you recommend for vitamin and mineral intake for Mrs. Davis, include doses and patient teaching.**

I would recommend Mrs. Davis double her calcium and vitamin D supplement intake. As far as other vitamins and minerals, she can get most of what she needs from her diet. It is important that she is getting enough protein, magnesium, vitamin K and trace minerals. I would possibly ask Mrs. Davis to keep a food journal so that we might identify any other problem areas.

5. **Evaluate Mrs. Davis' level of physical activity. Based on your readings surrounding osteoporosis, what education do you think is necessary.**

Adequate amounts of exercise are essential in slowing the progression of osteoporosis. Along with her continuing to go for long walks it may also be a good idea to incorporate different types of physical activity. A good one might be water aerobics because it allows for various exercises in an environment that doesn't have a high risk of falls or injuries.

6. **Describe a DEXA scan and its uses. What patient teaching is needed prior to the scan?**

DEXA stands for dual x-ray absorptiometry. This is the most commonly used tool in diagnostic screening for measuring bone density. It is a painless scan and the results are displayed on computer graph and a T-score is calculated. Doctors recommend women in their 40s obtain a baseline scan.

SWOCC-002291

## Medical Record

### Physical Exam and Laboratory Data:

Physical exam reveals a 74-yr old woman who appears younger than her stated age.

HEENT: Normal, no thyromegaly
Heart: RRR, carotids 2+ w/o bruits
Chest: Clear, mild kyphosis
Extremities: Good pulses, no swelling, erythema or edema. Some tenderness in right shoulder area, related to old rotator cuff injury. Neuro: Normal
Vital signs: BP 130/70, P 64, R 15

**LABS:**

|      | Chol (100-200) | TG (30-200) | HDL (39-96) | LDL (80-130) | PTH (1-5.2) | TSH (2.0-5.1) | Ca (8.9-10.1) | P (2.5-4.5) | Cr (0.5-1.4) | K (3.5-5.2) |
|------|------|------|------|------|------|------|------|------|------|------|
| 2013 | 172 | 71 | 44 | 114 |     |     |     |     |     |     |
| 2014 | 180 | 74 | 65 | 100 | 3.5 | 4.12 | 9.4 | 3.2 | 0.9 | 2.9 |

| DEXA scores | L2-L4 | | | re |
|------|------|------|------|------|
|      | T-score | Z-score |      |      |
| 2010 | -4.6 | -2.1 | -2.9 | -1.1 |
| 2011 | -4.5 | -2.0 | -2.9 | -1.2 |
| 2013 | -4.8 | -2.3 | -3.1 | -1.1 |
|      |      |      |      |      |

In discussion with Mrs. Davis, you learn that due to recent financial constraints she has had difficulty obtaining her prescription medications for the past year. Feeling that her cardiac condition was more significant than her osteoporosis, she has been taking her Fosamax 10 mg. every other day to make the prescription last longer. In questioning her further about her medications, you learn that she takes all of daily medications together with her breakfast.

### Discussion Questions:

1. **Develop a problem list for Mrs. Davis, including medical diagnoses as well as unexplained symptoms, psycho/socio/economic issues, etc. From this problem list, develop a nursing care plan for her primary diagnosis of**

SWOCC-002292

**osteoporosis. Include 2 nursing diagnosis, a goal for each and 3 interventions for each (use the care prep template ).**
(See below)

2. **Which additional disciplines might contribute to achieving this plan of care? Provide a brief explanation of why each discipline should be involved in her care.**

   <u>A nutritionist</u>: A nutritionist would be a good member of the team. They would provide good patient education to Mrs. Davis about the type of diet that she should be consuming to best manage her osteoporosis.

   <u>A physical therapist</u>: A physical therapist would be useful in providing Mrs. Davis with teaching on strengthening exercises that will help slow the progression of her osteoporosis.

3. **Identify and prioritize the areas of patient education that would benefit Mrs. Davis the most. Explain your choices.**

   I think Mrs. Davis understand the importance of compliance with her medications, it just seems that she lacks the resources. As a nurse I could find resources in her community that might help her afford her medications, so I would educate her on what I found.

   Besides addressing medication compliance, I would reiterate the teachings from the nutritionist and physical therapist and make sure she understands their instructions.

4. **How will you know you have met your nursing goals from #1?**
   When Mrs. Davis has signed up for community prescription resources and can comply with her medications, the first nursing goal will be met.
   When Mrs. Davis can verbalize what she should (and should not) be eating in her diet, the second nursing goal will be met.

SWOCC-002293

## Collaborative Case Study Activity – Setting 2

### Learning Objectives

At the completion of the case study, the learner will be able to:

1. Identify potential contributions from members of the interdisciplinary team to enhance patient outcomes and prevent complications in the institutional setting.
2. From your discipline, name potential barriers to this person's return to independent living.
3. Participate in the formulation a plan for her return to her home, to increase her safety and decrease her fall risk.

---

## Hospital Admission

---

### Hospitalization for Fractured Hip

Six months later, in the late fall, Mrs. Davis slipped on ice while out walking and fell, fracturing her left hip. She is admitted to the hospital through the emergency room and is taken to surgery for repair after a medical evaluation found her a good candidate for surgery. ORIF with hemiarthroplasty of the L proximal femur is successfully completed.

Post-op orders include: Lactated Ringers at 100 ml/hr, morphine 10 mg IM every 4 hours as needed for pain, IV famotidine (Pepcid) 20 mg every 12 hours due to GI distress post-op, cefazolin (Ancef) 1g IV every 8 hr X 3 doses.

Has quite a bit of hip and back pain in the immediate post-op period, leading to maximum doses of morphine. Patient becomes restless and confused with hallucinations, particularly in the evening. Evaluation by her internist leads to discontinuing IM morphine, replaced with hydrocodone/acetaminophen 5 mg/325 mg (Lortab) 1 or 2 every 4 to 6 hours as needed for pain. Her IV famotidine (Pepcid) is converted to the oral route and she is started on risperidone (Risperdal) 3 mg. daily forconfusion and hallucinations. Her aspirin and furosemide are restarted on the second day.

She finally starts on PT on day 3 of the admission but complains of dizziness and lightheadedness, almost resulting in a fall. She is found to be hypotensive so her diuretic therapy for hypertension is discontinued. On day 4 of her admission, she is making progress in PT but is complaining of constipation. Review of her intake/output shows that she has not had a bowel movement since surgery; evaluation of her medications shows that she has an order for docusate 100 mg. daily, which was started on day 3 when she began taking oral medications.

**Discussion Questions:**

1. **Provide your perspective on how the following items could be best managed:**
   a. Pain- Mrs. Davis appears to have possibly struggled with toxicity from the anesthesia/pain management. Switching to the Norco appears to have helped. We should be using alternate methods of pain management such a heat/cold therapy, music, pillows and adjustments in order to minimize need for narcotic medication.
   b. Constipation- Ducusate is a stool softener and is a good start. However, because of the narcotic pain medications causing such severe constipation, we should contact her provider to see about combining the docusate with another method of constipation relief and hopefully see results.
   c. Hypotension- Discontinuing the anti-hypertensives will hopefully resolve the hypotension, but it should be monitored closely, and Mrs. Davis should stay as hydrated as possible to assist with both the constipation and hypotension.
   d. Reduced functional mobility- Range of motion on the rest of her body is important as well as physical therapy with the effected side. The doctor may order use of a sequential compression device for DVT prevention.
   e. Assistance required for self-care- Discharge planning should start at admittance. We should already be working with Mrs. Davis and her family on education of self-care. Whenever a nurse or CNA assists Mrs. Davis, we should be showing her and her family what we are doing and why.
   f. Nutrition- We're at an advantage with her being in the hospital because we are providing her meals. This is a great opportunity to reiterate what type of foods she should be consuming.
2. **Create a care plan for this admission using the care prep template.**
   (See below)
3. **What recommendations would you provide to reduce Mrs. Davis' risk for falls?**
   Depending on what her doctor and physical therapist decide, we will probably be implementing the use of a walker to assist Mrs. Davis with balance. Patient teaching on devices implemented will be important in preventing falls.
4. **Based on the above information what discharge setting do you think would be most appropriate for Mrs. Davis at this point? Explain your choice.**

   I believe Mrs. Davis should be transferred to a postsurgical care facility on a temporary stay while she heals. Mrs. Davis lives in a house with a lot of stairs and minimal facilities on the first floor. Also Mrs. Davis is struggling in her recovery and could benefit greatly from being cared for by trained professionals for now.

SWOCC-002295

On day 5, she is judged ready for discharge. Her LLE weight bearing is limited to 30% for next 6 weeks. Her elderly husband is unable to provide care for her in their home, which is not set up for a walker. Neither of their children can take her into their homes due to lack of space, too many stairs, and working spouses. The decision is made to admit her to a LTC facility near the family home for a short stay for rehabilitation.

## Long-Term Care Admission

### LTC Admission for Rehabilitation

Medication list on transfer which is used as the admitting orders for the LTC facility includes:

Hydrocodone/acetaminophen 5 mg/325 mg (Lortab) 1 to 2 every 4 to 6 hours prn pain
Acetaminophen 325 mg, 1 to 2 every 4 to 6 hours prn headache or minor pain Famotidine (Pepcid) 20 mg b.i.d.
Risperidone (Risperdal) 2 mg daily
Docusate 100 mg daily
Alendronate 10 mg daily
Ferrous sulfate 325 mg t.i.d.
Milk of magnesia 30 ml prn for no BM in 2 days
Bisacodyl suppository prn for no BM in 2 days

Patient shows good progress after 1 week of PT, felt to be ready for discharge in another week. BP's have gradually risen to 150/90. Pain has been minimal with only a few doses of Lortab used; prn acetaminophen has been adequate.  Constipation has continued to be a problem with frequent use of prn laxatives. Patient complains of dizziness and tiredness, not feeling "normal" mentally. She has had no confusion or hallucinations since admission to the LTC facility.

### Discussion Questions

1. **Which disciplines should be included on the LTC team caring for Mrs. Davis? Explain your choices.**
   Besides the nutritionist and physical therapist (that should still be involved) we should be consulting with her cardiologist. Caring for her will also be a team of CNAs and nurses and of course her PCP.

2. **What goals will Mrs. Davis need to achieve in order to return home? Prioritize and explain your choices.**
   Mrs. Davis will need to be able to say/demonstrate how to care for herself again in her home environment. Tasks like climbing stairs, bathing, maintaining balance as well as maintain her baseline mental status.

SWOCC-002296

3. **What services will be needed following her discharge home?**

   Home Health Services will be a valuable resource. The same members of her team should still be involved as needed.

4. **Identify 2 to 3 criteria by which the team will determine whether Mrs. Davis achieves a "good" outcome?**

   A "good" outcome will be based on getting Mrs. Davis as close to her previous state as possible. The biggest criteria for that would be making sure mental status is alert and orientated. Of course the other big one is in her ability to get around an ambulate effectively.

5. **Write a care plan using the care prep template for the long term care setting.**

SWOCC-002297

## Geriatric Based Table of Normal Laboratory Values

| Comprehensive Metabolic Blood Panel[1] | |
|---|---|
| Test | Normal Range for and Adult |
| Glucose: | |
| Preprandial | <115 mg/dL |
| Fasting | 60-110 mg/dL |
| Non-fasting | <120 mg/dL |
| Calcium | 8.6-10.3 mg/dL |
| Albumin | 3.2-5 g/dL |
| Total protein | 6.5-7.9 g/dL |
| Sodium | 134-149 mEq/L |
| Potassium | 3.5-5.2 mEq/L |
| CO2 | 23-30 mEq/L |
| Chloride | 95-108 mEq/L |
| BUN | 7-20 mg/dL |
| Creatinine | 0.5-1.4 mg/dL |
| ALT | <35 IU/L |
| AST | <35 IU/L |
| Bilirubin | 0.1-1.2 mg/dL |
| TSH (55-87 years) | 0.5-8.9 mIU/L |

| Complete Blood Count with Differential[1] | | |
|---|---|---|
| Test | Normal Range for an Adult | |
| | Women | Men |
| Red Blood Cell Count | 4.0-4.9 mill/mm³ | 4.5-5.5 mill/mm³ |
| Hemoglobin | 12.0-15.0 g/dL | 13.5-16.5 g/dL |
| Hematocrit | 36-44% | 41-50% |
| RDW | <14.5% | |
| MCV | 80-100 fL | |
| MCH | 26-34 pg | |
| MCHC | 31-37% | |
| Platelet Count | 150-450 X10³/mm³ | |
| White Blood Cell Count | 4.5-11.0 X10³/mm³ | |
| ANC | >2000/mm³ | |
| Lymphocytes | 24-44% | |
| Monocytes | 3-6% | |
| Eosinophils | 0-3% | |
| Basophils | 0-1% | |
| Segs | 35-66% | |
| Bands | <11% | |

| Lipid Fraction/Cardiac Risk Assessment[1,2] | | |
|---|---|---|
| Test | Normal Range for an Adult (goals can vary per patient) | |
| Total cholesterol | ≤200 mg/dL | |
| HDL cholesterol | 40-60 mg/dL | |
| LDL cholesterol | <160 mg/dL | |
| Triglycerides | 45-155 mg/dL | |
| Homocysteine (>59 years) | 5.8-11.9 µmol/L | |
| | Women (65-74 years) | Men (65-74 years) |
| hs-CRP | 0.30-16.58 mg/L | 0.33-18.47 mg/L |

| Blood Pressure[1] | |
|---|---|
| Test | Normal Range for an Adult |
| Blood Pressure | <120/80-150/90 mmHg (goals can vary per patient) |

**References:**

1. Semla TP, Beizer JL, Higbee MD. Lexi-Comp's Geriatric Dosage Handbook. 17th ed. Hudson (OH): Lexi-Comp; 2012.
2. Jacobs DS, DeMott WR, Oxley DK. Lexi-Comp's Laboratory Test Handbook. 3rd ed. Hudson (OH): Lexi-Comp; 2002.

SWOCC-002298

## Case Study GLOSSARY

| | |
|---|---|
| ABI | Ankle-Brachial Index |
| ACC | American College of Cardiology |
| ACCF | American College of Cardiology Foundation |
| ACEI | Angiotensin-Converting Enzyme Inhibitor |
| ACP | American College of Physicians |
| ADR | Adverse Drug Reaction |
| AHA | American Heart Association |
| ALLHAT | Antihypertensive and Lipid-Lowering Treatment to Prevent Heart Attack Trial |
| ANA | Antinuclear Antibody |
| ApoB | Apolipoprotein B |
| ARB | Angiotensin Receptor Blocker |
| ASA | Aspirin |
| ASCVD | Atherosclerotic Cardiovascular Disease |
| ATP III | Adult Treatment Panel III |
| BAS | Bile Acid Sequestrants |
| BB | Beta-blocker |
| BMI | Body Mass Index |
| BP | Blood Pressure |
| BPH | Benign Prostatic Hypertrophy |
| BUN | Blood Urea Nitrogen |
| C&S | Culture and Sensitivity |
| C/O | Complains Of |
| CA | Cancer |
| CABG | Coronary Artery Bypass Graft |
| CAC | Coronary Artery Calcium |
| CAD | Coronary Artery Disease |
| CCB | Calcium Channel Blocker |
| CGA | Contact Guard Assist |
| CHD | Coronary Heart Disease |
| CIMT | Carotid Intima-Media Thickness |
| CK | Creatinine Kinase |
| CKD | Chronic Kidney Disease |
| CNS | Central Nervous System |
| CRP | C - reactive protein |
| CT | Computed Tomography Scan |
| CTA | Clear to Auscultation |
| CVA | Cerebrovascular Accident |
| CVD | Cardiovascular Disease |
| CYP450 | Cytochrome P450 |
| DASH | Dietary Approaches to Stop Hypertension |
| DBP | Diastolic Blood Pressure |

SWOCC-002299

DEXA           Dual energy X-ray absorptiometry
DOE            Department of Energy
ECG            Electrocardiogram
EOMI           Extra Ocular Muscles Intact
FH             Family History
eGFR           Estimated Glomerular Filtration Rate
GI             Gastrointestinal
HBP            High Blood Pressure
HCT            Hematocrit
HCTZ           Hydrochlorothiazide
HDL            High-Density Lipoprotein
HEENT          Head Eyes Ears Nose and Throat
Hemiarthroplasty Joint replacement where one-half of the joint is replaced with a
               plastic prosthesis.
HF             Heart Failure
HMG-CoA        3-Hydroxy-3-Methyl-Glutaryl Coenzyme A Reductase
HOPE           Heart Outcome Prevention Evaluation Study
HP2010         Healthy People 2010
HPI            History of Present Illness
HR             Heart Rate
Hs-CRP         High-sensitivity C - reactive protein
HTN            Hypertension
IBW            Ideal Body Weight
IDL            Intermediate-Density Lipoprotein
IHD            Ischemic Heart Disease
IHS            Indian Health Service
ISA            Intrinsic Sympathomimetic Activity
Kyphosis       A deformity of the spine characterized by extensive flexion.
LAD            Left Anterior Descending
LBP            Low Back Pain
LDL            Low-Density Lipoprotein
LFT            Liver Function Test
LLE            Left lower extremity

LOC            Level of Consciousness
LV             Left Ventricular
MI             Myocardial Infarction
NAD            No Acute Distress
NCEP           National Cholesterol Education Program
NG             Nasogastric
NHANES         National Health and Nutrition Examination Survey
NHLBI          National Heart Lung and Blood Institute
NKDA           No Known Drug Allergies
NSAID          Nonsteroidal Anti-inflammatory Drug

SWOCC-002300

| | |
|---|---|
| NTG | Nitroglycerin |
| oRiF | Open reduction with internal fixation |
| OTC | Over-the-Counter |
| P | Pulse |
| PCA | Patient-controlled Analgesia |
| PCNA | Preventative Cardiovascular Nurses Association |
| PE | Physical Exam |
| PERRLA | Pupils Equal Round and Reactive to Light and Accommodation |
| PMH | Past Medical History |
| PO | Orally |
| PRN | As Needed |
| PTCA | Percutaneous Transluminal Coronary Angioplasty |
| PTH | Parathyroid Hormone |
| ROS | Review of Systems |
| RR | Respiration Rate |
| RRR | Regular Rate and rhythm |
| SCAI | Society for Cardiovascular Angiography and Interventions |
| SBP | Systolic Blood Pressure |
| SCr | Serum Creatinine |
| SH | Social History |
| SOB | Shortness of Breath |
| STS | Society of Thoracic Surgeons |
| T | Temperature |
| T-score | A measure of bone density that is the number of standard deviations below that of a normal 30-year old woman or 40-year old man. |
| TC | Total Cholesterol |
| TG | Triglycerides |
| TIA | Transient Ischemic Attack |
| TLC | Therapeutic Lifestyle Changes |
| TM | Tympanic Membrane |
| TOD | Target Organ Damage |
| TPN | Total Parenteral Nutrition |
| TSH | Thyroid Stimulating Hormone   ULN    Upper Limit of Normal |
| VLDL | Very Low-Density Lipoprotein |
| VS | Vital Signs |
| WBC | White Blood Cells |
| WNL | Within Normal Limits |
| Z-score | A measure of bone density that is the number of standard deviations below that of someone of equal age and sex. |

SWOCC-002301

**NURSING CARE PREPARATION**

Student Name:  Nicole R. Gililland  Date of Care:  3/13/2011

| | |
|---|---|
| Unit/Room Number: 313<br>Age:  79<br>Gender: Female<br>Erikson's Developmental Level: Integrity Vs. Despair | Date of Admission: 3/10/13<br>Ethnic/Cultural Preferences: Christian<br>Allergies: Dairy Products<br>Code Status: Full Resuscitation |

<u>Primary Diagnosis:</u>

Osteoporosis

<u>Co-morbidities:</u>

Mild hyperlipidemia

Mild hypertension

Coronary artery disease

Tendonitis of R. shoulder

Post-surgical

<u>Discharge Plan (add day of clinical):</u>

<u>Integrated Pathophysiology</u> (what is going on with your patient; include comorbidities, personal history, labs and medication; APA format, no more than three pages in length, third page is the reference page, does not need a cover page) <u>(See Below)</u>

<u>Data Collection</u> (Record exactly what is written on the personal information sheet [aka Kardex]. Any assessment/elaboration should be made on the assessment sheet):

| | |
|---|---|
| Diet (Type): Low sodium | IV (Fluid type, rate, access type): Saline lock |
| I&O (MD order/Nursing Order/Frequency): Daily | CBG (Yes/No, frequency): No |
| Fall Risk/Safety Precautions (Yes/No): Yes | Activity (What is ordered): As tolerated |
| Wound Care (Yes/No): Yes | Oxygen (Yes/No, Delivery method, how much): No |
| Drains (Yes/No, Type): No | Last BM: 3/10/11 |
| Other Tubes: No | |

SWOCC-002302

SWOCC-002303

# CURRENT MEDICATIONS

List ALL regularly scheduled and prn medications scheduled on your client.

