Brandon J. Mark (041613)
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801-532-1234
Facsimile:  801-536-6111
bmark@parsonsbehle.com
ecf@parsonsbehle.com

*Attorney for Plaintiff*

---

## UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON, EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual, | Case No. 6:19-cv-00283-AA |
| Plaintiff, | **PLAINTIFF'S OPPOSITION TO DEFENDANTS' OMNIBUS MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college District and Board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR, an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual and PAMELA WICK, an individual, | |
| Defendants. | |

Plaintiff Nicole Gililland ("Nicole" or "Plaintiff"), by and through counsel, hereby respectfully submits her Opposition to Defendants' Motion for Summary Judgment.

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................... 3

INTRODUCTION ............................................................................................... 5

PLAINTIFF'S STATEMENT OF FACTS.................................................................. 6

ARGUMENT ...................................................................................................... 24

I.  THE COURT MAY NOT GRANT SUMMARY JUDGMENT WHERE
    GENUINE DISPUTES OF MATERIAL FACT RAISE QUESTIONS THE
    JURY MUST RESOLVE. ................................................................................ 24

II.  TITLE IX BROADLY PROHIBITS GENDER-BASED DISCRIMINATION IN
     EDUCATION, INCLUDING SELECTIVE ENFORCEMENT OF DISCIPLINE
     BECAUSE OF—AND OUTCOMES INFLUENCED BY—A PARTICIPANT'S
     GENDER. ................................................................................................... 25

     A.  SWOCC identifies and applies the wrong legal standard under Title IX. ........... 26

     B.  The available evidence establishes Nicole's Title IX claim. ............................. 27

     C.  "Academic Freedom" does not shield SWOCC from liability. Instead, its
         failure to investigate and take action demonstrates its culpability. ................. 29

III.  NICOLE HAS PRESENTED SUFFICIENT EVIDENCE TO ESTABLISH HER
      BREACH-OF-CONTRACT CLAIM. ................................................................. 31

IV.  NICOLE HAS ALSO PRESENTED SUFFICIENT EVIDENCE TO
     ESTABLISH HER CLAIM FOR INTENTIONAL INFLICTION OF
     EMOTIONAL DISTRESS. ............................................................................. 33

CONCLUSION.................................................................................................... 35

CERTIFICATE OF SERVICE ............................................................................... 37

# **TABLE OF AUTHORITIES**

Page(s)

## **Cases**

*Austin v. Univ. of Oregon*,
   925 F.3d 1133 (9th Cir. 2019) ........................................................................ 25, 27

*Carmichael v. Galbraith*,
   574 Fed. Appx. 286 (5th Cir. June 19, 2014) ............................................. 26

*Dauven v. George Fox Univ.*,
   No. CV.09-305-PK, 2010 WL 6089077 (D. Or. Dec. 3, 2010) ................... 31

*Davis v. Monroe Cty. Bd. of Educ.*,
   526 U.S. 629, 119 S. Ct. 1661 (1999) ......................................................... 26

*Doe 1 v. Manhattan Beach Unified Sch. Dist.*,
   No. 19CV6962, 2020 WL 2556356 (C.D. Cal. May 19, 2020) ................... 25

*Doe v. Columbia Coll. Chi.*,
   933 F.3d 849 (7th Cir. 2019) ........................................................................ 26

*Doe v. Columbia Univ.*,
   831 F.3d 46 (2d Cir. 2016) ........................................................................... 31

*Doe v. Purdue Univ.*,
   928 F.3d ........................................................................................................ 30

*Doe v. Washington & Lee Univ.*,
   No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426, 2015 WL 4647996 (W.D. Va. Aug. 5,
   2015) ............................................................................................................. 31

*Jackson v. Birmingham Bd. of Educ.*,
   544 U.S. 167 (2005) ...................................................................................... 27

*McGanty v. Staudenraus*,
   321 Or. 532, 901 P.2d 841 (1995) ............................................................... 33

*Morrow v. Red Shield Ins. Co.*,
   212 Or. App. 653, 159 P.3d 384 (2007) ...................................................... 32

*Prasad v. Cornell Univ.*,
    No. 5:15-cv-322, 2016 U.S. Dist. LEXIS 161297, 2016 WL  3212079 (N.D.N.Y. Feb. 24,
    2016) .................................................................................................................................. 29

*Sangan v. Yale Univ.*,
    No. 3:06CV587 (PCD), 2006 WL 2682240 (D. Conn. Sept. 15, 2006) .................................. 35

*Schwake v. Arizona Bd. of Regents*,
    967 F.3d 940 (9th Cir. 2020) .................................................................................... 26, 27

*Schwenk v. Hartford*,
    204 F.3d 1187 (9th Cir. 2000) ......................................................................................... 26

*Scott v. Harris*,
    550 U.S. 372 (2007) ......................................................................................................... 25

*Videckis v. Pepperdine Univ.*,
    150 F. Supp. 3d 1151 (C.D. Cal. 2015) ................................................................. 26, 27, 28

*Yusuf v. Vassar Coll.*,
    35 F.3d 709 (2d Cir. 1994) ........................................................................................ 25, 27

## **<u>Statutes</u>**

20 U.S.C. § 1682 .................................................................................................................. 25

## **<u>Regulations</u>**

34 C.F.R. § 106.31(b)(4) ...................................................................................................... 27

## INTRODUCTION

When Nicole Gililland enrolled in Southwestern Oregon Community College ("SWOCC") Nursing program in 2017, her future looked bright. She had overcome adversity in her youth and done well enough in early college courses to gain entry to SWOCC's highly competitive Nursing program. She was eager to excel and begin a career as a nurse, which would allow her to provide a stable upbringing for her young daughter and another on the way.

But everything changed when she made the unfortunate mistake of confiding in her advisor, Melissa Sperry, that she had an embarrassing personal history that she'd rather not have widely known at the school. Nicole did not know at the time—but soon came to find out—that Ms. Sperry had a history of and reputation for targeting non-traditional nursing students for harassment and expulsion and was fond of telling students about her power to ruin academic careers. Ms. Sperry exercised that power with Nicole.

Ms. Sperry first gave Nicole a fake assignment, distracting her from actual course work, and then deducted points for taking a test late for medical reasons despite allowing other students to do the same thing without penalty. And when Nicole confronted Ms. Sperry about her mistreatment, she told Nicole that "it takes a classy woman to be a nurse" and Nicole was an "unclassy woman." Days later, Ms. Sperry manufactured a plagiarism charge against Nicole on another assignment, which resulted in Nicole receiving a zero—and together with the points Ms. Sperry docked earlier—eventually failing out.

Nicole pleaded with SWOCC to investigate her claims of mistreatment by Ms. Sperry, but she was instead met with further abuse by Susan Walker, the head of the Nursing program, and cold indifference from Tim Dailey, SWOCC's Title IX investigator. Nicole brought evi-

dence of Ms. Sperry's selective enforcement of the plagiarism standards to the attention of numerous SWOCC officials, and although several acknowledged the evidence showed Nicole was being treated differently, SWOCC did nothing. Instead, SWOCC allowed Ms. Sperry to bring about Nicole's expulsion. On these facts, which are established by volumes of credible evidence, Nicole is entitled to present her claims to a jury. Defendants' Motion ought to be denied.

## PLAINTIFF'S STATEMENT OF FACTS

Nicole moved to Coos Bay, Oregon, in 2016 with her daughter seeking a fresh start after ending a toxic relationship with her former spouse. (Gililland Dep. 17:20–18:5, Ex. A hereto.) Nicole had been a paramedic in Utah previously, and seeking a stable career to help raise her children, she decided to pursue a degree in nursing. (*Id*. at 18:25–19:15.) After finishing up a few prerequisites at SWOCC, Nicole applied for entry in SWOCC's nursing program in 2017. (Id. at 28:21–29:13.) According to SWOCC's Dean, the nursing program is "super competitive" and Nicole's admission was a "huge thing." (Saldivar Dep. 137:23–138:4, Ex. B hereto; Gililland Dep. 28:12–20.)