**(Due morning of clinical)**

| Generic & Trade Name | Classification (Be specific, type of antibiotic, anti-hypertensive, etc.) | Dose/Route/ Rate if IV | Onset/Peak | Intended Action/Therapeutic use. Why is this client taking med? | 1 side effect 1 Adverse reactions | Nursing Implications for this client that is related to the identified side effect and adverse reaction identified in the previous column. |
|---|---|---|---|---|---|---|
| Simvastatin | Lipid Lowering Agent | 20 mg | Several Days/2-4 Weeks | High cholesterol | **Heart Burn/ Drug Induced Hepatitis** | **Obtain dietary history, especially with regard to fat consumption.** |
| Alendronate | Bone Resorption Inhibitor | 10 mg | 1 mo/3-6 mo | Treatment of osteoporosis | Flatulence/Esophageal Cancer | Asses patient for osteoporosis. |
| ASA | Antipyretics | | 5-30 min/1-3 hours | Family history and CAD, mild hypertension | Nausea/GI Bleeding | Asses for fever and note associated signs. |
| Furosemide **Hospital** | Diuretic | 10 mg | 30-60 min/1-2 hrs | Fluid retention with CAD | Rash/Toxic Epidermal Necrolysis | Asses for allergies to sulfonamides. |
| Morphine | Opioid analgesics | | 10-30 min/30-60 min | For acute pain | Unusual Dreams/ Respiratory Depression | Asses risk for opioid addiction, abuse or misuse prior to administration. |
| Famotidine | Antiulcer Agent | 20 mg | Within 60 min/1-4 hours | Anti-ulcer protection | Dizziness/ Arrhythmias | May cause spike in serum transaminases and serum creatinine. |
| cefazolin | Anti-infective | 1 gram IV x 3 | Rapid/end of infusion | Prevention of infection | Cramps/ Seizures | Asses for infections |
| Risperidone | Antipsychotic/ Moos stabilizer | 2 mg | 1-2 weeks/Unknown | Treatment of hallucinations | Spike in dreams/Neuroleptic Malignant Syndrome | Asses weight and BMI throughout therapy |
| Docusate | Laxatives | 100 mg | 12-72 hours/Unknown | Treatment of constipation | Mild Cramps/Diarrhea | Asses for abdominal distension, bowl sounds and odd BM's |
| Norco Center | Opioid agonists/nonop ioid analgesic | 5 mg/ 325mg | 10-30 min/30-60 min | Analgesic, treatment of pain | Unusual Dreams/Respiratory Depression | Asses for constipation |
| Acetaminophen | Antipyretic | | 0.5-1 hr/ 1-3 hrs | Analgesic, treatment of pain | Constipation/Hepato toxicity | Asses for rash throughout theapy |

SWOCC-002304

| Care Center | | | | | | |
|---|---|---|---|---|---|---|
| Milk of Magnesia | Laxative | 30 ml | 3-6 hrs/Unknown | Treatment of constipation | Flush/Diarrhea | Asses patient for distended abdomen, bowl sounds and odd BM's |
| Bisacodyl | Laxative | Suppository | 15-30 min/Unknown | Treatment of constipation | Diarrhea/Hypokalemia | Asses patient for distended abdomen, bowl sounds and odd BM's |

PATIENT CARE PLAN

| Patient Data: 79 y/o post-surgical/hip |
|---|

**HOME**

| Problem #1 Risk for deficient knowledge related to current health status and prescribed health therapies as evidence by patient states she does not comply with daily medications. |
|---|

| Desired Outcome: Patient will verbalize resources located that allow her to adhere to recommended daily prescriptions. |
|---|

| Nursing Interventions | Client Response to Intervention |
|---|---|
| 1.  Assist patient in finding resources available pertaining to prescriptions. | 1. |
| 2.  Educate patient on importance of daily medication. | 2. |
| 3.  Communicate often with the patient. Request feedback regarding what has been taught. | 3. |

| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): |
|---|

| Problem #2 Risk for imbalanced nutrition: Less than body requirement related to inadequate intake of foods/supplements containing calcium and vitamin D as evidence by patient intake below daily recommended values. |
|---|

| Desired Outcome: Within 24 hours of instruction, the patient demonstrates adequate intake of calcium and vitamin D. |
|---|

| Nursing Interventions | Client Response to Intervention |
|---|---|
| 1.  Provide education on recommended daily values of vitamin D and calcium. | 1. |
| 2.  Assess patient knowledge by asking patient to plan a 3-day menu with sufficient intake of calcium and vitamin D. | 2. |
| 3.  Teach patient about adequate sunlight exposure to prevent vitamin deficiency. | 3. |

| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): |
|---|

19

SWOCC-002305

**Hospital**

| Problem #1 Risk for acute confusion and hallucinations related to drug toxicity following surgical procedure as evidence by patient's failure to return to baseline mental state postoperatively. | |
| --- | --- |
| Desired Outcome: The patient verbalizes orientation to person, place, and time; exhibits intact signature; and is free of symptoms of injury caused by neurosensory changes. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Perform a baseline assessment of the patient's personality characteristics, LOC, and orientation. Enlist aid of the patient's significant others to help determine changes in behavior. | 1. |
| 2. Have patient demonstrate daily signature. | 2. |
| 3. Ask patient is she is experiencing hallucinations or confusion. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

| Problem #2 Risk for falls related to weakness and difficulty with balance as evidence by patient injured due to fall. | |
| --- | --- |
| Desired Outcome: Patient will experience no falls during stay. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Assess gait and monitor for weakness and difficulty with balance. | 1. |
| 2. Teach patient to maintain sitting position before standing. | 2. |
| 3. Teach patient on use of walking devices. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

20

SWOCC-002306

| Problem #3 Risk for infection related to post-surgical incision as evidence by patient having invasive surgical procedure. | |
|---|---|
| Desired Outcome: Patient will remain free of infections. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Monitor patient incision/dressing closely. Assess condition and report signs of infection. | 1. |
| 2. Monitor for fever or chills. | 2. |
| 3. Administer prescribed antibiotics. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

**Care Facility**

| Problem # Risk for acute pain/impaired comfort related to surgical procedure as evidence by patient had surgery. | |
|---|---|
| Desired Outcome: Keep patient pain low on her pain scale, under 4 during rotation. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Administer prescription analgesics and prescribed and as requested. | 1. |
| 2. Assist patient into positions of comfort. | 2. |
| 3. Assess for behavioral and physiological indicators of pain. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

21

SWOCC-002307

| Problem #2 Risk for constipation related for opioid analgesics. | |
|---|---|
| Desired Outcome: Patient will experience bowel movements on her regular baseline schedule. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Administer prescribed medications to increase motility. | 1. |
| 2. Encourage movement and exercise. | 2. |
| 3. Encourage adequate fluid intake. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

| Problem #3 Impaired Physical Mobility related to pain, decreased strength and weakness as evidence by injury and post-surgical status. | |
|---|---|
| Desired Outcome: Optimally by discharge patient shows return to baseline ambulation. | |
| Nursing Interventions | Client Response to Intervention |
| 1. Evaluate and correct factors limiting motility. | 1. |
| 2. Reiterate teaching and instructions from physical therapist. | 2. |
| 3. Evaluate patient progress regularly. | 3. |
| Evaluation (evaluate goal & interventions, what worked/what didn't, what would you adapt if needed): | |

22

SWOCC-002308

**Pathophysiology of Osteoporosis**

Primary osteoporosis is a metabolic bone disease characterized by low bone mass and microarchitectural deterioration of bone tissue, leading to enhanced bone fragility and increased fracture risk.[1] It also has normal mineral-to-collagen ratio. Primary osteoporosis represents bone mass loss that is unassociated with any other illness and is related to aging and loss of the gonadal function in women and the aging process in men.

Secondary osteoporosis can result from a variety of the chronic conditions that significantly contribute to bone mineral loss, or it can result from the effects of medications and nutritional deficiencies

Basic mechanisms responsible for development of osteoporosis are poor bone mass acquisition during growth and development and accelerated bone loss in the period after peak bone mass is achieved. Both processes are modulated by environmental and genetic factors.

About two thirds of the risk for fracture in postmenopausal women is determined by premenopausal peak bone mass. Peak bone mass is higher in blacks than in whites and Asians, and it is higher in men than women. Approximately half of the bone mass is accumulated during pubertal development. This is associated with the increase in sex hormone levels and is almost completed with closure of the end plates. There is only minimal additional accumulation of the bone minerals during the next 5 to 15 years (skeletal consolidation). Peak bone mass is achieved during the third decade of life.

Studies in twins and mother-daughter pairs suggest that 40% to 80% of the variability in the bone mass is determined by genetic factors. The genes implicated in osteoporosis include those for the estrogen receptor, transforming growth factor-β, and apolipoprotein E and collagen. Bone loss, in contrast, appears to be mostly determined by environmental factors (nutritional, behavioral, and medications). However, genetic factors also play a role, mostly acting on a person's estrogen status.

23

**Pathophysiology of General Anesthesia**

Two factors make obtaining a detailed description of how these agents act difficult. The first is that volatile anesthetics, unlike most of the drugs used in medicine, bind only very weakly to their site(s) of action. As a result, high concentrations, often more than 1,000 times greater than for typical receptor- or protein-targeting drugs, are needed to achieve an anesthetic state. This makes it tricky to obtain structural details of anesthetics bound in a specific manner to a protein. It also affects the function of many proteins in nerve cell membranes, making it challenging to ascertain which of them are the key mediators of anesthetic action. A second problem is that volatile anesthetics tend to partition into lipids and exert their primary effects on synaptic neurotransmission by interacting with proteins in a lipid environment. It is harder to gain detailed structural information for membrane proteins than it is for water-soluble proteins. Such structural data are essential for understanding how anesthetics interact with proteins and, more importantly, alter their function. Because of the lack of structural data for membrane proteins both in the presence and absence of anesthetics, it remains unclear whether anesthetics exert their primary effects by direct interaction with these proteins, or indirectly via interaction with the lipids surrounding them.

Despite these limitations, researchers are taking advantage of a variety of methods to better discern how anesthetic agents induce an anesthetic "state" at the molecular level. The term state is in quotes, because a wide variety of agents--ranging from single atoms such as xenon to polycyclic hydrocarbons--can produce insensibility to pain and loss of awareness. The molecular targets for these different agents do not appear to be the same. Thus, the notion that there is a single molecular mechanism of action for all anesthetic agents is probably an oversimplification.

24

SWOCC-002310

**Pathophysiology of CHF**

The syndrome of CHF arises as a consequence of an abnormality in cardiac structure, function, rhythm, or conduction. In developed countries, ventricular dysfunction accounts for the majority of cases and results mainly from myocardial infarction (systolic dysfunction), hypertension (diastolic and systolic dysfunction), or in many cases both. Degenerative valve disease, idiopathic cardiomyopathy, and alcoholic cardiomyopathy are also major causes of heart failure. Heart failure often occurs in elderly patients who have multiple comorbid conditions (eg, angina, hypertension, diabetes, and chronic lung disease). Some common comorbidities such as renal dysfunction are multifactorial (decreased perfusion or volume depletion from overdiuresis), whereas others (eg, anemia, depression, disorders of breathing, and cachexia) are poorly understood. CHF indicates not only an inability of the heart to maintain adequate oxygen delivery; it is also a systemic response attempting to compensate for the inadequacy.

The determinants of cardiac output include heart rate and stroke volume. The stroke volume is further determined by the preload (the volume that enters the left ventricle), contractility, and afterload (the impedance of the flow from the left ventricle). These variables are important in understanding the pathophysiologic consequences of heart failure and the potential treatments. Furthermore, an appreciation of cardiopulmonary interactions is important in our understanding of heart failure. In the simplest terms, the heart can be viewed as a dynamic pump. It is not only dependent on its inherent properties, but also on what is pumped in and what it must pump against. The preload characterizes the volume that the pump is given to send forward, the contractility characterizes the pump, and the afterload determines what the heart must work against. The preload is often expressed as the end-diastolic pressure/volume of the left ventricle and is clinically assessed by measuring the right atrial pressure.

25

SWOCC-002311

**References**

Figueroa, M. S. (2006). Congestive Heart Failure: Diagnosis, Pathophysiology, Therapy, and Implications for

Respiratory Care. *RC Journal, 104*(5). doi:10.15417/1881


Pathophysiology of Congestive Heart Failure. (n.d.). Retrieved January 23, 2018, from

http://medreviews.com/journal/reviews-in-cardiovascular-medicine/vol/4/no/0/pathophysiology-

congestive-heart-failure

26

SWOCC-002312

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

```
--------------------------------------------------
NICOLE GILILLAND,          )
an individual,             ) Case No.:
                           ) 6:19-cv-00283-AA
        Plaintiff,         )
                           )
    vs.                    ) Deposition of:
                           )
SOUTHWESTERN OREGON        ) ROBIN FINNEY
COMMUNITY COLLEGE DISTRICT )
BY AND THROUGH ITS BOARD   )
OF EDUCATION, an Oregon    )
Community College District )
Board; SOUTHWESTERN        )
OREGON COMMUNITY COLLEGE,  )
an Oregon community        )
college; PATTY SCOTT,      )
an individual; TIM DAILY,  )
an individual; FRANCISCO   )
SALDIVAR, an individual;   )
SUSAN WALKER, an           )
individual; MELISSA        )
SPERRY WALKER, an          )
individual; and PAMELA     )
WICK, an individual,       )
                           )
        Defendants.        )
_____)
```

April 16, 2021 - 4:00 p.m.

Proceedings recorded via Zoom teleconference and
transcribed simultaneously via stenographic means
by reporter Marsha Beuchert, RPR

     1          A.    Yeah.  Uh-huh (affirmative).

     2          Q.    Let's put up Exhibit 96, which is SWOCC

     3   4582.  It's actually a collection of -- random

     4   collection of documents.  We'll start with the last

     5   page.

     6              (EXHIBIT 96 MARKED.)

     7          Q.    BY MR. MARK:  Go ahead and review this.  If

     8   you need to make it bigger, we can make it bigger for

     9   you.

    10          A.    No, I can see it okay.

    11          Q.    First question, do you recall these events

    12   much or --

    13          A.    This helps quite a bit because I hadn't

    14   remembered everything, but I do remember now filling

    15   this out for -- I believe Susan asked me to complete

    16   that.

    17          Q.    Okay.  Do you recall the events leading up

    18   to this?

    19          A.    To the -- yeah.  So I had gone through and

    20   graded assignments.  Like the paper said, she --

    21   Nicole originally got a 77 percent on the assignment.

    22   I don't actually remember the assignment

    23   specifically, but it looks like they had to write a

    24   care plan.  I know they had to write -- in a care

    25   plan they usually had to write a pathophysiology, if



1  that's what the assignment was.  I really can't

2  remember the assignment, which is sad.

3          When I read Nicole's paper, I knew most

4  likely that there was plagiarism because you can tell

5  when you're reading papers if it's not somebody's

6  words, or if the wording changes.  You know, it

7  doesn't match up.  I was pretty sure there was

8  plagiarism.

9          So I had taken her paper, which I

10 originally graded as 77 percent, to Melissa, who is

11 her advisor, and expressed that I had concerns about

12 this paper, that I suspected there was probably

13 plagiarism.  We didn't have necessarily a great

14 system to filter through papers for plagiarism that

15 was used college-wide.  So I hadn't actually gone any

16 further, but this says that I put a sentence in the

17 paper.  I thought it was Melissa who did that but,

18 regardless, I do remember a block of the paper being

19 just typed in to, like, Google or whatever, and it

20 came up as a complete copy of something straight off

21 the web page -- some web page.

22          So I was discussing that with Melissa.  The

23 nursing handbook was very clear about what happens

24 with plagiarism, so her grade was changed to a zero

25 percent.



1                    REPORTER'S CERTIFICATE

2    STATE OF UTAH          )
                            )  ss.
3    COUNTY OF SALT LAKE  )

4                    I, Marsha Beuchert, Registered
     Professional Reporter do hereby certify:
5
                     That prior to being examined, the
6    witness ROBIN FINNEY was by me duly sworn to tell the
     truth, the whole truth, and nothing but the truth;
7
                     That said deposition was taken down by
8    me in stenotype on April 16, 2021 at the place
     therein named, and was thereafter transcribed, and
9    that a true and correct transcription of said
     testimony is set forth in the preceding pages;
10
                     I further certify that, in accordance
11   with Rule 30(e), a request having been made to review
     the transcript, a reading copy was sent to Mr. Reese
12   for the witness to read and sign and then return to
     me for filing with Attorney Mark.
13
                     I further certify that I am not of kin
14   or otherwise associated with any of the parties
     interested in the outcome thereof.
15
                     WITNESS MY HAND this 29th day of
16   April, 2021.

17

18                        _____
                            MARSHA BEUCHERT, RPR
19

20

21

22

23

24

25



# NRS 233 01 - Pathophysiological Processes II

---

**Musculoskeletal Case Study**                    ‹Previous    *Nicole's assignments*    Next›
Assignments in Week 3

By **Nicole Rene Gililland** ⓘ ✉            ‹Previous    *Other students*    Next›

---

Nicole's final grade is          📝Change this grade

**0/35, F (0%)**

Reopen the assignments to let Nicole do more work on it

View Nicole's detailed history for this assignment

Notes

This assignments was turned in **on time** on **Friday, April 20 at 11:48 PM**



📄Nicole.docx
feedback from Robin S
Finney, 4/25/2018 10:58
AM

Nicole,

You will need to make an
appointment to see your
advisor as soon as possible
please.

Robin

feedback from Robin S
Finney, 4/25/2018 1:44 PM

💬 Add a feedback comment    📝 Add a feedback file

Here are the files Nicole has uploaded for this assignments:

SWOCC-001636

Coursework - Student Assignment Faculty View | Coursework | NRS 23...          https://mylakerlink.socc.edu/ICS/Academics/NRS/NRS__233/2017_SP...

Osteoporosis Case Study - Student Version Edited.docx (.docx, 221K, 4/20/2018 11:47 PM)

 Download all of Nicole's files

Do you have a corrected copy of one of these files to return? You can upload files in the
Feedback area above.

By **Nicole Rene Gilliland** ⓘ ✉              ◄ Previous    *Other students*    Next ►

   **Musculoskeletal Case Study**              ◄ Previous    *Nicole's assignments*    Next ►
Assignments in Week 3

4/25/18

1452 Nicole burst into office stating Robin (nursing faculty) has instructed her to make an appt with me about her grade changing to a zero.

Informed Nicole that I was reviewing information and would be contacting her to make an appt. Nicole insists that it be dealt with right now. Robin is in room and proceeds to tell Nicole that the reason for the zero's is that plagiarism has been found in the pathophysiology. Robing comments that she was concerned about the care planning of the assignment and had brought that concern to me as Nicole's advisor  and it was discovered that the pathophysiology papers she has been submitting have been copied word for word from online sources.

Nicole states that her clinical instructor. Liz, told her it was ok to copy and paste from reputable sources for patho requirements of clinical papers. Nicole insists that this instructor call Liz and talk to her immediately.

Responded to Nicole that I was not calling Liz right now but would be reaching out to her. Also discussed that copy and paste from any source is not acceptable per student handbook. Suggested she re-read the handbook over the weekend as that is the source I would be using as I review material.

Nicole is very agitated, raises voice and states she has read the handbook and cited her material as she had been instructed and wants to discuss this right now.

Once again she is told that I will not discuss this until I have seen all the information and have had a chance to review the handbook.; once again suggesting she also review the handbook this weekend.

From Melissa

SWOCC-000144

**To:**      Gililland, Nicole R[nicole.gililland@email.socc.edu]
**Cc:**      Walker, Susan[swalker@socc.edu]
**From:**    Sperry, Melissa J
**Sent:**    Wed 4/25/2018 3:38:20 PM
**Subject:** Pathophysiology papers
Nicole G Student Deficiency.pdf

Hello Nicole

It has been identified that many of your pathophysiology papers have been copied directly from online resources. This is known as plagiarism and is not acceptable per policy.

Your pathophysiology regarding General Anesthesia was copied from Scientific America Online:
https://www.scientificamerican.com/article/how-does-anesthesia-work/

How does anesthesia work? - Scientific American
www.scientificamerican.com
Scientific American is the essential guide to the most awe-inspiring advances in science and technology, explaining how they change our understanding of the world and shape our lives.

Pathophysiology on Osteoporosis was copied from the Cleveland Clinic Online:
http://www.clevelandclinicmeded.com/medicalpubs/diseasemanagement/endocrinology/osteoporosis-disease/

Osteoporosis - Cleveland Clinic
www.clevelandclinicmeded.com
Osteoporosis Online Medical Reference - pathophysiology, signs and symptoms, and treatment options. Authored by Mario Skugor of the Cleveland Clinic. Primary osteoporosis is a metabolic bone disease characterized by low bone mass and microarchitectural deterioration of bone tissue, leading to enhanced bone fragility and increased fracture risk.

Your pathophysiology on CHF was copied from Respiratory Care Journal Online:
www.rcjournal.com/contents/04.06/04.06.0403.pdf

None of these resources were cited in text.

It has also been found that the pathophysiology paper you submitted with your care plan week 2 on urinary tract infection was copied directly from the Merck Manual Professional Version Online.
https://www.merckmanuals.com/professional/genitourinary-disorders/urinary-tract-infections-utis/bacterial-urinary-tract-infections-utis

SWOCC-002801



**Bacterial Urinary Tract Infections (UTIs) - Genitourinary ...**
www.merckmanuals.com
Bacterial Urinary Tract Infections (UTIs) - Etiology, pathophysiology, symptoms, signs, diagnosis & prognosis from the Merck Manuals - Medical Professional Version.

Susan is following up with Liz.

Susan and I would like to meet with you on Monday during your regularly scheduled advising meeting at 10:00 am to discuss this. You are welcome to bring a support person that is not in the nursing program as an observer only.

Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us." ~ Ralph Waldo Emerson*

SWOCC-002802

**Southwestern Oregon Community College**
**Nursing Program**
**Student Deficiency Form**

**Student Name** Nicole Gilliland                                    **Student ID#** _____

**Advisor** Melissa Sperry RNc _____

**Date** 4/25/18 _____

**Reason:**

1) Low Test Scores  Current grades below 75% passing level: NRS 231- 64.17%  NRS 233 - 64.62%  NRS 112 04 51.-.69% exam grades

2) Absences:    Clinical _____ Class _____ Skills Lab _____

3) Failure to complete and turn in assignments/tests _____

4) Unsafe Clinical Performance _____ Explanation: _____

_____
_____
_____

5) Violation of Handbook Policies (Description; Page #)  page 28 : Academic plagiarism- case study done week 3 - all pathophysiology

papers directly copied and pasted from Online sources. Page 29 inability to meet course outcomes  through application of theory and nursing principles

in the clinical setting:Final care plan week 3. Page 34 Plagiarism Page 37 Lack of Integrity or accountability: plagiarism

_____

6) Skills not completed at end of term assigned _____

7) Other _____
_____
_____
_____
_____

**Action Plan**  Placed on level 2 probation: Probation will conintue through entirety of nursing program. Additional offenses will require immediate

dismissal from the program. Page 39 _____
_____
_____
_____
_____

**Date of Re-evaluation** ongoing _____

**Outcome** _____


_____          _____
        **Student Signature**                              **Nursing Advisor Signature**


_____
      **Director of Nursing Signature**


Distribution:        Coordinator of Program        Advisor        Student

JS: 4/15  I:\Advising\Faculty Forms\Student Deficiency Form

SWOCC-003915

**4/25/18**

Nicole came to my office door during a class break and stated "why am I getting a zero on my assignment, I had a 77 and now I'm getting a zero (case study assigned by Robin). The instructor won't talk to me and told me to talk to my advisor and she won't talk to me." She also stated I never responded to her messages about an assignment from Melissa. I stated I had responded to the messages and that Melissa had reopened the assignment but Melissa had told me that she (Nicole) was going to take the hit on it and not do it.

I told her I didn't know what she was talking about regarding the zero and she repeated herself. Robin then came to the door and stated, "that isn't what I said, I told you to talk to your advisor." Both Nicole and Robin then went to talk to Melissa.

Followed up with faculty – Nicolle had just submitted the case study for Melissa but it hadn't been graded yet. Robin had assigned a case study and it was discovered that Nicole had plagiarized on the pathophysiology section of the case study. Her grade had been changed from a 77 to a zero when the plagiarism was discovered.

**4/25/18, 1600**

I was in the classroom to talk to the first year nursing students about the home-visiting project, afterwards Nicole asked to talk to me and came to my office and closed the door. She stated that she feels targeted and asked why she had a target on her back. I told her that she did not have a target on her back and referred her back to her concern regarding the assignment. She then stated that "this program has violated HIPAA and I can prove it". I asked her what she meant and she stated "she had asked Jade where to go to for a physical, Jade had told her to go to Carrie Kralicek and repeated that she should go to Carrie Kralicek and that somebody must have told us that she had gone to Carrie before. She was going to report Carrie to the board and would never go to her again." I did state that Jade usually recommends going to Audrey Duke. Nicole stated no that she told her to go to Carrie and then stated that she had recommended Audrey Duke. I then stated that we needed to talk about her original concern. She stated that she did the patho on Robin's paper the way Liz told her to do the pathos. Liz told her that she could cut and paste for her patho on the care prep. I stated I would talk to Liz to verify that but that we weren't discussing clinical we were discussing the assignment Robin have given. She stated it was the same that she does for all the pathos referring to the care prep. I repeated that her clinical assignments were not the same as Robin's assignment. She stated but it was a care plan just like clinical and it was a patho. She stated she didn't understand, it was just the disease, how am I supposed to write it if it's just the disease. I then stated that it should be in her own words and her understanding of the disorder for that patient. She referred back to Liz and what Liz required. I then stated that she needed to read the nursing student handbook about plagiarism. Melissa was or had sent her an email about a meeting on Monday at 10 am, I hadn't had the opportunity to check my emails yet, but we did have a meeting scheduled to discuss probation. She asked what her rights were. I referred her to the nursing student handbook and the college student handbook, that she had the right to have a representative with her. She asked if Liz could come. I stated yes, Liz was welcome to come to the meeting but per the handbook Liz or another student could not be a representative for her since she was nursing faculty. I suggested someone from the counseling office. She then asked if she could bring her lawyer. I stated that we would not have the meeting, as we need equal representation. We would reschedule. I then stated the meeting was over and she left.

**4/25/18, 9:10 am**

Contacted Liz. She stated Nicole had sent her a long text message and we were accusing her of plagiarizing on her care plans. Nicole had told her that she was going to talk to the Dean and that I told her she couldn't have her lawyer at a meeting. Nicole had told her that "everyone is out to get her. Jessica was targeted and now she

SWOCC-001300

is next." Liz stated that she did not respond to her as she was having an exam done. Liz also stated that Nicole kept asking Liz to call her. Liz sent her a message and said she can't contact her. I asked Liz how she asked them to do their patho. Liz stated that she never said anything about copying and pasting, that they need to have a good understanding of the APA format and use reliable resources, WebMD was not a reliable resource as some had used that, need to have stuff done in their own words. She stated that Nicole needs to be pushed to do procedures, she tends to sit back as she seems afraid to do something without the nurse holding her hand. She is also concerned that Nicole forgets things. Liz gave the example that Nicole reported that the "nurse hung an IV antibiotic on her patient, Liz asked her why she didn't call her so she (Nicolle) could do it and Nicole responded that we can't do that yet, Liz stated yes you just got checked off in lab and Nicole responded with "we did". She doesn't seem to be processing information.