Nicole was fully committed to school and getting good grades was—and always has been—very important for Nicole. (Gililland Dep. 25:14–25, 28:4–11.) Nicole's hard work paid off, earning her a spot on SWOCC's Dean's List her very first quarter in the Nursing program. (Reece Decl., Ex. 19.) According to Defendant Susan Walker, the Director of Nursing, Nicole had no issues during her initial time in the program and seemed successful. (Walker Dep. 10:5–18, 14:24–15:5, Ex. D hereto.)

Nicole's initial interactions with Defendant Melissa Sperry, a teacher in SWOCC's nursing program, were also positive. For example, in December 2017, Ms. Sperry gave Nicole the

highest or second-highest marks in every category on her benchmark assessment for the first quarter. (Sperry Dep. 13:18–15:25; Ex. E hereto; Ex. 26.) That positive feedback, particularly from Ms. Sperry, continued into the second quarter—Ms. Sperry gave Nicole positive feedback on assignments in January and February 2018. (Sperry Dep. 19:17–21:4, Exs. 27, 29.)

### **Everything changes after Nicole tells Ms. Sperry about her embarrassing personal history.**

But Nicole's interactions with Ms. Sperry changed sharply beginning in March 2018. At that time, another student in the program, J.M., was under threat of expulsion for reasons that had nothing to do with Nicole. Nicole had grown close to J.M. while carpooling during the first semester and had earlier confided in J.M. about her prior work as an adult film actress. (Gililland Dep. 156:17–158:6.) Because J.M. had become erratic and accusatory toward Nicole as her expulsion played out, Nicole was worried J.M. may disclose Nicole's past to SWOCC officials, including Ms. Sperry, who was involved in J.M.'s expulsion. In the event that happened, Nicole wanted to soften the impact by preparing Ms. Sperry. (*Id.*) To that end, Nicole wrote an email to Ms. Sperry on March 14, 2018, explaining the situation and sharing with Ms. Sperry that she's "confided in [J.M.] some things about my past that I'm not proud of back when I was teenager and I'm afraid . . . she could really embarrass me." (Sperry Dep. 21:19–23:24; Ex. 30.) Later in the conversation, Nicole expressed concern to Ms. Sperry that her past could "effect [her] negatively down the road" if disclosed. (*Id.*)

Ms. Sperry became obsessed the email and immediately forwarded it to Ms. Walker. (Walker Dep. 15:15–18:8.) And for the next year, the email hung in Ms. Sperry's mind—*a year later*, after Ms. Gililland had been gone from SWOCC for close to nine months because of what Ms. Sperry would later do to her, Ms. Sperry "remembered" the email about Nicole's embarrass-

ing personal history and *re-forwarded* the email to Ms. Walker *with a smiley face emoji*. (Sperry Dep. 86:4–87:15; Ex. 42.) In the three months that would follow Nicole's vulnerable email to Ms. Sperry, Ms. Sperry would engineer Nicole's departure from SWOCC, something Ms. Sperry was fond of threatening against students that she believed didn't fit the mold of a "traditional" nursing student. (Declaration of Stephanie Kyelberg, ¶¶ 3–7, 11–12, 18–20.)

Indeed, Ms. Sperry's treatment of Nicole changed dramatically after she revealed her embarrassing personal history. Whereas Ms. Sperry had previously been superficially friendly, she turned cold. (Gililland Dep. 54:1–55:9, 80:4–81:10, 87:14–88:2.) Nicole had fallen ill in late-March and had been to the Emergency Room of the local hospital several times. (Ex. 34, 48, 49, 51; Gililland Dep. 54:11–57:12.) When the condition still didn't improve, she was able to make an appointment at a local clinic for Friday, April 13, but the "only opening" conflicted with the time for Ms. Sperry's test. (Ex. 34.) Due to Ms. Sperry's policy of assessing a penalty on late work, Nicole requested to arrange to take the test *early*, as Ms. Sperry had done for other students in similar circumstances. (Exs. 34, 52; Gililland Dep. 60:1–15, 72:19–73:21.)

Nicole's illness apparently provided Ms. Sperry with the opening she was looking for to ruin Nicole's life in what can only be described as Kafkaesque. Instead of honoring Nicole's request to take the test early, Ms. Sperry sent an email stating simply that "[t]here will be an assignment you can work on for today posted on Laker Link," a part of SWOCC's Learning Management System (LMS) system. (Ex. 34, Gililland Dep. 73:22–75:13.) Since Nicole was eager to show Ms. Sperry that she was not using her illness to slack on her studies, Nicole repeatedly checked Laker Link for the assignment on Friday. (*Id.*) That afternoon, Nicole emailed Ms. Sperry to let her know that she was having trouble finding the assignment on the system. (Ex. 34.)

On Saturday, April 15, having not received a response from Ms. Sperry, Nicole emailed Ms. Sperry again about the "Assignment," noting that the only one on Laker Link was "an assignment titled Kaplan Remediation." Ms. Sperry confirmed that "[t]he remediation instructions and form are on your handouts page." (Declaration of Brandon Mark, Ex. 201; Gililland Dep. 75:17–76:20.)

On Monday, April 16, Ms. Sperry emailed Nicole, noting that she had not received back Nicole's assignment on Friday, which ignored their entire email exchange from Saturday. Nicole responded that she was feeling much better and was working on the assignment, but that on the LMS system, it said the remediation assignment was due Wednesday, April 18. (Ex. 34.) At no prior time had Ms. Sperry claimed the assignment was due on the same day she assigned it, which itself is odd. (Ex. 34; Gililland Dep. 77:17–78:21, 79:6–80:3.) However, Nicole offered to finish up the assignment earlier if Ms. Sperry desired and noted she could complete it that day, after first finishing her "care plan" for Ms. Finney's class. (Ex. 34.)

After Ms. Sperry changed the due date, Nicole rushed to complete the care plan for Ms. Finney's class so that she could turn her attention back to Ms. Sperry's assignment. (Gililland Dep. 96:22–97:6.) On the pathophysiology portion of the care plan, Nicole had copied descriptions of certain relevant health conditions of medical journal articles she found online, which she had been told by other SWOCC faculty was acceptable practice. (Gililland Dep. 104:5–105:7.) Nicole then turned her attention to the remediation assignment for Ms. Sperry—determined to get it done immediately to appease Ms. Sperry. Nicole worked long hours and turned it in to Ms. Sperry late on Monday night. (Gililland Dep. 96:16–99:8; Ex. 35.)

Early Tuesday morning, Ms. Sperry suddenly stated that the remediation assignment—

the one they'd emailed about on Saturday—was not the assignment Nicole was supposed to complete. (*Id.*) Instead, Nicole was supposed to complete an entirely different assignment—a "Case study." (Ex. 35.) Ms. Sperry had never mentioned anything about a case study for nearly four days of back-and-forth email communication about the issue, which were all about the remediation assignment. (Gililland Dep. 84:22–85:6, 89:18–90:1; Exs. 34, 35, 201.) While Ms. Sperry later attempted to downplay the whole episode as a "miscommunication" (Ex. 35; Gililland Dep. 79:6—80:1), the relevant emails demonstrate there was no miscommunication—Ms. Sperry directed Nicole to work on a laborious, time-consuming remediation project, which took time from her work on other classes, including her care plan for Ms. Finney. Then, Ms. Sperry claimed she'd assigned something entirely different. (Gililland Dep. 126:8–127:2.) Ms. Sperry's actions against Nicole were similar to others in which Ms. Sperry had targeted non-traditional nursing students for harassment. (Kyelberg Decl. ¶¶ 5–12, 19–20; Gililland Dep. 125:10–126:7.)