**4/30/2018 10:00 am**
Meeting with Nicole regarding probation due to plagiarism.

Present:
- Nicole Gililand
- Damon Gill, Introduced himself as Nicole's ex-husband, asked his background (career) stated he was a general contractor
- Francisco Saldivar
- Tim Dailey
- Robin Finney
- Melissa Sperry
- Susan Walker

Asked Nicole to read the section of the handbook regarding the students responsibility during the meeting. Informed Nicole that we were meeting to discuss the probation. Nicole began to speak loudly. During the meeting she:

- referred to plagiarism committed by other students, other students were going to contact Francisco and Tim, she was surprised that they hadn't contacted them, the students wanted to remain anonymous.
- mentioned plagiarism committed by Melissa and showed a PowerPoint presentation on her laptop that "was plagiarized." It was explained by Melissa and Francisco that faculty had academic rights to use materials created by others.
- was referred back to the purpose of the meeting by Francisco. Nicole deflected to other issues in the program. She stated to Francisco that he should have read her emails before he talked to us, that we would stick together and he would not have the truth
- stated that she was filing a lawsuit against the school and Melissa for defamation of character and harassment. She stated loudly, "This is harassment."

During the meeting, Damon Gill, stated that Nicole did not plagiarize, that the issue was a program wide issue. He stated that Victoria Kalmykova is working with Nicole and filing the lawsuit. He stated that we did the same thing to her and used the issue of patient safety against her like we are doing with Nicole.

Nicole was asked by Susan if she was willing to be teachable to become a competent nurse. She was asked what she could do and she stated, I would cite my resources.

SWOCC-001301

Robin had stated that she had not looked for plagiarism in all of the other papers and that she could look for them or have someone else look at them. The decision made was to have someone outside of the nursing faculty look at all of the papers.

The meeting ended and Nicole and Damon went to Francisco or Tim's office

**5/2/18**
It came to my attention that Nicole and Victoria were at Bay Area Hospital yesterday morning sitting together in a public place discussing what is happening here at the college. Victoria was scheduled for clinical. Nicole was not scheduled for clinical and does not do her clinical at BAH. Email was sent to Francisco and Tim of the incident and that this is inappropriate, against our policy and the hospital policy. The students are considered guests in the facility and the hospital has the right to dismiss a student. They both need to be made aware of what was observed and possible repercussions. I wanted to talk to them but felt one of them should be present.

Later in the day, Pam gave the students her test from the previous week. Both Victoria and Nicole had failed the exam and a decision was made to wait to tell both about the incident.

**5/8/2018**
Went to CVH, spoke with Liz. Asked her about the care plan, repeated that students were not told they could cut and paste, that the information should be in their own words. I asked about the previous statements (not remembering, etc.) and she stated that Nicole was doing okay today. She mentioned that the students have stated that this program puts targets on student's backs. We put a target on Jessica's back, she's gone and now Nicole is next. Liz mentioned that she went through the program, it is stressful, and we don't target people.

**5/15/18**
Pam, Robin and I met with Francisco about email Nicole sent to Pam. Contacted Joy and Nancy @ OSBN, reviewed what was occurring with the student. Per Joy, it is the board's expectation that the director and faculty of the nursing program keep patients safe.

**5/18/18**
Meeting held with Ali, Francisco, Tim, Robin, Pam, Kerry, Melissa and Susan

**5/21/18**
Email received from Joy at the OSBN, requesting follow-up. Responded.

**5/23/18, 8 am**

Meeting held with Nicole, Francisco and myself. Susan mentioned progression in the program, Nicole will not go to clinical on Tuesday and will do a simulation with me in the lab. Nicole stated that she is seeing her in-home patient next Tuesday. Asked when, she stated in the afternoon. Asked her to come in the morning, I would send her a case scenario, she needed to do a care prep, and it would be her prep for the day. She mentioned it could be her clinical make-up as she had missed a clinical, I mentioned that was a good idea. She did ask why was she

SWOCC-001302

doing that, I did mentioned it was just to see how she was doing, it was not meant to fail her, it was meant to help her.  She mentioned being anxious when working with simulation, I replied that I would guide her and help her through the simulation.

10:15  Nicole asked if she could talk to me as I was leaving.  I told her I was on my way to the hospital to do rounds and for a meeting.  She asked if I would be back and I said yes.

12:55  Returned to campus.  Nicole came to my office, stated that she didn't understand why she had to do the simulation, she wanted to be done with this, she mentioned the plagiarism, testing points, her situation that she is in.  I mentioned that let's just move forward so we could get this done.  She again repeated previous information about grades, 10% reduction, others haven't had to do that.  I referred her to the handbook and again mentioned that we needed to move forward, she needed to come on Tuesday for the simulation and let's move forward.  Kerry came to my door and mentioned class was starting.  Nicole went to the classroom.


1:50  Email received from Nicole and forwarded to Francisco and Tim

Perhaps email is best for both of us.

Either you're going to do the right thing or you're not. I had a very good reason for requesting to take the tests early and I have mountains of medical records to prove it. I'm as guilty of plagiarism as everyone else in this program. You are allowing this to happen to me when I know you know that I don't deserve it. I just went to the Presidents office and now I'm telling you; today is the last day I'm willing to offer a peaceful resolution. Tell your staff to treat Victoria and myself fairly (Pam and Melissa), reinstate my grades and end this probation and in turn I will resend all complaints against you and members of your staff with the school and the nursing board. I will forgive and forget and never speak of this again, I'll even sign a non disclosure agreement. All I want is to graduate and move away. I'm not asking for special treatment, I have what it takes to get there on my own.  If you prevent that from happening I will dedicate the rest of my life to exposing everything that wrong with this program/school. I have a reporter I've been speaking with from the Oregonian they want to interview Victoria and myself, they mentioned the exposure will help us secure a legal team willing to take on the multimillion dollar lawsuit against the school and the individuals involved. We will lobby the change the laws surrounding "academic freedom" that has allowed your staff to hurt so many students and your faces will be at the front of it. I don't want ANY of this, but I will do whatever I have to do to make this right.
Nicole Gililland

**5/25/18** Robin shared a text message sent to her from Nicole.  See copy of text.

**5/27/18** Email received from Nicole, sent 5/26/18 to Francisco and myself.

Susan and Francisco,
We need to reschedule this simulation on Tuesday morning. My attorney is in Eugene and that time doesn't work for him. I will not submit to anymore of this harassment without an attorney present and seeing as how you lack a legitimate reason why I'm continuing to be singled out, harassment is exactly what this is. We can do my advisory appointment at that time (still waiting on that) and reschedule the simulation at a time that works for everyone.
Thanks,
Nicole Gililland

**5/28/18** Email sent to Joy and Nancy at OSBN

SWOCC-001303

**5/29/18** Email sent to Nicole @ 8:01. Nicole came to my door at approximately 8:05 am. She asked if I had received her email. I stated yes and that I had responded to her email. I informed her that we would not have an advisory meeting this morning in place of the simulation. She could sign up for an advisory meeting on my calendar. She signed up for 4 pm today. At 8:43 am Nicole sent an email, forwarded to Francisco and Tim.

**6/4/18** Email from Nicole forwarded from Kerry.

**6/6/18** Robin discussed incident at hospital, concern related to comment made to student by Nicole and Victoria. Instructed to document the incident.

**6/7/18** Per Melissa, at the beginning of class Nicole came to the podium and announced that she was leaving early for a phone call with the board of education. Students were present. She left class at 3.

SWOCC-001304

**To:**      Finney, Robin S[robin.finney@socc.edu]
**From:**   Gililland, Nicole R
**Sent:**    Thur 4/26/2018 9:08:46 PM
**Subject:** Re: Grade

Robin,

I can think of legitimate plagiarism committed by every single student. Actually, some of my fellow classmates have approached me yesterday and today to point out times they have accidentally forgotten to properly cite their work. Just last week in your class we all made presentations, we all copied the information from our textbooks word for word, and not a single person cited their sources. Also in Melissa's class in week two, her case study, several of my classmates admitted to using their textbooks for that assignment and forgot to cite it. Nursing diagnosis, patho, there is plagiarism all over the place because we've all gotten sloppy on properly citing resources. This is absolutely a program wide issue. I think the fact that Melissa failed to see the plagiarism on her case studies, but found it on mine in your class is just further evidence of her unethical behavior towards me because literally every student is guilty of this, all you have to do is look. I will not have my reputation and future destroyed over this simply because Melissa is abusing power, or at the very least I intend to fight this and none of it is difficult to prove. I think you're a great teacher and I apologize for rushing the end of my case study and being sloppy at the tail end, I was struggling all week to catch up after being extremely ill AND I wasted all of the weekend on a bogus assignment from Melissa (I have the emails to prove that thankfully). I'm a ball of anxiety lately, but one thing I'm not is a liar.

Nicole Gililland

**From:** Finney, Robin S
**Sent:** Wednesday, April 25, 2018 3:15:38 PM
**To:** Gililland, Nicole R
**Subject:** RE: Grade

Nicole,

We need to talk about this. Please make an appointment with myself and your advisor, as discussed earlier in the hallway.

Thanks,
Robin

Sent from Mail for Windows 10

**From:** Gililland, Nicole R
**Sent:** Wednesday, April 25, 2018 2:07:28 PM
**To:** Finney, Robin S
**Subject:** Grade

Hey Robin,

The case study is showing up as 0%. Originally it was 77%, but now I'm failing every class. Is this an error?

SWOCC-002787

Nicole

SWOCC-002788

**Date:** 4/26/2018
**Re:** Student Nicole Gililland, 1ˢᵗ year nursing student
**Subject:** Plagiarism accusation (against Nicole), Retaliation/ Unfair Practices Accusation (by Nicole)

Nicole came to Julianna Seldon's office on Wednesday, April 25, 2018 as she was looking to make an appointment with Tim Dailey.  She was visibly upset and near tears. Tim was in a meeting but Nicole spent about 45 minutes with Julianna telling her story.  At that time Julianna made an appointment for Nicole with Tim for Thursday, April 26, 2018 at 10:00 AM.  When Nicole left, Julianna wrote down the details of the conversation and let Tim know what was going on.  At that point, Nicole also forwarded emails to Julianna that had been between her and Melissa Sperry, who is her advisor.

The next morning, Nicole came and met with Tim. Tim let Nicole know at that time that he would also be bring Francisco Salvador into the conversation at some point, since he is the Dean of the nursing department.

The following narrative is put together from the information given by Nicole both at the first meeting with Julianna on the 25ᵗʰ, and the meeting with Tim on the 26ᵗʰ.  This narrative is written by Julianna based on her notes of the two meetings:

Nicole has been at SWOCC for almost 2 years. In that time, she has been a good student, worked hard, and gotten good grades.  This is important to her and she strives to do her best.  She never wants to be a problem student.

Regarding the plagiarism accusation, Nicole stated up front that the way she is writing her care plans is how she had been told to do it by her instructor named Liz (from Coquille clinics) and she cites all her sources.  Nicole believes that if she is doing something the wrong way then other students are as well, other students use the same process as she does.  She also states that she was never trying to be sneaky, if she was doing something wrong she would have corrected it if she had been told of the problem.

Nicole feels that Melissa does not have her best interests at heart. She has seen this kind of thing happen to other students.  She believes that when the nursing staff decide they want a student gone, they look for something they can use against them.

The problem began when Nicole got sick in the second week of the term.  She ended up with a kidney infection and was in the hospital part of the time.  In spite of this, she attended class as much as she could and was able to keep up with much of the work although she did miss some lectures. She came to class twice and was sent home because she looked too sick.  She still communicated via email and did everything she could to keep up.  Towards the end of this time, as she was getting better, she was able to get an appointment with a doctor but it was on Friday, which is test day for the nursing program.  At that point, she contacted Melissa to see if she could come in early or arrive a little late to take the test.  Melissa told her at that time to just wait until the following week and she could take the test.  Melissa also indicated that there would be an assignment she should look for online. (This is all documented in an email chain dated April 13-17, 2018 titled Appointment).  Nicole looked for the assignment after her doctor's appointment on

SWOCC-000671

Friday but didn't see an assignment appear until late that evening. The assignment was listed as being due on Wednesday at 9:00 AM. There was not instructions for the assignment so she contacted Melissa by email the following morning (Saturday) and Melissa told her at that time where to find instructions in her packet. . (This is documented in an email chain dated April 14, 2018 titled Assignment) Nicole then worked on the assignment for the rest of the weekend and into Monday. Melissa emailed her on Monday to ask where the assignment was and at that point they had some further email conversations. The assignments got confused somehow, there was some kind of miscommunication. Melissa was referring to a case study she had opened during Friday's class during a 2 hour time frame. Nicole never saw it. Melissa informed Nicole she had opened an assignment on Friday and it had been due at 3:00. As Nicole was at a doctor's appointment at this time, this time frame was not reasonable or possible.

The Kaplan assignment was what Nicole received online and she began completing; she never saw the case study. On Monday, upon speaking/emailing with Melissa, Nicole went to check the Kaplan assignment again online. Though it had been there all weekend, on Monday the assignment was gone from the site. Finally, Melissa said it was miscommunication and they should talk in person. (This is documented in an email chain dated April 17, 2018 titled Completed Assignment).

That following week, Nicole took the tests she had missed the week before. When Nicole saw Melissa on Tuesday, Melissa told her at that time that she would get a zero on the assignment from Friday and would lose 10% on her exam for having to do the makeup that week. Nicole was upset but didn't argue about the 10% even though she had wanted to take the test on Friday but Melissa had told her to wait. Nicole felt confident that she could make up the 10% loss and be okay. She did argue with Melissa about getting a zero on the assignment. Melissa told her she was getting a 0 on the case study and that the Kaplan assignment means nothing to her. Nicole told Melissa that was unethical and it's not right. Melissa tried to say she hadn't talked with her. At that point, Melissa said she did not want to talk to Nicole about it anymore and told her she could talk to Susan Walker.

Nicole went to talk with Susan and told her what had happened and Susan asked Nicole to forward her the emails.

The following day, when Nicole met with Melissa she was told she was allowed to make up the assignment. Nicole believes Susan told Melissa to allow Nicole to do that based on the emails.

Nicole worked on assignment and got it done right away. She received a 75. Then, a case study she did for Robin Finney was posted as a 77. Nicole thought she would get a higher grade so she talked to Robin and then figured out what she had done wrong. Nicole felt she and Robin had had a good interaction. Then, she checked all her grades on mLL a bit later and they were all changed to F's; all 3 classes. Robin told Nicole she changed all those grades because she had thought that Nicole's care plan needed works and she took the work to Melissa. After looking over the work Melissa said that it was plagiarism. When Nicole found out, she tried to explain to Melissa what happened and what the issue was. She had already worked with Liz and gotten what she was told was the right information and how to cite the source. Melissa is saying she found all these errors.

Nicole is sure that Liz will vouch for her. Liz told her how to do the care plans and watched her do it. The way she is citing sources is the way she has always done it. The paper she is being accused of plagiarizing was written in the same style as the others she had done and Nicole has talked with

Liz about those and been told she was doing it correctly.  Nicole believes this accusation is a personal thing after Melissa had to reopen assignment for her; she doesn't understand why else it would be brought up now.

Melissa and Robin were condescending and wouldn't tell her why the grades had been changed. Melissa just told her she was doing an investigation.  Nicole went to Susan for information and Susan told Nicole she didn't know what was going on either.  At that point Melissa and Robin told Nicole what was going on.

Nicole went to Susan after class. She was told by Susan to come at 10:00 Monday morning and she was allowed to bring an advocate with her to be on her side. Nicole asked if Liz was coming to the meeting.  Susan said she could be there but Nicole didn't get the impression she thought it was important and that puzzled Nicole because if they are truly trying to get the correct information then she believes Liz can help provide that.

Nicole was still trying to understand about the meeting and asked if she should have a lawyer.  At that point Susan said if she has a lawyer there wouldn't be a meeting.

Nicole feels lots of the students use the same practice she does; if this is not Melissa just using her power to get rid of Nicole, they should look at everyone's papers because they all do the same thing.

The feeling Nicole is getting from the program is that they have already made up their minds about what happened and this is just a formality.  She also feels this was brought about because of the issue with the assignment and that this is in retaliation for that.

Nicole doesn't believe Melissa is in any way trying to help her or do the best for her.  She has always had a good reputations with teachers, it is important to her.

In the past, she thought she had a good relationship with Melissa. She's been hard on Nicole and harsh with grading but Nicole has just always thought that's the way she is in general.  There were no specific problems relating to Nicole before she got sick.


In addition, Nicole spoke of her concern that a counselor she had seen outside of the college had spoken to the nursing staff about her.  Jade Stalcup said some things to Nicole about the counselor which led Nicole to believe she knew Nicole had gone to see this person.  Jade also mentioned that Susan Walker is good friends with this person.  Nicole believes there was a HIPPA violation committed and in general, she had a terrible experience seeing that practitioner.  She is worried this has somehow made the nursing staff have negative feelings towards her.   She is not sure if Melissa might have heard about this and that would be why she has a target on her back.  She is thinking of reasons why she has been singled out. It didn't start until she was sick.  Nicole doesn't know what happened.

Nicole will bring in all the information she has on Monday. She wants to be transparent.

Tim let Nicole know he will relay all this information to Francisco Salvador.  He believes it would be helpful for them to meet on Friday before the hearing.

Nicole is still not sure what her rights are and what is going on. She stated that Susan was being vague; said they would talk Monday at the hearing.  Nicole came to Tim to figure out what she can do.

SWOCC-000673

| From: | Nicole Gililland |
|---|---|
| To: | Saldivar, Francisco W |
| Subject: | Fwd: Delivery Status Notification (Failure) |
| Date: | Monday, April 30, 2018 11:01:48 AM |
| Attachments: | icon.png |
| | Frontotemporal NCD[16420].pdf |
| | Lewy body (1).ppt |
| | Parkinsons and Lewy bodies final [16423] (1).ppt |
| | Prion.pdf |
| | Vascular NCD.pd.pdf |
| | MI PPT.pptm |
| | Gastrointestinal Disease.ppt |
| | GI Medications.pptx |

---------- Forwarded message ----------
From: **Mayra Rangel** <mayrangel32@gmail.com>
Date: Saturday, April 28, 2018
Subject: Fwd: Delivery Status Notification (Failure)
To: nicolegililland15@gmail.com

**Forwarded conversation**
Subject: **Southwestern's Nursing Plagiarism Case**
-----------------------

From: **Mayra Rangel** <mayrangel32@gmail.com>
Date: Sat, Apr 28, 2018 at 3:33 PM
To: nicolegililand15@gmail.com, Josue Rangel <josue.rangel.m@gmail.com>

Vice President of Enrollment & Student Services Tim Dailey,

I am emailing you to provide information regarding a current nursing student's case of plagiarism, Nicole Gililland. I have worked with Nicole in a clinical setting and in the classroom setting. She has proven to be an adept medical professional, who can reliably complete a task. So when it was brought to my attention she was being accused of plagiarism, I knew it to be a misunderstanding. She is brilliant, strong-willed, resourceful and does not need to steal the ideas of others. Nicole understands the content and will become a great nurse.

I am providing additional proof that she is not the only person who should be accused, in fact the entire program including myself and faculty have committed acts of plagiarism. This email provides the following information as proof:

- Powerpoints provided to the students, on behalf of the faculty with no proper citations (attached).
- Powerpoints created by the students, in a project-like fashion, with no proper citations (attached).
- Powtoon links, created by the students as group projects, again without

SWOCC-000304

proper citation (https://vimeo.com/265420183;
https://vimeo.com/265466943; https://www.powtoon.com/m/gsMuO
vi2rSY/1/m; https://vimeo.com/265467353; https://www.powtoon
.com/online-presentation/dJ3MD6L3Fog/?mode=movie#/; htt
ps://www.powtoon.com/m/fRiiATvxIeF/1/m; https://www.powtoon.
com/m/d6VXgOJjbYe/1/m; https://www.powtoon.com/online-
presentation/bwYfecAVnru/?mode=movie#/; https://vimeo.
com/265468802; https://www.powtoon.com/online-presentatio
n/bPFTnGQvLfM/?mode=movie#/; https://www.powtoon.com/online-
presentation/cDM9ogPnqZg/?mode=movie#/; https://www.
powtoon.com/m/dNigM8nh1Sl/1/m

https://vimeo.com/265470792)

This information has been gathered from the four weeks of this term alone. I can guarantee this is not the first year they have been lacking citation on their instruction material. There are several links to the nursing students' work which is a lot of information that will prevent a misunderstanding from potentially ruining the academic life of one singled-out student. If she will be punished for her act, the entire nursing class of 2019 should be as well. The faculty has failed to act as an example of properly citing an outside source especially on their powerpoints used for instruction (attached).

Thank you for your time. Please let me know if there is any other information I can provide for you and those working on this case.

Mayra Rangel
Student Ambassador
Office of Admissions
541.751.5168

----------
From: **Mail Delivery Subsystem** <mailer-daemon@googlemail.com>
Date: Sat, Apr 28, 2018 at 3:33 PM
To: mayrangel32@gmail.com



### Address not found

Your message wasn't delivered to **nicolegilliand15@gmail.com** because the address couldn't be found, or is unable to receive mail.

**LEARN MORE**

SWOCC-000305

The response was:

```
The email account that you tried to reach does not exist. Please try double-
checking the recipient's email address for typos or unnecessary spaces. Learn
more at https://support.google.com/mail/?p=NoSuchUser r6-v6sor1996385oth.104 -
gsmtp
```

Final-Recipient: rfc822; nicolegilliand15@gmail.com
Action: failed
Status: 5.0.0
Diagnostic-Code: smtp; The email account that you tried to reach does not exist. Please try
double-checking the recipient's email address for typos or unnecessary spaces. Learn more at
https://support.google.com/mail/?p=NoSuchUser r6-v6sor1996385oth.104 - gsmtp
Last-Attempt-Date: Sat, 28 Apr 2018 15:33:50 -0700 (PDT)


---------- Forwarded message ----------
From: Mayra Rangel <mayrarangel32@gmail.com>
To: nicolegilliand15@gmail.com, Josue Rangel <josue.rangel.m@gmail.com>
Cc:
Bcc:
Date: Sat, 28 Apr 2018 15:33:36 -0700
Subject: Southwestern's Nursing Plagiarism Case
Vice President of Enrollment & Student Services Tim Dailey,

I am emailing you to provide information regarding a current nursing student's case of
plagiarism, Nicole Gilliland. I have worked with Nicole in a clinical setting and in the
classroom setting. She has proven to be an adept medical professional, who can
reliabl ----- Message truncated -----

SWOCC-000306

| | |
|---|---|
| **From:** | Nicole Gililland |
| **To:** | Dailey, Tim; Saldivar, Francisco W |
| **Subject:** | Fwd: complain |
| **Date:** | Monday, April 30, 2018 5:55:43 PM |
| **Attachments:** | complain.docx |

Dean Saldivar and Vice President Dailey,

Included is the complaint from Victoria from last year. She gave this to me as well as permission to use it in this case. I would like to draw your attention specifically to the bottom of the complaint and what Susan said when she kicked Victoria out of the program. It is literally verbatim what Susan attempted to do at the end of our meeting today, again contributing to a very unsettling pattern of behavior within the SWOCC nursing program. It was bad enough to be labeled a plagiarist, but now my temperament and treatment of patients is being manufactured and twisted into these genetic lies that have been used successfully against students in the past. You both bore witness to this first hand this morning and I am asking that you include these defamatory statements into your investigation.

Thank you,
Nicole Gililland

Sent from my iPhone

Begin forwarded message:

> **From:** Victoria Kalmykova <kalmykova68@gmail.com>
> **Date:** April 30, 2018 at 12:35:22 PM PDT
> **To:** nicolegililland15@gmail.com
> **Subject: complain**

To: Vice President of Administrative Service Jeff Whitey
From :  Nursing Student Victoria Kalmykova
RE: Grievance

To whom it may concern.