The next day, Wednesday, April 18, Nicole completed her make-up tests from the previous Friday—the tests she'd asked to take early but which Ms. Sperry denied her. (Gililland Dep. 88:3–90:10.) Ms. Sperry assessed her a 10 percent penalty for taking the tests late, despite letting other students take tests early to avoid the penalty, and gave Nicole a zero on the assignment that she misdirected Nicole over. (Gililland Dep. 88:3–90:10; Sperry Dep. 34:23–35:3; Kyelberg Decl. 8–9.) When Nicole protested, Ms. Sperry said it was her "prerogative" to grade how she wanted. (Gililland Dep. 88:3–90:10; Kyelberg Decl. ¶¶ 10–12.) Ms. Sperry's "demeanor was off"—"she was smiling and she seemed to kind of be enjoying the moment. (*Id.*)

### **Ms. Sperry justifies her treatment of Nicole by explaining that only "classy women" can be nurses.**

Nicole asked Ms. Sperry "why she was doing" all of this to her, to which Ms. Sperry re-

sponded "'because it takes a classy woman to be a nurse, and unclassy women,' kind of pointing to [Nicole], 'shouldn't be nurses.'" (Gililland Dep. 91:9–21, 93:11–94:2 (internal marks added); Kyelberg Declaration ¶¶ 13–15.) Ms. Sperry told Nicole that if she had a problem with her decisions, she could take it up with Ms. Walker, the Director of the Nursing Program. (Gililland Dep. 91:9–21, 93:11–94:2.) Nicole did just that, going immediately to Ms. Walker's office, who backed Ms. Sperry's decision on the late penalty, despite the differential treatment. (Gililland Dep. 94:7–21.)

### The second phase of Ms. Sperry's campaign to expel Nicole—selective enforcement of SWOCC's plagiarism standards.

Robin Finney was newest member of SWOCC's nursing faculty in 2018 and admitted that as the "young teacher" in the department, she was forced to take the "leftovers." (Finney Dep. 7:10-23, Ex. G hereto.) On Friday, April 25, Ms. Finney was grading the care plans the students had turned in the week prior and thought that Nicole's pathophysiology—which is a portion of the care plan—appeared to be copied from another source. (Finney Dep. 10:22–11:6; Sperry Dep. 40:19–22; Gililland Dep. 107:2–20.) She brought this to the attention of Ms. Sperry, who took control of the assignment and investigation, even though it was entirely abnormal for one SWOCC nursing teacher to investigate plagiarism in another's assignment, having never happened in at least the decade prior. (Walker Dep. 26:12–15, 27:3–16; Gililland Dep. 97:15–99:4, 106:21–107:1.) Nevertheless, Ms. Sperry performed a Google search on pathophysiology portion and not surprisingly located the sources that Nicole had copied the material from. (Sperry Dep. 40:25–41:11.)

Ms. Sperry didn't tell Ms. Finney that she had caused Nicole to waste a tremendous amount of time completing a fake assignment at the same time Nicole was working on the path-

ophysiology. (Finney Dep. 32:19–33:5.) Within minutes, Ms. Sperry's investigation spread far

beyond Ms. Finney's assignment, with Ms. Sperry claiming to have found plagiarism by Nicole

in a care plan from a different assignment for a different professor. (Sperry Dep. 43:17–44:7,

47:6–11, 53:15–25; Walker Dep. 25:3–15, 25:19–26:8; Exs. 4, 5, 38.) Nobody other than Ms.

Sperry reviewed the prior assignment and found purported plagiarism, and Ms. Sperry never

provided anyone with "evidence of other papers being plagiarized." (Walker Dep. 33:10–34:2,

36:11–20; Exs. 3, 4.) Ms. Sperry compiled the materials that Nicole had purportedly copied into

an email to Ms. Walker. (Sperry Dep. 42:2–44:1; Ex. 4.) Ms. Sperry is the only person to have

done this—Ms. Finney played no part. (Finney Dep. 14:15–15:4; Gililland Dep. 97:15–99:4.)

Critically, Ms. Sperry didn't look at the care plans—current or past—of *any other stu-

dent* for potential copying when she looked at Nicole's. (Sperry Dep. 51:3–18, 47:18–25, 57:5–

11.)

Ms. Sperry then placed Nicole in deficiency based on the purported plagiarism on multi-

ple assignments, not only the one Ms. Finney graded. (Sperry Dep. 51:19–53:25; Ex. 5.) The de-

ficiency form noted that due to Ms. Sperry's plagiarism determination—and the grade changes

resulting therefrom—Nicole was now failing all three of her classes. (Sperry Dep. 54:14–55:22;

Exs. 4, 5; Gililland Dep. 97:15–18.)

On the same day, April 25, Nicole informed Ms. Walker that she was feeling targeted by

Ms. Sperry and explained that, based on past practice, she understood that preparing care plans

this way was not inappropriate. (Walker Dep. 28:2–29:6; Ex. 3.) Ms. Walker told her they would

hold an expulsion hearing for Nicole the following Monday, April 30. (100:3–102:11.)

Nicole was crestfallen but allies soon appeared, as several classmates rallied to her de-

fense to admit they had done similar things and to confirm that other professors had essentially condoned the practice of copying basic medical information for care plans. (Gililland Dep. 101:3–20, 110:1–7.) Buoyed by her classmates support, Nicole emailed Ms. Finney on April 26, which was forwarded to Ms. Walker, in which she again reiterated that she was not the only student who copied material for care plans—that it was "a program wide issue"—and again pointed out Ms. Sperry was treating her differently than the others. (Ex. 6; Walker Dep. 46:10–48:3.)

Nicole also immediately went to SWOCC's Vice President of Student Services and its Title IX Investigator, Defendant Tim Dailey, and pointed out that she was being treated differently than the other students. (Dailey Dep. 11:22–12:16, 21:7–18, Ex. H hereto; Ex. 60a; Gililland Dep. 109:14–110:16.) Mr. Dailey brought in Francisco Saldivar, the Dean over the Nursing program in April 2018. (Saldivar Dep. 7:25–8:13; Ex. 60a; Gililland Dep. 109:14–110:16.) On Saturday, April 28, Nicole provided Mr. Dailey with the names of witnesses who would confirm that other students had prepared their care plans similarly, including Mayra Rangel and Stephanie Kyelberg, and she specifically told Mr. Dailey where to find examples of copying by other students. (Dailey Dep. 22:4–24:8; Ex. 61a.)

Prior to the April 30 expulsion hearing, Ms. Walker contacted Nicole's clinical instructor, Liz Cooper, in an effort to dig up dirt. (Cooper Dep. 14:9–16:6.) Ms. Walker falsely told Ms. Cooper there had been an "incident" at SWOCC involving an "emotional outburst" by Nicole, which Ms. Cooper admitted caused her to scrutinize Nicole more. (*Id*.) Ms. Walker asked Ms. Cooper if she had any patient safety concerns with Nicole, to which Ms. Cooper responded: "She's been good.·She's right where·she should be.·I haven't seen any patient safety·issues." (*Id*.) Ms. Walker now denies this meeting happened. (Walker Dep. 44:17–21.)

**<u>Nicole provides SWOCC with clear evidence that Ms. Sperry is targeting her for selective enforcement of its plagiarism rules.</u>**

During the April 30 meeting, which was attended by Nicole, her ex-husband (Daymon), Melissa Sperry, Tim Dailey, Francisco Saldivar, and Susan Walker, among others,[1] Nicole immediately notified SWOCC of several important facts, including that (1) she believed Ms. Sperry's conduct amounted to targeted harassment (Sperry Dep. 63:10–64:15; Walker Dep. 41:18–42:18; Dailey Dep. 157:1–9; Ex. 3; Gililland Dep. 113:12–114:21, 117:4–8); (2) Ms. Sperry's search for and identification of plagiarism only in Nicole's assignment caused Nicole to receive a zero (Sperry Dep. 64:16–25); (3) many other students in the program had done similar things as Nicole, which Nicole brought examples of and shared (Walker Dep. 42:19–24; Ex. 3; Gililland Dep. 113:20–114:11, 116:14–24); and (4) Ms. Sperry's deduction for late work, when other students were allowed to take tests early, was part of the discriminatory treatment (Sperry Dep. 65:12–22).