I have been a nursing student at SWOCC since Fall, 2016. My nursing course include lectures, labs and clinical at BAH once a week. I am 45 y/o and I am originally from Ukraine and do speak Russian language. I do have accent and the way I express myself helps me to convey message to my best ability. I am a very humble, hardworking and very gentle person. I respect everyone I come in contact with as well my professors and peers.
 Nursing program is hard and I do my best to keep up with busy schedule between lectures, lab and clinical. Since Fall 2016 I have been successful in my clinical practices and had no issues with my clinical instructors in my two past semesters. However, this Spring 2017 semester, I have Melissa Sperry as my clinical instructor. The way clinical part of program is setup is my instructor evaluates my care plans, performance in clinical setting and would assigned a letter grade in my clinical evaluation folder. If student get several NI (need improvement) letter grade, student have to meet with his/her adviser and clinical instructor and to work on care plans and help student to understand what changes has to be made. However, if a student continues getting NI throughout semester, she/he would be dismissed from the program.
    Tuesday, April 11, 2017 I had my clinical day at BAH. I prepared my care plan for assigned to me patient by Melissa Sperry a night before, Monday April 10. I prepared my care draft for Melissa to check and evaluate my draft. I was supposed to meet my patient on the day of clinical Tuesday, to do my assessment on my patient, and submit my final care plan by Wednesday through my lakerlink drop box to Melissa for final evaluation. My assigned patient got discharged and I asked Melissa to assign a new patient to me. After I got my new patient, I texted Melissa question regarding my assignment. She came to my floor and asked me to come with her in the hospital office. I was asked by Melissa to sit down and she asked me in a raised voice, " What you don't understand about what I told you?" I was not able to answer right away, because I was taken back by instructor yelling in my face in such rude manner. Finally I said to her that I wanted to make sure that I do everything correct on my care plan. She said to me, "Sometimes I feel that you don't understand what I am telling you." She opened my care plan and start pointing out parts on my assignment that she thought were wrong. According to Melissa I was behind and scattered on my plans and I asked her if she can help me. I don't recall her answer, but I assumed that as any nursing instructor she want me to succeed and I felt positive about our meeting, despite of rude incident earlier. I decided not to report incident to nursing director, because I was afraid that I will stir up some problems for my progress, specially it was in the beginning of the semester. I found out that Melissa gave me NI on past couple of weeks and my adviser/director of nursing emailed me to meet with her regarding NI. I met with Melissa and Susan Walker on Friday 04/28/17 for reviewing my care plan and identify what I am missing on appropriateness  that would deserve S(satisfactory) from Melissa Sperry
Susan looked over my care plan and replied that my care plan looks better. However, she said that I will be put on probation, since I got 4 Nis from Melissa on my care plans. I asked her what will happened if Melissa will continue giving me NI till the rest of semester, Susan said that I will be dismissed from the

SWOCC-000301

program. I asked her if she is planning to dismiss me and she said" I don't know, you want me to answer you concrete answer, I don't have." Meanwhile I took all constructive criticism from both of them and applied on my next care plan. I did exactly what was asked from me by Melissa and Susan. Unfortunately, I kept getting NI from Melissa. Moreover, she notoriously was pulling me from my nursing station, where I was working on my patient shift assessment. She would open up my draft care plan and would point what I have to change or alter, I did exactly what she wanted me to do. Despite of all my attempts, I was continuing to receive NI from Melissa. Besides care plan problems, I started failing on lab where Melissa was instructor as well. I was only one in the class that did not pass lab simulation that was supposed to not be pass or fail but education with instructor guidance and prompt. Lisa who is assistant for Melissa was instructed prior to my turn on lab not to help me. My lab days become a nightmare for me and I failed another time, this time I was on fail, pass and was interrupted by Lisa while I was drawing two type of insulin for simulation, and I made a mistake. I asked when can I retake it again, and she said that she does not know, I have to ask a full time staff. I was scrutinized by Melissa on my lab checkoff and very harshly criticized for things that never were an issues for other instructors. In addition to all this, Melissa verbalized that she does not want me ask help from my peers or other instructors. She said that I am like a small child going to busy parents asking for help. Again, I did not say anything about belittling comment and decided not to ask for help. Melissa repeatedly stated in my clinical assessment tool report that she sees me talking to my classmates and asking for help. I felt intimidated by Melissa and in order to avoid conflict, I stop talking to my friends. Meanwhile, I asked Susan Walker, Nursing Director to assign me to a different clinical instructor, since she is obviously harassing me and I felt very intimidated by her actions and reports. Susan replied that she can not change my clinical instructor. Finally, on May 15, I received my patient and made my draft care plan. Tuesday May 16, I went to my clinical day as usual and again Melissa pulled me to separate room with comments, " I see that you still struggling with your care plans." When she opened my care plan draft and started asking me questions regarding rationale behind my diagnosis and intervention, I began answering and she said that I am defensive. I asked her if she has any problem with me, since no matter what I do and how hard I worked on improving for Melissa approval, it is all a futile attempt. She could not answer me if there are any personal issues that need to be resolved, I also sent her an email which is included and got no response. I apologized for anything if I happen to upset her in any way, which never occurred. Our meeting ended without any resolution and I decided to meet Melissa after my shift in hope for resolving care plan issues I told her that I need help to understand what is that I am still missing in my plan for her approval. I changed my diagnosis and interventions and put what Melissa wanted me, even if I though it was not a priority. she said "I can not help you, because it wouldn't do you any good." She apparently forgot to mention our last meeting on that day.

 Finally on May 22, 2017 after I received Melissa's last clinical report I found out that her report contained not only fallacies of what actually happened on May 16 , but also description of my body posture and the way I use my hand while talking were labeled as aggressive behavior.

This is what exactly she wrote on my assessment report "Cares for renal failure patient with DMII, HTN & wounds. When approached by instructor at hall computer desk to review care plan become defensive with feedback regarding care planning and prioritization of nursing dx. Uses aggressive non-verbal communication, rolling eyes, deep sigh, and elevated voice and is escorted to conference room for discussion. Does not acknowledge instructor suggestions around s/s of progressing renal failure, ie decreased CO2 18 , albumin levels 2.8, elevated BUN 83 and Creatinine 2.86, low platelet levels 141 and anemias Hgb 8.6 and Hct 26.9 but focuses on wounds and blood sugar. Leans aggressively towards instructor stating "you just hate me" with many arm gestures. When instructor identifies student's defensiveness and aggressive behavior student once again states "you just hate me. You have not given anyone else an NI in clinical". Discussion began to circle with same questions being asked around clinical/care planning topics and meeting is ended by instructor. Therapeutic and professional communication techniques are not demonstrated. Care planning continues to be scattered with small improvement- basic interventions are measurable and specific. Continues to evaluate what was done

SWOCC-000302

rather than patient response in 4 of 9 intervention. Assessment documentation continues to develop, more details noted from previous week. 2/10 of the medications and labs corrected by instructor in pre-clinical were corrected in final paperwork. MSperry RNc."

I called to The Dean and sent email to him about my situation.

Finally, on Monday may 22, I met with Melissa and Susan for what I thought was a discussing on my care plan from May, 16. However, I was mistaken. Susan found out from dean Cody Yeager regarding of my grievance. Melissa started with her version of incident on Tuesday and called my behavior as aggressive and defensive. Susan added that she felt that my body posture was aggressive , "the other day when you were sitting in my office you lean forward and put your arms above your head." Melissa added that my voice on the day of incident was loud and that deem to be aggressive as well. I asked Susan to check with my patients about my "seemingly aggressive " behavior and Susan said" One nurse told me that you were rude or rough with a patient and I am concerned about patient safety and can not allow someone like that in the hospital".  I asked about written report of the complaint and Susan got offensive that I don't believe her. I was banned to my last clinical, Susan told me," you can go to lecture and lab, even there you are not doing good, but you cannot go to hospital." I felt that I was accused without proof with no student representative and discriminated and harassed because I am speaking and moving my body different from other students in the class. I mentioned to Melissa about her professional behavior regarding the accepting  culture difference and was told that I have to understand them. I would like to be reinstated in my clinical and nursing program and I ask protection from discrimination and harassment from involved individuals.


With respect
Victoria

SWOCC-000303

4/30/18

1000

Meeting between Susan W., Robin F., Francisco S. Tim D., Nicole G., and Her x-husband. Nicole is very upset and accusatory towards this nurse. Accuses this instructor of student harassment, unethical behavior and plagiarism. Student is refocused to the assignment in question and that meeting is called about. Continues to digress to how this instructor is harassing students and fails to acknowledge the plagiarism of her articles.  Accuses this instructor of defamation of character, plagiarism, harassment and unethical behaviors towards students. Dean of CTE once again refocus her to the assignment in question and stresses that the articles in question are plagiarized per APA standard.

Nicole escalates in emotional responses and continues to accuse faculty of "sticking together" and "targeting" or "victimizing" students.

All faculty present attempt to assure Nicole that we are there to support her through the program and this is an attempt to help her grow in academics.

Student deficiency form is reviewed with Nicole by this instructor, verbalizing it as a way to help her grow and learn through the program. Student becomes agitated by the grades stating she is failing due to a 10% reduction for late work, on another assignment. She then continues on that the zero on the assignment in questions is this instructors fault for identifying the plagiarism.

After multiple approaches to redirect student she is agreeable to signing the student deficiency form.


1245 Nicole stops by office to review GI classroom assignment. Requests rubric and is directed to textbook for answers. Each question is reviewed with her and explanation of points deducted. She leaves without verbal questions but nods.

SWOCC-003914

**To:**       Gililland, Nicole R[nicole.gililland@email.socc.edu]
**From:**    Walker, Susan
**Sent:**     Mon 4/30/2018 6:17:38 PM
**Subject:**  Form
<u>20180430172107674.pdf</u>

Attached is a copy of the form that you signed this morning.
Susan

SWOCC-002784

**Southwestern Oregon Community College**
**Nursing Program**
**Student Deficiency Form**

**Student Name** Nicole Gilliland                                    **Student ID#** _____

**Advisor** Melissa Sperry RNc

**Date** 4/25/18

**Reason:**

1) Low Test Scores  Current grades below 75% passing level: NRS 231- 64.17%  NRS 233 - 64.62%  NRS 112 04 51.-.69% exam grades

2) Absences:    Clinical _____    Class _____    Skills Lab _____

3) Failure to complete and turn in assignments/tests _____

4) Unsafe Clinical Performance _____ Explanation: _____

_____

_____

_____

5) Violation of Handbook Policies (Description; Page #)  page 28 : Academic plagiarism- case study done week 3 - all pathophysiology papers directly copied and pasted from Online sources. Page 29 Inability to meet course outcomes  through application of theory and nursing principles in the clinical setting:Final care plan week 3. Page 34 Plagiarism Page 37 Lack of Integrity or accountability: plagiarism

6) Skills not completed at end of term assigned _____

7) Other _____

_____

_____

_____

**Action Plan**  Placed on level 2 probation: Probation will conintue through entirety of nursing program. Additional offenses will require immediate dismissal from the program. Page 39

_____

_____

**Date of Re-evaluation** ongoing

**Outcome** _____

_____            _____
**Student Signature**                    **Nursing Advisor Signature**

_____
**Director of Nursing Signature**

Distribution:        Coordinator of Program        Advisor        Student

JS: 4/15  I:\Advising\Faculty Forms\Student Deficiency Form

SWOCC-002785

| | |
|---|---|
| **From:** | Saldivar, Francisco W |
| **To:** | Mageehon, Ali; Dailey, Tim; Jackson, Shari L |
| **Subject:** | FW: Update needed |
| **Date:** | Monday, May 7, 2018 11:13:00 AM |
| **Importance:** | High |

Hi All,

I received this email from Nicole. I am not sure how to proceed. I did not give her any indication that my investigation would conclude today. I will send you all the contact I have had with her. I am not sure what she is looking for. I first meet with her last Monday April 30th.

Francisco W. Saldivar
Dean, Career Technical & Workforce Education
Southwestern Oregon Community College
1988 Newmark Ave.
Coos Bay, OR 97420
1-541-888-7312

-----Original Message-----
From: Nicole Gililland [mailto:nicolegililland15@gmail.com]
Sent: Monday, May 7, 2018 8:16 AM
To: Saldivar, Francisco W <francisco.saldivar@socc.edu>
Subject: Update needed

Dean Saldivar,

I still haven't heard back from you about my clinical tomorrow. I'm afraid I've given the college as much time as I can to act. I understand that you're an incredibly busy man, but I have to ensure that this blatant corruption (that you witnessed firsthand) will not go unanswered for. These women are so comfortable abusing their power that they have become incredibly sloppy about it, and luckily they've given me substantial evidence to move forward with a lawsuit. It's evident that the reason they're so comfortable with this behavior is because SWOCC has repeatedly allowed it to continue.

I really just wanted to get through college, a lawsuit is the last thing I want to deal with, but if I cannot get the school to protect us then I'm going to take this as far as it needs to go. You have yet to interview anyone (including the student that will admit to plagiarism and tell you where to find loads of it). What we're looking at is defamation, harassment and discrimination based on age. I'm not sure if you've noticed, but all of the students that these women target are 30 or above, your non-traditional students- that makes this discrimination too.

Considering my clinical is tomorrow, I can give this until lunch today before I am forced to contact the board of education, media, my attorney (Steve Baldwin in Eugene), the nursing board, and anyone else that I believe can help me and these other students.

Nicole Gililland

SWOCC-000540

| | |
|---|---|
| **From:** | Nicole Gililland |
| **To:** | Saldivar, Francisco W |
| **Subject:** | Last time |
| **Date:** | Monday, May 7, 2018 3:13:15 PM |

Dean Saldivar,

I've asked this question 3 times now very clearly (and in writing) and I'm going to ask it one last time; what is SWOCC doing to protect me from the corruption that you yourself witnessed? Susan literally spelled out her intentions to abuse her authority and LIE about my performance with patient care, this is incredibly serious. Again, there's no investigation needed in this area because you heard it from her mouth yourselves!

I just spoke with Roberta from the Oregon Board of Nursing (complaint investigation dept) and she told me that reigning in corrupt instructors from harassing students is absolutely the job of the college. She was very concerned about my claims and asked me to proceed with formal complaints ASAP, which I will do tonight but that ultimately has no bearing on the lawsuit I will file after today if no aid is offered.

Nicole Gililland

SWOCC-000559

| | |
|---|---|
| **From:** | Nicole Gililland |
| **To:** | Saldivar, Francisco W |
| **Subject:** | Re: Update needed |
| **Date:** | Monday, May 7, 2018 12:10:00 PM |

The issue is that Susan is planning on attending my clinical to "observe" me. Seeing as how she has zero qualms about telling lies about my performance- I'm wondering what I should do to protect myself. I had hoped that an investigation into their behavior would deter anymore corruption, but it appears they'll be doubling down on it. What is the school going to do to protect me in this situation? If nothing, then yes, it is absolutely time to start raising alarms about this situation to whatever higher power that contribute to a resolution. I have lecture at one, but yes, I would most definitely like to discuss this further.

Nicole Gililland

> On May 7, 2018, at 11:48 AM, Saldivar, Francisco W <francisco.saldivar@socc.edu> wrote:
>
> Hi Nicole,
>
> I have been looking into the mater, but it has only been one week. This process takes time. It is not our practice to discuss outcomes/discoveries of investigations of this nature with parties involved until we have concluded it. I am confused as to why an outcome must be made before you report to you clinical today? Your last email said that Liz had no issue with your performance. Did something change? It is my understanding that you are still in the nursing program and still able to attend clinicals.   If your nursing program status has changed, please let me know. I can say that we have been looking into the issues you identified to Tim and I on Monday and thought the week. I have a meeting from 12 to 1 but I am available after that if you would like to talk more about your concerns.
>
> Francisco W. Saldivar
> Dean, Career Technical & Workforce Education
> Southwestern Oregon Community College
> 1988 Newmark Ave.
> Coos Bay, OR 97420
> 1-541-888-7312
>
>
>
>
>
> -----Original Message-----
> From: Nicole Gililland [mailto:nicolegililland15@gmail.com]
> Sent: Monday, May 7, 2018 8:16 AM
> To: Saldivar, Francisco W <francisco.saldivar@socc.edu>
> Subject: Update needed
>
> Dean Saldivar,
>
> I still haven't heard back from you about my clinical tomorrow. I'm afraid I've given the college as much time as I can to act. I understand that you're an incredibly busy man, but I have to ensure that this blatant corruption (that you witnessed firsthand) will not go unanswered for. These women are so comfortable abusing their power that they have become incredibly sloppy about it, and luckily they've given me substantial evidence to move forward with a lawsuit. It's evident that the reason they're so comfortable with this behavior is because SWOCC has repeatedly allowed it to continue.
>
> I really just wanted to get through college, a lawsuit is the last thing I want to deal with, but if I cannot get the school to protect us then I'm going to take this as far as it needs to go. You have yet to interview anyone (including the student that will admit to plagiarism and tell you where to find loads of it). What we're looking at is defamation,

SWOCC-000661

harassment and discrimination based on age. I'm not sure if you've noticed, but all of the students that these women target are 30 or above, your non-traditional students- that makes this discrimination too.

>

> Considering my clinical is tomorrow, I can give this until lunch today before I am forced to contact the board of education, media, my attorney (Steve Baldwin in Eugene), the nursing board, and anyone else that I believe can help me and these other students.

>

> Nicole Gililland

SWOCC-000662

| | |
|---|---|
| **From:** | Saldivar, Francisco W |
| **To:** | Dailey, Tim |
| **Subject:** | RE: The Oregonian |
| **Date:** | Wednesday, May 23, 2018 5:45:00 PM |

Thanks Tim

Francisco W. Saldivar
Dean, Career Technical & Workforce Education
Southwestern Oregon Community College
1988 Newmark Ave.
Coos Bay, OR 97420
1-541-888-7312

-----Original Message-----
From: Dailey, Tim
Sent: Wednesday, May 23, 2018 1:43 PM
To: Saldivar, Francisco W <francisco.saldivar@socc.edu>
Subject: RE: The Oregonian

You may already know this. Nicole went to Patty (apparently she spoke to Deb) and informed her that she is dissatisfied with the progress of the investigation. She said that witnesses have not been contacted. I'm assuming Maze. She once again threatened to go to the press tomorrow if nothing has been done to her satisfaction.

We met with Kelly, I spoke briefly with Victoria who does not want to be involved.

Not sure what turned her around from your meeting this morning. She is not going to give us any sort of leeway here, so we need to be prepared for whatever comes next. t

Tim Dailey (pronouns: he/him)
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439

   Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

SWOCC-000656

-----Original Message-----
From: Saldivar, Francisco W
Sent: Sunday, May 20, 2018 9:55 PM
To: Mageehon, Ali <ali.mageehon@socc.edu>; Dailey, Tim <tdailey@socc.edu>
Subject: FW: The Oregonian

Hi Ali and Tim,

I received this email from Nicole. I hope to talk to you about it tomorrow.

Francisco

On 5/20/18, 4:50 PM, "Nicole Gililland" <nicolegililland15@gmail.com> wrote:

   Mr. Saldivar

   I haven't heard a time from you for tomorrow, but I wanted to give you a heads up that I have been in touch with
the investigative journalist team from the Oregonian, this type of story is their thing. You asked me to trust you and
be patient while you got to the truth, but all you've done is repeatedly meet with the nursing staff and seemingly try
to formulate gameplans to continue to sabotage my education and run out the term clock. You've repeatedly refused
to look for the truth and actually appear to be avoiding it at all costs. First you're saying that the other forms of
plagiarism need to be JUST like mine, why? Plagiarism is plagiarism via the student handbook. But okay, I played
ball and got you plagiarism just like mine and you actually had the audacity to try to tell me it wasn't there so far. It
doesn't take weeks to see it, you know exactly where to find it and the student that can point to the word for word
texts since locating is proving to be so problematic.

   I trusted you, I was patient, but that stops now. I have proven that I'm being singled out. I have proven that I
didn't deserve the zero or the 10% deductions of those assignments. Tomorrow is the last day I will give SWOCC to
do what already should've been done; my grades need to be reinstated, my record needs to be cleared, and my
teachers need to stop harassing me. If this doesn't happen by the close of business tomorrow, Victoria and myself
will give the interview to the Oregonian and move forward with a lawsuit. If you do accomplish these things
tomorrow I will drop all complaints with all agencies and put this situation to rest. I will take this last offer for peace
to the President if I don't hear a response from you by lunch tomorrow.

   Nicole Gililland

SWOCC-000657

**Walker, Susan**

| | |
|---|---|
| **From:** | Wick, Pam |
| **Sent:** | Thursday, May 17, 2018 12:39 PM |
| **To:** | Walker, Susan |
| **Subject:** | Nicole |
| **Attachments:** | Nicole.docx |

Updated with description

1

SWOCC-000124

5-15-18 1615;

Nicole Gililland came to my office to review her test today. She was reviewing the points that she would receive back, when she was done reviewing she stated "that puts my grade where I need it" I stated that her nursing grade was still low, she then stated "The deans are correcting that". I was a bit taken aback and stated I did not think the deans could change the grades in a class and that academic freedom is observed and valued by instructors. Nicole then stated "well its happening". I then stated that the Board of Nursing will usually become involved when there is a program issue along with nursing issues as that is our governing board, Nicole then said when corrupt teachers are teaching the board will put a stop to this. She continued to state that the Board of Nursing was involved and the B.O.N. will fix us. I then told her I would update her grade and returned to answering another student, she continued to change her tone and body language to a more aggressive stance (Nicole leaned in closer to me, shifting agitatedly in her seat, tone of voice changes to a more threatening tone, eyes lowered at me with her words short, clipped and irritated) while reviewing her test. Nicole then stated the deans will set you straight. As Nicole was leaving I felt she was aggressive and angry displaying subversive aggression.

SWOCC-000125

| | |
|---|---|
| **From:** | Walker, Susan |
| **To:** | Dailey, Tim; Saldivar, Francisco W |
| **Subject:** | FW: Board of Nursing |
| **Date:** | Wednesday, May 16, 2018 4:35:36 PM |
| **Importance:** | High |

We need to discuss the direct threat from Nicole below as this has gone too far.

Susan

**From:** Wick, Pam
**Sent:** Wednesday, May 16, 2018 4:30 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** FW: Board of Nursing

**From:** Gililland, Nicole R
**Sent:** Wednesday, May 16, 2018 4:22 PM
**To:** Wick, Pam <pam.wick@socc.edu>
**Subject:** Board of Nursing

Pam,

I didn't think it was appropriate to get into it in front of the other students, but the Oregon State Board of Nursing is most definitely NOT okay with corrupt nursing instructors abusing their power to harass and hurt their students. If you honestly believe they are, please write a statement to that effect to include in this investigation. The formal complaints I've filed with the board of nursing are against Susan and Melissa, I'm happy to include you too if you don't stop skimming my grades.

Thanks,
Nicole Gililland

SWOCC-000480

From:       Dailey, Tim
To:         Saldivar, Francisco W
Subject:    FW: Pam Wick
Date:       Thursday, May 17, 2018 2:06:59 PM
Attachments: IMG_1526.PNG

This is worrisome. How I interpret her statement regarding the Dean will remove the grades if I am proven true seems to be manipulative. Regarding the plagiarism, it was determined that she did. I don't believe it was intentional, just hurried. The grade comment is a different matter.

Will see you later. t

Tim Dailey (pronouns: he/him)
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S). THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

From: Nicole Gililland <nicolegililland15@gmail.com>
Sent: Wednesday, May 16, 2018 4:51 PM
To: Saldivar, Francisco W <francisco.saldivar@socc.edu>; Dailey, Tim <tdailey@socc.edu>
Subject: Pam Wick

Dean Saldivar and Vice President Dailey,

I just had a rather shocking encounter with Pam Wick that you and the nursing board need to be made aware of. Today Pam posted our grades from our test Friday. Not taking any chances, I decided to go review the test after lecture. There were several questions that I had correct Pam marked wrong. I was very polite about it and she did fix the score on the front of the test. I asked if she would please be sure to change the scores in the computer, she rolled her eyes and said yes. I said "Thank you, that will help me a lot." She smiled and said "It's not going to help you nearly enough!" (Referring to the grades Melissa was able change) I told her I'm not worried about those because the Dean promised in our meeting to change those back if I was telling the truth. She laughed and said the Dean can't help me, they have academic freedom. I pointed out academic freedom doesn't give permission to be blatantly unethical. She said they only have to answer to the State Board of Nursing. I responded by telling her that I've included the nursing board in this investigation and then I got up and left her office because other students were present and I didn't think an argument was appropriate. I emailed her after I left (included).

Nicole R. Gililland



**To:** Wick, Pam;

Pam,

I didn't think it was appropriate to get into it in front of the other students, but the Oregon State Board of Nursing is most definitely NOT okay with corrupt nursing instructors abusing their power to harass and hurt their students. If you honestly believe they are, please write a statement to that effect to include in this investigation. The formal complaints I've filed with the board of nursing are against Susan and Melissa, I'm happy to include you too if you don't stop skimming my grades.