During the April 30 meeting, SWOCC decided to start an investigation into Nicole's claims of selective enforcement of the plagiarism standards. (Dailey Dep. 44:22-45:6, 49:15–22; Exs. 65, 66, 60a; Gililland Dep. 117:16-118:3.) That investigation was supposed to include another professor conducting an independent review the care plans of all Nicole's peers to determine if others had also used copied material for their care plans. (Walker Dep. 43:14–21.)

**<u>Ms. Walker slanders Nicole with salacious and false claims of patient safety problems.</u>**

But even before SWOCC began its investigation of Nicole's claims of selective enforcement, Ms. Walker attempted to bias its conclusions. At the *very end* of the April 30 meeting

---

[1] Nicole was prevented from bringing any student witnesses with her to the expulsion hearing. (Gililland Dep. 100:3–102:4.)

(Saldivar Dep. 16:18–23, 17:13–18), Ms. Walker accused Nicole of being unsafe with patients, *directly contrary to what Ms. Cooper had just told her*. Multiple witnesses who attended that meeting recall Ms. Walker accusing Nicole of being unsafe with patients, including Ms. Finney, Mr. Dailey, and Mr. Saldivar. (Saldivar Dep. 16:18–23; Finney Dep. 43:14–18; Dailey Dep. 32:25–33:14; Gililland Dep. 117:16–119:2; 120:12–121:11.)

In retrospect, Ms. Walker appears to realize that her knowingly false accusation was wholly inappropriate and actionable and she flatly denies she said it, despite the (at least) four others who clearly recall her doing so. (Walker Dep. 44:1-10, 114:19–24.) Even Liz Cooper, Nicole's clinical instructor, heard about Ms. Walker's accusation in that meeting since it involved Ms. Cooper's area. (Cooper Dep. Ex. I hereto, 12:22–13:16.)

While denying she made that false accusation at the April 30 meeting, Ms. Walker has doubled down on her fabrication, claiming she spoke with Liz Cooper, Nicole's clinical instructor, about a week later and that Ms. Cooper told her that Nicole was "having trouble remembering things." (Walker Dep. 45:12-21.) But according to Ms. Cooper, at that meeting, "I told [Ms. Walker] what I had said to·her on the phone [earlier], . . . that *I didn't have·any concerns for Nicole, that there wasn't any·patient safety concerns*." (Cooper Dep. 12:4–21 (emphasis added).) When Mr. Saldivar interviewed Ms. Cooper around the same time, she was "very clear that there [we]re no patient safety concerns" with Nicole. (Saldivar Dep. 51:16–52:10.) In fact, Ms. Cooper "never had any, like, patient safety concerns or anything with" Nicole at any time. (Cooper Dep. 9:14–23.) Ms. Sperry told another student that the "easiest way to end a nursing student's career was for an instructor to accuse a student of being unsafe with patients, whether true or not." (Kyleberg Decl. ¶ 11.)

## **SWOCC's Investigation Fails All of the Minimal Requirements Outlined by its Own Title IX Investigator.**

According to SWOCC's Title IX investigator, Mr. Dailey, a minimally adequate Title IX investigation should include gathering a list of witnesses the complaining student wants the investigator to talk to, interviewing those witnesses, and collecting the evidence into a report to the Title IX coordinator for action. (Dailey Dep. 12:14-14:14, 80:6–19.) A student may initiate a Title IX investigation through a conversation with Mr. Dailey. (Dailey Dep. 15:22–16:3; SWOCC (Whitey) Dep. Ex. J hereto, 21:4–13.)

But in this case, *none of those things happened*: none of the three witnesses that Nicole provided SWOCC through Mr. Dailey and Mr. Saldivar were interviewed and no evidence of Nicole's claims was collected or reported. (Dailey Dep. 40:13–20, 41:16–23, 64:6–65:10, 69:25–70:17, 142:11–143:22; Exs. 69, 70, 72, 74, 82; Saldivar Dep. 47:10–48:6, 53:4–22, 90:1–20, 99:4–100:7, 106:21–107:4, 108:17–109:6, 135:23–137:4, 138:5–12; Kyelberg Decl. ¶ 16; Gililland Dep. 130:8–131:8.) For example, on April 30, Nicole forwarded an email to Francisco Saldivar from one of the witnesses she asked SWOCC to interview, Mayra Rangel—offered by Ms. Rangel to prevent SWOCC from "ruining the academic life of one singled-out student"— which attached 10 examples of uncited copying by students and faculty. (Ex. 62a; Saldivar Dep. 17:24–20:22.) The same day, she forwarded a statement from Victoria Kalmykova, a former student, identifying similar copying by Ms. Sperry. (*Id*.; Ex. 63.) Mr. Dailey failed to review these other examples of uncited copying provided to him. (Dailey Dep. 51:17–52:3; Gililland Dep.

109:14–110:7.)[2]

Nor did Mr. Dailey or Mr. Saldivar interview Ms. Sperry, the teacher that Nicole specifically identified as the source of the selective enforcement, or discuss the selective enforcement issues with Ms. Finney, the teacher who gave the original assignment, even though that was Mr. Saldivar's "normal practice." (Dailey Dep. 50:15–23, 52:20-24, 65:11–24, 70:25–71:14, 121:17–122:4, 160:8–161:13; Saldivar Dep. 29:2-7; Finney Dep. 42:8–22, 54:8–18.)

As SWOCC's Title IX investigator, Mr. Dailey received no training in how to handle selective enforcement of academic standards. (Dailey Dep. 14:11–15:1.) Mr. Dailey believed that as the Title IX investigator, he had no role to ensure an impartial investigation of Nicole's claims of selective treatment based on gender stereotypes. (Dailey Dep. 55:2–22.) Mr. Dailey agreed that Title IX protects against harassment based on gender stereotypes but said SWOCC failed to undertake any investigation of those issues here. (Dailey Dep. 97:8–14.)

### **Rather than protect Nicole during the investigation, SWOCC allows her to become the victim of retaliation for asserting her rights.**

Following the April 30 meeting, Nicole frequently emailed Mr. Dailey and Mr. Saldivar inquiring about the progress of their investigation. Nicole explained she sent them because she was "anxious and frankly pretty bummed at this entire situation" and she noted how "stressful" the situation was for her. (Exs. 21, 67, 70; Kyelberg Decl. ¶ 17.) Mr. Dailey noticed that as nothing happened in SWOCC's investigation, Nicole was sometimes "sad" and "sometimes she was

---

[2] From the beginning, Nicole also identified two other recent, similar assignments where SWOCC would find similar widespread copying by students to Mr. Dailey. (Ex. 61a; Dailey Dep. 24:22–25:6.) But no one at SWOCC ever reviewed those assignments, or, it turns out, bothered to preserve them for later review. (Dailey Dep. 24:22-25:21, 65:25–66:20; Saldivar Dep. 56:9–18, 57:10–12; SWOCC (Mageehon) Dep., 32:24–33:25, 35:21–36:14.)

concerned and anxious." (Dailey Dep. 63:6–11.)

But SWOCC failed to explain to Nicole what the investigation process was supposed to entail or when to expect it to conclude—it left Nicole completely in the dark about her future. (Dailey Dep. 88:8–89:18.) And instead of protecting a vulnerable student, SWOCC allowed Nicole to become the victim of retaliation for attempting to vindicate her rights. Indeed, after growing concerned by the apparent lack of action by SWOCC, Nicole filed formal complaints with the Oregon State Board of Nursing (OSBN) and US Department of Education (DOE). (Exs. 8, 11.) Mr. Dailey predicted Nicole "will fail a class or get dismissed due to disruptive behavior" for daring to file them. (Ex. 8.)

Shortly thereafter, Ms. Walker again accused Nicole of being unsafe with patients and demanded that she submit to a patient simulation for Ms. Walker's own evaluation. (Gililland Dep. 133:16–134:24; Ex. 13; Walker Dep. 69:1–70:18.) Ms. Walker made no other student submit to a simulation that term. (*Id.*) Nicole informed Mr. Dailey, SWOCC's Title IX investigator, and Dean Saldivar that Mr. Walker was again treating her differently than everyone else, but they never inquired of Ms. Walker about the differential treatment. (Exs. 64, 65, 72; Dailey Dep. 38:5–40:2, 43:6–9, 51:7–12, 102:23–103:8; Saldivar Dep. 125:22–126:5.)