Thanks,
Nicole Gililland



Sent from my iPhone

SWOCC-000527

**From:** Dailey, Tim
**To:** Saldivar, Francisco W
**Subject:** FW: Board of Nursing
**Date:** Wednesday, May 16, 2018 4:49:57 PM
**Importance:** High

This has spun out of control.  I was hoping that she would focus on her nursing classes and allow the process to move along.  I sent an email calling for patience and calm.  She is ignoring our counsel. I'm not sure how to advise her at this point.  If she keeps up her campaign either she will fail a class or get dismissed due to disruptive behavior.  Am I over stating my concerns?  t


Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.


THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.


**From:** Walker, Susan
**Sent:** Wednesday, May 16, 2018 4:36 PM
**To:** Dailey, Tim <tdailey@socc.edu>; Saldivar, Francisco W <francisco.saldivar@socc.edu>
**Subject:** FW: Board of Nursing
**Importance:** High

We need to discuss the direct threat from Nicole below as this has gone too far.
Susan

SWOCC-000481

**From:** Wick, Pam
**Sent:** Wednesday, May 16, 2018 4:30 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** FW: Board of Nursing

**From:** Gililland, Nicole R
**Sent:** Wednesday, May 16, 2018 4:22 PM
**To:** Wick, Pam <pam.wick@socc.edu>
**Subject:** Board of Nursing

Pam,

I didn't think it was appropriate to get into it in front of the other students, but the Oregon State Board of Nursing is most definitely NOT okay with corrupt nursing instructors abusing their power to harass and hurt their students. If you honestly believe they are, please write a statement to that effect to include in this investigation. The formal complaints I've filed with the board of nursing are against Susan and Melissa, I'm happy to include you too if you don't stop skimming my grades.

Thanks,
Nicole Gililland

SWOCC-000482

**From:** Nicole Gililland
**To:** Saldivar, Francisco W
**Subject:** Meeting
**Date:** Friday, May 18, 2018 4:17:33 PM

Dean Saldivar,

I'm growing increasingly concerned about this investigation. I know you represent the staff side of things in this, but my hope was that means you hold your staff accountable. I'm unsure how you can claim Susan Walker is "on my side" when she has lied about my clinicals, my patient interactions, and most recently my grades. I'm alarmed that you said this morning that if I fail I will be out of the program, yet you still have not even spoken to the student that can clear up this plagiarism debate in a manner of minutes. My grades are being unfairly altered and I'm being harassed constantly. I feel like we're just running in circles while the damage to my future is being done daily. I'm bringing Victoria and Mayra to our meeting Monday. Victoria can confirm a pattern of behavior and Mayra can confirm that I'm being unfairly singled out when it comes to plagiarism. If the truth is what you're interested in, I'm bringing it to you. Victoria and I are also trying to get a meeting with the President, I just finished speaking with her assistant Deb. I have repeatedly given everyone the opportunity to make this go away by simply agreeing to stop harassing me and just treat me fairly. I'm flabbergasted that the people involved aren't more interested in that path, because at the end of all this it will be their careers that are lost, not mine. Their only hope of getting rid of me is to leave me alone and let me graduate. I will fight this all the way to the very top.

Nicole Gililland

SWOCC-000560

| | |
|---|---|
| **From:** | Saldivar, Francisco W |
| **To:** | Mageehon, Ali; Dailey, Tim |
| **Subject:** | FW: The Oregonian |
| **Date:** | Sunday, May 20, 2018 9:54:39 PM |

Hi Ali and Tim,

I received this email from Nicole. I hope to talk to you about it tomorrow.

Francisco

On 5/20/18, 4:50 PM, "Nicole Gililland" <nicolegililland15@gmail.com> wrote:

Mr. Saldivar

I haven't heard a time from you for tomorrow, but I wanted to give you a heads up that I have been in touch with the investigative journalist team from the Oregonian, this type of story is their thing. You asked me to trust you and be patient while you got to the truth, but all you've done is repeatedly meet with the nursing staff and seemingly try to formulate gameplans to continue to sabotage my education and run out the term clock. You've repeatedly refused to look for the truth and actually appear to be avoiding it at all costs. First you're saying that the other forms of plagiarism need to be JUST like mine, why? Plagiarism is plagiarism via the student handbook. But okay, I played ball and got you plagiarism just like mine and you actually had the audacity to try to tell me it wasn't there so far. It doesn't take weeks to see it, you know exactly where to find it and the student that can point to the word for word texts since locating is proving to be so problematic.

I trusted you, I was patient, but that stops now. I have proven that I'm being singled out. I have proven that I didn't deserve the zero or the 10% deductions of those assignments. Tomorrow is the last day I will give SWOCC to do what already should've been done; my grades need to be reinstated, my record needs to be cleared, and my teachers need to stop harassing me. If this doesn't happen by the close of business tomorrow, Victoria and myself will give the interview to the Oregonian and move forward with a lawsuit. If you do accomplish these things tomorrow I will drop all complaints with all agencies and put this situation to rest. I will take this last offer for peace to the President if I don't hear a response from you by lunch tomorrow.

Nicole Gililland

SWOCC-000539

**To:**       Walker, Susan[swalker@socc.edu]; Saldivar, Francisco W[francisco.saldivar@socc.edu]
**From:**     Dailey, Tim
**Sent:**     Mon 5/21/2018 1:31:59 PM
**Subject:**  RE: OSBN

Susan, we met with Nicole this morning.  We reviewed the current state of affairs with her.  Francisco was very direct regarding what he can do as it relates to his investigation into allegations of plagiarism and the 10% reduction on specific class assignments.  It was stressed to her that she needs to be patient as we can only work as fast as we can given the realities of our schedules.

The Threat Assessment Team is relevantly new.   We will meet on Wednesday to talk about the situation.  I will print out emails for the group  to review.  If you or other nursing faculty have information that we should take a look at, please forward.  Thanks t

Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

**From:** Walker, Susan
**Sent:** Monday, May 21, 2018 1:10 PM
**To:** Saldivar, Francisco W <francisco.saldivar@socc.edu>; Dailey, Tim <tdailey@socc.edu>
**Subject:** OSBN

Hi Tim and Francisco,

Joy, from the OSBN, has asked for a follow-up report regarding Nicole.  I will let her know that we met on Friday, what the decision was and that you have met with her today.  I can't find any information on the college website about a "threat assessment committee".  I'm not sure that I heard that correctly but if that is what I heard she's going to ask for more information.

SWOCC-001329

Susan

SWOCC-001330

**To:**      'Nicole Gililland'[nicolegililland15@gmail.com]
**From:**    Saldivar, Francisco W
**Sent:**    Wed 5/2/2018 5:34:14 PM
**Subject:** RE: Rate My Professor

Hi Nicole,

I am familiar with the site, but I have not looked at it yet. It is on my list. Please keep me posted on any interactions you have that you feel I should hear about. Hang in there!

Francisco W. Saldivar
Dean, Career Technical & Workforce Education
Southwestern Oregon Community College
1988 Newmark Ave.
Coos Bay, OR 97420
1-541-888-7312

-----Original Message-----
From: Nicole Gililland [mailto:nicolegililland15@gmail.com]
Sent: Wednesday, May 2, 2018 4:01 PM
To: Saldivar, Francisco W <francisco.saldivar@socc.edu>
Subject: Rate My Professor

Dean Saldivar,

I'm sure you're familiar with the popular website ratemyprofessor.com. Have you looked at Melissa Sperry's feedback from her students? You should take a look, it is by far the worst rating I have seen. I'm very quickly discovering her reputation is common knowledge. I guess I don't understand how this has been allowed to continue for so long. I am absolutely making it my mission to bring change and protect future student nurses from this horrific experience. Please keep me updated about your investigation so I know what my next move should be. Not doing anything right now is proving extremely difficult. I'm now failing every class and Victoria and I are facing intense backlash and being forced into situations with Melissa that we thought we'd be protected from.

Nicole Gililland

SWOCC-000564

| | |
|---|---|
| **From:** | Sperry, Melissa J |
| **To:** | Saldivar, Francisco W; Dailey, Tim; Walker, Susan |
| **Subject:** | Fw: Melissa Sperry has given feedback on your Endocrine Study Questions Assignments |
| **Date:** | Tuesday, May 22, 2018 9:22:36 AM |

Greetings all

The class was given an assignment on Monday last week to help study content-- they were given 5 days to complete the assignment and turn it in for assignment points. All students successfully completed the assignment with the exception of Nicole. I did reach out to her to see if it had been submitted elsewhere.
The following is her response

Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

"*What lies behind us and what lies before us are tiny matters compared to what lies within us.*" ~ *Ralph Waldo Emerson*

---

**From:** Gililland, Nicole R
**Sent:** Monday, May 21, 2018 5:55 PM
**To:** Sperry, Melissa J
**Subject:** Re: Melissa Sperry has given feedback on your Endocrine Study Questions Assignments

No, I didn't. I spent about 4-5 hours on it and then decided to forgo the assignment due to how much time it was taking me and I needed as much time as I could to study because I found endocrine to be very challenging. I apologize, but considering my current predicament, I had to choose which was more important (grade-wise).  I am happy to submit what I did or complete it tomorrow if you would still like it.

Nicole

---

**From:** melissa.sperry@socc.edu <melissa.sperry@socc.edu>
**Sent:** Monday, May 21, 2018 3:45:40 PM
**To:** Gililland, Nicole R
**Subject:** Melissa Sperry has given feedback on your Endocrine Study Questions Assignments

In your Pathophysiological Processes II course, Melissa Sperry has given feedback on your Endocrine Study Questions Assignments, saying:

SWOCC-000519

Hi Nicole

I did not receive you Endocrine assignment here or in an email. Did you submit it in a different area?


To view your Assignments, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/NRS/NRS__233/2017_SP-NRS__233-01/Coursework.jnz?
portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change&id=bf2d4db2-8ed0-49f6-8b75-3aa35ebe1483

SWOCC-000520

| From: | Sperry, Melissa J |
|-------|-------------------|
| To: | Saldivar, Francisco W; Dailey, Tim; Walker, Susan |
| Subject: | Fw: Melissa Sperry has given feedback on your Ticket out of Class Assignments |
| Date: | Tuesday, May 22, 2018 10:52:12 AM |

This is her response from the second assignment not turned in

Melissa Sperry MSN, RNc, NC-BC,
Nursing Faculty
T. 541.888.1533
Southwestern Oregon Community College
http://www.socc.edu
http://www.facebook.com/swocc
http://www.twitter.com/swocc

*"What lies behind us and what lies before us are tiny matters compared to what lies within us." ~ Ralph Waldo Emerson*

---

**From:** Gililland, Nicole R
**Sent:** Tuesday, May 22, 2018 9:59 AM
**To:** Sperry, Melissa J
**Subject:** Re: Melissa Sperry has given feedback on your Ticket out of Class Assignments

No Melissa, that was supposed to be completed in class on Friday as a part of lecture. When you were unable to attend lecture, that plan fell through. We did our tests and were released at which time I needed to go and see about meeting with the SWOCC President and immediately following that I had important business with the nursing board that needed to by addressed before they closed for the weekend. By the time I was finished with these important functions, there was not enough time to complete the assignment before the 5pm deadline that hadn't been adjusted in spite of the other adjustments. I know you can see that I attempted it after 4pm and stopped when I realized there was no way to get it done again in time (it was incredibly time consuming the first time). So I took a zero. If there's a problem with any of that, please let me know a good time to do it again.

**From:** melissa.sperry@socc.edu <melissa.sperry@socc.edu>
**Sent:** Tuesday, May 22, 2018 9:46:57 AM
**To:** Gililland, Nicole R
**Subject:** Melissa Sperry has given feedback on your Ticket out of Class Assignments

In your Clinical Pharmacology II course, Melissa Sperry has given feedback on your Ticket out of Class Assignments, saying:

Hi Nicole
I do not see the second half of the assignment for Kaplan this week, either in LakerLink or in my

SWOCC-000521

email. Was it submitted elsewhere?

To view your Assignments, you can go directly to:
https://mylakerlink.socc.edu/ICS/Academics/NRS/NRS__231/2017_SF-NRS__231-
01/Coursework.jnz?
portlet=Coursework&screen=StudentAssignmentDetailView&screenType=change&id=938e1ae8-
41d0-4f7a-804b-f44b195c35d5

SWOCC-000522

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual, | ) ) Remote Deposition of: |
| Plaintiff, | ) ) NICOLE GILILLAND ) |
| vs. | ) ) |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILEY, an individual; FRANCISCO SALDIVAR, an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | ) No. 6:19-cv-00283-MK ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

March 12, 2021 - 10:32 a.m.

Held through a Zoom videoconference

Reporter:  VICKY McDANIEL, CSR, RMR

1    were Melissa Sperry; is that right?

2            A.    (Inaudible.)

3            Q.    I'm sorry.  You glitched right there.  Can

4    you repeat what you said?

5                  MR. MARK:  She was telling me that I was

6    on mute.  I was going to lodge -- I was holding my

7    hand up.  I was going to lodge an objection to your

8    question after you finish it fully here.

9            Q.    (By Mr. Reese)  Sure thing.  And if

10   Mr. Mark has an objection to my question, I'll do my

11   best to ask it in a better way.  I'll also keep an

12   eye on him so I don't talk right through his ability

13   to object.

14                 Ms. Gililland, I believe I didn't get an

15   answer to confirming that of the faculty members who

16   worked under Ms. Walker's direction, we have Melissa

17   Sperry.  Correct?

18           A.    Yes.

19           Q.    And she was also assigned to be your

20   advisor?

21           A.    Correct.

22           Q.    What's the role of the advisor, as you

23   understand it?

24           A.    Especially in the nursing program, because

25   the nursing program is very internal, it's like a --



1      A.    So they're all just combined.  That's kind

2   of why it's more difficult to separate them by name,

3   because the instructors all teach parts of different

4   classes.  It's mostly each instructor takes a week at

5   a time instead of a class per se.  I know that their

6   testimony is it's more assigned.  And that could be,

7   you know, true, because I'm just saying it from my

8   understanding, not theirs.

9            But every week, like this is Robin's week,

10   this is Melissa's week to teach, this is Pam's week

11   to teach.  And so they would just kind of alternate

12   weeks, probably based on the subjects they were

13   discussing in their depositions.  But that's how

14   it -- so, you know, it's a Melissa week, it's a Pam

15   week, it's -- so on and so forth.

16            And you get taught -- again, you have

17   lecture Monday, Wednesday, Friday.  You have clinical

18   at the hospitals on Tuesday, and then you have

19   clinical lab on Thursday.  So -- and then, again, the

20   classes are just kind of all combined into the week.

21      Q.    So -- and I appreciate you walking me

22   through this, because it is confusing.  In a quarter

23   in the nursing program, ultimately you're going to

24   get credit for three classes.  But as you move

25   through the quarter, each week you are taking a mash



```
 1   of those three classes from whatever instructor is
 2   assigned for the topic that is being addressed in a
 3   given week?
 4        A.    Yes.
 5        Q.    So if we're referring to like week three
 6   of the program, that is going to be taught by one
 7   particular instructor but cover course material for
 8   up to all three of the classes that you're getting
 9   credit for.  Right?
10        A.    Yes.
11        Q.    Okay.
12              MR. MARK:  Thank you for clarifying that.
13   I now understand.
14              THE WITNESS:  Okay.  Sorry.  Sorry I
15   wasn't clear before.  I apologize.
16              MR. MARK:  No, I just -- he asked a great
17   question.
18        Q.    (By Mr. Reese)  Well, and there's no
19   secret here.  Brandon and I have not participated in
20   this program, so there is a bit of a learning curve
21   here as we both try to understand how this works.
22              The big point is if I ask you a question
23   that makes some assumption that clearly isn't true,
24   will you make sure you point that out so that we can
25   be clear as to our understanding of how this works?
```



 1        A.    I will do my absolute best.

 2        Q.    All right.

 3        A.    We could probably make it to the hour

 4  mark, but I kind of -- at least at that point, maybe

 5  in ten minutes we can take a break.

 6        Q.    Let's take a break right now if you'd

 7  like.  That's fine.

 8        A.    Are you sure?  I can make it to the hour

 9  mark.

10        Q.    No, let's take a break now and come back

11  at half past the hour.

12        (Recess from 11:19 a.m. to 11:31 a.m.)

13        Q.    (By Mr. Reese)  Before we took our break,

14  you were -- Ms. Gililland, you were helping us

15  understand how a particular quarter is structured.

16  And I understand that the teachers essentially take a

17  week and will teach the content that will apply to

18  the three courses in which you're enrolled for a

19  quarter.  Is it fair to say that each week is a

20  different topic?  Is it broken up into kind of

21  ten-week quarters?

22        A.    Yes.  It's usually surrounding, like, a

23  system.  So like this week will be more focused on

24  cardiovascular, this week will be neurologic.  And,

25  again, I'm not -- I'm sure there's, like, other



1    teachers that help other teachers on their weeks; and

2    it might not be exactly set up that way, but from my

3    perspective, that's how it seemed, yes.

4         Q.    And during a given week when you're

5    focusing on one system, are you doing projects?

6    Taking tests?  What does the coursework look like?

7         A.    So you're supposed to prepare for the

8    week, do all the reading.  There's a lot of reading.

9    You do that the weekend before the week starts.  So

10   by Monday you should have already read everything

11   that you need to read and be prepared for that, that

12   week's system.

13              And then typically, in class you'll do

14   like a presentation with the group and then lectures

15   obviously by the teacher.  Sometimes random little

16   games.  Robin was big on games, like a Jeopardy type

17   game sort of thing.

18              And then on Friday you come to classes and

19   you take your exam, which is -- your exams are worth

20   90 percent of your grade, and you come and take your

21   tests for the week Friday in class.  And then your

22   week is over, and you start Saturday by starting

23   reading for the next week.

24        Q.    One exam per week?

25        A.    Yes.  Well, it's -- no, it's three --



1  three -- it's one sitting, but again, it's covering

2  three classes.  So technically, it's three exams in

3  one sitting.

4      Q.    Is the subject matter for all three exams

5  on the same system that you were studying in that

6  week?

7      A.    I don't recall specifically.  It should be

8  how that class relates to that system, I believe.

9      Q.    Okay.

10     A.    Like, so if it were the pharmacology test,

11 might be talking about drugs for that system, like

12 that kind of thing, but there are different classes

13 technically maybe approaching it from different ways.

14     Q.    Okay.  We've seen a lot of reference to

15 case studies.  What are case studies?

16     A.    It's basically just a summary of a person,

17 a patient, what they're presenting with, their signs,

18 symptoms, hospital notes.  Just a study of a

19 patient's experience in a medical setting.

20     Q.    Dealing with whatever system you're

21 studying in that particular week?

22     A.    Typically, yes.

23     Q.    How does your clinic experience play into

24 the program?

25     A.    That's when you're learning -- okay, so if



1  meeting on Monday morning?

2      A.    No, not that I -- I mean, if I do, I don't

3  recall her ever even replying to this.

4      Q.    Sure.

5      A.    So -- yeah.

6      Q.    All right.

7      A.    I don't know if that was a response, or

8  was mine the last one?  I don't know if she responded

9  to that.  I don't recall.

10     Q.    Okay.  Let's take a look at SWOCC 564,

11 which will be Exhibit 54.

12            (EXHIBIT 54 WAS MARKED.)

13     Q.    So this appears to be an e-mail that you

14 sent to Dean Saldivar on May 2nd?  So after that

15 Monday meeting, correct?

16     A.    Yes.

17     Q.    And here you're directing Dean Saldivar to

18 look into Sperry's Rate My Professor website.  Is

19 that right?

20     A.    Yes.

21     Q.    What prompted you to send this e-mail?

22     A.    I'm not sure who told me to look at it,

23 but someone in the midst of all -- one of my

24 classmates mentioned that she had terrible reviews.

25 I looked and added to it myself.  But, yeah, there



1                  REPORTER'S CERTIFICATE

2

3          I, Vicky McDaniel, Registered Professional
Reporter and Certified Shorthand Reporter in and for
4   the State of Utah, do hereby certify:

5          That prior to being examined, the witness,
NICOLE GILILLAND, was remotely by me duly sworn to
6   tell the truth, the whole truth, and nothing but the
truth;

7

          That said deposition was taken down by me
8   in stenotype on March 12, 2021 through a Zoom
videoconference and was thereafter transcribed, and
9   that a true and correct transcription of said
testimony is set forth in the preceding pages,
10  according to my ability to understand through Zoom.

11          I further certify that, a request having
been made to review the transcript, a reading copy
12  was sent to Mr. Mark for the witness to read and sign
and then return to me for filing with Mr. Reese.

13

          I further certify that I am not of kin or
14  otherwise associated with any of the parties to said
cause of action and that I am not interested in the
15  outcome thereof.

16          WITNESS MY HAND this 20th day of March,
2021.

17

18

19                         Vicky McDaniel

20

21                    Vicky McDaniel, CSR, RMR

22

23

24

25



**Walker, Susan**

| | |
|---|---|
| **From:** | Gililland, Nicole R |
| **Sent:** | Wednesday, May 23, 2018 1:50 PM |
| **To:** | Walker, Susan |
| **Subject:** | Re: Advisory appointment. |

Perhaps email is best for both of us.

Either you're going to do the right thing or you're not. I had a very good reason for requesting to take the tests early and I have mountains of medical records to prove it. I'm as guilty of plagiarism as everyone else in this program. You are allowing this to happen to me when I know you know that I don't deserve it. I just went to the Presidents office and now I'm telling you; today is the last day I'm willing to offer a peaceful resolution. Tell your staff to treat Victoria and myself fairly (Pam and Melissa), reinstate my grades and end this probation and in turn I will resend all complaints against you and members of your staff with the school and the nursing board. I will forgive and forget and never speak of this again, I'll even sign a non disclosure agreement. All I want is to graduate and move away. I'm not asking for special treatment, I have what it takes to get there on my own.  If you prevent that from happening I will dedicate the rest of my life to exposing everything that wrong with this program/school. I have a reporter I've been speaking with from the Oregonian they want to interview Victoria and myself, they mentioned the exposure will help us secure a legal team willing to take on the multimillion dollar lawsuit against the school and the individuals involved. We will lobby the change the laws surrounding "academic freedom" that has allowed your staff to hurt so many students and your faces will be at the front of it. I don't want ANY of this, but I will do whatever I have to do to make this right.


Nicole Gililland

**From:** Gililland, Nicole R
**Sent:** Tuesday, May 22, 2018 4:51:55 PM
**To:** Walker, Susan
**Subject:** Re: Advisory appointment.

Okay, see you then.

**From:** Walker, Susan
**Sent:** Tuesday, May 22, 2018 4:44:56 PM
**To:** Gililland, Nicole R
**Subject:** RE: Advisory appointment.

We can meet in Sumner 13.

**From:** Gililland, Nicole R
**Sent:** Tuesday, May 22, 2018 4:11 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Re: Advisory appointment.

Yes I can. Where would you like to meet?

1

SWOCC-000120

**From:** Walker, Susan
**Sent:** Tuesday, May 22, 2018 4:07:40 PM
**To:** Gililland, Nicole R
**Subject:** RE: Advisory appointment.

Hi Nicole,

I checked with Francisco and he and I are available at 8 am tomorrow. Can you meet with us then?

Susan

**From:** Gililland, Nicole R
**Sent:** Tuesday, May 22, 2018 1:39 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Advisory appointment.

Hi Susan,

I just wanted to check with you before I head home from Coquille, do you happen to know a time that would work best for you for an advisory appointment? If today is no good, I will be there tomorrow for both lab and lecture. Also, Friday I will be on campus at about 8am and can stay past our test as well.

Thanks,
Nicole Gililland

SWOCC-000121

**From:** Dailey, Tim
**To:** Saldivar, Francisco W
**Subject:** FW: OIG Complaint #C18HQ02951
**Date:** Tuesday, May 29, 2018 1:55:47 PM

From Nicole


Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.


THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC
COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS
INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS
CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR
DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED
THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF
ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU
HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL,
AND DELETE THE ORIGINAL MESSAGE.


**From:** Nicole Gililland <nicolegililland15@gmail.com>
**Sent:** Tuesday, May 29, 2018 12:18 PM
**To:** Dailey, Tim <tdailey@socc.edu>
**Subject:** Fwd: OIG Complaint #C18HQ02951


Sent from my iPhone

Begin forwarded message:

> **From:** HQOPSHL <HQOPSHL@ed.gov>
> **Date:** May 29, 2018 at 11:22:16 AM PDT
> **To:** "nicolegililland15@gmail.com" <nicolegililland15@gmail.com>

SWOCC-000524

**Subject: OIG Complaint #C18HQ02951**

Madam,

Thank you for contacting the Department of Education, Office of Inspector General (OIG) Hotline. We have reviewed your complaint and determined the appropriate office to address your concerns is the Department's Federal Student Aid (FSA), Office of Program Compliance.