In late May 2018, after Mr. Dailey and Mr. Saldivar missed several appointments with Nicole to discuss the situation and a month after Nicole asked SWOCC to first look into her accusations of selective enforcement as a form of harassment by Ms. Sperry, Nicole found out from SWOCC administration that Mr. Dailey had failed to treat her complaint "in a formal capacity." (Ex. 71; Gililland Dep. 150:4–14.) Nicole immediately emailed Mr. Dailey and insisted that he handle her complaint in a formal manner and filled out the official complaint form. (Ex.

71; Gililland Dep. 165:20–166:2.)

When after another week went by without any progress on the investigation, on May 29, Nicole decided to finally disclose to Mr. Dailey the "unclassy woman" comments that Ms. Sperry had made to her in mid-April—just before Ms. Sperry "discovered" the copying. (Gililland Dep. 151:25–156:16; Dailey Dep. 107:19–108:22; Saldivar Dep. 100:8-20; Exs. 13, 14.) Nicole had been reluctant to that point to fully disclose those comments out of fear of having to reveal her whole personal history and why she thought Ms. Sperry made them—which she had tried so hard to keep hidden from SWOCC the entire time. (Gililland Dep. 151:25–156:16.) Nicole also told Mr. Saldivar about the emails she sent to Ms. Sperry relating to the other student, in which she had disclosed her personal history. (Exs. 1, 77; Saldivar Dep. 44:14–45:3, 147:24–150:8.)

### Initially SWOCC found that most of Nicole's peers had engaged in the same activity, but SWOCC allowed Ms. Sperry to bias the final outcome.

SWOCC asked Rod Keller, an English professor, to review the assignments of Nicole and her peers to see if he could detect plagiarism in any of them. (Keller Dep. 11:9–23, Ex. F hereto.) SWOCC granted him access to the LMS class folder so he could review the turned-in assignments. (Finney Dep. 38:19–25; Keller Dep. 11:9–23.) When Ms. Finney turned the folder over to Mr. Keller, the materials Nicole had copied from were not included. (Finney Dep. 40:12–18.) Initially, Mr. Keller reported that "the majority of nursing students can be guilty of plagiarism," a conclusion with which Dean Saldivar concurred (Ex. 15; Dailey Dep. 112:13–113:2; Saldivar Dep. 84:17–85:2 ("I felt that the whole program was plagiarizing . . . .").)

On June 7, as the quarter drew to a close, Mr. Dailey drafted a letter, on behalf of himself and Mr. Saldivar, to Ms. Walker and Ms. Sperry. (Saldivar Dep. 128:12–18.) Mr. Dailey reported that Mr. Keller had found the same problems as found in Nicole's care plan in a "majority" of

the "other student's [sic] care plans." (Ex. 17.) Separately, Mr. Dailey also noted that "Nicole had a legitimate reason for missing class due to a doctor's appointment that was a follow-up to a kidney infection," which was "well documented in emails between Susan, Melissa and Nicole" and that "Nicole ha[d] proof of the medical appointment." (Exs. 17, 75; Dailey Dep. 123:19– 124:6, 145:14–9; Saldivar Dep.128:23–130:17.)

Mr. Dailey's letter concluded that the "***fair and equitable solution***" would be "[t]hat Nicole be removed from a probationary status and returned to good standing" and "[t]hat points be restored to the assignments in question." (Ex. 17 (emphasis added).) Mr. Saldivar agreed. (Saldivar Dep. 141:15–24, 142:2–24.)

When it appeared the outcome of Mr. Keller's would favor Nicole, Ms. Sperry apparently decided to take action to prevent that from happening by uploading the internet sources that Nicole had copied from into the LMS folder that Mr. Keller was reviewing, which caused Mr. Keller to ***mistakenly believe*** Nicole had simply copied from materials given to the students in the assignment. (Keller Dep. 14:24–15:11, 24:21–25:5, 37:22–38:1, 39:14–40:2, 40:19-25, 42:1–5, 43:10–17.) But Mr. Keller was never supposed to have access to the materials from which Nicole had copied—there should have been nothing in the folder except for the students' completed assignments and the original assignment—and it was improper for someone to have put the materials in the folder without Ms. Finney's knowledge. (Finney Dep. 39:1–23, 43:23–45:5, 45:6–24.) Every SWOCC teacher had access to the folder and could have uploaded material at any time, but Ms. Sperry was the ***only*** person who had compiled the source materials. (Ex. 4; Finney Dep. 41:2–6, 14:15–15:4.) Notably, SWOCC's LMS system has an audit trail function that would permit a determination of who placed the materials in the folder and when, but SWOCC (con-

veniently) can't find it. (Finney Dep. 41:7–12; SWOCC (Mageehon) Dep. 26:1–28:13, 39:9–24, Ex. C hereto.)

With the erroneous understanding that Nicole had brazenly copied material from the assignment due to Ms. Sperry improperly uploading those materials into the folder, Mr. Keller backtracked and concluded Nicole's actions were more "intentional" than other students'. (Keller Dep. 31:10–32:6, 43:10–17; Ex. 90 (SWOCC5375); Saldivar Dep. 39:3–25, 79:15–23, 85:3–8.) That caused Mr. Dailey to refrain from sending the letter to Ms. Walker and Ms. Sperry directing the "fair and equitable outcome" of restoring all points from the care plan and earlier test and effectively ended the involvement of SWOCC's Title IX investigator, who turned the issue over to Ms. Walker and Ms. Sperry. (Dailey Dep. 125:3–127:9, 129:13–130:4, 138:15–139:20, 145:14–9; Ex 75.)

In short, despite Nicole telling Mr. Dailey what Ms. Sperry had said about her being an insufficiently classy woman to be a nurse, SWOCC's Title IX investigator concluded his involvement without ever "look[ing] for any sort of evidence of [Nicole] being targeted," even though "she mentioned that . . . on several occasions," because he didn't think it was "relevant." (Dailey Dep. 157:10–18, 159:14–160:7; Saldivar Dep. 100:8–20.)

**SWOCC's failure to protect Nicole causes her to attempt suicide.**

Nicole became increasingly anxious as the third quarter drew to a close in early June 2018 because her situation with SWOCC was still not resolved—the last she'd heard was that she was still receiving a zero and losing points on the Sperry make-up tests. (Ex. 21.) That zero, along with the other points Ms. Sperry deducted associated with her illness, caused her to start failing each of her three classes. (Sperry Dep. 54:14–55:22; Exs. 4, 5, 21; Saldivar Dep. 41:16–

19.). On June 8, the day after Mr. Dailey sent the letter about the "fair and equitable solution" being to restore all points to Nicole, which no one ever shared with Nicole, Nicole reached a breaking point. (Kyelberg Decl. ¶ 17; Gililland 166:21–167:9.) There had been no resolution and no indication of an investigation, and her academic life was on the line. (Kyelberg Decl. ¶¶ 11–12, 17, 19–20.) Unfortunately, once it appeared everything had been taken from her and she had no options, she attempted to take her own life on June 8. (Kyelberg Decl. ¶ 17; Gililland Dep. 168:1–169:4; Ex. 79 ("I am being put through the wringer here and I'm absolutely exhausted.").)

### Even though other students also copied outside materials into their care plans—and some didn't even turn in the care plan—only Nicole received a zero.

While SWOCC's Title IX investigator did nothing, Dean Saldivar had seen the evidence for himself and concluded that "plagiarism was rampant" in "the nursing program" and "it was clear they were all plagiarizing" like Nicole. (Saldivar Dep. 108:11–12.) Not only did many students copy and paste directly from outside sources, including their own textbook, one male student failed to turn in the pathophysiology portion of the care plan at all—which is where Nicole and the other students used copied material—yet he still received a passing grade on the care plan and in the course. (Mark Decl. ¶¶ 3–34.)