A copy of your complaint has been referred to that office for further review and appropriate handling.  Please contact that office directly at 202-377-4277, or via email at: CaseTeams@ed.gov for information regarding your complaint.

Please allow 7 to 10 business days before contacting the program office to allow the office time to receive and review your information.


Sincerely,

Hotline Operator
Department of Education
Office of Inspector General
https://www2.ed.gov/about/offices/list/oig/hotline.html


This is a send only email address, replies will not be received.

SWOCC-000525

| | |
|---|---|
| **From:** | Dailey, Tim |
| **To:** | Nicole Gililland |
| **Cc:** | Saldivar, Francisco W |
| **Subject:** | Harassment policy and form |
| **Date:** | Friday, May 25, 2018 12:45:27 PM |
| **Attachments:** | APP_7165_Discrimination_and_Harassment_Complaint_F.pdf |
| | APP_7165_Discrimination_and_Harassment_Policy.pdf |

Good afternoon Nicole, I wanted to give you an update regarding your complaint.  I spoke with Francisco this morning after reading your letter outlining your concerns.  Francisco has been trying to meet with Maze for the past few days.  Due to scheduling conflicts this has been a difficult meeting to set up.

In your letter you reference harassment by nursing faculty regarding your complaint.  I have attached the Discrimination and Harassment form and Policy.  This will not cover your complaint regarding your nursing grades but will address your concerns regarding your interactions with nursing staff.   Please fill out the form and I will get it to the appropriate parties for review.

Francisco and I have another meeting scheduled for Tuesday morning to talk about your complaint.  We will have additional information and will bring you up to date.

In your letter you referenced ACCSC.  I am not familiar with this organization can you tell me with the letter stand for?

Tim


Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.


THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU

SWOCC-000551

HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

SWOCC-000552

**From:**   Dailey, Tim
**To:**   Walker, Susan; Saldivar, Francisco W
**Subject:**   RE: Reschedule
**Date:**   Tuesday, May 29, 2018 6:25:24 PM

Just an FYI, Nicole stopped by my office at 11:30 today.  She informed me that she is planning to go to the national media along with the Dept... Of Ed.  Francisco and I met at 10:00 to talk about the latest information.

I told Nicole the following,
She is still on probation
She is receiving a zero for her case study
She is receiving a 10% reduction on her exams she took late

She also talked about being placed in the simulation lab and that she is not or never has been unsafe with patients.

She feels that she has been targeted and is not receiving the kind of support necessary to resolve the issue of plagiarism and being put on probation.

I told her that we are indeed working on the complaint.

She unfortunately does not have many options.    Our current Grade Appeal policy does not fit her situation.    I did send her the Discrimination/Harassment policy and form last Friday.  I have not received anything to this date.

So this is what I know for now.  Thx t


Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS

SWOCC-000646

CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

**From:** Walker, Susan
**Sent:** Tuesday, May 29, 2018 8:51 AM
**To:** Saldivar, Francisco W <francisco.saldivar@socc.edu>; Dailey, Tim <tdailey@socc.edu>
**Subject:** RE: Reschedule

I emailed Joy and Nancy at the Board of Nursing and am awaiting their reply.  I do feel we need to resolve this and not let it play out.

**From:** Walker, Susan
**Sent:** Tuesday, May 29, 2018 8:47 AM
**To:** Saldivar, Francisco W <francisco.saldivar@socc.edu>; Dailey, Tim <tdailey@socc.edu>
**Subject:** FW: Reschedule

FYI

**From:** Gililland, Nicole R
**Sent:** Tuesday, May 29, 2018 8:43 AM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Re: Reschedule

For the record, I don't feel last week was an advisory appointment. We didn't discuss anything I need advising on and when I tried to discuss those things I was told we'd discuss them another time. Almost immediately following that meeting I emailed Francisco to express my discomfort with the simulation. He said he would call me to discuss it, he never did. I feel it's incredibly inappropriate to continue feeding this false narrative that there's any reason to be concerned about my patient skills. I have passed every simulation with flying colors and every week in clinical I get positive feedback about my patient care. I have not done anything wrong. I have offered resolution multiple times to no avail.. If legal remedies are what remain, so be it.  Again, I just want to be clear that last week was not an advisory appointment and we didn't "come up with a plan for progression."

See you at 4. You're welcome to have whoever you'd like present, I just need clarification on some upcoming assignments so I can do them to your standards.

Thanks,
Nicole Gililland

**From:** Walker, Susan

SWOCC-000647

**Sent:** Tuesday, May 29, 2018 8:00:39 AM
**To:** Gililland, Nicole R; Saldivar, Francisco W
**Subject:** RE: Reschedule

Nicole,

In the advisory meeting that we had last week, we developed a plan for progression which involved a simulation for today.  We will not meet for an advisory appointment during the scheduled lab time as I am also working with another individual.  You may sign up on my schedule that is posted on my door for an advising meeting.

Susan

---

**From:** Gililland, Nicole R
**Sent:** Saturday, May 26, 2018 4:55 PM
**To:** Saldivar, Francisco W <francisco.saldivar@socc.edu>; Walker, Susan <swalker@socc.edu>
**Subject:** Reschedule

Susan and Francisco,

We need to reschedule this simulation on Tuesday morning. My attorney is in Eugene and that time doesn't work for him. I will not submit to anymore of this harassment without an attorney present and seeing as how you lack a legitimate reason why I'm continuing to be singled out, harassment is exactly what this is. We can do my advisory appointment at that time (still waiting on that) and reschedule the simulation at a time that works for everyone.

Thanks,
Nicole Gililland

SWOCC-000648

**To:**      tdailey@socc.edu[tdailey@socc.edu]
**From:**    Nicole Gililland
**Sent:**    Thur 5/31/2018 6:20:49 PM
**Subject:** Enough
IMG_1650.PNG
ATT00002.txt

Tim,

I've attached a copy of what the nursing student handbook says in regards to plagiarism.  I searched and couldn't find ANYTHING that talks about all of these technicalities that Francisco seems to create to excuse both of your failures in this so-called "investigation." Please provide documented proof of your new claims about what does and doesn't constitute plagiarism and on what date we students were advised of these "rules." You're both going to have to answer for the way you've handled this situation.

SWOCC-003970

**To:** Dailey, Tim[tdailey@socc.edu]
**From:** Gililland, Nicole R
**Sent:** Fri 6/1/2018 12:10:51 PM
**Subject:** Re: Question

Francisco has been coming up with rules to guide this investigation to a favorable end for Susan/Melissa and I'm afraid that's impossible, I have too much evidence and at this point the school is looking terrible. Coos Bay is still reeling with embarrassment from the investigation at the middle school. The administration at this school needs to consider the implications and consequences of continuing this behavior. It's not fair for the whole school and community to suffer because corrupt individuals want to play a game of chicken with me. I promise, I'm not backing down until I'm exonerated and my record is clear, whatever that takes.

**From:** Dailey, Tim
**Sent:** Friday, June 1, 2018 11:47:42 AM
**To:** Gililland, Nicole R; Saldivar, Francisco W
**Subject:** RE: Question

Thanks Nicole, I spoke with Rod Keller today and he confirmed what Marta has said.  t

Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

**From:** Gililland, Nicole R
**Sent:** Friday, June 01, 2018 10:12 AM
**To:** Saldivar, Francisco W <francisco.saldivar@socc.edu>; Dailey, Tim <tdailey@socc.edu>
**Subject:** Fw: Question

SWOCC-002736

**From:** Wozniak, Marta
**Sent:** Friday, June 1, 2018 10:05:36 AM
**To:** Gililland, Nicole R
**Subject:** RE: Question

Hi Nicole,
You are absolutely right. It is "considered plagiarism to copy word for word text from our textbooks and course materials if we don't properly cite the source in our work." Also, we should remember to enclose all borrowed words with quotation marks if we are actually quoting, and not paraphrasing. If a student includes a citation, but  forgets quotation marks for material copied word for word, it would also be an example of plagiarism.
Keep up the good work,

*Marta*

Marta Wozniak
Associate Professor of Writing and Literature
Southwestern Oregon Community College, Curry Campus
96082 Lone Ranch Parkway, Brookings, OR 97415
541-813-1670



Southwestern Oregon Community College is an equal opportunity employer and educator.

**From:** Gililland, Nicole R
**Sent:** Friday, June 01, 2018 8:38 AM
**To:** Wozniak, Marta <mwozniak@socc.edu>
**Subject:** Question

Hello Professor Wozniak,

My name is Nicole Gililland and I'm a student here at SWOCC. I have a question regarding APA citations and plagiarism and since you teach so much English/Writing and even Academic Literacy here at the college, I knew you could probably answer.

Is it considered plagiarism to copy word for word text from our textbooks and course materials if we don't properly cite the source in our work?

Yesterday someone told me that it's only considered plagiarism if you copy an outside source (like a website or book not in the syllabus). They said students and teachers have assumed permission to copy from our textbooks. This sounded wrong to me. Can you tell me if this is accurate?

Thank you for your time,
Nicole Gililland

SWOCC-002737

| | |
|---|---|
| **From:** | Dailey, Tim |
| **To:** | Walker, Susan |
| **Cc:** | Saldivar, Francisco W |
| **Subject:** | FW: Update |
| **Date:** | Wednesday, June 13, 2018 9:41:59 AM |

Good morning Susan, I wanted to send you the latest email from Nicole.    Do you have any additional information you can share with Francisco and myself?   We will need to respond to her.. Thanks t

Tim Dailey (pronouns: he/him)
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439

  Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

-----Original Message-----
From: Nicole Gililland <nicolegililland15@gmail.com>
Sent: Wednesday, June 13, 2018 6:01 AM
To: Dailey, Tim <tdailey@socc.edu>
Subject: Update

Tim,

It's the end of the year and I would like an update please. It appears that I will just barely fail one class, although Susan had to manipulate which assignments go with what class to ensure it. These grades that they changed (about 2 months ago now) make the difference between passing and failing. If this is going to be allowed I need to know now so I can file suit and get this court case going and hopefully resolved in time for fall.

Nicole

SWOCC-000541

**To:**      Dailey, Tim[tdailey@socc.edu]; Saldivar, Francisco W[francisco.saldivar@socc.edu]
**From:**    Walker, Susan
**Sent:**    Wed 6/20/2018 10:34:14 AM
**Subject:** RE: NG

Yes, she did plagiarize on the case study that Robin gave but she also decided to forgo an assignment in Nursing 112 as well.  She decided to forgo an assignment in Nursing 233 and was notified in a meeting on 5/23/18 that it affected her grade.  Francisco was present during that meeting.  She also did not turn in her last assignment for Nursing 233.

Susan

---

**From:** Dailey, Tim
**Sent:** Wednesday, June 20, 2018 10:05 AM
**To:** Walker, Susan <swalker@socc.edu>; Saldivar, Francisco W <francisco.saldivar@socc.edu>
**Subject:** NG

Good morning Susan, I checked on Nicole's grades.  I have a question.

Was NUS 112 the course she was accused of plagiarizing in?  If so, how did she fail NUS 233?

Just want to be clear in case she contacts me.  Thanks t

Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

SWOCC-001328

## Walker, Susan

| | |
|---|---|
| **From:** | Gililland, Nicole R |
| **Sent:** | Thursday, June 14, 2018 11:59 AM |
| **To:** | Walker, Susan |
| **Subject:** | Re: Why? |

Also, the website evaluation is supposed to be filled out by you, or at least that's the impression I was given last term when Melissa said as much and filled it out. I filled out the top and did my part.

**From:** Gililland, Nicole R
**Sent:** Thursday, June 14, 2018 11:38:22 AM
**To:** Walker, Susan
**Subject:** Re: Why?

First of all, you're not accurate in your grading summary. Those are the top patient teaching information links form the 2020 website, which is a lot closer to what the syllabus stated than I did last term and had no problems then.

Ultimately it doesn't matter, not in the bigger picture. You should do whatever you feel is right because me trying to get you to demonstrate integrity and ethics this term put me on a very dark path and in a very lonely place (which was clearly the point). I have seen the light at the end of the tunnel (literally) and I have a renewed sense of purpose. So again, do whatever you see fit and we will let the cards fall where they may afterwards. There are much bigger forces than you that haven't been corrupted by their power.

If I don't speak with you again, take care of yourself.

Nicole

**From:** Walker, Susan
**Sent:** Thursday, June 14, 2018 7:48:00 AM
**To:** Gililland, Nicole R
**Subject:** RE: Why?

I'm happy to change that and put it in your nursing grade.

**From:** Gililland, Nicole R
**Sent:** Wednesday, June 13, 2018 9:01 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Re: Why?

Not according to any other Kaplan test or according to any student in the class :)

1

SWOCC-000109

**From:** Walker, Susan
**Sent:** Wednesday, June 13, 2018 10:54:50 AM
**To:** Gililland, Nicole R
**Subject:** RE: Why?

The Kaplan test you took on Monday was the Kaplan pathophysiology test.  It goes under the patho class.

**From:** Gililland, Nicole R
**Sent:** Tuesday, June 12, 2018 8:41 PM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Why?

Also, why was the Kaplan test moved to the patho class? That was supposed to be under 112.

2

SWOCC-000110

**Walker, Susan**

| | |
|---|---|
| **From:** | Gililland, Nicole R |
| **Sent:** | Saturday, June 16, 2018 8:33 AM |
| **To:** | Walker, Susan |
| **Subject:** | Fix my grade |

You do realize how bad you're making yourself look, right? You cannot be this disillusioned unless you've got something very wrong with you. Put the Kaplan where it belongs and fix all of the grades Melissa broke ethics to decrease. You could've fixed this from the very start, it has only gotten this bad because you have repeatedly refused to do the right thing. We both know that I have emails proving I asked Melissa to take her tests early and I was INCREDIBLY ill, I had a doctors appointment. Two weeks later Jane needed to take her son to the doctor for a cold, she had no problems and didn't get her grades docked. There isn't a jury in the world that won't find that wrong. There is proof everywhere to what I'm saying and if you will not win. Only one of us is proving they shouldn't be a nurse and I promise it's not me. Stop making this bigger and uglier, fix my grades before you destroy the entire program.

Nicole

1

SWOCC-000108

Exhibit 73, Page 1 of 1



| From: | Nicole Gilliland |
| Too: | Dailey, Tim; Walker, Susan; Saldivar, Francisco W |
| Subject: | Grade Report |
| Date: | Saturday, July 7, 2018 12:22:02 PM |
| Attachments: | IMG_1933.PNG |

Few things wrong with this; NRS112 was the only F at the end of term and that was because of the grades they changed and a test Susan moved. I didn't fail patho, so that's a lie. Also, this lists Melissa as my advisor despite the fact we agreed in the hearing (clear back at the beginning of term) that Melissa would no longer serve in that capacity. You would think considering the current environment you all would at least pretend that you're not corrupt.

**ᐧᐧᐧᐧ TFW  LTE**          **12:12 PM**          ⌇ ▬

🔒 **mylakerlink.socc.edu**          ↻

**SOUTHWESTERN**
*myLakerLink*                          Search...  🔍

Welcome back **Nicole Rene Gilliland** ( *Personal Info* | *Logout* )

HOME   ADMISSIONS   ACADEMICS   CAMPUS LIFE   FINANCES   ADMINISTRATIVE SERVICES   MORE ▼

You are here:  Academics > Students

### Academics                                    ⚙ 🖨

| Academics |
| --- |
| Students ⊟ |
| Before You Drop a Course |
| Tips and Tricks |
| Student Schedule |
| Course Schedules |
| Do I have a hold on my account? |
| Grade Report |
| Unofficial Transcript |
| My eLearning Courses |
| Am I a LiveText student? |
| Student Reports |
| **Academic Advising** |
| **Academic Resources** |

**Quick Links**

| Quick Links |
| --- |
| ⊞ My Pages |
| Email (Office 365) |
| SWOCC Home |
| Athletics |
| Bookstore |
| Campus Services |
| Future Students |
| Library |
| OCCI Home |
| Nursing |

## Grade Report – Final Grade Report

Grade Report > Final Grade Report

**Final Grade Report for: Nicole Rene Gilliland**

**Term:**  2017-2018 Academic Year - Spring Term  ▼    View Midterm Grade Report

### Continuing Education

| Course | Title | Final Grade | Repeat | Attempted Credits | Earned Credits | GPA Credits | Quality Points | GPA |
|---|---|---|---|---|---|---|---|---|
| ED 0593 80 | Tutoring Lab | Q | - | 0.00 | 0.00 | 0.00 | 0.00 | |
| | | | Term Totals: | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |
| | | | Career: | 0.00 | 0.00 | 0.00 | 0.00 | 0.0000 |

### Undergraduate

**Advisor:**   Melissa J Sperry
**First Major:**   AA/OT Associate of Arts Oregon Transfer

| Course | Title | Final Grade | Repeat | Attempted Credits | Earned Credits | GPA Credits | Quality Points | GPA |
|---|---|---|---|---|---|---|---|---|
| NRS 112 04 | Foundations of Nursing in Acute I | F | - | 6.00 | 0.00 | 6.00 | 0.00 | |
| NRS 231 01 | Clinical Pharmacology II | C | - | 3.00 | 3.00 | 3.00 | 6.00 | |
| NRS 233 01 | Pathophysiological Processes II | F | - | 3.00 | 0.00 | 3.00 | 0.00 | |
| | | | Term Totals: | 12.00 | 3.00 | 12.00 | 6.00 | 0.5000 |
| | | | Career: | 199.00 | 182.50 | 190.50 | 601.00 | 3.1549 |

Printable Grade Report 📄

Privacy Policy   About Us   Contact Us   Campus Directory          Powered by Jenzabar. v8.5.0

Server: JENZWEB01



Sent from my iPhone

SWOCC-000549

**Walker, Susan**

| | |
|---|---|
| **From:** | Nicole Gililland <nicolegililland15@gmail.com> |
| **Sent:** | Saturday, July 07, 2018 12:22 PM |
| **To:** | Dailey, Tim; Walker, Susan; Saldivar, Francisco W |
| **Subject:** | Grade Report |

Few things wrong with this; NRS112 was the only F at the end of term and that was because of the grades they changed and a test Susan moved. I didn't fail patho, so that's a lie. Also, this lists Melissa as my advisor despite the fact we agreed in the hearing (clear back at the beginning of term) that Melissa would no longer serve in that capacity. You would think considering the current environment you all would at least pretend that you're not corrupt.

1

SWOCC-000107

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


| | | |
|---|---|---|
| NICOLE GILILLAND, an individual, | ) ) ) | Remote Deposition of: |
| Plaintiff, | ) ) | TIM DAILEY |
| vs. | ) ) ) | |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILEY, an individual; FRANCISCO SALDIVAR, an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 6:19-cv-00283-MK |
| Defendants. | ) ) ) | |


March 16, 2021 - 10:02 a.m.

Held through a Zoom videoconference


Reporter:  VICKY McDANIEL, CSR, RMR

1        A.    No.

2        Q.    Okay.  And that's completely fair.  So

3   this is -- just to confirm, this is an e-mail from

4   you to Francisco Saldivar on April 27th, 2018,

5   correct?  Or -- pardon me -- it's to Nicole, and you

6   copied Francisco Saldivar.  Correct?

7        A.    Yeah.  That's correct.

8        Q.    And you say, "Nicole, I spoke with

9   Francisco, the dean of CTE, about your situation."

10  Correct?

11       A.    That's correct.

12       Q.    What does "CTE" stand for?

13       A.    He is the -- he was the dean of career

14  technical education, which nursing falls under.

15       Q.    So -- and this is a good question, or

16  point to ask this question.  Was there sort of a

17  chain of command?  In other words, did Francisco

18  answer to you, or were you sort of, you know,

19  partners in this?  How exactly did that sort of

20  structure fall?

21       A.    His direct report was to the vice

22  president of instruction.  So no, he didn't -- he

23  didn't report to me at all.

24       Q.    So was his role in this because he was

25  over the nursing department as the dean of CTE?



1          A.     Yeah, he -- yeah, he worked with Susan

2     Walker, the director of nursing.  But yeah.

3          Q.     And what exactly was your role in this?

4     Just that Ms. Gililland had come to you?  Is that why

5     you were involved at this stage?

6          A.     Yes, that's correct.

7          Q.     Okay.  And then you say, "You mention that

8     you may have other classmates willing to provide some

9     information on your behalf.  Would they be willing to

10    submit a care plan that indicates information from

11    web sites or taken verbatim from a nursing test to

12    support your case?" question mark.  Do you see that?

13         A.     Yup.

14         Q.     So she had mentioned immediately, right,

15    that other students had done exactly the same thing

16    she was being accused of doing.  Correct?

17         A.     Yeah, coming from what -- that's what she

18    told me, yes.

19         Q.     And she had offered to provide examples of

20    those and to provide other witnesses in support of

21    that claim, correct?

22         A.     That is correct.

23         Q.     So back in April 27th she's already made

24    that offer to you, correct?

25         A.     Yeah, correct.



1    don't think that the result is fair, do they have any

2    recourse with the administration?  Can the

3    recourse -- can the administration overrule the

4    academic side if they took a look at the evidence and

5    thought that the student was correct?  Or are they --

6    are they resigned to whatever the academic side

7    decides?

8          A.    Well, we have -- we have a process called

9    a grade appeal process.  However, that grade appeal

10   is pretty prescriptive.  It sort of deals with the

11   final grade being miscalculated or somehow being

12   mis-recorded or whatever into the grade book.  If

13   that had been the case, then the student would bring

14   that up to the academic standards committee, and then

15   they would -- they would look at it at that point and

16   make a decision based on if it had merit.  And then

17   if it did, they would bring in the student and the --

18   and the faculty member, then they would make a

19   decision on that.  That -- that grade appeal process

20   is available.

21               So, you know, we don't have a process to,

22   for example, intervene and overturn a probation from

23   a nursing department.  That's part of the nursing

24   handbook that all students sign.  So -- but regarding

25   the grade, that's -- that's how that would be



1   handled.

2        Q.    So is that grade book process, would you

3   put that in the administrative bucket or the academic

4   bucket?  Which side is doing that?

5        A.    That's in the academic bucket.

6        Q.    Okay.  Does the administrative side ever

7   have any ability to overrule the academic side if

8   that committee comes to a decision that the

9   administration feels is incorrect?

10       A.    No, the decision is final, made by

11  faculty.  So --

12       Q.    Okay.  And just to be clear: you don't --

13  that policy only applies to final grades, correct?

14  It wouldn't apply to a situation where somebody

15  wanted to challenge an interim grade that they got on

16  an assignment that made up that final grade.  Is that

17  right?

18       A.    Yeah, that's -- that's correct.  I don't

19  like our grade appeal policy, but that's how it's

20  currently written.

21            MR. MARK:  Okay.  Let's look at next

22  Exhibit 67, which is from May 9th, 2018, SWOCC-4011.

23            (EXHIBIT 67 WAS MARKED.)

24       Q.    (By Mr. Mark) We're just going to be

25  looking at that top e-mail.



1    consequence or whatever should occur based on that

2    particular academic dishonesty.

3         Q.    Okay.  But just to be clear: you said,

4    quote, "I don't believe it was intentional, just

5    hurried," period, close quote, with regard to the

6    issues that my client had.  Correct?

7         A.    Yeah.  I wrote that, yeah.

8         Q.    Okay.  And then you had said that "I

9    interpret her statement regarding the dean will

10   remove the grade if I am proven true seems to be

11   manipulative."  That's what you said, correct?

12        A.    If I wrote it, I said it, yeah.

13        Q.    Okay.  Why was that manipulative for her

14   to think that if she was proven true, that everybody

15   else was also plagiarizing, that her grades would be

16   restored or that others would also suffer the same

17   consequences?  Why is that manipulative?

18        A.    I think she was using that to try to

19   manipulate Pam Wick into changing her grades and

20   stuff, that Francisco could sweep in and, you know,

21   change those grades, which he can't do.  So I'm not

22   quite sure where she got that information, but

23   clearly, you know, she said it in that e-mail to Pam.

24   So that's -- that's my -- that's how I referred to

25   that as manipulative.