Based on his conclusion there had been widespread copying, Mr. Saldivar was falsely led to believe that care plan grade had "been removed from everybody's grading scheme," including Nicole's, which was the "absolutely" "equitable outcome" under the circumstances. (Saldivar Dep. 59:24–60:9, 61:14–21, 92:8–23, 134:22–135:5.) While Ms. Finney agreed that would have been the appropriate outcome had she been told that others had plagiarized, she claims that since no one at SWOCC talked to her about the issue, she did nothing. (Finney Dep. 70:13–71:11, 80:19–81:7, 54:8–20, 57:11–19.) SWOCC's "official position" is that "no determination was

made" about whether other students copied—SWOCC just looked the other way. (SWOCC

(Mageehon) Dep. 51:12–52:19.)

And entirely separate from the care plan, even though Mr. Dailey had determined that

Nicole had good cause to take the previous test late due to a kidney infection and should also

have those points restored, Ms. Sperry never restored them either. (Ex. 17; Sperry Dep. 79:8–22.)

Dean Saldivar specifically directed Ms. Sperry to return the points but she refused to do so. (Sal-

divar Dep. 128:23–130:17, 144:2–16, Ex. 75.)

### The points Nicole lost on the care plan and test caused her to fail out of SWOCC.

While SWOCC contends that Nicole's dismissal from the program was due to her failure

to complete certain unidentified assignments (Mot. 15), SWOCC offers nothing than its attor-

ney's unsupported characterization of a hearsay email (Reece Ex. 71). Moreover, the author of

that email, Ms. Walker, testified that to determine "what actually caused [Nicole] to fail" re-

quires consulting the electronic gradebooks in SWOCC's LMS. (Walker Dep. 116:4–23.) The

one gradebook SWOCC can actually find for a class she failed—***SWOCC's missing an entire***

***gradebook***—refutes SWOCC's claim. (Ex. 97, 101; SWOCC (Mageehon) Dep. 42:23–43:23.)[3]

Indeed, the lone gradebook that SWOCC managed to find and produce shows that the ze-

ro on the care plan in week 3, along with the points Ms. Sperry had taken on the prior test in

week 2, caused Nicole to fail that class—not the one small assignment she skipped. Had Nicole

---

[3] SWOCC's Rule 30(b)(6) witness, designated to provide SWOCC's official testimony on this subject, did not know why Nicole failed the classes. (SWOCC (Mageehon) Dep. 45:1–11.) SWOCC is bound by that position. Fed. R. Civ. P. 30(b)(6). Nicole, on the other hand, clearly recalls that she was actually pass-ing all of her classes at the end of the quarter and that "[m]ore than a month after the term had ended," someone changed the grades. (Gililland Dep. 171:18–172:15.) Notably, Ms. Sperry had access to all the grades and could have changed Nicole's grades at any time. (Sperry Dep. 50:2–16.)

received the original grade she was awarded by Ms. Finney, she would have received 77% of the 35 points available on the care plan—or approximately 26.95 points. (Finney Dep. 64:20–65:1, 65:22–24; Ex. 97 ("Week 3: Muscuoloskeletal Case Study").) And if she received back the 10 percent reduction for taking the Week 2 test late, that would've added another 1.35 points to her evaluation score. (*Id.* ("Week 2 Acute GI").) Adding those points to her total "evaluation" grade (124.5) would have resulted in Nicole earning a total of 152.8 points, giving her a solid B (152.8/182 = 84%) for the evaluation portion and a B- for the whole class (182.3/222 = 82%)— *even with the 5 points she missed for skipping one small assignment*. (*Id.* ("STI Presentation").) Or, if the grade had instead been thrown out for everyone, as Dean Saldivar was told would happen, Nicole also would have passed the class: she would have received 125.85 points out of a total of 167 (or 77%) on evaluations and 155.35 points out of a total of 207 (or 75%) for the class as a whole—again, even with the assignment she skipped. (*Id.*)

While Mr. Saldivar, the Dean over the Nursing program, was told the grade "was being removed and it wasn't being counted by anybody . . . so people didn't get an A or zero," and even though almost everyone agreed that should have been the outcome under the circumstances, that's not what happened. (Saldivar Dep. 107:20–108:19; Finney Dep. 31:18–24; 54:21–55:4; 57:5–58:22; Keller Dep. 27:6–14, 33:2–13; Dailey Dep. 111:5–16; 133:24–134:5.) Instead, SWOCC allowed Ms. Sperry's campaign of harassment to succeed, Nicole received a zero on the assignment and a failing grade in her classes, and that caused her to fail from the program.

## **ARGUMENT**

**I.** **The Court may not grant summary judgment where genuine disputes of material fact raise questions the jury must resolve.**

On a motion for summary judgment, "courts are required to view the facts and draw rea-

sonable inferences in the light most favorable to the party opposing the [summary judgment] motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## II.    Title IX broadly prohibits gender-based discrimination in education, including selective enforcement of discipline because of—and outcomes influenced by—a participant's gender.

Title IX declares that "no person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1682.[4] Generally, Title IX prohibits three types of discrimination: "(1) disparate treatment, (2) disparate impact, and (3) retaliation." *Title IX and Sex Discrimination,* U.S. Dep't Educ. (Apr. 2015), *available at* https://www2.ed.gov/about/offices/list/ocr/docs/tix_dis.html.

"Selective enforcement, erroneous outcome, and deliberate indifference are theories that can support a disparate treatment claim." *Doe 1 v. Manhattan Beach Unified Sch. Dist.*, No. 19CV6962, 2020 WL 2556356, at *4 (C.D. Cal. May 19, 2020) (citing *Austin v. Univ. of Oregon*, 925 F.3d 1133, 1138-39 (9th Cir. 2019)). "A selective enforcement claim asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Doe 1*, at *4 (citing *Yusuf v. Vassar Coll.,* 35 F.3d 709, 715 (2d Cir. 1994)) (cleaned up). "An erroneous outcome claim asserts, in essence, that the outcome of a proceeding was flawed due to the plaintiff's sex." *Doe 1*, at *4 (citing *Austin*, 925 F.3d at 1138-39) (cleaned up).

However, the Ninth Circuit has held that these theories, while useful analytic tools, are

---

[4] SWOCC does not dispute that is it an educational institution that receives federal funds and is therefore subject to Title IX.

not absolute requirements for a plaintiff to succeed "because, at bottom, they all ask the same question: whether . . . the university discriminated [against the plaintiff] 'on the basis of sex'?" *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020) (quoting *Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019)). Ultimately, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Schwake*, 967 F.3d at 946.

"It is [also] undisputed that Title IX forbids discrimination on the basis of gender stereo-types," *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015), and that Ti-tle IX protects against discrimination that stems from "a person's views about the proper roles of men and women," *id.*, or differential treatment for failing "to conform to socially-constructed gender expectations," *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000); *Carmichael v. Galbraith*, 574 Fed. Appx. 286, 293 (5th Cir. June 19, 2014) (Title IX protects against adverse action based on a "failure to conform to stereotyped notions of masculinity and femininity").

## A.  SWOCC identifies and applies the wrong legal standard under Title IX.

While SWOCC assumes that Plaintiff is proceeding under a deliberate indifference theo-ry alone (Mot. 18 (citing *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650, 119 S. Ct. 1661, 1675 (1999)), she has always pursued her claims primarily under other theories, particularly the selective-enforcement/erroneous-outcome analyses. *Davis* made clear that private rights of action under Title IX require that the institution have notice of the underlying acts giving rise to the cause of action. The "deliberate indifference" test has thus historically been applied in contexts of student-on-student or teacher-on-student harassment *not resulting in disciplinary action against the student* to ensure schools have proper notice and ability to remedy the harassment.