1        Q.    Actually, this is the issue I really
2   wanted to talk about, and I think you've already said
3   this, but to confirm:  it's your position that
4   Francisco Saldivar did not have the authority to
5   change anybody's grades, regardless of what he found
6   in his investigation.  Correct?
7        A.    Yeah.  I think he would have -- he would
8   have talked with the folks in the nursing department.
9   I have never been aware of a dean coming in and
10  changing a grade for a student in -- in my years
11  here.  If that has happened, it's happened behind --
12  I have not been involved in that.  But I have not
13  heard a dean talking about that and said, yeah, I --
14  you know, I'm going to change this grade.  I've
15  never -- I've never heard that before.
16       Q.    I appreciate that you -- there may be no
17  precedent for it, but my question is slightly
18  different and slightly more important than that,
19  which is, would a dean who found that somebody had
20  given a grade because they were being targeted for
21  some sort of bias, would they have the authority to
22  change the grade if that's what they determined was
23  the case?
24            MR. REESE:  Object to the form.
25            Go ahead and answer.



1  events.

2      Q.    Other than that meeting in April 30th, did

3  you ever talk to either one of them about that?

4      A.    No, I did not.

5      Q.    Did it strike you as at all odd that an

6  instructor would find plagiarism in the assignment

7  turned in to another professor?

8      A.    Melissa was her advisor, so I would -- you

9  know, it's not uncommon for faculty to talk with each

10  other in departments, especially, you know, in such a

11  close -- a tight department as a nursing department.

12      Q.    And then you go on to write, "After that

13  meeting, Francisco requested that Rod Keller, the

14  dean of the LDC and a 35-year writing instructor,

15  review a sample of other students' care plans.  After

16  review, he concluded that" the care plan -- "of the

17  care plans he sampled, the majority were cited

18  incorrectly."  And "Rod brought this information to

19  Susan last week."  Correct?

20      A.    Yeah.  That's what it says, yeah.

21      Q.    And that's all correct, correct?

22      A.    Yeah.

23      Q.    And then you go on in the next paragraph

24  to write, "Both Rod and Marta Wozniak, a writing

25  faculty member, have confirmed that students must



1   cite their sources for presentations to meet APA

2   guidelines."  Correct?

3        A.    Yeah.

4        Q.    Okay.  Going on, we're going skip a

5   paragraph.  Picking up with the paragraph "with

6   regards."

7              You write, "With regards to the late

8   assignment due to Nicole's illness, e-mails between

9   Nicole and Melissa are confusing regarding the

10  assignment that was posted for Nicole to complete.

11  Melissa confirms the confusion in an e-mail

12  indicating that a," quote, "miscommunication,"

13  unquote, "has occurred."

14             Right, you wrote that?

15       A.    I did.

16       Q.    That's all factually correct?

17       A.    Yeah.  That was the e-mails I received

18  back and forth from Nicole.

19       Q.    Okay.  You write then, "We also believe

20  that Nicole had a legitimate reason for missing class

21  due to a doctor's appointment that was a follow-up to

22  a kidney infection.  Information regarding the

23  infection is well documented in e-mails between

24  Susan, Melissa and Nicole.  Nicole has proof of the

25  medical appointment."



1              Right, you wrote that?

2        A.    Yes.

3        Q.    And that's all correct?

4        A.    Yes.  I didn't see the excuse she received

5   from her doctor, but that's what -- that's what she

6   told me.

7        Q.    Okay.  And then you conclude that with,

8   "Given all of this, we believe the following should

9   occur.  1. Nicole should be removed from a

10  probationary status and returned to good standing

11  within the nursing program," and "that points be

12  restored to the assignments in question."

13              And you conclude, "Based on the evidence

14  we have collected, we believe this is a fair and

15  equitable solution."  Correct?

16       A.    That's what I wrote, correct.

17       Q.    Did that happen?

18       A.    This letter was never submitted.

19       Q.    Why not?

20       A.    I sent it -- I wrote it as a draft to my

21  colleagues, Rod and Francisco, to review and give me

22  feedback on what they -- what they said.

23       Q.    Okay.  And was that in -- through e-mails

24  that you had these -- this exchange?

25       A.    Yeah.  Rod sent back something like, you



1  know, that she did plagiarize.  So that was part of

2  Rod's e-mail response to me.

3       Q.    Okay.  But do you -- do -- do you remember

4  sending a draft of this letter out to anybody for

5  them to review and comment upon?

6       A.    I sent it to -- I sent it to Rod because I

7  think I was directing it to Rod.  I'm not quite sure

8  if I sent it to Francisco or not, but I did send it

9  to Rod.

10      Q.    Okay.  And did Rod say any of that was

11 wrong that you had written in the draft?

12      A.    He said that Nicole plagiarized and, in

13 essence, saying that my conclusions were not correct.

14      Q.    Okay.  And why did he believe that your

15 conclusions were not correct?

16      A.    Well, because he's a 35-year writing

17 instructor that has more expertise in the plagiarism

18 than I would -- than I will ever be able to

19 accumulate.  So it's typical for us to run things by

20 each other to get a perspective, and that's what this

21 draft was about.

22      Q.    Yeah.  Let me separate the two things.  So

23 I want to separate what should occur, the conclusion

24 part of the letter, from the plagiarism part of the

25 letter.  So I assume that you conferred with Rod



1   about the plagiarism part of the letter.  Or did you

2   also confer with him about what should occur?

3        A.   What -- you mean what -- what the final

4   outcome should be?

5        Q.   Correct.  Did you confer with both parts,

6   or did you ask him whether or not, you know --

7        A.   No, I -- yeah, I wrote this -- I wrote

8   this independently, and I sent it to Rod for his

9   feedback.  And that's what I was asking for.

10       Q.   So did he think that because she had

11  plagiarized that she had -- she should have her

12  points deducted?

13       A.   Rod -- yeah, Rod would -- yeah, Rod says

14  she plagiarized.  The probation should be -- should

15  be kept in place.

16       Q.   And did he think that because all the

17  other students had also plagiarized that he found,

18  that they also should have points deducted so that

19  there was not selective enforcement of that policy?

20       A.   All I can respond to is that Rod wrote

21  back, said that Nicole did plagiarize.  So he didn't

22  refer to any other students outside of that.

23       Q.   Okay.  But did he dispute the fact that he

24  had also reviewed other care plans and they were --

25  majority were cited incorrectly?



1                    REPORTER'S CERTIFICATE

2


3          I, Vicky McDaniel, Registered Professional
Reporter and Certified Shorthand Reporter in and for
4   the State of Utah, do hereby certify:

5          That prior to being examined, the witness,
TIM DAILEY, was remotely by me duly sworn to tell the
6   truth, the whole truth, and nothing but the truth;

7          That said deposition was taken down by me
in stenotype on March 16, 2021 through a Zoom
8   videoconference and was thereafter transcribed, and
that a true and correct transcription of said
9   testimony is set forth in the preceding pages,
according to my ability to understand through Zoom.

10

          I further certify that, a request having
11  been made to review the transcript, a reading copy
was sent to Mr. Reese for the witness to read and
12  sign and then return to me for filing with Mr. Mark.

13          I further certify that I am not of kin or
otherwise associated with any of the parties to said
14  cause of action and that I am not interested in the
outcome thereof.

15

          WITNESS MY HAND this 30th day of March,
16  2021.

17

18



19

20               Vicky McDaniel, CSR, RMR

21

22

23

24

25

**CITICOURT**
THE REPORTING GROUP

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION


| | | |
|---|---|---|
| NICOLE GILILLAND, an individual, | ) ) ) | Remote Deposition of: |
| Plaintiff, | ) ) | FRANCISCO SALDIVAR |
| vs. | ) ) ) | |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILEY, an individual; FRANCISCO SALDIVAR, an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | No. 6:19-cv-00283-MK |
| Defendants. | ) ) | |


March 16, 2021 - 3:17 p.m.

Held through a Zoom videoconference


Reporter:  VICKY McDANIEL, CSR, RMR

1        Q.    And just to be clear: so because you

2   didn't think you had authority to do so, you never

3   asked the director of nursing or anybody else in the

4   nursing program to produce copies of my client's

5   assignment that was accused of plagiarism.  Correct?

6        A.    No, I didn't say that.  I -- no.

7        Q.    I'm sorry.  I didn't mean to interrupt --

8   I did not mean to put words in your mouth.  Correct

9   me, please.  Tell me what -- how am I wrong?

10       A.    Well, what Nicole gave me we looked at.  I

11  brought to Rod and went to Rod and asked him if he

12  could get some assignments off of our learning

13  management system.  I -- if anything went on, I would

14  have -- what we had access to, if I remember

15  correctly, Rod went through some of those and said,

16  okay, I'm going to try to look for this plagiarism.

17            And, once again, I am not a trained

18  nursing instructor, so it might as well be written in

19  a foreign language that I can't read for me to

20  determine whether or not it's plagiarism.  So I'm not

21  the right person to be looking at those.  But if I

22  remember correctly, we took some of those assignments

23  that we could gather, and Rod did a review.

24       Q.    Okay.  I'm trying to keep the timeline

25  clean here, but you really want to talk about Rod, so



1  let's do it.  Do you remember when that happened?  Do

2  you remember --

3        A.    No.

4        Q.    -- when you had the discussion with Rod?

5        A.    No, I don't.

6        Q.    Do you recall whether it was weeks after

7  that April 30th meeting, or days or any -- can you

8  give me any sense of timeline here?

9        A.    No.  I wish I could.

10       Q.    No, I understand.  It's -- it's been

11 years.  Did you -- did you participate in helping Rod

12 find the assignments?  I mean, how did Rod know which

13 assignments to look at?  How did that transpire?

14       A.    If I remember correctly, we talked to -- I

15 think Robin presented some of her access to the

16 MyLaker Link to Rod to allow that.  Once again, I

17 can't demand it.  It was provided.  I believe Robin

18 provided some of those assignments.

19       Q.    Do you know what else Mr. Keller was

20 provided, if anything, to review those assignments?

21 For example, was he provided a copy of the textbook?

22       A.    The textbooks, yes.  The copies of

23 textbooks, right.

24       Q.    So he was provided a copy of the textbook,

25 as far as you understand?





1      A.    Correct.  Either the digital version of it

2  or something to that effect, yes, if I remember

3  correctly.

4      Q.    Was he presented with any other set of

5  materials in order to check for Internet-based

6  plagiarism in any other assignments?

7      A.    I don't recall what he was provided.  I do

8  remember him saying that it was difficult for him to

9  determine based on the limited knowledge of where to

10  go to for some of these, for this information.

11      Q.    In the textbook, you mean?  He didn't know

12  where to go --

13      A.    Well, no --

14      Q.    -- to in the textbook?

15      A.    Right.  Right.  Right.  Once again,

16  textbook or on the web -- the Internet.  He's not a

17  nursing instructor.

18      Q.    Do you know whether he was provided the

19  material that my client was allegedly accused of

20  copying?

21      A.    Yes, that -- I think so, yes.

22      Q.    Okay.  You said it was a textbook earlier.

23  I'll represent to you that it was Internet material.

24  Do you --

25      A.    Okay.



1        Q.    So do you know whether he was provided

2   with the Internet materials that my client was

3   accused of copying?

4        A.    I don't know if he was specifically --

5        Q.    Sorry.  Didn't mean to interrupt.

6        A.    I don't know if he was specifically given

7   the exact -- I guess I don't understand the question

8   you're asking me, so repeat that.

9        Q.    Yeah.  I mean, was he given the material

10  that my client was purported to have copied it from

11  the Internet?

12       A.    I believe so, yes.

13       Q.    Okay.  Was he given any material that

14  anybody else had copied from the Internet?

15       A.    I don't know.

16       Q.    Did anybody else's assignment get run

17  through a program that would determine whether they

18  had copied from the Internet?

19       A.    I don't know if he used a program to do

20  that or not.

21       Q.    Assuming -- and I think that this is a

22  representation that you and Mr. Reese will agree

23  with -- my client had been accused of copying stuff

24  off the Internet.  Don't you think it's important to

25  find out whether the other assignments, if you're



1  comparing them, were also perhaps copied off the

2  Internet?

3       A.    Wait.  Why are we comparing other -- you

4  mean the other assignments that were alleged to have

5  been plagiarized as well?

6       Q.    Right.  The ones that he's comparing,

7  right.

8       A.    Correct.  And to my knowledge, that was

9  complete, because I remember -- or at least that part

10  was.  Someone attempted, because Rod and I had a

11  conversation, I couldn't tell you what it was, but

12  Rod told me he could clearly see Nicole cutting and

13  pasting but could not find that on any of the

14  assignments, the other assignments which he looked

15  at.

16       Q.    Okay.  This is an important piece.  I'm

17  going -- and I appreciate the testimony.  Just to be

18  clear: he said that he was unable to find evidence of

19  copying and pasting on any other student's

20  assignment?

21       A.    Not to the extent to which Nicole had

22  done.  Now, were there other plagiarism issues?  Yes.

23  There were citing issues.  I remember him saying that

24  they were misrepresenting citing, but it wasn't the

25  same direct type of plagiarism.



1     Q.    Okay.  So when he -- because this is

2  important, because Mr. Dailey just testified that,

3  you know, he made a lot of decisions based on what

4  Rod Keller's assessment was.  So I want to make sure

5  I understand what Rod Keller's assessment was based

6  upon.  So I want to understand, did anybody run those

7  other assignments through a program that would have

8  detected copying from websites for Mr. Keller?

9     A.    I do not know.

10     Q.    And to be clear: he told you that he was

11  unable to find evidence of copying and pasting from

12  other students, correct?

13     A.    To my knowledge, yes.

14     Q.    Okay.  Did he say that he tried in any way

15  to find out whether other students had copied and

16  pasted from Internet sources?

17     A.    I don't know.

18     Q.    So you don't even know if he made the

19  effort to try to determine that?

20     A.    I will say this.  I believe he made an

21  effort.  Did he specifically say, "I did this, this,

22  this, and this to make that effort" to me?  No.  He's

23  a professor of writing.  This is his job.  He's also

24  a dean.  I didn't question his process in there.

25               I will also add that this is one piece of



Francisco Saldivar  *  March 16, 2021                49

1   let me know when you're done.

2        A.    I read this, this piece, yes.

3        Q.    Okay.  You say in that e-mail to Ali

4   Mageehon, Tim Daily, and Shari Jackson that you

5   received an e-mail from Nicole, it's the one below,

6   and you say, "I did not given her any indication that

7   my investigation would conclude today."

8              Do you see that?

9        A.    Yes.

10       Q.    Did you ever tell Nicole how long to

11  expect for the investigation to take?

12       A.    I don't recall giving her a finality date,

13  no.

14       Q.    Did you ever explain to her the process

15  that your investigation would take?

16       A.    I do remember having conversations with

17  her about her expectations and what I could do and

18  what I was doing, yes.

19       Q.    And what did you tell her you were able to

20  do and were doing?

21       A.    Well, I remember having conversations --

22  see, one of the things I remember having

23  conversations with Nicole about is her expectations

24  of what could happen.  You know, she asked for

25  faculty members to be removed because they were --



1   she -- unfit, or I needed to somehow go in there and

2   make this zero go away and make these changes.

3            And I remember having conversations where

4   we indicated that was not the case, that there was --

5   I specifically remember talking about union and

6   tenure and the nursing director and what role I had

7   as an advocate to try to bring up her concerns to the

8   people that could maybe make that change and do the

9   best I could with that.

10       Q.    Okay.  And this -- to be fair, this

11  circles back to the issue that you really believed

12  that Susan Walker ultimately had the decision-making

13  authority here.  Is that right?

14       A.    Yes.  Susan Walker, with regard to the

15  nursing program, correct.  There was some --

16  obviously, the vice president of instruction had some

17  authority in that process as well, but it was not me.

18       Q.    Let's go back to Exhibit 77.  This is your

19  set of notes.  Move to the entry for May 8th.  Go

20  ahead and read that.  Let me know when you're done.

21       A.    (The witness reviews the document.)  I've

22  read this.

23       Q.    These are your notes, correct?

24       A.    Yes.

25       Q.    And they're accurate, as far as you know



1   also remember him having some issues in trying to

2   find out where they were getting their information

3   from.  I do remember him saying, I'm having a hard

4   time figuring out where this stuff could be from.

5          Q.     Did he talk to you about using any

6   computer program or Internet-based program to find

7   out whether others had copied and pasted from

8   Internet sources?

9          A.     I don't recall if we had a conversation

10  about that.  I mean, there were programs out there.

11  I was familiar with one that my last institution had

12  built into their learning management system, which

13  would automatically look for plagiarism.

14         Q.     Did you use that?

15         A.     We didn't have access to that.

16         Q.     Did you use any?

17         A.     I did not personally, no.

18         Q.     Did Rod Keller?

19         A.     I don't know.

20         Q.     Did you ask him?

21         A.     I don't think I did ask him if he used a

22  program or not.  I couldn't tell you.

23         Q.     Did you --

24         A.     I don't know.

25         Q.     Did you ask him whether he tried to find



1  whether other students had copied from Internet

2  sources?

3      A.    I asked him if he was finding any other

4  examples of plagiarism like Nicole had.

5      Q.    Did you ask him specifically whether he

6  was trying to compare to Internet sources?

7      A.    No.  I was not asking him how to do his

8  job, no.

9      Q.    But he nevertheless expressed -- I don't

10  know the right way to put it -- that he was unable to

11  sort of match up other students with the textbook or

12  anything like that?

13      A.    He -- if I -- what I remember him saying

14  to me is that he was not able to find the same

15  extensive blatant plagiarism that Nicole had on her

16  assignment on any of the other assignments that he

17  looked at.  And for the accusation to say everyone is

18  doing it, it should be fairly easy to find that

19  example.

20      Q.    Did you personally ever look, other than

21  Rod Keller?

22      A.    No.

23      Q.    Did you ever try to compare the text of

24  the textbook to any of the assignments?

25      A.    No.



1      Q.    Did you ever try to compare any of the

2  class assignments to Internet-based sources?

3      A.    No.

4      Q.    It sounds like Rod Keller thought that

5  Nicole's plagiarism was somehow worse in degree than

6  what he saw in the other papers.  Is that fair?

7      A.    That's fair, sure.

8      Q.    Okay.  I'm going to give you a

9  hypothetical.  Let's assume that a handful of

10  students copied and pasted verbatim sentences,

11  paragraphs out of the textbook, put that into their

12  assignments.  Let's assume another student found

13  three different scientific articles about the subject

14  that she was studying, went into those scientific

15  articles and found the relevant passages for the

16  assignment, and used those passages just as the other

17  students had used the passages from the textbook.

18      A.    Uh-huh.

19      Q.    Do you have an opinion as to which group

20  of plagiarizers is worse?

21             MR. REESE:  Object to the form of the

22  question.

23             Go ahead and answer.

24             THE WITNESS:  I personally, and this was

25  always my conjecture on this or my thoughts,



1                    REPORTER'S CERTIFICATE

2


3           I, Vicky McDaniel, Registered Professional
Reporter and Certified Shorthand Reporter in and for
4    the State of Utah, do hereby certify:

5           That prior to being examined, the witness,
FRANCISCO SALDIVAR, was remotely by me duly sworn to
6    tell the truth, the whole truth, and nothing but the
truth;

7

            That said deposition was taken down by me
8    in stenotype on March 16, 2021 through a Zoom
videoconference and was thereafter transcribed, and
9    that a true and correct transcription of said
testimony is set forth in the preceding pages,
10   according to my ability to understand through Zoom.

11          I further certify that, a request having
been made to review the transcript, a reading copy
12   was sent to Mr. Reese for the witness to read and
sign and then return to me for filing with Mr. Mark.

13

            I further certify that I am not of kin or
14   otherwise associated with any of the parties to said
cause of action and that I am not interested in the
15   outcome thereof.

16          WITNESS MY HAND this 30th day of March,
2021.

17

18

19                      

20

21              Vicky McDaniel, CSR, RMR

22

23

24

25

CitiCourt
THE REPORTING GROUP

# STEVE C. BALDWIN

## ATTORNEY

1390 OAK STREET, NO. 5
PO BOX 1148
EUGENE, OREGON 97440-1148
(541) 505-7871
sbaldwin@sbaldwinlaw.com

August 1, 2018

Karen Smith
General Counsel
Oregon Community College Association
260 13th St NE
Salem, OR 97301

      Re:   *Tort Claim Notice by Nicole Rene Gililland*
              *Claims Against Southwestern Oregon Community College & Employees*

Dear Ms. Smith:

Pursuant to ORS 30.275, I write to inform Southwestern Oregon Community College ("SWOCC") that Nicole Rene Gililland has claims for damages against SWOCC and its employees Melissa Sperry, Susan Walker, Pamela Wick, Tim Dailey, Francisco Salvidar, and Patty Scott.

Ms. Gililland just finished her first year of nursing school and her claims arise from acts and omissions of SWOCC and its employees beginning in Spring term of the 2017-2018 academic year, or on about April 2, 2018, and continuing to the present. The acts and omissions took place on the SWOCC Campus, at off-site clinical locations, and possibly other unknown locations.

Melissa Sperry and Susan Walker have defamed Ms. Gililland and treated her in an arbitrary and unfair manner contrary to SWOCC policies, including manipulating her grades. The employees in supervisory roles have been informed of the arbitrary treatment and have either failed to rectify or ratified the arbitrary acts. Ms. Gililland's claims are for intentional interference with economic relations, intentional infliction of emotional distress, and defamation because the described acts and failures to act have damaged Ms. Gililland's reputation, her future career as a nurse, and have caused her severe emotional distress.

Prior to enrolling in nursing school, Ms. Gililland was a paramedic. After having children, the shifts associated with that work were no longer feasible. Ms. Gililland enrolled in the nursing program at SWOCC because she enjoys helping others as a healthcare professional. Ms. Gililland's main aim has been to graduate from nursing school with distinction and to continue her healthcare career.

Def 000003

REDACTED



Sincerely,


Steve C. Baldwin


SCB:gh

Def 000003.02

Brandon J. Mark
PARSONS BEHLE & LATIMER
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Tel: (801) 532-1234
Fax: (801) 536-6111
bmark@parsonsbehle.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual | No.     6:19-cv-00283-MK |
| Plaintiff, | |
| vs. | **PLAINTIFF'S RESPONSES TO DEFENDANTS' FIRST SET OF INTERROGATORIES** |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | |
| Defendants. | |

Plaintiff Nicole Gililland ("Gililland"), by and through its counsel of record, hereby responds to Defendants' First Set of Interrogatories pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure ("FRCP"), as follows:

RESPONSES TO 1ST SET OF INTERROGATORIES                                Page - 1
*Gililland v. Southwestern Oregon Community College, et al.*
4843-2129-3244v1

## **GENERAL STATEMENT CONCERNING PLAINTIFF'S RESPONSES**

1.      Gililland objects to the Interrogatories to the extent the information sought was previously produced or provided to Defendants or its counsel.

2.      Gililland bases her answers and objections to the Interrogatories on currently known and available information. Gililland will amend or supplement her responses to the extent necessary and required by Rule 26 of the FRCP.

3.      Gililland objects to the Interrogatories to the extent the information sought therein is contained in publicly available records that are equally available to both Gililland and Defendants.

4.      Gililland objects to the Interrogatories insofar as they seek information not relevant or proportional to the questions presently before the Court.

5.      Gililland objects to the Interrogatories to the extent they are overbroad, vague, ambiguous, compound, complex, unduly burdensome, or oppressive in the amount, scope, or type of information requested.

6.      Gililland objects to the Interrogatories insofar as they seek to impose burdens on Gililland inconsistent with or in addition to its discovery obligations as set forth in Rules 26 and/or 33 of the FRCP.

7.      Gililland objects to the Interrogatories as overbroad, unduly burdensome and oppressive insofar as they seek to impose upon Gililland the obligation to identify information that is more than 10 years old, is no longer reasonably known or available to Gililland, or cannot be determined or ascertained through a reasonably diligent search and inquiry on the part of Gililland. Gililland will not undertake any obligation to identify or disclose information that is not reasonably and readily within her current knowledge, custody, possession, or control.

RESPONSES TO 1ST SET OF INTERROGATORIES                                   Page - 2
*Gililland v. Southwestern Oregon Community College, et al.*
4843-2129-3244v1

Exhibit 79, Page 2 of 5

8.      Gililland objects to the Interrogatories to the extent they seek disclosure of information that would violate rights of privacy and other statutorily or judicially recognized protections and privileges, confidentiality agreements, or court orders restricting dissemination of information, or result in disclosure of materials or information prepared in anticipation of litigation or confidential settlement discussions.