But federally funded institutions such as SWOCC already have adequate notice that they could be liable for decisions regarding disciplinary proceedings. Department of Education guidance from 2001 states that one of the "basic Title IX responsibilities a recipient undertakes when it accepts Federal financial assistance" is an agreement not to "subject students to separate or different rules of behavior, sanctions, or other treatment" on the basis of sex. U.S. Dep't of Educ. Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties ("2001 Guidance"), at 4 (citing 34 C.F.R. § 106.31(b)(4)). Indeed, "Title IX 'encompass[es] diverse forms of intentional sex discrimination"—deliberate indifference is not the only doctrinal test available. *Schwake*, 967 F.3d at 94 (quoting *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005).

**B.  The available evidence establishes Nicole's Title IX claim.**

Under the "selective enforcement" theory outlined in *Yusuf v. Vasser Coll.,* 35 F.3d 709, 715 (2d Cir. 1994), and recognized by the Ninth Circuit in *Austin*, 925 F.3d at 1138-39 and *Schwake,* 967 F.3d at 947, "Title IX bars the imposition of university discipline where gender is a motivating factor in the decision to discipline"—that "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Id.*

Evidence establishing a "causal connection in the case of university disciplinary cases can be of the kind that are found in the familiar setting of Title VII cases," including "statements by pertinent university officials." *Yusuf*, 35 F.3d at 715. Sometimes courts look to the treatment of similarly situated students. *Videckis v. Pepperdine Univ.*, 150 F.Supp.3d 1151, 1161 (C.D. Cal. 2015).

Nicole's evidence overwhelmingly establishes that regardless of her own guilt or innocence of plagiarism, SWOCC's decision to initiate the proceedings and the severity of the penalty was affected by her gender. Specifically, SWOCC engaged in impermissible discrimination on the basis gender stereotypes under Title IX where evidence establishes that: (1) SWOCC official Melissa Sperry was aware of and obsessed with Nicole's embarrassing personal history; (2) Ms. Sperry had threatened to ruin the academic careers of other non-traditional nursing students; (3) Ms. Sperry already exhibited suspect bias and unfair behavior against Plaintiff by giving her a "fake assignment" to complete and then docking her grade taking a test late due to illness, contrary to how other students were treated; (4) when asked why she was treating Nicole differently—and more poorly than the other students—Ms. Sperry explained it was because Nicole was an "unclassy woman," and "it takes a classy woman to be a nurse"; (5) Ms. Sperry was instrumental in the decision to initiate a plagiarism investigation against Nicole and handled that investigation solely on her own; (6) Ms. Sperry was very likely the person who improperly uploaded the material into the LMS folder that biased Mr. Keller's review; (7) SWOCC's Title IX investigator was told about Ms. Sperry's "unclassy woman" comments but did nothing to investigate possible selective enforcement and concluded it was irrelevant in any event;[5] (8) as SWOCC's own Dean over the Nursing program concluded and the objective evidence clearly demonstrates,

---

[5] Notably, SWOCC officials, including Tim Dailey, and all Defendants by way of their Motion for Summary Judgment, have continued to betray their sexist treatment of Nicole. Her requests for due process, a fair review process, and for officials to review other students' work were met with terms such as "belligerence" (Mot. 10), "disruptive behavior" (*id.*), "hostile" (*id.* at 14), and "angry" (*id.* at 11). Indeed, much of the tenor of SWOCC's Motion is that Nicole was emotionally volatile and, as such, deserved the treatment she received. Not only does the evidence reveal the opposite—that Nicole displayed an appropriate amount of frustration and concern over her treatment (Kyelberg Decl. ¶ 17)—but that was not the reason SWOCC kicked Nicole out of the nursing program in any event. It is a distraction—and one dripping with outdated sexist tropes about how women, but not men, are to expected respond when treated unfairly.

other similarly situated students, including male students, either also copied material into their

care plan or neglected to complete that portion of the assignment altogether—and yet none were

disciplined or given a zero on the care plan; and (9) the zero and deductions that Nicole received

as a direct result of Ms. Sperry's actions caused SWOCC to dismiss her from the program.

    This evidence, when viewed in a light most favorable to Nicole, certainly warrants a ju-

ry's consideration and Defendant's motion should be dismissed. *See Prasad v. Cornell Univ.,*

No. 5:15-cv-322, 2016 U.S. Dist. LEXIS 161297, 2016 WL  3212079, at \*17 (N.D.N.Y. Feb. 24,

2016) (holding that a slanted investigative report, a drastic change in position by one investiga-

tor, and a possibility that male respondents are invariably found guilty at the university "plausi-

bly establishes a causal connection between gender bias and the outcome of [plaintiff's] discipli-

nary proceeding").

### C.  "Academic Freedom" does not shield SWOCC from liability. Instead, its failure to investigate and take action demonstrates its culpability.

    That Robin Finney allegedly had "academic freedom" with which to decide Plaintiff's fi-

nal grade does not insulate Defendant and is, frankly, irrelevant. First, it is disputed whether Ms.

Finney even understood the full context in which the grade was given: she admitted that had she

known other students had copied, she would have corrected the issue for Nicole—all SWOCC

had to do was ask her, but no one did. (Finney Dep. 57:11–19, 70:13–71:11, 80:19–81:7.)

    Further, SWOCC cannot hide behind so-called academic freedom if the outcome contra-

venes the protections afforded by Title IX—no professor has the "academic freedom" to give a

lower grade to one student based on another professor's view that a student is insufficiently fem-

inine to be a nurse.[6] SWOCC provides no legal authority for that proposition; SWOCC's own Rule 30(b)(6) witness disputed it. (SWOCC (Mageehon) Dep. 8:18–9:3, 11:18–13:20, 14:13–15:3.) If the process by which the plagiarism was found or the sanctions to which Nicole was subjected were influenced by gender stereotypes, SWOCC had an obligation under Title IX *to intervene* and prevent it. It "was clear they were all plagiarizing" like Nicole (Saldivar Dep. 108:11–12), but that policy was not equally enforced because Ms. Sperry manufactured the charge, directed and biased the investigation, and steered the result to the outcome she wanted.

Further, SWOCC's manner of investigation (or really, lack thereof) reveals how SWOCC ratified Ms. Sperry's discriminatory treatment. SWOCC refused to consider any of Plaintiff's evidence: other student's documented plagiarism, Ms. Sperry's statements about gender stereotypes, or other statements of other non-traditional students about Melissa Sperry's efforts and threats to expel them from the program and use of similarly discriminatory language, among others. SWOCC's Director of Nursing also fabricated that Nicole was "unsafe with patients," despite knowing that such a claim was false and would be extremely harmful. And when Nicole reported all of this to the US Department of Education, Ms. Walker retaliated against her further with additional claims of patient–safety concerns.

Nicole attempted to show SWOCC that the plagiarism policy was being unequally enforced, but the school not only refused to consider her evidence, it retaliated against her. Such conduct further reveals SWOCC's biased treatment. *See, e.g.*, *Doe v. Purdue Univ.*, 928 F.3d at

---

[6] None of Defendants' cited cases stand for the proposition that a school is allowed to condone a violation of Title IX under the so-called protection of "academic freedom." Indeed, such an exception would readily swallow the rule, with schools justifying every discriminatory action as protected by some form of "academic freedom."

669 (crediting female accuser "on her accusation alone" and taking "no other evidence into ac-

count" raised a plausible inference of gender bias); *Doe v. Columbia Univ.,* 831 F.3d 46, 57 (2d

Cir. 2016) ("When the evidence substantially favors one party's version of a disputed matter, but

an evaluator forms a conclusion in favor of the other side (without an apparent reason based in

the evidence), it is plausible to infer . . . that the evaluator has been influenced by bias."); *Doe v.*

*Washington & Lee Univ.,* No. 6:14-CV-00052, 2015 U.S. Dist. LEXIS 102426, 2015 WL

4647996, at \*10 (W.D. Va. Aug. 5, 2015) (holding that investigators' omissions in witness sum-

maries and failure to consider evidence of plaintiff and accuser's post-incident consensual sexual

encounter "plausibly established a causal link between [plaintiff's] expulsion and gender bias").