9.      Gililland objects to the Interrogatories to the extent they seek information and documents protected from discovery by the attorney-client privilege, the work-product doctrine, the common-interest privilege, the joint-defense privilege or other applicable privileges or protections.

10.      Gililland objects to the "Definitions and Instructions" accompanying the Interrogatories insofar as they are vague, overly broad, and unduly burdensome and seek to impose burdens on Gililland that are inconsistent with, or in addition to, Gililland's obligations as set forth in Rules 26 and/or 34 of the FRCP.

11.      Gililland objects to the definition of the term "identify" as set forth in the Interrogatories as overly broad, unduly burdensome, and inconsistent with Gililland's obligations under Rules 26 and 33 of the FRCP.

13.      Gililland does not in any manner waive or intend to waive, but rather intends to preserve and is preserving, (1) all objections as to competency, relevancy, materiality, and admissibility, (2) all objections to the use of any of the answers herein in any proceeding, motion, hearing, or trial in this or any other action, and (3) all objections to any further discovery or request involving or related to any of the Interrogatories. The supplying of any information in response to the Interrogatories does not constitute a waiver of any stated objections or an admission by Gililland that such information is relevant, admissible, or material to the limited jurisdictional

RESPONSES TO 1ST SET OF INTERROGATORIES                              Page - 3
*Gililland v. Southwestern Oregon Community College, et al.*
4843-2129-3244v1

Exhibit 79, Page 3 of 5

question currently before the court, and Gililland reserves the right to object to any further inquiry with respect to any subject matter at any time.

## **INTERROGATORIES**

Interrogatory No. 1:    Please identify the individual alleged in paragraph 14 of the Complaint to have "informed SWOCC that Plaintiff was a former adult model and actress."

Answer to Interrogatory No. 1:   Plaintiff objects insofar as the interrogatory presumes that Plaintiff is required to prove how Defendants became aware of Plaintiffs' former career. Plaintiff is not required to prove who, how, or when some person informed SWOCC about her history, as that is not an element of her claims. The import of Paragraph 14 of the Complaint is the final sentence: that Plaintiff is informed and believes "Defendant Melissa Sperry became aware of Plaintiff's former career."

Coos Bay is a small, tight-knit community. Defendant Sperry may have become aware from others associated with SWOCC—students, faculty, staff, or her or their social circles in the community—or she may have become aware on her own through other sources.

Based on some information, Plaintiff believes the source may have been one of her estranged family members who live in the community. Plaintiff is currently investigating the possibility that one or more of the following family members may have communicated with one or more individuals associated with SWOCC: Kristina Moon, Ryan Moon, Michelle Westfall, Amber Culp, Annmarie Cohen, Michael Cohen, and Cydnee Nathe.

Additionally, it is possible that others in the community with knowledge of Plaintiff's history may have been told someone associated with SWOCC and/or Defendant Sperry about Plaintiff's history. Plaintiff is currently investigating the possibility that one or more of the following may have communicated with one or more individuals associated with SWOCC: Jessica McCourt, Rachel Ellis, and Larry Ellis.

RESPONSES TO 1ST SET OF INTERROGATORIES                                                  Page - 4
*Gililland v. Southwestern Oregon Community College, et al.*
4843-2129-3244v1

Interrogatory No. 2:  Please identify the SWOCC official(s) alleged in paragraph 14 of the Complaint to have been informed by "an individual . . . that Plaintiff was a former adult model and actress."

Answer to Interrogatory No. 2:  Plaintiff incorporates its objections and responses to Interrogatory No.1.

Interrogatory No. 3:  Please describe the assignment that plaintiff was accused by Ms. Sperry to have plagiarized, as alleged in paragraph 19 of the Complaint, as well as the nature and scope of the claimed plagiarism.

Answer to Interrogatory No. 3: Pursuant to Rule 33(d), Plaintiff identifies records she has already produced to Defendants to respond to this Interrogatory, including copies of emails discussing the assignment and Plaintiff's contemporaneous description of the assignment. *See, e.g.*, PL-370–78,

Interrogatory No. 4:  Please identify the factual bases for plaintiff's "formal complaint" against SWOCC, as alleged in paragraph 19 of the Complaint.

Answer to Interrogatory No. 4: Pursuant to Rule 33(d), Plaintiff identifies records she has already produced to Defendants to respond to this Interrogatory, including copies of the formal complaint that Plaintiff submitted relating to SWOCC. *See, e.g.*, PL-370–78.

Interrogatory No. 5:  Please list the factual bases for the allegation in paragraph 21 of the Complaint that Susan Walker "threatened" plaintiff.

Answer to Interrogatory No. 5:  Plaintiff objects that the term "factual bases" is vague and ambiguous as used in this context. Plaintiff assumes Defendants are asking for the evidence that supports the allegation, which would consist of the testimony of Plaintiff and other witnesses

RESPONSES TO 1ST SET OF INTERROGATORIES                                   Page - 5
*Gililland v. Southwestern Oregon Community College, et al.*
4843-2129-3244v1

Exhibit 79, Page 5 of 5

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual, | Deposition of: |
| Plaintiff, | SUSAN WALKER |
| vs. | No. 6:19-cv-00283-MK |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an OREGON COMMUNITY COLLEGE; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | |
| Defendants. | |

March 10, 2021 * 1:58 p.m.

Location:  Zoom

Reporter:  Ann Fleming, RPR

1           Should they have all gotten zeroes?

2           A.    I don't know.  You know, I think we would

3    have to decide probably.  Just none other

4    students would have gotten points -- they wouldn't

5    have gotten zeroes.  We would have just eliminated

6    the assignment.

7           Q.    So it wouldn't have affected anybody at

8    that point then?

9           A.    Right.

10          Q.    Let's talk about -- I'm sorry.  Go ahead.

11          A.    We would have also had some education on

12   plagiarism.

13          Q.    And that's exactly what the exhibit we

14   just saw, Exhibit 17, suggested, right?  Mr. Keller,

15   in fact, suggested that everybody in your department

16   needed a remedial course on correct citations,

17   correct?

18          A.    I'm sorry.  Can you say that again?

19          Q.    Yeah.  In fact, that is exactly what Rod

20   Keller had suggested is that everybody in the nursing

21   department needed a remedial course on correct

22   citations, correct?

23          A.    He didn't say that to me.

24          Q.    Okay.  And if he had, that would be

25   consistent with the fact that the problems were



1  widespread and not isolated to my client, correct?

2      A.    Yes.  Susan Walker  *  March 10, 2021

3      Q.    Now, let's go back to Grammerly for a

4  minute.  So you saw the Grammerly report.  Did you

5  see as part of the Grammerly report that it will

6  actually show you what is alleged to have been

7  plagiarized?

8      A.    I didn't see that.  I just saw the one --

9  I just saw one paper with the score.

10     Q.    So I'll again represent to you and you can

11  feel free to ignore it and whatever it represents to

12  you is not right, then what I'm about to ask will be

13  useless, but I can tell that you that Grammerly does

14  in fact, because I'm now become a full-fledged

15  member, give you the actual source of the material

16  that is alleged to have been plagiarized.

17          And, so, it appears that you didn't bother

18  to look at any of those sources that my client

19  allegedly plagiarized; is that correct?

20          MR. REESE:  Object to the form of the

21  question.  Go ahead and answer, if you can, Susan.

22     A.    I never received anything other than that

23  one paper.

24     Q.    Did Robin, as far as you know, did she

25  tell you that she had looked at what had been



```
 1                    REPORTER'S CERTIFICATE

 2                    Susan Walker  *  March 10, 2021
     STATE OF UTAH           )
 3                           )  ss.
     COUNTY OF WASHINGTON    )
 4

 5           I, Ann Fleming, Registered Professional
     Reporter, do hereby certify:
 6
             That prior to being examined, the witness,
 7   Susan Walker, was by me duly sworn to tell the truth,
     the whole truth, and nothing but the truth;
 8
             That said deposition was taken down by me
 9   in stenotype on March 10, 2021, at the place therein
     named, and was thereafter transcribed and that a true
10   and correct transcription of said testimony is set
     forth in the preceding pages;
11
             I further certify that, in accordance with
12   Rule 30(e), a request having been made to review the
     transcript, a reading copy was sent to Mr. Reese for
13   the witness to read and sign, and the original
     transcript will be delivered to Mr. Mark for
14   safekeeping.

15           I further certify that I am not kin or
     otherwise associated with any of the parties to said
16   cause of action and that I am not interested in the
     outcome thereof.
17
             WITNESS MY HAND this 22nd day of March,
18   2021.

19

20           _____

21               Ann Fleming, RPR

22

23

24

25
```



CITICOURT
THE REPORTING GROUP

| | |
|---|---|
| **From:** | Dailey, Tim |
| **To:** | Saldivar, Francisco W |
| **Subject:** | FW: Fix my grade |
| **Date:** | Monday, June 18, 2018 1:28:21 PM |

Fyi I don't agree with the late work policy.  What Susan references below seems to me to be a legitimate reason for missing class.  Why then loose points.  Seems too rigid without a reason.


Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.


THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.


**From:** Walker, Susan
**Sent:** Monday, June 18, 2018 9:12 AM
**To:** Dailey, Tim <tdailey@socc.edu>
**Subject:** RE: Fix my grade

Yes she met the noon deadline and did not receive any deductions in points for being late.  She sent an email on 6/12/18 and asked to have the last Kaplan test put in her nursing course.  I offered to do that for her but she then sent an email (6/14 – forwarded to you) and stated to put it where ever I wanted.  I put it in the pathophysiology course where all the other test grades were entered.

I'll have to talk to Melissa about taking the test early but taking a test early when one is incredibly ill doesn't make sense.  Jane did have an ill baby that was admitted to the hospital but if she took a test

SWOCC-000500

late she would have received the 10% deduction that we have in our policy.  In case it comes up, we did have one other student (Heidi) that took a test late because her father was life-flighted to OHSU. She also received the 10% deduction.  We have been strictly following the policy.

Susan

---

**From:** Dailey, Tim
**Sent:** Monday, June 18, 2018 8:15 AM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** RE: Fix my grade

Good morning Susan, what is Nicole referring to?  was she able to make the noon deadline for her assignment?  I will be talking with Francisco today.  Thanks t

Tim Dailey *(pronouns: he/him)*
VP of Enrollment and Student Services
Southwestern Oregon CC
1988 Newmark Ave.
Coos Bay Oregon 97459
tdailey@socc.edu
541-888-7439



Southwestern Oregon Community College is an equal opportunity educator and employer.

THIS MESSAGE AND ACCOMPANYING DOCUMENTS ARE COVERED BY THE ELECTRONIC COMMUNICATIONS PRIVACY ACT, 18 U.S.C. §§ 2510-2521, AS AMENDED, AND CONTAINS INFORMATION INTENDED FOR THE SPECIFIED INDIVIDUAL(S) ONLY. THIS INFORMATION IS CONFIDENTIAL. IF YOU ARE NOT THE INTENDED RECIPIENT OR AN AGENT RESPONSIBLE FOR DELIVERING IT TO THE INTENDED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT YOU HAVE RECEIVED THIS DOCUMENT IN ERROR AND THAT ANY REVIEW, DISSEMINATION, COPYING, OR THE TAKING OF ANY ACTION BASED ON THE CONTENTS OF THIS INFORMATION IS STRICTLY PROHIBITED. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE NOTIFY US IMMEDIATELY BY E-MAIL, AND DELETE THE ORIGINAL MESSAGE.

---

**From:** Walker, Susan
**Sent:** Saturday, June 16, 2018 1:32 PM
**To:** Dailey, Tim <tdailey@socc.edu>; Saldivar, Francisco W <francisco.saldivar@socc.edu>
**Subject:** FW: Fix my grade

SWOCC-000501

FYI

---

**From:** Gililland, Nicole R
**Sent:** Saturday, June 16, 2018 8:33 AM
**To:** Walker, Susan <swalker@socc.edu>
**Subject:** Fix my grade

You do realize how bad you're making yourself look, right? You cannot be this disillusioned unless you've got something very wrong with you. Put the Kaplan where it belongs and fix all of the grades Melissa broke ethics to decrease. You could've fixed this from the very start, it has only gotten this bad because you have repeatedly refused to do the right thing. We both know that I have emails proving I asked Melissa to take her tests early and I was INCREDIBLY ill, I had a doctors appointment. Two weeks later Jane needed to take her son to the doctor for a cold, she had no problems and didn't get her grades docked. There isn't a jury in the world that won't find that wrong. There is proof everywhere to what I'm saying and if you will not win. Only one of us is proving they shouldn't be a nurse and I promise it's not me. Stop making this bigger and uglier, fix my grades before you destroy the entire program.

Nicole

SWOCC-000502

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | | |
|---|---|---|
| NICOLE GILILLAND, an individual, | ) ) ) | Videotaped Deposition of: |
| Plaintiff, | ) ) | MELISSA SPERRY |
| vs. | ) ) ) | No. 6:19-cv-00283-MK |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an OREGON COMMUNITY COLLEGE; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

March 11, 2021 * 2:01 p.m.

Location:  Zoom

Reporter:  Ann Fleming, RPR

Videographer:  Ryan Reverman, CLVS

1  but actually the two of you, you know, face-to-face.

2  Do you recall saying anything to her that day?

3      A.    Not specifically.

4      Q.    Let's go to Exhibit 4 from yesterday,

5  which is an email chain -- actually it's not an email

6  chain.  No, it's just an email.  This is SWOCC 2801.

7  If you could go ahead and scroll down.  Do you recall

8  this email, Ms. Sperry?

9      A.    Yes.

10     Q.    What precipitated this email?

11     A.    There was an assignment given for an APA

12 paper by one of my colleagues and my colleague

13 brought it in to me and informed me that she had

14 graded the paper and it looked like Nicole was

15 struggling with the nursing care planning process and

16 she felt it may also be plagiarized.

17     Q.    Your colleague was Robin Finney?

18     A.    Yes.

19     Q.    Your claim is that Robin Finney was the

20 first one to suggest that it was plagiarized?

21     A.    When she gave it to me she said it might

22 be plagiarized.

23     Q.    Did she document that in any written form?

24     A.    I do not know.

25     Q.    You say there in the top of that email, It



1  has been identified that many of your pathophysiology

2  papers have been copied directly from online

3  resources.  Do you see that?

4        A.    Yes.

5        Q.    Who did the identification?

6        A.    I, after the paper was given to me, I took

7  some of the paper and did a Google search to identify

8  if it had been -- come from another source.

9        Q.    So you were the one that identified the

10  plagiarism?

11        A.    Yes.

12        Q.    And you go on to say in that that, This is

13  known as plagiarism and is not acceptable per policy;

14  is that right?

15        A.    Yes.

16        Q.    And what exactly is in this situation the

17  plagiarism?

18        A.    The paper was copied word for word from

19  sources that were not cited.

20        Q.    And it was copied without direct quotation

21  marks, correct?

22        A.    Correct.

23        Q.    Okay.  And that -- we'll talk about that

24  later.  Let's go down scroll down to the bottom of

25  that first page.



1                    REPORTER'S CERTIFICATE

2

STATE OF UTAH            )
3                        )  ss.
COUNTY OF WASHINGTON    )

4

5            I, Ann Fleming, Registered Professional
Reporter, do hereby certify:

6

            That prior to being examined, the witness,
7  Melissa Sperry, was by me duly sworn to tell the truth,
   the whole truth, and nothing but the truth;

8

            That said deposition was taken down by me
9  in stenotype on March 11, 2021, at the place therein
   named, and was thereafter transcribed and that a true
10  and correct transcription of said testimony is set
   forth in the preceding pages;

11

            I further certify that, in accordance with
12  Rule 30(e), a request having been made to review the
   transcript, a reading copy was sent to Mr. Reese for
13  the witness to read and sign, and the original
   transcript will be delivered to Mr. Mark for
14  safekeeping.

15            I further certify that I am not kin or
   otherwise associated with any of the parties to said
16  cause of action and that I am not interested in the
   outcome thereof.

17

            WITNESS MY HAND this 22nd day of March,
18  2021.

19

20       
        _____

21            Ann Fleming, RPR

22

23

24

25

CITICOURT
THE REPORTING GROUP

APP # 7165

## DISCRIMINATION AND HARASSMENT POLICY

All complaints about behavior that may violate this policy shall be promptly investigated. Any student or employee who has knowledge of conduct in violation of this policy or feels he or she is a victim of harassment or discrimination must immediately report his or her concerns to the appropriate management authority. It is the intent of the Board that appropriate corrective action will be taken by the College to stop any form of discrimination or harassment that may occur, prevent its recurrence, and address negative consequences. Appropriate disciplinary measures for all substantiated incidents of discrimination or harassment will be taken, up to and including termination for employees or suspension for students.

### Definitions

1. **Harassment**: Any conduct which has the purpose or the effect of unreasonably interfering with an individual's education or performance of duties or creates an intimidating , hostile or offensive environment and is based on a person's race, color, religion, and ethnicity, national origin, sex, sexual orientation, marital status, disability, veteran status, gender identity or age.

   Any form of harassment using electronic devices by staff, students or third parties is prohibited and will not be tolerated by the College.

2. **Sexual Harassment**: Requests for sexual favors and other verbal, nonverbal, or physical conduct of a sexual nature when:

   A. The conduct or communication has the purpose or effect of demanding sexual favors in exchange for benefits;

   B. Submission to or rejection of the conduct or communication is used as the basis for educational decisions affecting a student, or employment or assignment of staff;

   C. The conduct or communication is so severe, persistent, or pervasive that it has the purpose or effect of unreasonably interfering with a student's educational performance or with an employee's ability to perform his/her job; or creates an intimidating, offensive, or hostile educational or working environment. Relevant factors to be considered will include, but not be limited to, did the individual view the environment as hostile; was it reasonable to view the environment as hostile; the nature of the conduct; how often the conduct occurred and how long it continued; whether the alleged harasser was in a position of power over the student or staff member subjected to the harassment; number of individuals involved; where the harassment occurred; and other incidents of sexual harassment at the school involving the same or other students or staff.

   Examples of sexual harassment may include, but not be limited to, physical touching or graffiti of a sexual nature; displaying or distributing sexually explicit drawings, pictures, or written materials; sexual gestures or obscene jokes; touching oneself sexually or talking about one's sexuality in front of others; and spreading rumors about or rating other students or others as to appearance, sexual activity, or performance.

3. **College**: College facilities, College premises and non-College property if the student or employee is at any College- sponsored, College-approved, or College-related activity or function.

*Page 1 of 4  Discrimination and Harassment Procedure*

SWOCC-000554

**Consensual Relationships**

Sexual relationships between subordinates and supervisors and faculty and students are strongly discouraged by the College because of the liability that may result from such activities from both a personal and institutional perspective and the inappropriateness of such relationships.

**Non-Retaliation Statement**

The initiation of a complaint in good faith about behavior that may violate this policy shall not adversely affect the educational assignments or study environment of a student complainant or any terms or conditions of employment or work environment of a staff complainant. There shall be no retaliation by the College against any person who, in good faith, reports, files a complaint, or otherwise participates in an investigation or inquiry of discrimination or harassment.

Employees are expected to promptly report concerns about retaliation to the Director of Human Resources, the Vice President of Administrative Services (EEO/AAO), or the Vice President of Instruction. Students should promptly report concerns about retaliation to the Vice President of Instruction or the Vice President of Administrative Services (EEO/AAO). A complaint alleging retaliation by the President should be reported to the Director of Human Resources, who will then refer the complaint to the Board.

**Complaint Procedure**

Employees who feel that they are being harassed or discriminated against or who witness harassment or discrimination of another employee or student must immediately notify the Vice President of Administrative Services (EEO/AAO) or the Vice President of Instruction. A student who feels they are being harassed may report this conduct to the Vice President of Administrative Services (EEO/AAO) or the Vice President of Instruction. A complaint alleging harassment by the President should be reported to the Director of Human Resources, who will then refer the complaint to the Board.

Any individual may initiate a discrimination or harassment complaint by contacting the EEO/AAO. The allegations will be examined for application of this policy. If the allegations do not implicate discrimination or harassment, the College will notify the individual of any other applicable College policy or procedure for addressing the concerns. A record will be kept of the complaint or incident for the time period required by law.

If any of the College's representatives typically involved in processing a discrimination and harassment policy complaint are or become the subject of the complaint, the following guidelines will be followed:

1. If the President is the subject of allegations of harassment or discrimination, the complaint will go directly to the chair of the Board of Education.
2. If the EEO/AAO or any member of Human Resources is the subject of allegations of harassment or discrimination, the complaint will go directly to the President.
3. If the complaint is against the Board of Education, the complaint falls outside the scope of this document and should be filed with the State of Oregon Affirmative Action Director.

**STEP I: INFORMAL COMPLAINT PROCEDURE**

The informal procedure is voluntary and creates an avenue to attempt to resolve the complaint through personal and cooperative meetings with the involved parties. Complainants may skip the Informal Complaint Procedure and file a formal complaint which will be handled under the Formal Complaint Procedure.  If informal means do not resolve the complaint, the complainant has the option of filing a formal complaint.

*Page 2 of 4   Discrimination and Harassment Procedure*

SWOCC-000555

1. Complaints within the scope of the Discrimination and Harassment Policy must be addressed to the Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction either in writing using the harassment/discrimination informal complaint report.

2. Complaints should be made as soon as possible and ideally within sixty (60) days of the incident. A complaint is most effectively handled if the College receives immediate notice of an incident.

3. After receiving an informal complaint, the Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction or his or her designee will:

    A.  Meet with the complainant and determine the nature of the complaint.

    B.  Explain the informal complaint procedure and develop an action plan.

    C.  Attempt to resolve the complaint by meeting with the complainant, any individual accused of discrimination or harassment, College officials, and anyone else involved. These meetings will be informal.

4. Informal complaints will be conducted in a prompt and equitable manner in attempt to resolve complaints alleging action prohibited under this policy.

## STEP II: FORMAL COMPLAINT PROCEDURE

1. If the complaint is not resolved informally or if it begins with the Formal Complaint Procedure, the complainant must prepare a written statement, using appropriate forms, describing the basis of the claim and a summary of the facts which are alleged to constitute discrimination or harassment.

2. The Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction or designee will meet with the complainant to learn more about the complaint. The Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction will determine whether the Discrimination and Harassment Policy is applicable.

3. If the complaint alleges behavior that is prohibited by the Discrimination and Harassment Policy, the Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction, or designee shall notify the person against whom the complaint has been made. The Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction, or designee, shall objectively investigate the allegations, interview witnesses, and review any supporting documentation.

4. Complainants, respondents and witnesses are expected to fully cooperate with any investigation. If the respondent or employees identified as witnesses refuse to cooperate, it will be considered a violation of College policy. Failure of an accused student to attend a scheduled conference, without good cause and prior notification or a verifiable emergency, will constitute a waiver of the student's right to participate and appeal further.

5. After completing the investigation, the Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction, or designee shall prepare a report describing the complaint, the results of the investigation, and the suggested remedy, if any. The complainant will be notified in writing when the investigation is concluded.

6. The Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction, or designee will strive to complete the investigation and the report within thirty (30) College business days of the receipt of

*Page 3 of 4   Discrimination and Harassment Procedure*

SWOCC-000556

the complaint. If circumstances warrant an extension of the thirty (30) day deadline, the complainant and the respondent will be notified.

In cases where allegations are proved to be without foundation, no record of the allegations or the investigation would be included in the personnel or student file of the accused.

## STEP III: APPEAL TO THE COLLEGE PRESIDENT

1.  A complainant may appeal a decision that finds the complaint unsubstantiated to the President by providing a written letter of appeal within fifteen (15) calendar days of receipt of the letter from the Vice President of Administrative Services (EEO/AAO).

2.  The President or designee will review the appeal and any information the President deems necessary to determine if the investigation was fair and impartial and whether the findings are supported by facts. Within fifteen (15) business days of receiving a written appeal, the President or designee will respond to the complainant and provide a copy to the Vice President of Administrative Services (EEO/AAO) or Vice President of Instruction, the respondent, and any other appropriate personnel.

3.  The decision by the President is final, subject only to appeal pursuant to OAR 589-010-0100.

## STEP IV: APPEAL
The complainant may appeal the College's decision by writing to the Department of Community Colleges and Workforce Development commissioner pursuant to the Oregon Department of Education Administrative Rule OAR 589-010-0100.


## BP 7165

Created as Administrative Policy & Procedure:  January 9, 2013
Revised: April 1, 2015

SWOCC-000557