     If credited by the jury, the evidence presented above is more than adequate for Nicole to

establish the elements of her Title IX claim, so Defendants' Motion should be denied.[7]

### III.   Nicole has presented sufficient evidence to establish her breach-of-contract claim.

     Plaintiff's breach of contract claim is based upon SWOCC's breach of its own policies,

and its violation of the covenant of good faith and fair dealing implied in them. As SWOCC con-

cedes, it is well established "that the relationship between a university and a student is contractu-

al in nature" and students "may bring a breach of contract action against an educational institu-

tion arising out of the institution's failure to follow" it's own policy documents. *Dauven v.*

*George Fox Univ.*, No. CV.09-305-PK, 2010 WL 6089077, at \*16 (D. Or. Dec. 3, 2010). It is

equally established that "[a]ll contracts include an implied covenant of good faith and fair deal-

ing," which serves to "effectuate[] the parties' objectively reasonable expectations under the con-

---

[7] Plaintiff acknowledges that Title IX does not impose personal liability on individual defendants and
agrees that the Court should dismiss the Title IX claim as to the individual defendants only.

tract." *Morrow v. Red Shield Ins. Co.*, 212 Or. App. 653, 661–62, 159 P.3d 384, 388–89 (2007).

Here, there are two specific policies that SWOCC agreed to but ultimately breached—(1) a promise not to discriminate against students and to correct the consequences of any such discrimination through specific steps, and (2) to equally and fairly enforce its plagiarism policy to all students. First, SWOCC's Discrimination and Harassment Policy (Mark Decl., Ex. 202) provides that "appropriate corrective action will be taken by the College to stop *any form of discrimination* or harassment that may occur . . . and address negative consequences." (emphasis added). As SWOCC acknowledges, since Nicole has established a triable issue of fact on her Title IX claim, she has necessarily presented a triable case on her breach-of-contract claim founded on the Discrimination and Harassment Policy (Mot. 26.). Notably that policy includes numerous specific steps that SWOCC is supposed to take ("Complaint Procedure")—*none of which SWOCC performed in this case.*

Second, SWOCC's Nursing Student Handbook (Mark Decl, Ex. 203, p. 28) provides that "Academic Plagiarism" includes "copying or cutting and pasting portions of the writing of others . . . with only minor changes in wording, with inadequate footnotes, quotes, or other reference forms of citation or only a list of references," and notes that "[p]araphrasing without appropriate citation is also plagiarism." But it beyond dispute that the implied covenant of good faith and fair dealing requires SWOCC to apply that contract rule equally, fairly, and free of illegal bias and discrimination—that was obviously an "objectively reasonable expectation" for Nicole to have. But that's not what occurred here according to Plaintiff's evidence. Instead, SWOCC applied the policy discriminatorily and with the intent of harming one student due to her perceived failure to adhere to the preferred gender norms of certain SWOCC faculty. Nicole's evidence more than

establishes a question of fact regarding her breach-of-contract claims against SWOCC.

**IV.    Nicole has also presented sufficient evidence to establish her claim for intentional infliction of emotional distress.**

Nicole has presented sufficient evidence to overcome summary judgment on her claim of intentional infliction of emotional distress (IIED) against SWOCC and Defendants Sperry, Walker, and Dailey.[8] As Defendants acknowledge, the intent element does not require specific intent to cause emotional distress; rather, it is sufficient that the defendant know that such distress "is certain, or substantially certain, to result from his conduct." *McGanty v. Staudenraus*, 321 Or. 532, 550, 901 P.2d 841, 853 (1995).

Here the available evidence supports all the elements of Nicole's IIED claim. First, there is evidence—including from Ms. Gililland and Ms. Kyelberg—that Defendants' actions were the cause of Nicole's suicide attempt and other emotional distress. Additionally, the conduct of Ms. Sperry, Ms. Walker, and Mr. Dailey—acting on behalf of SWOCC—constituted an extraordinary transgression of the bounds of socially tolerable conduct. For her part, Ms. Sperry singled-out and targeted Nicole for harassment, gave her fake assignments while she was trying to complete real ones, treated her differently with regard to late work, manufactured the plagiarism charge and biased SWOCC's investigation, and refused Dean Salidvar's direct orders to restore Nicole's points. Moreover, Ms. Sperry knew the effect her actions would have on Nicole—Ms. Sperry bragged to other students (at least Ms. Kyelberg) that she understood how important the nursing program is to students and how she could manipulate SWOCC's processes to expel students she did not care for. Ms. Sperry's similar (though less severe) treatment of Ms. Kyelberg,

---

[8] Following depositions, Plaintiff agreed to dismiss her claims against Patty Scott, Francisco Saldivar, and Pam Wick.

for example, has left her with symptoms of Post-Traumatic Stress Disorder.

Similarly, Ms. Walker's harassment and targeted defamation campaign against Nicole for daring to stand up for herself and demand SWOCC take action against Ms. Sperry was likewise extreme and outrageous conduct. Ms. Walker told falsehoods to Nicole's clinical instructor in order to dig up dirt on Nicole, and when that failed, Ms. Walker just flat-out fabricated concern about Nicole's safety with patients, even though Nicole's clinical instructor told her exactly the opposite. Ms. Walker then continued to fabricate false accusations about what the clinical instructor told her—again, refuted by the witness—demanding that Nicole submit to Ms. Walker's personal scrutiny just after Nicole complained to the US Department of Education and others about her treatment of Nicole. Moreover, Ms. Walker knew that her false accusations of lack of patient safety would be devastating—the evidence demonstrates that was a well-known tactic among SWOCC faculty to get rid of unwanted students.

Likewise, Mr. Dailey was well aware what he was *supposed to do* in this situation—he was supposed to conduct a full investigation as SWOCC's Title IX investigator and enforce SWOCC's anti-discrimination policy. But he did none of that—he admittedly failed to undertake the very steps he identified should have been done. Dean Saldivar conceded that plagiarism was widespread and that action should be taken, but Mr. Dailey—the one actually in charge—did nothing in the face of this information. Mr. Dailey understood what was required of him—he had the information to act before him—he just did nothing. It was Mr. Dailey's job to protect Nicole from continued mistreatment and to correct what had already occurred, but instead he allowed Ms. Walker to further mistreat Nicole. In short, Mr. Dailey knowingly failed to protect Nicole from the harassment and discrimination she was continuously facing at SWOCC, and under the

circumstances, his refusal to do anything was outrageous in the extreme. And it should have been clear to him under the circumstances—with Nicole pleading with him to do something—that his lack of action would subject Nicole to emotional distress. Indeed, according to the evidence, it was Mr. Dailey's complete and total failure to do *anything* that finally caused Nicole to snap. (Kyelberg Decl. ¶ 17.) *See Sangan v. Yale Univ.*, No. 3:06CV587 (PCD), 2006 WL 2682240, at *5 (D. Conn. Sept. 15, 2006) (noting that "harassment and/or discrimination on the basis of a plaintiff's protected status often gives rise to a claim for IIED" and collecting cases finding questions of fact precluding summary judgment on that issue).

Accordingly, the Court should deny Defendants' Motion on this claim as well.

## CONCLUSION

For the reasons stated above, the Court should deny Defendants' Motion on Plaintiff's Title IX claim against SWOCC, her breach-of-contract claim against SWOCC, and her intentional infliction of emotional distress claim against SWOCC and Defendants Sperry, Walker, and Dailey.[9]

DATED: July 2, 2021.

PARSONS BEHLE & LATIMER

/s/ Brandon J. Mark
Brandon J. Mark

*Attorney for Plaintiff*

---

[9] Although Plaintiff believes that she could prevail on her claims for Negligent Supervision and Intentional Interference with Economic Relations if she pursued them, because they offer no practical advantages to her, Plaintiff has elected to withdraw those claims at this time and consents to the Court dismissing them.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of July 2021, I caused to be filed a true and correct copy of the foregoing **PLAINTIFF'S OPPOSITION TO DEFENDANT'S OMNIBUS MO-TION FOR SUMMARY JUDGMENT** with the Court's ECF system, which sent notice of such filing to counsel of record for all parties.

DATED: July 2, 2021.

_/s/ Brandon J. Mark_____