**1**

```
          UNITED STATES DISTRICT COURT
             DISTRICT OF OREGON
               EUGENE DIVISION

NICOLE GILILLAND, an          )
individual,                   ) Remote Deposition of:
                              )
      Plaintiff,              ) NICOLE GILILLAND
                              )
   vs.                        )
                              )
SOUTHWESTERN OREGON COMMUNITY ) No. 6:19-cv-00283-MK
COLLEGE DISTRICT by and       )
through its BOARD OF          )
EDUCATION, an Oregon          )
community college district    )
and board; SOUTHWESTERN       )
OREGON COMMUNITY COLLEGE, an  )
Oregon community college;     )
PATTY SCOTT, an individual;   )
TIM DAILEY, an individual;    )
FRANCISCO SALDIVAR, an        )
individual; SUSAN WALKER, an  )
individual; MELISSA SPERRY,   )
an individual; PAMELA WICK,   )
an individual,                )
                              )
      Defendants.             )
```

             March 12, 2021 - 10:32 a.m.
            Held through a Zoom videoconference
            Reporter:  VICKY McDANIEL, CSR, RMR

**2**

```
1          A P P E A R A N C E S
2
   FOR THE PLAINTIFF:
3
         BRANDON J. MARK, ESQ.
4        PARSONS BEHLE & LATIMER
         201 South Main Street, Suite 1800
5        Salt Lake City, Utah 84111
         Tel: (801) 532-1234
6        Fax: (801) 536-6111
         bmark@parsonsbehle.com
7
8  FOR THE DEFENDANTS:
9        LUKE W. REESE, ESQ.
         GARRETT HEMANN ROBERTSON P.C.
10       1011 Commercial Street N.E.
         Salem, Oregon 97301-1049
11       Tel: (503) 581-1501
         Fax: (503) 581-5891
12       lreese@ghrlawyers.com
13
   ALSO PRESENT:  Jonathan Lyon
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1              I N D E X
2  NICOLE GILILLAND                          PAGE
3    Examination by Mr. Reese                  5
4
5          EXHIBITS MARKED
6  NUMBER         DESCRIPTION               PAGE
7    43  4/13/17 e-mail from Ms. Gililland to   25
         Anny Mueller Re: Grading
8    44  8/8 and 8/9/17 e-mail exchange between 27
         Ms. Gililland and Gary Will Re: Grade
9
10   45  10/2/17 e-mail from Ms. Gililland to   59
         C. Alexander Re: Late work
     46  11/15/07 e-mail from Robin Finney from 62
         Ms. Gililland Re: Lecture today
11
12
13   47  2/3/18 e-mail from Ms. Gililland to    64
         Melissa Sperry Re: Journal entry
14   48  3/20/18 e-mail to Melissa Sperry and   65
         Susan Walker Re: What would you
         prefer?
15
16   49  3/12/18 e-mail from Ms. Gililland to   66
         Melissa Sperry Re: Lecture today
17
18   50  11/20/17 e-mail from Ms. Gililland to  67
         Christina Alexander Re: Book report
19   51  4/9/18 e-mail from Ms. Gililland to    70
         Susan Walker and Melissa Sperry
20       Re: Kidney infection
21   52  E-mail chain ending 4/16/19 from       72
         Melissa Sperry to Ms. Gililland
22       Re: Appointment
23   53  e-mail chain ending 4/26/18 to Robin  122
         Finney from Ms. Gililland Re: Grade
24
25
```

**4**

```
1        EXHIBITS MARKED (Continued)
2  NUMBER        DESCRIPTION               PAGE
3    54  5/2/18 e-mails between Ms. Gililland  124
         and Francisco Saldivar Re: Rate My
4        Professor
5    55  5/7/18 e-mail from Ms. Gililland to   127
         Mr. Francisco, forwarded to others
6        Re: Update needed
7    56  Messages between Ms. Gililland and    137
         Dave Bowman
8
9    57  5/16/18 e-mail from Ms. Gililland to  144
         Pam Wick, forwarded to Susan Walker,
         Tim Dailey and Francisco Saldivar
10
11   58  E-Mail chain ending 5/23/18 from      151
         Ms. Gililland to Susan Walker
12       Re: Advisory appointment
13   59  "To Whom it May Concern" letter       165
14   60  5/25/18 e-mail from Tim Dailey to     165
         Ms. Gililland, with discrimination
         attachments
15
16   61  e-mail chain ending 5/22/18 from      172
         Melissa Sperry to Salvidar, Dailey,
         Walker Re: Melissa Sperry's feedback
17
18   62  5/22/18 e-mails between Melissa Sperry 174
         and Ms. Gililland Re: Ticket out of
         class assignments
19
20             * * *
21
22
23
24
25
```

---

5

1           P R O C E E D I N G S
2              NICOLE GILILLAND,
3    called as a witness, having been first remotely
4    duly sworn, was examined and testified as follows:
5                   EXAMINATION
6  BY MR. REESE:
7       Q.    Good morning, Ms. Gililland.  My name is
8  Luke Reese, and I represent Southwestern Oregon
9  Community College, Patty Scott, Tim Dailey, Francisco
10 Saldivar, Susan Walker, Melissa Sperry, and Pamela
11 Wick in the lawsuit that you have filed against all
12 of them.
13             Do you mind stating your name and spelling
14 it for the record?
15      A.    Nicole Gililland.  It's N-i-c-o-l-e,
16 G-i-l-i-l-l-a-n-d.
17      Q.    And this is the first time we've had an
18 opportunity to meet, so the first thing I wanted to
19 do is make sure that I'm pronouncing your name
20 correctly.  Gililland?  Okay.  Can you say it for me?
21      A.    It's "gil-ill-and."  So Gililland.
22      Q.    Gililland.  All right.
23      A.    Yes.
24      Q.    I will do my best, and I apologize if I'm
25 fumbling with it a little bit.

---

6

1       A.    I'm actually going back to my maiden name,
2  which is Westfall, so I'll help you out shortly with
3  something much easier.
4       Q.    No problem.  What would you prefer that I
5  call you today?
6       A.    For now Gililland is fine.
7       Q.    Okay.  Ms. Gililland, have you ever had
8  your deposition taken before?
9       A.    No, no deposition, just testimony.
10      Q.    Okay.  And when you're referring to
11 testimony, is that in connection with the DHS matters
12 that you've been involved in?
13      A.    And custody and eviction and, yeah, quite
14 a bit of things happening in Oregon.  So yes --
15      Q.    Okay.
16      A.    -- a lot of testimony.
17      Q.    Have you been a party of any other
18 lawsuits besides the one that we're here to discuss
19 today?
20      A.    No.
21      Q.    You mentioned eviction matters.  Were you
22 the person being evicted?
23      A.    Yes.  Is that a lawsuit?
24      Q.    It could be.  And for what we're dealing
25 with today, if you have any questions like that, feel

---

7

1  free to ask.  I'm more than happy to clarify.  The
2  key for this deposition process is that we understand
3  one another.  So I'll do the same thing; if I don't
4  understand your question, I'll be sure to make sure
5  that I ask to clarify as well.
6             How many eviction matters have you been
7  involved in?
8       A.    Just the one in Coos Bay after I decided
9  to sue the school.
10      Q.    Okay.  So sometime after June of 2018?
11      A.    Yes.
12      Q.    Any other lawsuits that you've been a
13 party to?  I'm sorry; I didn't catch that.
14      A.    No.
15      Q.    That brings up another issue that we're
16 going to have to be mindful of today.  Because of
17 obvious safety concerns, we're doing this via Zoom.
18 Inevitably, there might be some technology issues
19 like what occurred right there.  If I can't
20 understand what you've said or there's a glitch or
21 something occurs, I'll be sure to ask you to repeat
22 your answer.  Same thing for you; if you can't
23 understand what I'm saying or there's a technology
24 issue, let me know.  Wave your hands.  We will take a
25 break and we'll get it figured out to make sure that

---

8

1  we're all communicating well today.  Okay?
2       A.    Sounds good.
3       Q.    I'm here in my office in Oregon.  Where
4  are you physically located?
5       A.    Downtown Salt Lake City.  We're in
6  Brandon's office building.
7       Q.    Great.  And Brandon is your attorney,
8  Mr. Mark?
9       A.    Yes.
10      Q.    Is anyone else in the room with you?
11      A.    Yes.  My significant other, Jonathan.
12      Q.    And what's Jonathan's last name?
13      A.    Lyon.
14      Q.    Okay.  Was Jonathan involved at all with
15 your interactions at SWOCC, and by "SWOCC" I mean
16 Southwestern Oregon Community College?
17      A.    He was a support system.  He wasn't
18 directly involved.
19      Q.    Okay.  Were you and Mr. Lyon together in
20 2018?
21      A.    No.  We've been friends for ten years, and
22 we got together when I moved back.
23      Q.    Okay.  And what's -- is Mr. Lyon here
24 today just to support you through this process, or
25 does he have any information that might be helpful to



9

1  refresh your memory about what occurred during your
2  time at SWOCC?
3      A.    No, just a purely supportive role.
4      Q.    Okay.  Other than Mr. Lyon and your
5  attorney, have you spoken to anyone about your
6  deposition today?
7      A.    Generally, not in specifics.
8      Q.    Did you reach out to anyone to try to
9  refresh your memory about the events that took place
10 back in your time at SWOCC?
11     A.    No.
12     Q.    Did you review any documents to refresh
13 your memory in preparation of today's deposition?
14     A.    I just went over the nursing board
15 complaint.
16     Q.    And when you say "the nursing board
17 complaint," what documents were you reviewing?
18     A.    The nursing board complaint, the initial
19 complaint to the nursing board about -- it was a
20 narrative about what had taken place, what brought
21 the nursing board to SWOCC.
22     Q.    And is that a narrative that you prepared?
23     A.    Yes.
24     Q.    Do you have the copy of the narrative that
25 you reviewed with you right now?

10

1      A.    Yeah.  I just reviewed it.
2      Q.    Great.  Are there -- on a lot of the
3  documents that we've exchanged in this lawsuit
4  there's numbers at the bottom right-hand side.  We
5  call them Bates numbers.  Does the narrative that you
6  reviewed have any Bates numbers on it?
7      A.    004062.  Oh, SWOCC-004062.  Oh, that was
8  the last page.  The first page is SWOCC-004057.
9      Q.    Okay.  Did you review any documents other
10 than the narrative you provided to the nursing board?
11     A.    No.
12     Q.    All right.  We're going to go through your
13 time at SWOCC, and we're doing that because this is
14 my opportunity to understand your testimony in
15 support of your lawsuit.  I anticipate showing you
16 some documents through this process.  Because of the
17 format, I'll be doing that by sharing my screen.
18 When I do, make sure that you have an opportunity to
19 review it and see it.  If you'd like me to manipulate
20 it, move it up or down, Zoom in on something, just
21 let me know.
22         The purpose is to help refresh your
23 memory, so I want to make sure that you have an
24 opportunity to review what documentation we have from
25 events that occurred maybe two, three, four years ago

11

1  to give me your best understanding of what you recall
2  happening.
3      A.    Yes.
4      Q.    I also want you to make sure that you're
5  clarifying for me whether you have an independent
6  memory as you sit here today versus looking back at
7  documents and having to rely on those.  Does that
8  make sense?
9      A.    Yes, absolutely.
10     Q.    Perfect.  Have you ever filed bankruptcy?
11     A.    Yes.
12     Q.    When did you file bankruptcy?
13     A.    When I was pregnant with my first
14 daughter.
15     Q.    What year was that?
16     A.    2013.
17     Q.    Okay.  Any subsequent filings?
18     A.    No.
19     Q.    It's also important that I make sure that
20 today's a good day for me to get your best, fullest,
21 and most complete testimony.  Are you on any
22 medications that impact your memory or ability to
23 recall events?
24     A.    No.
25     Q.    Anything going on in your life that has

12

1  particular stressors on you today that would make
2  giving accurate testimony difficult?
3      A.    I have a busy schedule, but it's not
4  unhappy.
5      Q.    Sure.  Anything going on in your life
6  that's impacting your ability to recall events?
7      A.    Again, I have a very busy schedule.  I go
8  to school full time, work full time, preparing for
9  law school and have kids.  But all good.
10     Q.    Sure.  Where are you going to school
11 currently?
12     A.    I'm about to graduate next month with my
13 bachelor's from Southern New Hampshire University.
14     Q.    Is that online?
15     A.    Yes.
16     Q.    How long --
17     A.    Everything is right now.
18     Q.    How long have you been attending Southern
19 New Hampshire?
20     A.    Two years.
21     Q.    Are you pursuing any particular degree?
22     A.    Political science, a bachelor's.  I'm
23 finishing it, like I said.
24     Q.    Earlier in this litigation process we had
25 requested several documents from you, and one of them



13

1  was grade transcripts from any studies that you're
2  currently going through.  I appreciate perhaps you
3  had -- didn't have grades previously, but I don't
4  believe we received any.  Would you be able to get
5  your attorney the transcripts for your coursework at
6  Southern New Hampshire?
7       A.    Oh, of course.  I've already -- yeah, I'm
8  graduating summa cum laude next month at the top of
9  my class, so I won't have any problem getting
10 transcripts sent, but I thought that I -- maybe not
11 official transcripts.  I sent grades.  But, yeah, I
12 can definitely get complete transcripts.
13      Q.    Okay.  From the time that you left SWOCC
14 until starting at Southern New Hampshire, did you
15 attend any other schools?
16      A.    No.
17      Q.    And you mentioned you have aspirations of
18 attending law school.  Have you started the
19 application process at all?
20      A.    Yeah.  I'm already done.
21      Q.    Where -- have you accepted a position with
22 any schools?
23      A.    No.  The 14 law schools that I applied to,
24 half of which were schools that reached out to me
25 based on my GPA and LSAT score and offered

14

1  scholarships, so I'm just waiting.  So I applied to
2  seven of those that I chose and then seven that I had
3  chosen prior to the offers.  So it was 14 total, and
4  those were just submitted last month, and should
5  being getting responses by the end of March.
6       Q.    Okay.  So to make sure I understand:
7  you've been admitted to seven law schools and you're
8  waiting to hear from seven others?
9       A.    No.  I've received seven offers from law
10 schools, so not necessarily admissions, but offers to
11 apply with potential for full scholarship based on my
12 merits.
13      Q.    Okay.  And the plan is to start law school
14 in the fall of 2021 semester?
15      A.    Yes.
16      Q.    And you're currently living in Utah?
17      A.    Yes.
18      Q.    What's your current address?
19      A.    It's 3510 South 300 East, Salt Lake City,
20 Utah 84115.
21      Q.    How long have you been living in Utah?
22      A.    Since the beginning of -- middle of
23 January of 2020.
24      Q.    And who do you live with?
25      A.    Currently I live with my partner,

15

1  Jonathan.  That's just since October, though.
2       Q.    Anyone else in the house?
3       A.    My children.
4       Q.    How many children do you have?
5       A.    I have two daughters.
6       Q.    How old are they?
7       A.    Seven and four.
8       Q.    Do you currently have an e-mail address?
9       A.    It's my first name, Nicole; my last name,
10 Gililland; the numbers 15@gmail.com.
11      Q.    Okay.  And I'm curious the e-mail
12 addresses that you have used since starting your
13 enrollment at SWOCC until now.  So other than that
14 one, any other e-mail addresses that you've used from
15 2017 to the current?
16      A.    My school e-mail is nicole.gililland@
17 snhu.edu.  There's Nicolewestfall1987@gmail.com, and
18 westfall77@yahoo.com, but that's my old -- I think
19 that about covers it.  Yeah.
20      Q.    Okay.  You also used a SWOCC e-mail
21 address while a student there?
22      A.    I don't remember what that was, but I did
23 have a SWOCC e-mail.  So --
24      Q.    And I understand you are active on social
25 media.  Do you use Facebook?

16

1       A.    Yes.
2       Q.    And what's your Facebook user name?
3       A.    I don't know what the user name is.  My
4  name on there is under Niki Westfall.
5       Q.    Okay.  What about Instagram?
6       A.    I have one that I set up based on
7  recommendation from a reporter to, like, claim my
8  name, stage name that he asked me to do, but I've
9  never used it beyond setting it up.  So I'm not
10 really on Instagram.
11      Q.    Do you know what the name is of that
12 account that you don't really use?
13      A.    I think it was like "Real Bree Bear" or
14 something along those lines.
15      Q.    Any other social media platforms that you
16 participate on?
17      A.    Twitter.
18      Q.    And what's your Twitter handle?
19      A.    NicoleG_801.
20      Q.    Any others?  Periscope, TikTok, anything
21 like that?
22      A.    I do have a Snapchat, but I don't use it
23 to communicate with other people.  I have no friends
24 on it.  It's just for my girls and I to play with
25 filters when they want to be goofy.



17

1    Q.    Sure.  And cell phone numbers that you've
2  used since your time at SWOCC until now?
3    A.    Same one:  (801) 710-5678.
4    Q.    Do you text message as a way of
5  communicating with folks?  Is that yes?
6    A.    Yes.
7    Q.    Sorry.  Again, I'm not trying to be --
8    A.    Oh, no.  You're totally fine.  I've been
9  watching the last couple of days, so I totally get
10  the Zoom, the Zoom dilemma.  I've been seeing it
11  firsthand.
12    Q.    We do have a bit of information to cover
13  today.  I'll try to take breaks every hour or so to
14  give everyone some opportunity to rest their eyes.
15  You're also free to take a break at any time.  Just
16  let me know, and we can go off the record and you can
17  confer with your attorney or do whatever you need to
18  do.
19    A.    Sounds good.
20    Q.    So I understand you first enrolled at
21  SWOCC in the summer 2016 term.  Is that correct?
22    A.    Yes.
23    Q.    And what brought you to that college?
24    A.    My divorce.  I was pregnant with my second
25  daughter.  My husband -- we lived in Utah.  He -- I

18

1  left him and we moved to Oregon because that is where
2  my fairly estranged family lives; but I didn't have
3  very many options with a toddler and being six months
4  pregnant and leaving an abusive situation, so I ended
5  up in a Coos Bay.
6    Q.    Okay.  And your ex-husband, what's his
7  name?
8    A.    Daymon Gililland.
9    Q.    So when did you divorce Daymon?
10    A.    The divorce was filed I believe, not sure,
11  I think in June, right around the time I enrolled at
12  SWOCC, and was finalized maybe later that fall.
13    Q.    Do you recall in what state the divorce
14  was filed?
15    A.    Utah.
16    Q.    So you filed for divorce sometime that
17  fall, moved to Coos Bay in the summer of 2016?
18    A.    I didn't file for divorce, Daymon did.  I
19  left him and moved to Oregon, but yes.
20    Q.    Moved to Oregon with your daughters and
21  you said to be -- because you had estranged family
22  here.  Did you move in with your family?
23    A.    I have a fifth-wheel trailer that -- we
24  lived in their driveway.
25    Q.    Okay.  Is it a fair summary to say that

19

1  you came to Coos Bay because of your family and ended
2  up going to school there, as opposed to coming to
3  Coos Bay specifically to go to SWOCC?
4    A.    No, SWOCC was a big part of it.  I mean,
5  I -- there was no situation that was going to be
6  ideal.  And being a paramedic and not being able to
7  stay in Utah where my license was wasn't helpful, and
8  reciprocity for paramedics is a nightmare from state
9  to state.  So when I -- I was already planning on
10  going into nursing.  It made a lot more sense than
11  paramedic for a mom, especially, because you can go
12  into office work where you're working nine to five
13  instead of a paramedic where you're working 24, 48,
14  72 hours.  So going to SWOCC and becoming a nurse was
15  pretty much the goal from the door.  So --
16    Q.    Did you do any research into the nursing
17  program at SWOCC that made it more attractive than
18  other programs, anything like that?
19    A.    It was more about what could work and
20  given the situation.  So no, it wasn't like, "that's
21  the one."  It was a "that will do" in my current
22  situation and how complicated and difficult it is.
23    Q.    So you have all of the complicating
24  factors going on in your life and you move to Coos
25  Bay.  It sounds like you started classes at SWOCC

20

1  shortly after moving to the area.  Is that right?
2    A.    Yes.
3    Q.    And you started in the general -- the
4  general ed program.  Right?
5    A.    Yes.  I was doing all my prerequisites for
6  the nursing program.
7    Q.    Okay.  So in order to be eligible to the
8  nursing program, you had to satisfy certain
9  prerequisites.  Generally speaking, what were those
10  prerequisites you needed to complete?
11    A.    There's like microbiology.  Just a bunch
12  of random ones.  The big one was anatomy and
13  physiology.  But their teacher -- which originally
14  they wouldn't transfer my credits from Weber State,
15  which I had done A&P there because I became a
16  paramedic there; but their transcript evaluator
17  wasn't going to let me transfer the A&P credits, but
18  their A&P professor met with me and kind of quizzed
19  me, and I was already in his microbiology class and
20  got an A in it.  He read the material from Weber
21  State and ultimately made the decision to let those
22  credits transfer.  So -- but that was a big one in
23  that -- so they let those transfer.
24          But then there was just other random ones,
25  like I said, micro -- there's some math classes and



21

1  things like that.
2      Q.    You had attended Weber State in order to
3  get the degree you needed to be a paramedic; is that
4  right?
5      A.    Yes.  Technically, my paramedic degree did
6  end up coming from SWOCC, because in Utah you only
7  need an institutional certificate, which was just a
8  few classes shy of an associate's.  So at Weber State
9  I got my institutional certificate, and then while I
10 was at SWOCC I ended up doing those last few classes
11 to earn the actual degree.
12     Q.    So you hold a certificate from Weber State
13 but no degrees, a degree from SWOCC for your
14 associate's degree.  Correct?
15     A.    For paramedic associate's, correct.
16     Q.    And when did you complete the prerequisite
17 courses to get your associate's degree?
18     A.    You mean from the last two classes that
19 were missing from it?
20     Q.    Sure.
21     A.    Just throughout the time I was at SWOCC,
22 periodically.  I didn't know I earned those degrees
23 until I'd been away from SWOCC for like a year; and I
24 think after my attorney, my prior attorney first
25 subpoenaed their records of me, all of a sudden SWOCC

22

1  called me like seven or eight o'clock at night and
2  were like, oh, looks like we owe you a few college
3  degrees.  What's your address?  So then I got those
4  and found out I had earned them.
5      Q.    So was having an associate's degree not a
6  prerequisite for getting into the nursing prom?
7      A.    No, it was not a prerequisite for getting
8  into the nursing program.  The nursing program is the
9  associate degree.
10     Q.    Okay.  I understand from your lawsuit that
11 you're claiming the defendants who we listed
12 previously violated Title IX.  You're also arguing a
13 breach of contract claim, a claim for negligent
14 supervision, a claim for intentional interference
15 with economic relations, and a claim for intentional
16 affliction of emotional distress.  Does that line up
17 with your understanding of what this lawsuit is
18 about?
19     A.    I didn't choose, obviously, what we had
20 here because I'm not a lawyer yet, and I don't know
21 what is necessarily applicable under the law.  But I
22 know that my prior attorney looked at the evidence,
23 and my testimony is that this is what we have.  So
24 that's kind of how it started, yes.
25     Q.    Okay.  And I'm not asking for a legal

23

1  opinion, obviously, at any point today.  I'm also not
2  asking for you to relay information that either you
3  discussed or were told by any of your attorneys.  So
4  if I do ask a question that would call upon that
5  answer, either give Mr. Mark an opportunity to object
6  or let me know that it's something you discussed with
7  one of your lawyers.  Okay?
8      A.    Okay.
9      Q.    You were taking the prerequisite courses
10 between starting in the summer of 2016 and when you
11 started in the nursing program.  When did you start
12 in the nursing program?
13     A.    It would be the fall of 2017, right?  Yes.
14     Q.    So during your time at SWOCC before
15 entering the nursing program in the fall of 2017, do
16 you have any concerns or complaints about the way
17 that you were treated?
18     A.    No.  I mean, no, not necessarily.  It was
19 tough to go from a place like Weber State to a place
20 like SWOCC.  They're not really -- they don't
21 function on a high level, I mean, as far as like
22 financial aid, and there's always a problem or
23 somebody misfiled something.  It just was there -- it
24 wasn't as smooth as I was used to at a state
25 university going to Coos Bay, Oregon and going to

24

1  SWOCC.  There was just a lot of nonuniformity and one
2  hand not talking to the other, and just a lot of
3  little kind of confusion all over the place when it
4  came to, like I said, things like financial aid and
5  things like that.
6          But other than just that kind of culture
7  shock, no, I loved my classes and I liked the
8  instructors, and I thought the education was sound.
9      Q.    Correct me if I'm wrong, but is it a fair
10 summary to say that the basis for your lawsuit is
11 your belief that you were treated differently than
12 your classmates in the nursing program?
13     A.    Yes.
14     Q.    Do you believe you were treated
15 differently than any of your classmates in the
16 classes that you took prior to entering the nursing
17 program?
18     A.    Not that I recall.
19     Q.    Okay, I'm going to share my screen.  And,
20 again, this is just to show you documents to see if I
21 can refresh your memory and make sure we're not
22 missing something.  Okay.
23          Can you see the PDF that I have up there,
24 which is --
25     A.    Yeah, go back.  Sorry.  You had it perfect



25

1  the first time.
2      Q.   Yup, no problem.  This is SWOCC-003469.
3  Now, just to make sure that we've got the technology
4  working correctly here, you can see the PDF that's up
5  on the screen there?
6          (EXHIBIT 43 WAS MARKED.)
7      A.   Yes.
8      Q.   Perfect.  And I understand this is an
9  e-mail from you to Anny Mueller.  Is that correct?
10     A.   Correct.
11     Q.   Who is Anny Mueller?
12     A.   I assume she was one of my prerequisite
13  teachers.
14     Q.   Okay.  Now, just to, again, make sure
15  we're on the same page here, do you recognize this
16  e-mail or recall it?
17     A.   I don't specifically recall this e-mail,
18  but it absolutely seems like something I would write.
19  Anytime I have a grade discrepancy to this day, I
20  absolutely reach out to my professor and try and get
21  on the same page.  I actually just had one last
22  night.  So it's something that's very common for me
23  to do when I need to understand what they're looking
24  for a lot better, because I'm obviously missing the
25  mark.

26

1      Q.   Okay.  As we review these documents, I'd
2  like you to bring to my attention if you think that
3  it's -- there's something wrong with it.  It's an
4  e-mail that you didn't send, if there's something
5  that strikes you as odd, please let me know so we can
6  follow up on it.  The reason I want you to take a
7  look at this April 13th, 2017 e-mail is it looks like
8  you are raising concerns about a grade that you have
9  in Ms. Mueller's class.  Do you recall that?
10     A.   I don't specifically recall this, but I
11  have no reason to doubt it came from me.
12     Q.   Okay.  It looks like on the last sentence
13  there you write, "I know it's tough with 50 students,
14  but a D is pretty extreme."  Do you recall having a D
15  in Ms. Mueller's class?
16     A.   I don't recall the specificities of this,
17  no.
18     Q.   Sure.  Does this e-mail refresh your
19  memory at all about having any concerns about the way
20  Ms. Mueller was treating you compared to the other
21  students in her class?
22     A.   I definitely don't feel like that's what
23  I'm saying about necessarily being treated
24  differently or anything like that.  I'm raising
25  concerns about a poor grade and trying to get on the

27

1  same page with her.  Again, that's not at all
2  uncommon for me to do.  My grades are extremely
3  important to me.
4      Q.   If I -- I just moved kind of where I've
5  got all my exhibits on the screen.  Can you see that?
6  Does that get in the way of the PDF?
7      A.   Yeah.  I mean, I'm seeing what you're --
8  what you're clicking on and pulling up your files
9  right now.
10     Q.   Perfect.  All right.  I am putting up on
11  the screen -- oh, sorry.  We're going to mark the
12  last one as Exhibit 42.
13         THE REPORTER:  Sorry to interrupt.
14     (A discussion was held off the record.)
15     Q.   So now I'm putting up on the screen what's
16  been Bates labeled SWOCC 3208 -- so we'll mark SWOCC
17  3469 as Exhibit 43, and the one that we're looking at
18  right now, SWOCC 3208, as 44.
19         (EXHIBIT 44 WAS MARKED.)
20     Q.   Ms. Gililland, do you recognize this
21  August 9th, 2017 e-mail exchange between you and Gary
22  Will?
23     A.   I don't specifically recognize or recall
24  it, no.
25     Q.   Okay.  And, again, this appears to be an

28

1  e-mail discussing a concern you had about a grade in
2  Mr. Will's class.  Is that correct?
3      A.   Yes, it appears to be that.
4      Q.   Okay.  And do you have any concerns about
5  the way that Mr. Will treated you compared to your
6  classmates?
7      A.   No, this looks exactly like what I
8  explained the last thing is.  It's something I do
9  whenever I get a bad grade, absolutely figure out
10  what the problem is and get on the same page with my
11  professor so I can continue to be an honor student.
12     Q.   Let's talk about how you went to become
13  admitted into the nursing program.  I understand
14  there's a limited number of positions for each
15  academic year.  Is that correct?
16     A.   Yes.
17     Q.   I believe I've read that it's a pretty
18  competitive program at SWOCC to get a place in any
19  incoming class?
20     A.   For a small town, yes.
21     Q.   And you were trying to gain admittance
22  into the fall 2017 semester; is that right?
23     A.   Yes.
24     Q.   And originally you were not in the
25  incoming class, but you came to be.  Is that correct?



29

1    A.    Yes.

2    Q.    Tell me how that worked.

3    A.    You're on an alternate list and, depending
4  on who actually takes a spot, because people apply
5  multiple places and whether they're offered a spot
6  and take it are two different things, and if there's
7  enough people who didn't take it, you go into your
8  place.

9    Q.    And how did you come to learn that there
10 was an opportunity for you to get a spot in the
11 class?

12   A.    You can see yourself.  They e-mail you
13 where your position is.

14   Q.    And upon learning that there was an
15 opportunity for you, did you go and meet with Susan
16 Walker to discuss that opportunity?

17   A.    I don't specifically meeting -- remember
18 meeting her to discuss an opportunity.  I think that
19 I -- you go in several times to work with Jade
20 Stalcup, her secretary.  I think one of the times
21 when I went in for either paperwork or -- they give
22 you like a to-do list of things you have to do,
23 requirements, guidebooks and everything.  When you're
24 even on the alternate list, they prepare you.  So I
25 was in their offices several times throughout that

30

1  process, and I know I spoke with Susan a couple of
2  those times.

3         So what she's specifically referring to
4  sounds about right.  I don't recall any specific
5  first meeting.  It was kind of a blur of a lot of
6  paperwork and things like that.

7    Q.    But you did receive your place in the
8  class before classes started in that fall 2017
9  quarter, right?

10   A.    Yes.

11   Q.    So you were part of the program from day
12 one of that year?

13   A.    Yeah, I had enough time in the summer to
14 complete everything they needed done, and I got it
15 done pretty quickly.  Like I said, my physical,
16 titers, immunizations, a lot of paperwork.  There's a
17 lot to it, yeah.

18   Q.    And just to make sure I have a complete
19 understanding of how the nursing department was set
20 up, I understand Susan Walker was the then director
21 of the program.  Right?

22   A.    Yes.

23   Q.    So she was in charge of the program and
24 supervised the other faculty members.  The faculty
25 members that I understand were in place at that time

31

1  were Melissa Sperry; is that right?

2    A.    (Inaudible.)

3    Q.    I'm sorry.  You glitched right there.  Can
4  you repeat what you said?

5         MR. MARK:  She was telling me that I was
6  on mute.  I was going to lodge -- I was holding my
7  hand up.  I was going to lodge an objection to your
8  question after you finish it fully here.

9    Q.    (By Mr. Reese)  Sure thing.  And if
10 Mr. Mark has an objection to my question, I'll do my
11 best to ask it in a better way.  I'll also keep an
12 eye on him so I don't talk right through his ability
13 to object.

14        Ms. Gililland, I believe I didn't get an
15 answer to confirming that of the faculty members who
16 worked under Ms. Walker's direction, we have Melissa
17 Sperry.  Correct?

18   A.    Yes.

19   Q.    And she was also assigned to be your
20 advisor?

21   A.    Correct.

22   Q.    What's the role of the advisor, as you
23 understand it?

24   A.    Especially in the nursing program, because
25 the nursing program is very internal, it's like a --

32

1  it's its own -- like when you're doing any other
2  classes on campus, you only ever just glimpse nursing
3  students.  You don't ever really have classes with
4  them or things like that.  They're very much their
5  own private little world, and your advisor is your
6  advisor in that huge -- or that very important
7  private little world.  So yeah, it's a pretty big
8  role.

9    Q.    And did you have routine meetings with
10 your advisor to discuss your classes and how the
11 program is going?

12   A.    Absolutely, yes.

13   Q.    Were those weekly?  Monthly?  Whenever you
14 needed them?  How did that work?

15   A.    Those, there's the set ones that you have
16 to have, you know, I think maybe before, beginning
17 and end of each term.  I don't recall specifically.
18 There are assigned ones, though, and then there are
19 ones when you need them, and we utilize both.

20   Q.    Did you -- were you aware of Ms. Sperry
21 before starting the nursing program?

22   A.    Yes.  She had quite a reputation.

23   Q.    What was her reputation?

24   A.    That she picks people to make examples of
25 and exercise her powers on and that she's a bully; to



33

1  watch out for her, that she's vindictive. So I was
2  ultimately initially not happy that she was my
3  advisor and a little bit scared, but we seemed to hit
4  it off actually right away, and I try not to judge
5  people based on reputation alone.
6       Q.   How did you come to learn of Ms. Sperry's
7  reputation --
8       A.   Most --
9       Q.   -- before you started the program?
10      A.   Oh, sorry.  I didn't mean to cut you off.
11 Mostly through the second-year students.
12      Q.   Do you recall any of the names of the
13 students who told you about Ms. Sperry's reputation?
14      A.   Yeah.  One was my mentor, because you get
15 a mentor that's a second year, and her name was
16 Nicole as well.
17      Q.   Do you remember Nicole's last name?
18      A.   I don't.
19      Q.   Have you spoken to Nicole since you left
20 SWOCC?
21      A.   Oh, no.  I was -- I was marked, I guess
22 you could say.  A lot of people pretty much that I
23 thought were my friends ran the other way once I
24 was -- once the issues started.
25      Q.   And part of this process, as you probably

34

1  saw from the last couple of days, is I'll continue to
2  ask those questions about additional people.  I
3  appreciate your communicating to me generally that
4  you haven't been in contact with anyone, but I just
5  want to make sure I'm not missing anything.  Okay?
6       A.   Absolutely.  There -- I mean, it's a fair
7  question, because there are maybe one for sure, but
8  maybe two people that I communicate with from back
9  there.  But it's -- yeah, so it's good to
10 individually ask me so that we can make sure.
11      Q.   Appreciate it.  Anyone else other than
12 your mentor, Nicole, give you a heads up about the
13 concerns about Ms. Sperry prior to starting in the
14 program?
15      A.   Prior to starting in the program, no.  It
16 was just the reputation -- like, it's a small town,
17 so mostly through co-nursing students going in, like
18 from the orientation and the kind of whispers there
19 to our mentors and their friends kind of gossiping
20 behind the scenes.  That was -- that was it going
21 into it.
22      Q.   You mentioned that you were made aware
23 Ms. Sperry was vindictive.  Did you ever receive any
24 information as to what would make her vindictive
25 against any particular student?

35

1       A.   Now, we're saying "ever," not just prior
2  to the program?
3       Q.   That's a good clarifier.  Why don't we go
4  back in time and what you were being told prior to
5  entering the program.  Did any of the people who were
6  giving you this caution give you any further
7  information as to what perhaps would get someone on
8  her bad side?
9       A.   No, not prior to the program.
10      Q.   There was no explanation that she targeted
11 younger students, older students, people of color,
12 people because of their sex, anything like that?
13      A.   Not that I recall.
14      Q.   Okay.  You mentioned that the nursing
15 program is its own little world, which makes sense to
16 me.  Physically, is the nursing program in a
17 particular building on the SWOCC campus?
18      A.   It's its own building and kind of the back
19 corner of the campus, depending on where you're
20 entering from.  The parking lot goes all the way
21 around it.  But yeah, it's its own private building
22 off in a corner.
23      Q.   Any other programs run out of that
24 building?
25      A.   I believe that the EMS side of things are

36

1  still there.  I'm not sure if any other ones were.
2       Q.   Does SWOCC share that building with any
3  other organizations, businesses, anything like that?
4       A.   Again, I'm not exactly sure.  I know that
5  the paramedic classes were -- I saw them in our
6  halls, so I assumed we shared some of the building
7  with them, but I don't know.
8       Q.   I understand as part of the nursing
9  program you also do clinics at the hospital, Coquille
10 Valley Hospital.  Is that right?
11      A.   Right.  There's the Coos County -- or the
12 Coos Bay Hospital, which is the main hospital which
13 is where most of the teachers worked; and then
14 Coquille's like half an hour away, so it's kind of
15 like that's the one I got because I was the last
16 person accepted into the program.  It wasn't ideal
17 initially because it's such a far drive and it's so
18 out of the way, but ultimately I ended up being
19 pretty happy that's where I ended up.
20      Q.   Okay.  You're assigned a clinical
21 instructor at the hospital; is that right?
22      A.   Yes.
23      Q.   And I understand yours was Liz Cooper?
24      A.   Correct.
25      Q.   Any other instructors at the hospital?



37

1    A.    No.  Well, all the nurses are your
2 instructors.  Liz is your person.  You don't do -- or
3 learn, even if the other nurses are trying to teach
4 you something, you have to know that -- what Liz is
5 allowing and what your scope is.  So they're
6 instructors to a degree, but Liz is obviously "the"
7 the person.
8    Q.    And Liz is not a defendant -- named as a
9 defendant in this lawsuit, right?
10    A.    Correct.
11    Q.    Okay.  Other faculty members at the time
12 you entered the program.  Pam Wick, correct?
13    A.    Yes.
14    Q.    And what's Pam's role with the program, or
15 was Pam's role with the program?
16        MR. MARK:  Object to foundation.  You can
17 answer.
18        THE WITNESS:  Okay.  She was a full-time
19 nursing instructor.  We had just a few of them.  It
20 was Susan, Melissa, Kerry, Robin, and Pam.  Yeah.
21 There's only like five full time.  She was one of
22 them.
23    Q.    (By Mr. Reese)  Robin is Robin Finney,
24 F-i-n-n-e-y.  Correct?
25    A.    Correct.

38

1    Q.    And then you mentioned a Kerry.  Do you
2 remember Kerry's last name?
3    A.    I don't.
4    Q.    So we have Ms. Walker, who's the director
5 and also instructor; Ms. Sperry, who's an instructor
6 and also served as your advisor; Ms. Wick, who was an
7 instructor; Ms. Finney, who was an instructor; Kerry,
8 who was an instructor; and then your clinic
9 supervisor, Liz Cooper.  Right?
10    A.    Correct.  And there were other, like, the
11 clinics that we -- like on Tuesday we'd be at the
12 hospital and on Thursdays our labs were on -- well,
13 if you went to the Coos Bay Hospital your lab would
14 be on the SWOCC campus, but because I went to
15 Coquille, Thursdays were also at the hospital, and
16 that's like an in-classroom lab.  Had I done my lab
17 at the Coos County, there would have been other lab
18 instructors because it was a much bigger group.  So
19 it wasn't just the full-time faculty.  There were lab
20 assistants that worked at the college, too.
21    Q.    Did you have any kind of relationship with
22 any of the instructors we just listed before starting
23 the program?
24    A.    No.
25    Q.    And I understand you were given a heads up

39

1 about Ms. Sperry's reputation.  Did anybody give you
2 any kind of warnings about any of the other nursing
3 program instructors?
4    A.    There was gossip about every instructor.
5 Specifically what kind and how it related to them
6 varied widely, and I don't recall a lot of it.  But
7 overall, the whole theme was watch your step.
8    Q.    Were you provided any guidance as to what
9 was meant by "watch your step"?
10    A.    Keep your head down, don't talk back,
11 don't trigger their egos, they're always right, never
12 correct them, things like that.  Take your
13 punishments lying down kind of thing.
14    Q.    And I understand you got this information
15 from your mentor, second-year student Nicole?
16    A.    Partially, yes.
17    Q.    And you don't recall the specific names of
18 anyone else who was giving you these cautions?
19    A.    No.  I could probably point them out in a
20 picture kind of thing.  It's just the second-year
21 crowd in general.  You know, when they're mentoring
22 in front of the instructors they're, you know,
23 cheerleaders, and then when they're mentoring behind
24 the scenes they're "watch out," kind of.
25    Q.    Any of these cautions done in writing,

40

1 text message, e-mails, something that we could go
2 back and review now to get more insight into what you
3 were being told?
4    A.    Not that I can recall, no.
5    Q.    So to the best of your memory, these were
6 all statements that were given to you in person?
7    A.    To the best of my memory, yes.  If you
8 mean, again, prior to the program -- there are plenty
9 of exchanges while this is all happening between me
10 and certain classmates.  So to be clarified, if you
11 mean, again, prior to going into the program, no.  If
12 you mean during the course of these events unfolding,
13 there is certain correspondence between me and
14 certain classmates and things like that, yes.
15    Q.    Great.  So you start the program in fall
16 of 2017.  What classes were you taking that first
17 term or quarter?
18    A.    I don't recall the specific names.
19    Q.    Do you remember how many classes you had
20 that first quarter?
21    A.    I believe it's three a quarter.
22    Q.    And generally speaking, just describe for
23 me what the structure of the classes are.  You have
24 three classes.  How are they taught?  What's the
25 general form that they take?



41

1      A.    So they're all just combined.  That's kind
2  of why it's more difficult to separate them by name,
3  because the instructors all teach parts of different
4  classes.  It's mostly each instructor takes a week at
5  a time instead of a class per se.  I know that their
6  testimony is it's more assigned.  And that could be,
7  you know, true, because I'm just saying it from my
8  understanding, not theirs.
9          But every week, like this is Robin's week,
10  this is Melissa's week to teach, this is Pam's week
11  to teach.  And so they would just kind of alternate
12  weeks, probably based on the subjects they were
13  discussing in their depositions.  But that's how
14  it -- so, you know, it's a Melissa week, it's a Pam
15  week, it's -- so on and so forth.
16          And you get taught -- again, you have
17  lecture Monday, Wednesday, Friday.  You have clinical
18  at the hospitals on Tuesday, and then you have
19  clinical lab on Thursday.  So -- and then, again, the
20  classes are just kind of all combined into the week.
21      Q.    So -- and I appreciate you walking me
22  through this, because it is confusing.  In a quarter
23  in the nursing program, ultimately you're going to
24  get credit for three classes.  But as you move
25  through the quarter, each week you are taking a mash

42

1  of those three classes from whatever instructor is
2  assigned for the topic that is being addressed in a
3  given week?
4      A.    Yes.
5      Q.    So if we're referring to like week three
6  of the program, that is going to be taught by one
7  particular instructor but cover course material for
8  up to all three of the classes that you're getting
9  credit for.  Right?
10      A.    Yes.
11      Q.    Okay.
12          MR. MARK:  Thank you for clarifying that.
13  I now understand.
14          THE WITNESS:  Okay.  Sorry.  Sorry I
15  wasn't clear before.  I apologize.
16          MR. MARK:  No, I just -- he asked a great
17  question.
18      Q.    (By Mr. Reese)  Well, and there's no
19  secret here.  Brandon and I have not participated in
20  this program, so there is a bit of a learning curve
21  here as we both try to understand how this works.
22          The big point is if I ask you a question
23  that makes some assumption that clearly isn't true,
24  will you make sure you point that out so that we can
25  be clear as to our understanding of how this works?

43

1      A.    I will do my absolute best.
2      Q.    All right.
3      A.    We could probably make it to the hour
4  mark, but I kind of -- at least at that point, maybe
5  in ten minutes we can take a break.
6      Q.    Let's take a break right now if you'd
7  like.  That's fine.
8      A.    Are you sure?  I can make it to the hour
9  mark.
10      Q.    No, let's take a break now and come back
11  at half past the hour.
12          (Recess from 11:19 a.m. to 11:31 a.m.)
13      Q.    (By Mr. Reese)  Before we took our break,
14  you were -- Ms. Gililland, you were helping us
15  understand how a particular quarter is structured.
16  And I understand that the teachers essentially take a
17  week and will teach the content that will apply to
18  the three courses in which you're enrolled for a
19  quarter.  Is it fair to say that each week is a
20  different topic?  Is it broken up into kind of
21  ten-week quarters?
22      A.    Yes.  It's usually surrounding, like, a
23  system.  So like this week will be more focused on
24  cardiovascular, this week will be neurologic.  And,
25  again, I'm not -- I'm sure there's, like, other

44

1  teachers that help other teachers on their weeks; and
2  it might not be exactly set up that way, but from my
3  perspective, that's how it seemed, yes.
4      Q.    And during a given week when you're
5  focusing on one system, are you doing projects?
6  Taking tests?  What does the coursework look like?
7      A.    So you're supposed to prepare for the
8  week, do all the reading.  There's a lot of reading.
9  You do that the weekend before the week starts.  So
10  by Monday you should have already read everything
11  that you need to read and be prepared for that, that
12  week's system.
13          And then typically, in class you'll do
14  like a presentation with the group and then lectures
15  obviously by the teacher.  Sometimes random little
16  games.  Robin was big on games, like a Jeopardy type
17  game sort of thing.
18          And then on Friday you come to classes and
19  you take your exam, which is -- your exams are worth
20  90 percent of your grade, and you come and take your
21  tests for the week Friday in class.  And then your
22  week is over, and you start Saturday by starting
23  reading for the next week.
24      Q.    One exam per week?
25      A.    Yes.  Well, it's -- no, it's three --



45

1  three -- it's one sitting, but again, it's covering
2  three classes.  So technically, it's three exams in
3  one sitting.
4        Q.    Is the subject matter for all three exams
5  on the same system that you were studying in that
6  week?
7        A.    I don't recall specifically.  It should be
8  how that class relates to that system, I believe.
9        Q.    Okay.
10       A.    Like, so if it were the pharmacology test,
11 might be talking about drugs for that system, like
12 that kind of thing, but there are different classes
13 technically maybe approaching it from different ways.
14       Q.    Okay.  We've seen a lot of reference to
15 case studies.  What are case studies?
16       A.    It's basically just a summary of a person,
17 a patient, what they're presenting with, their signs,
18 symptoms, hospital notes.  Just a study of a
19 patient's experience in a medical setting.
20       Q.    Dealing with whatever system you're
21 studying in that particular week?
22       A.    Typically, yes.
23       Q.    How does your clinic experience play into
24 the program?
25       A.    That's when you're learning -- okay, so if

46

1  you mean clinic on Tuesdays, you're learning with
2  actual patients.  So if you learned something in
3  class, then you're going to learn the skills to go
4  with it.  You'll learn those like the Thursday in the
5  classroom lab setting, and then once you get cleared
6  in the lab setting you can start practicing on
7  patients the following Tuesdays.
8        Q.    Your weekly exams that are 90 percent of
9  your grade, the exams, are they taken online?  Are
10 you given paper in class?  How does that work?
11       A.    Specifically, paper, in-class, proctored.
12       Q.    When do you get the results of your exam,
13 typically?
14       A.    The following week.  Sometimes they're
15 posted over the following weekend.  But yeah.
16       Q.    And they're posted into the myLaker
17 grading system?
18       A.    Yes.
19       Q.    What is the other 10 percent of your grade
20 comprised of?
21       A.    Everything else.
22       Q.    Okay.  Let's go over what everything else
23 is.
24       A.    I don't recall specifics like -- but I
25 just remember the 90 percent, because it was a doozy

47

1  of a number.  But I don't -- I mean, so I guess
2  classroom assignments.
3        Q.    Were you graded on attendance?
4        A.    I'm not sure.  I know you couldn't really
5  miss too many things without making up their specific
6  rules and numbers, but I don't remember what they
7  were.  Like, you can only miss so many this and that
8  many that, and so on and so forth.
9        Q.    The case studies, were they part of the 10
10 percent?
11       A.    No, not necessarily, because the one that
12 started this whole thing obviously was worth a lot
13 more, although it wasn't a test, so I'm not
14 sure how -- I still am confused as to how that
15 worked.
16             And actually, Brandon and I were just
17 talking about getting more into the whole, what they
18 graded on and how and where, because it's still
19 pretty confusing.  But -- like, for instance, the one
20 that was changed to a zero, the case study that's
21 been the subject of the last couple of days, it
22 spanned all three classes, and it turned all three
23 classes to F's when that went to a zero.
24             So I was passing all three classes, and
25 when they gave me a zero on that case study, it

48

1  significantly impacted all three classes and changed
2  every grade to an F.
3        Q.    Can you recall anything else that you were
4  graded on that we haven't discussed yet?
5        A.    I'm sorry.  Can you rephrase or be more
6  specific?  I don't understand the question.
7        Q.    Yeah.  Although I understand you have
8  questions about how the grades were determined, I
9  want to know what your understanding is.  And you
10 said 90 percent was the exams that you took on
11 Fridays --
12       A.    Uh-huh.
13       Q.    -- and then the other 10 percent was
14 comprised of everything else, and we believe that
15 would include case studies, although you're curious
16 how this particular case study was graded.  What else
17 would you have received evaluation on that would play
18 into your grade?
19       A.    So the exams also cover -- if lab exams,
20 that would include practical exams, including skills.
21 It's not just what you do on Friday on the paper
22 test.  So it's those exams.  The Kaplan exams at the
23 end of every term, like, your final for the term,
24 that's in the 90 percent.
25       Q.    Does the Kaplan exam carry more weight



49

1    than your weekly exams, if you know?
2         A.    Yes.  I don't know exactly what and how
3    much, but yes.
4         Q.    All right.  That first quarter in the
5    fall, you don't recall exactly what classes you were
6    taking.  How did you do, though, if you remember?
7         A.    I loved it.  I felt like it was going very
8    well.
9         Q.    You got good grades?
10        A.    Yes.
11        Q.    How --
12        A.    Although I do want to be clear of one
13   thing that even your clients can confirm, is the
14   first thing they tell you is don't expect to walk out
15   of here with a 4.0.  Only one person in the history
16   of this program has ever done that.  We don't give
17   out A's.  They are very tough graders.  You basically
18   just lower all your expectations for A's and B's and
19   just get to the 75 percent.
20           I was exceeding that for sure, but
21   comparatively to, like, how I choose to look at
22   grades now, like how an A is everything and my 4.0 or
23   maintaining a 3.9 to 4.0 is super important.  You
24   don't have that in the nursing program.  Like, you
25   kind of do away with that expectation because they

50

1    are going to be really tough on grading and you're
2    not going to be like straight A's.
3           But, yeah, I was doing -- I was
4    succeeding, yes.
5         Q.    So the goal is to pass your classes with
6    the expectation that A's and B's are difficult to
7    obtain, right?
8         A.    Yes.
9         Q.    Ultimately, if you're passing classes
10   you're eligible to graduate with what degree?  Your
11   associate's degree?
12        A.    Yes, your RN.
13        Q.    To the best of your understanding, does
14   the grade point average that you get on your way to
15   your RN impact your job prospects post graduation?
16           MR. REESE:  Foundation.
17           THE WITNESS:  I have no idea.  No, I think
18   that's kind of the point.  It's like if you got to
19   this point, if you graduated, you have met your
20   marks.  I don't think they weigh, like I said, too
21   heavily on straight A's and stuff, because they're
22   going to be really hard about giving those out.  They
23   want to make sure that you just -- you're getting it.
24        Q.    (By Mr. Reese)  What about your
25   relationship with your instructors that fall quarter?

51

1    Did you have any concerns with the way you were being
2    treated, evaluated, or graded in any way?
3         A.    If I had any concerns specifically, I
4    don't recall.  There might have been conversations
5    about grades.  Again, if anything, if a grade is low,
6    I'm going to talk to my instructor always, always, if
7    there's a low grade to figure out getting on the same
8    page and what they're looking for.  So there might
9    have been conversations if there was a bad grade, but
10   there just wasn't very many bad grades, and I don't
11   remember any specific conversations.  So --
12        Q.    And, again, my goal isn't to try to catch
13   you confused about conversations you may have had,
14   but I do need to confirm whether anything occurred in
15   that fall semester that you believe supports the
16   claims in your lawsuit.  So to the best of your
17   ability, do you recall having any concerns about
18   being treated inappropriately or illegally or
19   improperly in any way during that first fall quarter?
20        A.    Not that I recall.
21        Q.    How was your relationship with Ms. Sperry,
22   your advisor, during that fall quarter?
23        A.    I felt like we grew close.
24        Q.    You had earlier testified that you had
25   some concerns based on what you were being told about

52

1    her reputation.  Describe for me what your
2    interaction with her was during that fall term,
3    generally speaking.
4         A.    I didn't see anything that people were
5    referring to.  I thought she was very sweet and
6    seemed very compassionate and understanding.  Seemed
7    that way.  I think she was good at getting people
8    sized up.  And she likes to do that, so she's good at
9    finding ways to communicate with just about anybody
10   she wants to.  Yeah.  So it seemed like it was good.
11        Q.    Okay.  When did the winter term start?  Is
12   that after the new year?
13        A.    Yes, I believe so.
14        Q.    So January of 2018 you start the winter
15   quarter.  Do you remember what classes you were
16   taking that quarter?
17        A.    Not specifically.  I mean, there's always
18   the foundations of nursing.  I'm not sure if the
19   number changes every term, but foundations of nursing
20   was almost always a class.  Like the last term, for
21   instance, it was pharmacology and pathophysiology.
22   I'm not sure how often those changed or if it was
23   just for one term, et cetera, but yeah, I don't
24   remember specifically.
25        Q.    Yeah, and I have the class names, so I'll



53

1  just tell them to you to refresh your memory.  We had
2  NRS 112, which was Foundations of Nursing, and
3  Acute 1.  Does that sound right?
4      A.    Yes.
5      Q.    NRS 231, Clinical Pharmacology 2.  Does
6  that sound right?
7      A.    Yes.
8      Q.    And NRS 233, Pathophysiology Process 2?
9      A.    These also sound like the classes from the
10 spring term.  So if you're talking about winter term,
11 these -- unless they were, again, the prereqs to
12 those second classes, then what you just described is
13 spring term.
14     Q.    Okay.  That may be the case.
15           Same format, though, for the winter and
16 springs terms that you described in the fall with the
17 ten weeks, one system per week taught by all the
18 instructors?
19     A.    Correct.
20     Q.    Let's -- help me understand when you first
21 began to have concerns about the way Ms. Sperry was
22 treating you.  Do you recall as you sit here today
23 when you first suspected that she may be treating you
24 differently than other classmates?
25     A.    Yes.

54

1      Q.    When was that?
2      A.    When we got back into spring term.  I came
3  back from spring break for spring term.  I had spent
4  all of spring break in bed.  I had a UTI that I guess
5  you would say was mis-treated, and there was
6  miscommunications around the treatment that allowed
7  it to advance to it a full kidney infection, and I
8  was basically septic.  So I was extremely ill.
9           But yeah, I spent all of spring beak in
10 bed, and then I came back.  I was worried about
11 covering my bases so that I didn't appear weak or
12 like I wasn't a serious student.  So I was pretty
13 stressed out that week of making sure that even
14 though I was very ill, that I was on my A game still.
15           And it seems like I was in constant
16 communication with Melissa, and initially it seemed
17 like she was very concerned.  But then there were
18 just little things, like, you know, having me verify
19 or prove -- again, you could see -- and this is
20 something I'm sure will come up with other testimony
21 later, but you could see very clearly how sick I was.
22 I mean, we wore white scrubs, and I was the same
23 color as my scrubs and I looked like I was on death's
24 doorstep.  So it wasn't really up for debate type
25 thing.  You could take one look at me and be like,

55

1  "you should be in the hospital" kind of thing.
2           Yeah, it was just little things, like
3  asking me for proof that I was so sick.  So even
4  though you could very much take one look at me, and
5  everyone would gasp and come running and make sure I
6  was okay, she knew I was very ill and could see it.
7  But for some reason she wanted a doctor's note, which
8  was fine because, again, I was basically at the
9  hospital every day at this point.  So --
10     Q.    Okay.  You mentioned that your UTI
11 infection came about in spring break, which would
12 have been the third or fourth week of March.  Is that
13 correct?
14     A.    It started before that.  I had gone to the
15 hospital for like a week-long, horrible head pain,
16 headache that kind of precipitated the whole thing.
17 And they did a CT scan, and they'd done it where
18 there's artifact, which is like a blur.  When we say
19 "artifact," it could be something that is actually
20 being seen on the scan.  Or it could be that you
21 moved during the scan.  We're not sure.
22           So they did a CT scan.  They found a spot
23 that they were worried was a tumor that turned out to
24 be artifact.  But that's when they also told me --
25 they were a little preoccupied by a potential brain

56

1  tumor, so they were like, By the way, you have a UTI;
2  here's an antibiotic.  And then that was the last I
3  heard about the UTI.  They didn't give me any
4  discharge instructions relating the UTI.  Once they
5  cleared the brain tumor, they were like, okay, go
6  home.
7           So I wasn't aware that they had sent a
8  prescription to my pharmacy.  They never had a
9  conversation about sending a prescription to my
10 pharmacy.  So that UTI was allowed to just get worse.
11           And so I kept calling them and telling
12 them, I'm feeling way worse.  They're like, give the
13 medication time to work.  And I'm like -- call a
14 couple days later.  And then finally they're like,
15 "Did you take all of it?"  "What did you mean 'all of
16 it?'  You only brought me one."  "Oh.  Well, we
17 called in a prescription to your pharmacy."  "Well,
18 the next time you do that, tell your patient.  That's
19 a good idea, for starters."
20           So by the time that we had figured out
21 where the miscommunication occurred, it was -- the
22 prescription they called in wouldn't touch the
23 infection.  I was far, far too advanced in my
24 infection at that point.
25     Q.    So because of the failure to communicate



57

1  to you the medicine that you needed to take, your UTI
2  progresses to the point where you're nearly septic,
3  and I'm assuming because of that, need to take some
4  days off from the nursing program that's going on.
5  Correct?
6      A.   If I missed anything, it wasn't because I
7  was at home in bed, it was because I was actively in
8  the hospital getting treated, like I.V. antibiotics
9  or anything like that.  I didn't miss anything just
10 because I was sick.  If I had to miss something, just
11 was because I had a scheduled appointment for
12 treatment.
13     Q.   Okay.  This is going down around spring
14 break.  Is spring break a week off from the nursing
15 program, or are you still in classes?
16     A.   Right.  No, I was getting treated and very
17 sick spring break, and still sick when we returned.
18          MR. MARK:  Let him finish his question
19 before you interrupt.
20          THE WITNESS:  I'm sorry.
21          MR. MARK:  We need to make a clear record.
22     Q.   (By Mr. Reese)  Prior to the issues with
23 this horrible infection, did you have to work with
24 your instructors in the program to address issues
25 with smaller illnesses, adjust deadlines because of

58

1  other events going on in your life?
2      A.   I had had a stomach virus or flu in
3  January, and then, like I said, just that headache
4  throughout that week before the UTI was discovered.
5  But I don't recall any others specifically, no.
6      Q.   During the first two quarters, the fall
7  and the winter quarter, did you ever have any
8  problems with your instructors when you asked for
9  either additional time or some adjustments to your
10 schedule because of illness or whatever else was
11 going on in your life?
12     A.   Not that I recall.
13     Q.   When you would need to reach out to an
14 instructor because of an issue, would you do it via
15 e-mail, generally?
16     A.   Generally.  There was -- I mean, again,
17 it's -- if -- their offices are just all right next
18 to your classroom.  So if you're coming or going to
19 lunch, they're very easy to speak to before and after
20 as well.
21     Q.   Okay.  So let me just pull up a couple of
22 these.
23          All right.  Can you see what we pulled up
24 on the screen, which is SWOCC-003070?
25     A.   Yeah, there you go.

59

1      Q.   Which we'll mark as Exhibit 45.
2          (EXHIBIT 45 WAS MARKED.)
3      Q.   And I just want to make sure I understand
4  how you would interact with your professors when
5  something would come up that would require an
6  adjustment to one of your assignments.  For example,
7  here it looks like you have an October 2nd, 2017
8  e-mail to -- it looks like c-a-l-e-x-a-n-d-e-r.  Do
9  you know who that is?
10     A.   I don't recall a Professor Alexander.
11     Q.   Okay.  So here we had an issue where you
12 wanted to sleep and not being able to upload the
13 papers, so you reach out and have a request to do it
14 later.  Is that kind of consistent with how you would
15 interact with your professors if something came up
16 that required an adjustment to the schedule?
17     A.   Well, just to clarify, it doesn't look
18 like I'm asking for a later date or anything.  I'm
19 saying that it looks like the upload link has closed.
20 According to the syllabus, you can still turn in work
21 late for a -- like a penalty, I'm sure.  It doesn't
22 say that.  But at this point I'm trying to upload it,
23 and because it was past the time, the link had
24 closed.  So I think I'm asking what I need to do to
25 get it to them.

60

1      Q.   If a particular assignment was turned in
2  late in the nursing program, was there a standard
3  deduction or penalty?
4      A.   Ten percent.
5      Q.   And what would trigger the 10 percent
6  penalty?  If a test needed to be completed by a
7  certain time and you had to take it later, was that
8  an automatic 10 percent deduction from your score?
9      A.   Not automatic.  As long as you have
10 arranged with the professor beforehand or
11 communicated beforehand, typically they would do one
12 of two things, either just give you the okay to take
13 it later, which would not include a penalty, or they
14 would let you take it early, which obviously would
15 still not include a penalty.
16     Q.   Okay.  What about the presentations or
17 case studies or other assignments that you would have
18 to turn in during the week?  Did the same 10 percent
19 penalty apply if it was turned in after the stated
20 due date?
21     A.   On that I'm not sure, only because, again,
22 there's some confusion with my understanding based on
23 what has transpired or what is being said now.  So,
24 for instance, with Melissa, when I came back to turn
25 in her tests that she had -- I had arranged to take



61

1  early, she said I didn't need to, we were fine.
2       I brought them to her.  She said, here's a
3  10 percent penalty on all of these, which didn't make
4  sense because she was the one who wouldn't let me
5  take them early.  And then she said that she was
6  giving me a zero on a case study assignment, which
7  she had actually never assigned me and had given me a
8  bonus assignment instead that I spent all week on.
9       But my confusion was, of course, I wasn't
10  given an option for 10 percent on that case study.
11  She just said zero.  So I don't know if it's just
12  ambiguous or they -- just fluid and it can change.
13  But my understanding, yes, is it could be 10 percent.
14  If that's how it played out or not depended on the
15  teacher and the date.
16      Q.   Okay.  If you or another student in the
17  program had a question about these policies, where
18  would you look?  I've heard reference to a student
19  handbook.  Would that be a resource to get some
20  information on how this is supposed to be handled?
21          MR. MARK:  Objection.  Foundation.
22          THE WITNESS:  I -- it's been years and
23  years since I read it, but apparently, with as much
24  hype as I've heard the last couple of days, that
25  seems to be the place to go.

62

1      Q.   (By Mr. Reese)  And this is important.  I
2  don't want your opinion based on what you've heard in
3  the last couple of days.  I want your understanding
4  of how the program worked, and if you don't know,
5  that's fine.  But to the best of your memory, what
6  resources were available if you had a question about
7  either grading, attendance, or some other issue in
8  the nursing program?
9      A.   Again, I don't know how to explain this in
10  a way that is going to -- here, let me articulate
11  myself better.  There was that idea that you have
12  this resource.  Did it actually play out the way
13  things were written in the student nursing handbook?
14  Absolutely not.  It was almost like just a nice
15  paperweight, you know, or a doorstop.  It wasn't
16  actually something they lived by in any way, shape,
17  or form, no.
18          So it's easy to say and point to it, well,
19  according to the student handbook.  But they did
20  things exactly how they felt like doing them in the
21  moment; and so it was very, like I said, unclear and
22  fluid and depended on the teacher at the time.
23      Q.   Okay.  I'll pull up what's SWOCC-003034.
24  We can mark that Exhibit 46.
25          (EXHIBIT 46 WAS MARKED.)

63

1      Q.   First, do you recognize this e-mail
2  exchange between you and Robin Finney?
3      A.   Do I recall it, no.  But, yes, it's from
4  me to Robin Finney.
5      Q.   Okay.  It looks like you're letting
6  Ms. Finney know that you're ill and not going to be
7  able to make a particular class or lecture.  Is that
8  right?
9      A.   Yes.
10      Q.   Would there be, to your best
11  understanding, any penalty or grade impact for
12  missing a lecture because of illness?
13      A.   No.  You're allowed to miss a certain
14  number of lectures a term, and as long as you stay
15  under the cap you're okay, and as long as you
16  communicate with your professor who's teaching the
17  lecture, you're okay.
18      Q.   Okay.  And you would communicate via
19  e-mail, generally?
20      A.   Generally.  Sometimes by phone, sometimes
21  in person.  But generally e-mail, yes.
22      Q.   Did Ms. Finney ever give you a hard time
23  or act out towards you because of having to miss a
24  lecture for illness?
25      A.   Not that I recall.  She was tough, but I

64

1  always remember her being very fair.
2      Q.   All right.  I'm going to pull up what's
3  Bates labeled SWOCC-003002.  We'll mark it as
4  Exhibit 47.
5          (EXHIBIT 47 WAS MARKED.)
6      Q.   Do you recognize this e-mail between you
7  and Ms. Sperry?
8      A.   I don't recall it, but I'm reading it and
9  that it's from me to Melissa, yes.
10      Q.   Looks like this is February 2018, so
11  during the winter term, right?
12      A.   Yes.
13      Q.   And it appears to me that you're relaying
14  that you had been unable to turn in a journal entry
15  because of a migraine?
16      A.   Yeah.  That's what it says, yes.
17      Q.   Okay.  And you reference here that you
18  read the student handbook and understand no late work
19  is acceptable but ask if this ruins the whole
20  project.  Do you remember looking up in the student
21  handbook how turning a journal entry in late would be
22  handled?
23      A.   I don't remember that.  But again, like I
24  said, every assignment is different, so that would be
25  I guess a resource I would look into to find where



65

1  that specific assignment would fall on the late scale
2  of the 10 percent or not.
3       Q.   And what's a journal entry?
4       A.   I don't remember.
5       Q.   And do you recall how a journal entry
6  plays into the whole project?
7       A.   I don't.  I do not recall.
8       Q.   Do you recall what Ms. Sperry's response
9  was to the request to turn the journal entry in late?
10      A.   I do not recall.
11      Q.   Do you recall that, as of this early
12  February 2018 timeline, if you had any concerns about
13  your interactions with Ms. Sperry and asking for
14  adjustments to the schedule like this?
15      A.   I don't recall anything, no.
16      Q.   Okay.  I'm going put up SWOCC-002959,
17  which we'll mark as Exhibit 48.
18           (EXHIBIT 48 WAS MARKED.)
19      Q.   So this is March 20th, 2018.  Do you
20  remember sending this e-mail to Ms. Sperry?
21      A.   I'm sorry; I'm reading it.
22      Q.   Please take your time.
23      A.   This is around the time I was getting very
24  ill.  I don't remember this specific e-mail.  It's
25  describing what I'm doing, where I'm at, who I'm

66

1  being treated by, what the treatment was.  Again, I
2  don't specifically recall this.  I'm asking them what
3  they would like me to do to fulfill my obligation to
4  the assignment.
5       Q.   Do you recall what Ms. Sperry's response
6  was to this, or Ms. Walker's response?
7       A.   I do not.
8       Q.   And I'm guessing this is around that
9  spring break timeline.  Is it fair to say that this
10 is when you were becoming ill but before you were
11 able to work with your doctors to figure out what was
12 wrong?
13      A.   Correct.
14      Q.   I'll pull up SWOCC-002986, which we will
15 mark as Exhibit 49.
16           (EXHIBIT 49 WAS MARKED.)
17      Q.   Go ahead and take a look at this e-mail,
18 and let me know if you recognize it as a March 12th,
19 2018 e-mail from you to Ms. Sperry.
20      A.   This is taking so long for me.  Yeah,
21 again, this is missing a lecture within the confines
22 of the quota, and communicating with my professor as
23 I was supposed to for missing a lecture.
24      Q.   Do you recall Ms. Sperry's response to
25 this?

67

1       A.   I do not.
2       Q.   Any kind of adverse response or
3  retaliation for having to miss her lecture because of
4  this road rage incident?
5       A.   I do not recall.
6       Q.   How did your attendance compare to that of
7  your classmates during this time frame?  Were you --
8  were you kind of on par with everyone else?  Were
9  these circumstances in your life causing you to miss
10 more time?
11      A.   Not -- not more than everyone else.  Maybe
12 not better than or on par with everyone else.  There
13 was a wide array of people.  Some missed more than
14 me, some missed less than me; so I'm not exactly
15 sure.  I didn't have a tally.  But it was more for me
16 than I guess I was used to at the time, but still
17 within the confines of the quota.
18      Q.   I had one more I want you to take a look
19 at.  This is SWOCC-003032, which we can mark as
20 Exhibit 50.  This is an e-mail to Christina
21 Alexander.  Do you recall who Christina Alexander is?
22           (EXHIBIT 50 WAS MARKED.)
23      A.   No.  I just saw this and I said I don't
24 remember Professor Alexander, so I'm not sure.
25 Obviously a teacher.

68

1       Q.   This was the fall of 2017.  Were you still
2  taking prerequisite courses outside of the nursing
3  program during that fall quarter?
4       A.   I didn't think so; but yeah, there's -- if
5  you haven't fit the whole -- there's certain classes
6  you can't start the program without finishing them.
7  There's a couple that can be done in unison or tandem
8  or -- so that -- there was no Christine Alexander in
9  the nursing program, so I would assume I was taking
10 another class.
11      Q.   Seems to make sense.  You're reporting
12 you're a hot mess, I've got the nursing program going
13 on, I've got my kids, I'm overwhelmed, I haven't been
14 able to do this assignment for whatever class she was
15 teaching.
16           Okay.  All right.  So you get the kidney
17 infection, you're dealing with the UTI.  That was
18 exasperated because of the hospital's poor
19 communication.  And eventually you report kind of the
20 significance of the problem to Ms. Sperry and
21 Ms. Walker, right?
22      A.   Yes.
23      Q.   And I'm assuming you did that via e-mail?
24      A.   I don't recall.  I think there was a lot
25 of commotion when I showed up in person looking as



69

1   badly as I did.  So I remember being sent away a
2   couple of times, like showing up at my clinical
3   location and -- that which was at a hospital, and
4   then my teacher, like, Liz Cooper looking at me and
5   telling me to go straight to the ER for treatment
6   instead of trying to stick around and participate,
7   which is what I did.  I walked from the classroom
8   down to the ER and crashed into a bed.  That's --
9            So a lot of the conversation could have
10  just been in the middle of showing up and being
11  evaluated based on my appearance.  It could have been
12  over e-mail.  There was a lot happening all at once.
13       Q.   Sure.  And, again, I'm not expecting you
14  to have a crystal clear memory of all this,
15  especially given how ill you were.  So if I ask you
16  something and you don't remember, let me know.  I'll
17  try to refresh your memory, and if we can, great; if
18  we can't, that's fine.
19            I am still a little confused, though.
20  While you were in dealing with these medical issues,
21  do you remember when you first had to miss classes
22  because of them?  Would it have been after spring
23  break?
24       A.   Yes, after spring break.  Like, you showed
25  me an e-mail from like March 20th that looks like I

70

1   missed a lecture.  That's when I started getting ill.
2   So I'm not exactly positive or remember what the
3   first instance of missing anything occurred.  So I
4   know that the week going in after spring break or the
5   time after spring break there was just a lot of
6   appointments and a lot of hospital visits, so --
7        Q.   You testified earlier that there was a
8   certain allotment of time to miss lectures or
9   whatever it may be because of illness.  Was there a
10  specific number that you can recall that once you hit
11  it, then it was going to become a more significant
12  issue?
13       A.   I don't remember the number.
14       Q.   That's fine.  Do you remember that there
15  was a number, though, where --
16       A.   Yes.
17       Q.   -- you were asked to keep track of, once I
18  get to X number of misses or absences, this is going
19  to have a more significant impact?
20       A.   Yes.  I don't remember what the
21  step-by-step process was when you hit these numbers
22  or not, but yes, there was.  There was a standard.
23       Q.   Okay.  I put up on the screen
24  SWOCC-000128, which we can mark as Exhibit 51.
25            (EXHIBIT 51 WAS MARKED.)

71

1        Q.   This is an April 10th, 2018 e-mail -- or,
2   sorry -- April 9th, 2018 e-mail from you to
3   Ms. Walker and Ms. Sperry.  Do you remember sending
4   this?
5        A.   I do not recall, no.
6        Q.   This to me looks like you're letting your
7   advisor and the director of the program know that
8   you've been battling the kidney infection and that
9   it's going to require you to miss some, or has
10  required you to miss some time?
11       A.   No, that's not what this is saying.  This
12  is talking about a volunteer basis that she asked for
13  nursing students to help out with an EMS -- EMT
14  class.  It wasn't for credit or part of my
15  curriculum.  I volunteered to help out with what she
16  needed but couldn't make it to that because -- and
17  explained here, it looks like, everything that was
18  going on, what medications I was trying.  An allergy
19  to a medication.  The next step -- anyways, and then
20  summing up all of that and saying I won't be able to
21  help out with what I volunteered for.
22       Q.   Okay.  Ms. Walker writes back, "Sorry to
23  hear you have a kidney infection.  Please take care
24  of yourself.  Hope the medication helps."  Generally
25  seems like a positive response wishing you well.  Was

72

1   that consistent with the way Ms. Walker was
2   interacting with you in person?
3        A.   Yes, up until that point, yes.
4        Q.   Okay.  So now I'm pulling up what's Bates
5   numbered SWOCC-002903, which we can mark as
6   Exhibit 52.
7            (EXHIBIT 52 WAS MARKED.)
8        Q.   This is an e-mail chain, so I'm going to
9   scroll to the first one in time here at the bottom.
10  Go ahead and take a look at that, which is a Friday,
11  April 13th e-mail from you to Ms. Sperry with the
12  subject "Appointment."
13       A.   Uh-huh.
14       Q.   Do you recall -- do you recall sending
15  this e-mail to Ms. Sperry around this time?
16       A.   I recall this chain.  I recall this being
17  the beginning of a shift.  But there was a lot of
18  back and forth this week, a lot.
19       Q.   Okay.  Was this the e-mail the start of a
20  conversation about you having a doctor's appointment
21  that was going to interfere with your ability to take
22  a test?
23       A.   Yeah.  This is, like I mentioned earlier,
24  this is me arranging to take a test early as to not
25  get docked or again at her discretion before or

73

1  afterwards because I wouldn't be able to do it at the
2  designated time.
3        Q.   Okay.  So I'm assuming -- correct me if
4  I'm wrong -- but you learned that your doctor needs
5  to see you, and the only time that you can get an
6  appointment interferes with a scheduled test.  Right?
7        A.   Correct.
8        Q.   And you send this e-mail a little after
9  9 a.m. on the 13th to Ms. Sperry to let her know of
10 that issue, right?
11       A.   Yes.
12       Q.   And you didn't have any in-person or
13 telephone conversations with Ms. Sperry about this
14 before sending the e-mail?
15       A.   Yeah, there was a couple of phone
16 conversations.  I don't remember exactly when they
17 were or if they were before or after this e-mail.
18       Q.   Okay.  And you're asking --
19       A.   To either take her test before or after,
20 whichever will -- I can arrange, obviously, so that
21 it's not negatively affecting the test.
22       Q.   Okay.  I'm going to go up to Ms. Sperry's
23 response.  Shortly after 9:38 a.m. she writes, "We
24 can look at that next week."  Do you recall receiving
25 that?

74

1        A.   Yes.
2        Q.   And, again, any -- any in-person or
3  telephone conversations that you recall that would
4  supplement this or change it or add anything further
5  to it?
6        A.   I remember something along the lines of
7  "focus on getting better."  I don't know if that was
8  in a different e-mail chain or in person or on the
9  phone; but she specifically in regarding the testing
10 said, focus on getting better and we'll worry about
11 that next week, not just that simple sentence.  So
12 where that recollection comes from I'm not positive,
13 but I know that there was something more closely
14 related to focus on getting better and not the test;
15 we'll work about that next week.
16       Q.   And I think because of how the program was
17 taught, it's probably important to confirm, you're
18 communicating with Ms. Sperry here because she's the
19 instructor for the week where you're going to have to
20 reschedule the test, not just because she's your
21 advisor.  Right?
22       A.   Yes, correct.
23       Q.   Okay.  Ms. Sperry writes back -- kind of
24 responds to her own e-mail at 10:14 saying, "There
25 will be an assignment you can work on for today

75

1  posted on LakerLink also."  Do you recall that?
2        A.   I do.
3        Q.   Okay.  And then you respond a little
4  before one o'clock, "Key words being," and in quotes,
5  "will be."  Right?
6        A.   Correct.  That's because I kept refreshing
7  on my phone the LakerLink to see where the assignment
8  was.  And I was pretty eager to please her and to
9  make sure she knew that my illness wasn't affecting
10 my dedication to the program, so I was refreshing all
11 day, including at the doctor's office, waiting for
12 the assignment to pop up, and it didn't until much
13 later.
14       Q.   Okay.  Is this day, Friday, the day you
15 had your appointment with your doctor?
16       A.   Correct.
17       Q.   Okay.  It looks like the next
18 communication in this e-mail chain occurs the
19 following Monday, April 16th, and it's an e-mail from
20 Melissa to you checking in and asking how you're
21 feeling, but also reporting that she did not receive
22 the assignment back on Friday and asking if you were
23 able to access it okay.  Do you recall getting this
24 e-mail?
25       A.   But this is not, I guess, correct -- the

76

1  correct e-mail.  There was communication between
2  Melissa and I over that weekend that is a different
3  set of e-mails.  Specifically, an assignment appeared
4  finally that night, on Friday night.  It was
5  something Kaplan.  It came with no instructions, so I
6  didn't know how to complete the assignment.
7             So the next morning, I think on Saturday
8  morning I e-mailed her asking how to complete the
9  assignment, because, again, this was the only
10 assignment that showed up at all on Friday.  I was
11 refreshing all day.
12            Saturday morning I asked her where I could
13 find the instructions for the assignment.  She told
14 me where to find the instructions.  That's exactly
15 what was there was the instructions for this Kaplan
16 assignment, And it was a lot more lengthy than I had
17 anticipated.  It was -- it took me from Saturday
18 morning when she pointed me to the instructions until
19 I was wrapping up Monday morning when I got this
20 e-mail.
21       Q.   So I believe you explained that the Kaplan
22 assignment was kind of like the final exam for a
23 particular subject matter.  Right?
24       A.   No, there are Kaplan exams, and this was a
25 Kaplan assignment relating to a previous exam.  So it



77

1  basically wanted me to go over I believe a prior exam
2  and remediate, because it gives you feedback on the
3  exams you took.  So any question you might have
4  gotten wrong, write an explanation or something along
5  those lines.  I'm not exactly sure the details of the
6  assignment, but it was long.
7      Q.   And this sort of Kaplan assignment, was it
8  something you would get on a weekly basis?  Or how
9  frequently would they be part of the program?
10     A.   I think this was -- it was supposed to be
11  an assignment that wasn't actually due until the end
12  of spring term, like a final part of your final week.
13  Thankfully, later, when this actually did pop up as a
14  real assignment instead of a wild goose chase, I was
15  allowed to use my prior work in part for that
16  assignment since I had already done it once.
17     Q.   What makes you think this Kaplan
18  assignment was a wild goose chase?
19     A.   Because of this e-mail that's right here
20  on the screen.  This assignment, the Kaplan one that
21  popped up that Friday, said it was not due until
22  Wednesday morning.  So she's e-mailing me on a Monday
23  saying, I did not receive your assignment back from
24  Friday, were you able to access this okay.  In my
25  understanding, I still had some more days, so I was

78

1  confused by that.
2          I think we go further up the chain, and
3  that gets more clarification if you want to do that.
4      Q.   Okay.  So let's go up.  And this is from
5  you to Ms. Sperry a little after 5:30 that evening.
6  Does this help refresh your memory as to what you did
7  next?
8      A.   "The assignment is almost complete.  It
9  had a lot of content that has taken a while.  It has
10  a lot of content that has taken a while.  I saw it
11  was due at Wednesday at 9:00.  Is that still okay, or
12  would you like me to finish it up tonight after my
13  care plan?"
14     Q.   And then Ms. Sperry reports it was a
15  Friday assignment, it was due Friday at 3:00;
16  complete it as soon as possible, please, and stop by
17  to see me.  Did you --
18     A.   Yeah, this -- sorry.  I'm sorry.
19     Q.   Please go ahead.
20     A.   No.  I just was commenting this is when I
21  knew things were off, because we talked on Saturday.
22     Q.   First, she's inviting you to come see her.
23  Did you in fact go have a meeting with her to talk
24  about the confusion on the assignment?
25     A.   Yes.  Somewhere in one of the two chains

79

1  and further up we discussed a time for me to retake
2  the test that I missed, the one that she told me to
3  wait until next week to take.  This is that week.  So
4  we planned a time, and then I was going to see her
5  after I -- after she proctored my exam.
6      Q.   So through separate communications you
7  were able to confirm that Ms. Sperry had been
8  referring to a test that she wanted you to take on
9  Friday, not the Kaplan assignment that you spent the
10  weekend working on?
11     A.   No, that's not what I said.  Through
12  separate communication she said it was a
13  miscommunication.  But, again, I don't understand how
14  there really was so much of a miscommunication when
15  we spoke on Saturday.  No assignment showed up Friday
16  before 3:00.  There was no assignment that showed up
17  whatsoever.  It was not put up online, especially
18  before 3:00 p.m.  So that in itself was confusing.
19         The one that did show up on Friday night
20  said it was due on Wednesday, not Friday at 3:00.  I
21  e-mailed her Saturday morning for the instructions.
22  She told me exactly where to find these exact
23  instructions for the Kaplan remediation.
24         So I'm not sure how much I can say I
25  misunderstood as much as it was easily -- obviously,

80

1  the confusion through e-mails is very clear.  It was
2  pretty confusing where she was going with what she
3  wanted me to do.
4      Q.   Okay.  And you are pointing to this as the
5  moment where you realized things between you and
6  Ms. Sperry had changed?
7      A.   It seemed odd, not changed.  Things were
8  seeming odd.  Her communication became very short
9  like this.  It was a Friday assignment due Friday at
10  three, smiley face.  Complete it as soon as possible,
11  please, and stop by to see me.  Just these really
12  quick responses that completely don't make sense.  It
13  seemed odd.
14     Q.   Did you have an opinion at the time as to
15  why Ms. Sperry's demeanor and conduct toward you was
16  changing?
17     A.   I -- at that moment specifically, no.
18  Again, I had concerns before anything even seemed odd
19  about making sure I stayed on my A game and let her
20  know there was no concerns about me as a student, and
21  that no matter how sick I got, my priority was going
22  to be the nursing program and to be in constant
23  communication with her.
24         So I had concerns about seeming weak,
25  because that is, you know, the number one advice you



81

1  get going in, like I said, don't -- don't stand up
2  for yourself, don't talk back, don't be weak,
3  don't -- I mean, just kind of be in this perfect
4  walk-the-line place, and being sick made that hard to
5  do.  So make sure they know you're serious; be
6  respectful; communicate, communicate, communicate.
7        So any concerns I had were about my own --
8  making sure I came across as a serious student still.
9  As far as concerns about Melissa, all I can say at
10 this point specifically is that it seemed odd.
11     Q.   Did you reach out to anyone else within
12 the program to ask questions about why you were
13 having odd interaction with Ms. Sperry?
14     A.   Do you mean, again, in prior, like, as in
15 during this exact exchange?  Or do you mean like the
16 following week when I went to turn in the test?
17 Because those are two different answers.
18     Q.   Well, let's say before you went to turn in
19 the test.
20     A.   Did I have any communication?  Not that I
21 can recall.
22     Q.   What about with your mentor or other
23 classmates?  Did you say, I'm starting to have a
24 different dynamic with Ms. Sperry?  Any conversations
25 like that?

82

1     A.   No.  There might have been some sort of
2  venting over the confusion of the assignment and how
3  long it took.  Because, like I said, you spend the
4  whole weekend prior to your week getting started for
5  your next week.  So this whole time I was working on
6  the Kaplan remediation that took all weekend, and
7  then some into the next week I should have been
8  preparing for Robin's material, and I wasn't able to
9  do that.  So maybe a sense of overwhelming
10 frustration, but nothing I can recall specifically.
11     Q.   Do you recall any of your classmates
12 having frustration about the Kaplan remediation?
13     A.   None of them were ever asked to do it
14 until the end of term when it was actually assigned.
15     Q.   And the Kaplan mediation I believe you
16 explained was follow-up because of a previous test or
17 assignment that had been turned in?
18     A.   It was a -- Kaplan remediation was based
19 on a prior Kaplan exam.
20     Q.   And it's based on your specific exam, so a
21 Kaplan remediation project would be unique to the
22 student.  Right?
23     A.   It would be all of us remediating the same
24 exam, but more -- the individuality to it would
25 obviously depend on what answers you got wrong.

83

1        MR. REESE:  Okay, let's take a break.  I
2  believe we're right at the noon hour where you guys
3  are at.  Do you want to grab lunch, Brandon, or would
4  you prefer to keep going?
5        MR. MARK:  I don't care.  I will leave it
6  up to Nicole.  Do you want to take 45 minutes for
7  lunch?  Or do you want to just --
8        THE WITNESS:  I can go either way.  You
9  put this on the wrong person.
10        MR. MARK:  You're the witness, so I think
11 we're all here to accommodate you.
12        MR. REESE:  Well, and I think for the sake
13 of Vicky's fingers and her endurance, why don't we
14 take --
15        THE WITNESS:  Let's do a lunch break.
16 There's a deli down the street that looked good,
17 so --
18        MR. REESE:  Okay, let's start back up at
19 12:30.  I'm positive we'll be able to get done so
20 Vicky can get to her vaccination schedule as well.
21 So let's take a nice lunch, be back at 1:30 your
22 time.
23        THE WITNESS:  All right.  Thank you.
24     (Recess from 12:25 p.m. to 1:30 p.m.)
25     Q.   (By Mr. Reese)  Ms. Gililland, can you see

84

1  the PDF that I'm sharing?  If it's working correctly,
2  I've put up what we previously marked in a different
3  deposition as Exhibit 35, an e-mail exchange between
4  you and Ms. Sperry, and I believe this is the
5  contemporaneous one to the exhibit we were talking
6  about before we took our break, the two e-mail chains
7  you had going on with Ms. Sperry over this weekend.
8  Is that right?
9     A.   Correct.  It was -- I know it's super
10 confusing, especially now that we had two going on
11 simultaneously.
12     Q.   It's confusing to review, but it makes
13 total sense.  You're basically having the same
14 conversation, just through two e-mail threads.  This
15 one, Exhibit 35, is titled "Completed Assignment."
16 And I'd like you to take a look at the e-mail that
17 Ms. Sperry sent to you at 8:39 on Tuesday, the 17th,
18 where she explains that she has the Kaplan
19 remediation and refers, "That may be the assignment
20 that was due on Wednesday; I was asking about the
21 case study from Friday."
22        If you recall, was this the first time
23 that you realized there was a case study in addition
24 to the Kaplan assignment that you'd been working on?
25     A.   It was the first mention at all, period,



CITICOURT
THE REPORTING GROUP

85

1   of a case study.  Case study never showed up on
2   LakerLink, and there was not in addition to the
3   Kaplan remediation, because it turns out that that
4   wasn't something until the end of term.  So it wasn't
5   actually the assignment that I was supposed to be
6   working on.
7        Q.    In the conversation that you had with
8   Ms. Sperry regarding the Kaplan remediation versus
9   the case study assignment, was that done in person in
10  addition to the two e-mail chains, Exhibit 52 and
11  Exhibit 35, or are the e-mail chains the extent of
12  the conversation?
13       A.    The extent of the conversation to this
14  point.
15       Q.    Let's use April 25th and when the concerns
16  about plagiarism came as a point in time.  Prior to
17  that point in time, did you have any conversations
18  outside of the two e-mail chains?
19       A.    Yes.  That following week after my
20  make-up, we scheduled a time for my make-up further
21  up one of the chains.  I think she said she could
22  proctor at like 10 a.m. for my make-up test.  And she
23  said we discussed -- I believe she said something
24  along the lines that we discussed the
25  miscommunication, which she verified it was all just

86

1   a big miscommunication which can happen over e-mail.
2   We discussed it at our meeting.
3             I showed up the next morning.  I took the
4   test in an empty classroom near her office, and then
5   took the test to her office where we proceeded to
6   have a conversation about these things.
7        Q.    Okay.  So on Tuesday, the 17th, the
8   conversation was appearing via e-mail only, though?
9        A.    I believe so, yes.
10       Q.    Okay.  And this is that e-mail chain read
11  in conjunction with the one we were looking at before
12  the break, Exhibit 52?
13       A.    Yes.  Again, there is a possibility for
14  phone calls somewhere in this.  I can't be specific
15  on when those phone calls occurred, but I have called
16  her office before and probably during this whole
17  experience of being sick.
18       Q.    How were you doing with your illness at
19  this point of April 17th, if you remember?
20       A.    I was on the mend.  Still very weak, but
21  yeah, I was finally on the mend.
22       Q.    And we don't need to review this e-mail
23  exchange verbatim, but I just want to make sure that
24  I'm not missing any information about this exchange
25  beyond what's here in the e-mail.  Do you recall any

87

1   separate conversations or anything in addition to
2   this communication, trying to figure out what was
3   going on with the case study versus the Kaplan
4   remediation?
5        A.    Again, just -- just these conversations
6   where it finally comes to a head.  I'm like, that's
7   not what you said; you pointed me in this direction.
8   You never said anything about a case study.  It
9   didn't show up on Friday, so on and so forth.
10  Pointing out all the kind of flaws with
11  miscommunication, and it landed on me, talk in
12  person; and that's the next big event, I guess, in
13  the way things happened.
14       Q.    So was it your feeling in having this
15  e-mail discussion with Ms. Sperry that she was being
16  accusatory or argumentative?
17       A.    Again, I think she was being odd, because
18  Melissa doesn't miscommunicate, and she's calculated
19  in everything that she does and very aware.  So
20  miscommunication with someone like her isn't
21  something that occurs very often; so I thought this
22  was odd, especially being this odd where, again, we
23  spoke on Saturday and she's telling me an assignment
24  was due Friday, and Saturday she's telling me where
25  to find the instructions.  It just was all odd.  I

88

1   wouldn't say accusatory, of course not.  That came
2   later.
3        Q.    Okay.  And you did eventually re-take the
4   three tests that she had been asking you to take that
5   Friday?
6        A.    Yes.  I believe that would be the
7   following day from this last e-mail.  So it would be
8   a Wednesday.
9        Q.    And did you receive the 10 percent
10  deduction for taking the test late?
11       A.    I brought the test back to her office, sat
12  down.  She said that all of the tests would be marked
13  late.  And I -- and I finally, and confused tone, but
14  not trying to rock the boat, said that I thought that
15  because I asked to take them early, and you
16  specifically said I should take them the following
17  week, but that was just your prerogative, and that I
18  wasn't going to be docked late.
19            She says, well, they're late, and that is
20  my prerogative, or something along those lines.  And
21  then she said -- just, her demeanor was off.  But
22  she, you know -- she was smiling and she seemed to
23  kind of enjoying the moment.  It was just an odd
24  smile and an odd expression and an odd presentation
25  to what I was used to from her, and then she said

89

1  that I was getting a zero on the case study
2  assignment.
3          So that's a pretty significant blow to get
4  a zero on anything, and a lot to come back from.
5  That's when I knew that something was wrong.
6      Q.   What case study assignment are you
7  referring to?
8      A.   The one that you were just referring to in
9  these e-mails that was never actually assigned to me.
10     Q.   Okay.  So you rescheduled to take the test
11 that had occurred the last Friday; you weren't able
12 to take the test because you were at the doctor's
13 office; and she assigns a 10 percent deduction for
14 those exams, and then gives you a zero for the
15 assignment that had not been completed because you
16 had been working on the Kaplan remediation instead of
17 the assignment.  Correct?
18     A.   Because it was never assigned to me,
19 specifically that.  It was literally never assigned
20 to me.  It was never available in LakerLink.  She
21 never said anything about a case study prior to
22 Monday, when she said, oh, that one that was due
23 Friday.  It literally never came up.  The only thing
24 that came up was Kaplan.  She told me where to find
25 the instructions.  It's exactly where I found them.

90

1  That's what was assigned to me.
2          And then as far as the 10 percent, again,
3  I want to reiterate that I asked to take those early.
4  So the way you're phrasing it is, oh, you got the 10
5  percent deduction because you took them late.  Only
6  because I wasn't allowed to take them early.  And,
7  oh, you got a zero on this case study because you
8  didn't do the one assigned to you.  Again, the case
9  study was never assigned to me until it was
10 apparently far too late.
11     Q.   In her April 17th e-mail that she sent at
12 about 10:25 a.m., Ms. Sperry refers, or has a
13 sentence here at the bottom of the first paragraph,
14 "The class assignment was posted to you nursing
15 Section 111-04 at 1250 just after your e-mail."
16         Is it your understanding that she was
17 referring to the case study?
18     A.   I can only say what I experienced on my
19 end, refreshing and refreshing and refreshing that
20 day, which is evident by the e-mails in which I'm
21 saying, I don't see it, I'm looking for it.  There's
22 some e-mails earlier on that Friday where I'm
23 specifically asking her, I'm not saying, I'm looking,
24 I'm looking, I'm just not seeing.  Something along
25 those lines.  So I was indeed looking for it.  It was

91

1  never posted, not for me.
2      Q.   In the meeting where -- that you're
3  describing the conversation where she relayed what
4  the grade would be or the zero for that case
5  assignment, that was the next day, Wednesday, the
6  18th?
7      A.   Yes.
8      Q.   Just one second.
9          All right.  Tell me how you came to learn
10 that there was concern about a plagiarism issue with
11 one of the assignments that you had turned in.
12     A.   Well, there was kind of a buildup with
13 tension with Melissa after that meeting.  I had to --
14 I had to bring in Susan.  That's -- along with that
15 meeting, she told me she was giving a zero, that
16 there was nothing I could do about it.
17         I asked her why she was doing it.  She
18 said because it takes a classy women to be a nurse,
19 and unclassy women, kind of pointing to me, shouldn't
20 be nurses.  If I had a problem, I could take it up to
21 Susan.
22         I went to Susan's office --
23     Q.   When did that conversation occur?
24     A.   That's still on the Wednesday that I
25 retook her test.

92

1      Q.   So the same conversation where she
2  explained you'd get a zero for the case study?
3      A.   Yes.
4      Q.   Okay.  Was anyone else present for that
5  conversation?
6      A.   I believe there was someone waiting
7  outside the door in the hallway.  I know I talked to
8  Stephanie Kyelberg right after it happened, right
9  after I was done in Susan's office.  I was perplexed
10 and upset and told a few classmates.
11     Q.   And Stephanie Kyelberg, can you spell that
12 last name?
13     A.   Stephanie.  K-y-e-l-b-e or b-u-r-g.
14         MR. MARK:  I believe it's e-r-g.
15         THE WITNESS:  Okay.  Mayra Rangel.  I
16 believe I told Victoria Kalmycova.  I'm next to
17 positive I told.  Not then, because I didn't really
18 get acquainted with her until the following week, but
19 I told her then.  I told Stephanie right after it
20 happened.  I believe I told May right after it
21 happened, and possibly Megan -- Megan Greer.
22     Q.   (By Mr. Reese)  Okay.  And Stephanie, was
23 she -- you mentioned she was just outside the door?
24     A.   She might have been the one standing
25 out -- there -- there was -- there's always someone



93

1  lingering when you're in an office with a teacher,
2  because they're popular.
3       Q.    Okay.  Was it your perception that the
4  student who was outside the door could have heard the
5  conversation that you were having with Ms. Sperry?
6       A.    I have no idea.  I never asked.
7       Q.    Since that time, have you spoken to anyone
8  who was present or observed that conversation?
9       A.    Not specifically anyone saying that they
10  observed that conversation.
11       Q.    Okay.  And tell me what you recall
12  Ms. Sperry telling you in response to your question
13  about why you were getting a zero on the case study.
14       A.    She said I was getting a zero, with a
15  smile on her face.  And just the whole -- everything
16  about it, I knew something was wrong.  I'd always
17  been able -- I felt we'd developed a rapport where
18  she was a fairly straightforward person.  So I just
19  asked, Why are you doing this?  Why are you doing
20  this to me?  Just, why, something along those lines.
21            And she said again, with a disturbing grin
22  on her face, that it takes a classy woman to be a
23  nurse and unclassy women shouldn't be nurses, and if
24  I have a problem with her decision, I should take it
25  up with Susan Walker.  I didn't say anything else.  I

94

1  got up and left the room and went to Susan's office
2  directly.
3       Q.    You described Ms. Sperry's demeanor.  What
4  was your demeanor during this meeting?
5       A.    Lost.  Sad, confused.  But mostly
6  confused.
7       Q.    And did you in fact go see Ms. Walker
8  after that?
9       A.    Immediately.
10       Q.    Okay.  And where was Ms. Walker when you
11  met with her?
12       A.    She was in her office at her computer.
13       Q.    And describe for me what happened in that
14  meeting.
15       A.    Susan had no idea what I was talking
16  about.  I showed her the two e-mail chains back and
17  forth between Melissa and I, told her of Melissa's
18  decision to give me the 10 percent penalty on the
19  test and the zero.
20            She said, you know, taking a test late was
21  a teacher's prerogative.  It didn't make sense to
22  her, though, that I had asked to take it early and
23  still been docked.  But, you know, that's -- that
24  ball is in the teacher's court but that she didn't
25  see any way, shape, or form that I should be getting

95

1  a zero on the case study and that she would take care
2  of it.  And she did.
3       Q.    And what -- how did she take care of it?
4       A.    She ordered Melissa to let me take the
5  correct assignment.
6       Q.    Were you privy to the conversation that
7  Ms. Walker had with Ms. Sperry on that?
8       A.    No.  She just said that she would -- she
9  would do that.  And the next thing I know, I was
10  getting contacted by Melissa for a make-up time in
11  the library to go and do the GI case study.  It was a
12  gastrointestinal case study.
13       Q.    Do you recall what grade you received on
14  the GI case study?
15       A.    It was significantly lower than my
16  classmates that had answered either the exact same or
17  worse or outright wrong.  They were all getting in
18  the 90 percents on it, and I got a 70 something.
19       Q.    Did you have a conversation with
20  Ms. Sperry following up on what the new decision was
21  on your ability to re-complete the GI case study?
22       A.    I can say I don't believe I ever had
23  another in-person conversation alone with Melissa
24  after she made that comment towards me.
25  Intentionally, I tried to keep everything in writing.

96

1  So if there is anything about that, that grade, then
2  you have it.  I don't recall specifically.
3       Q.    So just to make sure I'm oriented from
4  your conversation with Ms. Sperry on Wednesday,
5  April 18th forward, you didn't meet with her in
6  person by yourself ever?
7       A.    Not ever again, no.  There was always
8  somebody with me.
9       Q.    Okay.  Sorry, I'm looking for something.
10       A.    That happens to me all the time.
11            MR. MARK:  We can always take a break if
12  you need time.
13            MR. REESE:  No, just bear with me.  I had
14  some things a little out of order, but we're going --
15  we're going to get to them here.
16       Q.    (By Mr. Reese)  All right.  On about
17  April 25th, 2018, you received some communications
18  first I believe from Robin Finney, and later from
19  Melissa Sperry about a concern about a
20  pathophysiology paper that had been submitted.  Do
21  you recall that?
22       A.    Yeah.  It didn't start with them
23  contacting me, but I had received my grade from Robin
24  earlier that morning for the case study assignment,
25  which, again, was something that was extremely rushed

97

1  because of all the time I spent on the not-assigned
2  miscommunication that was the Kaplan remediation.  So
3  I was rushed, and I was happy to just get a passing
4  grade.  So I just wanted some clarification, you
5  know, as to where I screwed up, and I swung by
6  Robin's office on my way to the lecture.
7          She said I had done the pathophysiology
8  wrong at the end, and I read it and I was wrong.  And
9  so I'm like, all right, thank you for your feedback;
10 you know, I'll do better next time, I'm sorry, it was
11 hectic coming back sick, and I was -- I was
12 preoccupied when I should have been working on your
13 assignment.  Just gave her my -- my apologies and
14 went to class.
15         While I was in class I looked at my grades
16 again because I was trying to calculate, I don't
17 know, if that made a big dent, the 77 or what I got
18 on that.  And all of my grades had changed to F's.
19 So I'm in the middle of class looking at my phone,
20 and all of my grades for all three classes are now
21 F's.  And I pretty much just shot up out of my chair
22 and just went straight to Robin's office.
23         And I'm like, what is happening?  Like,
24 she was like -- I think she was -- I don't want to
25 say emotional.  She seemed very sad and said that I

98

1  needed to talk to Melissa Sperry.
2          And I went down to Melissa's office, and
3  she looked up, her grin just as strong as ever, and
4  said she was in the middle of conducting an
5  investigation and that she would be with me when she
6  had concluded it.
7          I ran down then to Susan Walker's office
8  and I said, Susan, what is happening?  And she's
9  like, I don't know; what are you talking about?  What
10 do you mean?  Like, super confused.  And I'm just
11 like, all my grades are F's, all my grades are F's.
12 And she's like, What?
13         And so she came with me to Robin's office.
14 And Robin again was like, uh, I have a loss of what
15 to say.  And she's just like, let me take you to
16 Melissa's office.  Melissa -- the way she explained
17 it, Melissa took the assignment is what she said from
18 her and had discovered plagiarism.  She said
19 something very much along those lines.  Melissa had
20 taken my case study and discovered plagiarism and
21 that she was conducting an investigation.
22         When we got back down to Melissa's office,
23 or this conversation was occurring right outside her
24 office, that's when Melissa, you know, finally
25 responded and said that she had found -- it had been

99

1  identified that my papers contained plagiarism and
2  that I would be dealt with accordingly, and that for
3  now I was to return to class and complete my lecture
4  and not worry about what she was doing kind of thing.
5          I really wasn't in the mood to go back to
6  lecture, but I sat there silently crying my eyes out
7  the entire rest of the time until then these e-mails
8  started coming in.
9          Q.   Okay.  So the interaction you've described
10 with the various faculty members in their offices
11 occurred before you started to get e-mail
12 communications about the concerns?
13         A.   Yes.  I was aware before they started
14 sending these things what was happening.
15         Q.   All right.  Looking at what we've marked
16 as Exhibit 4.  This you received it looks like from
17 Ms. Sperry around 3:38 in the afternoon on the 25th.
18 Is that right?
19         A.   Yes.
20         Q.   So you had already had these interactions
21 that you just described with the various faculty
22 members and returned to your class.  Where were you
23 when you recall receiving this e-mail?
24         A.   I -- I honestly don't remember.  There was
25 a lot more in-person that occurred after lectures.

100

1  Specific e-mails and what was happening, when I was
2  getting those, I don't remember specifically.
3          Q.   Well, describe for me what you recall
4  about the in-person interactions you had after you
5  completed lecture.
6          A.   I went back to Susan's office.  Her entire
7  demeanor changed.  She was very, very cold and curt.
8  And I said, I understand, like, I might have rushed
9  this assignment and maybe not done everything up to
10 perfect standards, but we don't -- since when does
11 that matter in this program?  And that kind of I
12 guess triggered her a little bit more.
13         She's like, What are you referring to?
14 I'm like, You know that if you were to grab anyone's
15 paper it would be the exact same way, or something
16 like that.  And she just disregarded it, just kind
17 of -- and she said, we're going to be having a
18 hearing for you on Monday to discuss the seriousness
19 of your -- I don't know if she said crimes or
20 infractions or something along those lines -- very
21 much to discuss you and your crimes, or something
22 like that.
23         Yeah.  I asked immediately if I could
24 bring an attorney.  She said, if you bring an
25 attorney there won't even -- we won't even bother



101

1  having a hearing.  And then I asked if I could record
2  it; and she said, No, absolutely not.
3        Then I asked if I -- because I had already
4  I think even in class -- I sat next to May, so even
5  in class I'm crying, so she's trying to comfort me
6  and ask what's going on.  Stephanie Kyelberg and
7  Megan Greer sat next in front of me, so they kind of
8  did the same thing.  I told them a bit of what was
9  happening, and they all immediately said that their
10 papers were plagiarized, too, That we just
11 plagiarized in class, fully, all of us.
12       Like, in Melissa's class on Friday when
13 they did the GI case studies, that every single one
14 of them had made their slides and things directly
15 from the books and not cited it.  So they -- they all
16 started to kind of get a little panicky and then
17 tried to comfort me by saying, they can't expel all
18 of us or there won't be a program.  You know, they
19 need to make us do these things if they want them
20 done, but you don't have anything to worry about.
21       So I asked, knowing that and what they had
22 just told me, if I could bring May to the meeting or
23 bring one of my classmates to the meeting to
24 elaborate on what they had just said, and I was told
25 no.  I can bring one person, a support person.  They

102

1  can't be a lawyer, they can't be a reporter, they
2  can't be anyone in the program.  I'm not allowed to
3  record, and I'm to show up at that time for my -- I
4  think she said expulsion hearing.
5        Q.   What makes you think she said "expulsion
6  hearing"?  Is that what you're recalling right now?
7        A.   It's I'm pretty sure the language that was
8  used, yes.  Because it was very much centered around
9  if I would stay in school.  It was not a probationary
10 hearing.  That's not what it was labeled as
11 initially.  It was labeled as an expulsion hearing.
12       Q.   You say it was labeled as an expulsion
13 hearing.  Where was it labeled that way?  Did you
14 receive any kind of written communication referring
15 to it as an expulsion hearing?
16       A.   I haven't looked at these specific e-mails
17 in years, but specifically what Susan said.  That's
18 what I -- I was told I couldn't have a lawyer, I
19 couldn't record, I couldn't bring anyone from the
20 program.  My expulsion hearing would be up in the
21 state.  So --
22       Q.   Did you take any notes either during or
23 shortly after this interaction to record what
24 happened?
25       A.   I don't think I started -- I don't think I

103

1  did the narrative until maybe a week or two later.
2        Q.   Okay.  But you don't have any personal
3  notes, or you don't have the habit of keeping a
4  journal or anything that we could go back and look to
5  about your more contemporaneous recollections of what
6  was said?
7        A.   No.  Just, like I said, the narrative I
8  did the following week, I believe.  I keep a lot of
9  notes now, but no, I can't say that I wrote anything
10 down specifically.  It was definitely more of a
11 panic, depression, shock.  Just ready to prepare for
12 Monday for my expulsion hearing.
13       Q.   Okay.  The afternoon of the 25th,
14 Ms. Sperry did send you the e-mail that we have up on
15 the screen previously marked as Exhibit 4.  Do you
16 recall maybe not specifically when you received this,
17 but receiving this prior to your meeting on Monday?
18       A.   I recall receiving this.  But, again, I
19 don't know where I was at in the day.
20       Q.   Okay.  In it Ms. Sperry reports that "it
21 has been identified that many of your pathophysiology
22 papers have been copied directly from online
23 resources.  This is known as plagiarism and is not
24 acceptable per policy."
25       Let's start with the basics.  Did you

104

1  understand it to be plagiarism if a student were to
2  copy from online resources?
3        A.   Yeah, I understand that to be the
4  definition of plagiarism, yes.
5        Q.   Okay.  And it says here that "your
6  pathophysiology regarding general anesthesia was
7  copied from Scientific America Online," and it has a
8  link to a website that appears to be Scientific
9  America Online.  Do you recall if you did copy and
10 paste information in your assignment from Scientific
11 America Online?
12       A.   I don't specifically remember making the
13 assignment.  I just know that it was, like I said,
14 rushed.  And I'm sure that if I put sources in, I
15 tried to keep them as credible and medical based as
16 possible.  So I'm not doubting that.  But do I
17 specifically remember that website itself?  No.
18       Q.   What about Cleveland Clinic, which is also
19 referred in here?  Do you have any memory of copying
20 and pasting case from Cleveland Clinic?
21       A.   I have no memory of making the paper
22 besides the sheer panic of rushing to get it done.
23       Q.   Okay.  And you were rushing because you
24 had been working on the Kaplan remediation, I believe
25 you said.  Right?



105

1      A.    Correct.
2      Q.    So let's -- let's make sure that I
3 understand this.  Are you disputing that you in fact
4 copied and pasted from Internet websites in the
5 assignment that you turned in, the pathophysiology
6 assignment?
7      A.    No, I'm definitely not disputing.
8      Q.    Okay.  When you got this e-mail, did you
9 have any concerns that Ms. Sperry was lying or being
10 inaccurate in her reference that some of your work
11 appeared to be taken from Internet websites?
12      A.    No.  I, again, just thought for kind of
13 the strangeness that, again, if they can recognize,
14 quote-unquote, plagiarism and it's suddenly a
15 problem, it should have been very easily identifiable
16 in the other papers, because those came directly from
17 the textbooks that these teachers should be very
18 familiar with.  So if they were looking for
19 plagiarism, I was just shocked that my paper would be
20 the one that stood out.
21      Q.    Were you also quoting directly from your
22 textbook in this assignment?
23      A.    I don't recall.
24      Q.    Okay.  Exhibit 4 doesn't reference any
25 concern about quotations or excerpts from the

106

1 textbook; it refers to online sources.  Right?
2      A.    I guess I'm looking for clarification on
3 the difference of how that matters according to APA
4 guidelines.
5      Q.    So I'm not asking about the difference in
6 APA guidelines.  I'm just asking about your
7 understanding of the distinction between the two.
8 The concern that Ms. Sperry raised was about cutting
9 and pasting from online resources, correct?
10      A.    Right.  And I told you my confusion would
11 be why that stood out to them, why that -- yeah,
12 again, stood out to them.  Obviously, they don't have
13 these online sources memorized.  So if they are
14 looking for plagiarism, the most obvious to them is
15 going to be the stuff directly cited from the
16 textbook that was in all the other papers, so why is
17 my paper standing out?  That -- that was my thought
18 process on the confusion of this e-mail, if that's
19 what you're asking.  So --
20      Q.    Okay.  I appreciate that.
21            You mentioned that your understanding is
22 Ms. Sperry took this assignment from Ms. Finney to
23 review it for plagiarism.  Did I hear that correctly?
24      A.    I believe the wording Robin used was
25 Melissa took the assignment and discovered plagiarism

107

1 in it.
2      Q.    Have you at any time discussed with
3 Ms. Finney the interaction she had with Ms. Sperry in
4 how the concerns were discovered or discussed?
5      A.    It came up at the expulsion hearing.
6      Q.    So the meeting the next Monday --
7      A.    Yes.
8      Q.    -- it came up as to how it was discovered?
9      A.    Yes.
10      Q.    What was discussed at that meeting
11 regarding how this was discovered?
12      A.    Like I had mentioned, I had the
13 pathophysiology wrong.  The whole paper was rushed
14 and not to my normal standards as academically as I
15 would normally perform.  So the way Robin explained
16 it in the meeting is she was concerned that maybe I
17 was falling behind from my illness, and she wanted to
18 make Melissa aware so that she could help me stay on
19 track and keep performing at the standard which I
20 had.
21      Q.    Okay.  Attached to this e-mail was what
22 we've previously marked as Exhibit 5, the Student
23 Deficiency Form.  Do you see this Exhibit 5?
24      A.    Yes.
25      Q.    Do you recall this being the attachment to

108

1 the e-mail that's Exhibit 4?
2      A.    I don't recall it being the attachment,
3 and I do believe this is what I was shown in the
4 hearing.
5      Q.    Okay.  Going back to Exhibit 4, do you see
6 that it references a PDF attachment, "Nicole G
7 Student Deficiency"?
8      A.    Yeah.  I mean, I'm definitely not doubting
9 it.  I'm taking your word for it.  But do I
10 specifically recall it, no.
11      Q.    Okay.  And in here the student deficiency
12 plan has an action plan.  "Placed on Level 2
13 probation.  Probation will continue through entirety
14 of nursing program.  Additional offenses require
15 immediate dismissal from the program."  Right?
16      A.    Okay.
17      Q.    Does that help refresh your memory about
18 whether this meeting that you had on Monday was to
19 make a determination about expulsion or --
20      A.    It doesn't change what I heard Susan say.
21      Q.    And you're positive that that's what you
22 heard?
23      A.    As positive as I can be years later.  But
24 yeah, it was a pretty descript thing.  And, again,
25 I'm kind of surprised to see, if this hearing was to



109

1  determine what was going to happen, then why was it
2  determined on the 25th?  And so you're saying, or
3  what you're alluding to is that this hearing was to
4  determine probationary status, things like that, but
5  it looks like they determined that well before this
6  hearing.  I was told it was an expulsion hearing.
7  Possibly in the meantime, these were the
8  repercussions.  But I know specifically that Tim
9  Dailey and Francisco Saldivar stopped my expulsion
10 from happening.
11      Q.    How do you know that?
12      A.    Because they told me they were stopping my
13 expulsion from happening.
14      Q.    When did they tell you that, those people?
15 Before the Monday meeting?
16      A.    Yeah.  So Tim Dailey, I spoke with him --
17 well, first I went directly to his office after I
18 left Susan's office after she said "expulsion
19 hearing."
20           The first time I went to his office I
21 wasn't able to meet with him.  I spoke with his
22 secretary, Julianna, I believe her name was, at
23 length about what was happening.  She was very
24 sympathetic.  Scheduled me an appointment with Tim
25 the next day.

110

1           The next day is when I took examples, and
2  then I actually provided an e-mail with maybe four or
3  five examples of class-wide plagiarism for him to
4  review.  Teachers committing plagiarism in their own
5  classes constantly.  I was able to compile with some
6  classmates a pretty hefty file right off the bat of
7  class-wide plagiarism.
8           He told me that he wanted to meet with me
9  and him and Francisco to discuss what was happening
10 with Melissa and everything, but that he was going to
11 stop me from being expelled.
12          That meeting didn't occur.  It couldn't
13 occur, but I received word I believe over the weekend
14 that not to fear, that Francisco and Tim were going
15 to be there at this hearing to make sure it went okay
16 for me.
17          And that's -- Daymon ended up, my
18 ex-husband, being my support person that was allowed,
19 and we arrived the Monday morning for the hearing.
20 They were all meeting already -- Francisco, Tim,
21 Robin, Melissa, and Susan -- when we showed up, and
22 then we were invited to join them after about 10 or
23 15 minutes.
24      Q.    Okay.  Why -- I have to ask.  Why was your
25 ex-husband appearing at the meeting as your support

111

1  person?  And I'm asking, because last I heard in your
2  testimony you had moved to Oregon to escape him.
3      A.    Right.  Like I mentioned, my family and I,
4  comparative to my family, Daymon isn't all that bad.
5  But actually, after our daughter was born, because
6  like I said, my -- we divorced when I was pregnant.
7  So a month after she was born he came up to Oregon to
8  meet her, and then decided that he didn't want after
9  all to not be a part of her life like he initially
10 decided when I was pregnant, and that he wanted to be
11 involved in it.  So over the course of the next year,
12 he came about once a month to visit and then
13 relocated to Oregon altogether.
14      Q.    So by the time you were starting your
15 nursing program classes, Daymon had relocated to
16 Oregon?
17      A.    Correct.
18      Q.    Were you living together at that time or
19 throughout your time in the program?
20      A.    We were.  We were.  I mean, not
21 consistently, but on and off, yes.
22      Q.    Okay.  Did you record that meeting on the
23 Monday morning?
24      A.    The one that I was told I wasn't allowed
25 to record?  No.

112

1      Q.    Did you record any of your interactions
2  with any of the SWOCC administrators regarding this?
3      A.    Much later, like a year after the fact I
4  believe I recorded my last interaction with Tim
5  Dailey, but I'd have to go back in my file and look
6  at it.
7      Q.    Okay.  Again, we have requested any copies
8  of any recordings that you had with any of the
9  defendants in the case.  So if you do have any, I'd
10 like you to give those to your attorney.
11      A.    Yeah, if I can go back and recheck my old
12 file, but I think it was more of a -- nothing of
13 substance in that meeting, so I might not have kept
14 it.  Not a hearing, a quick meeting with him, but I
15 was trying to be more careful and mindful to record
16 every interaction with SWOCC.  But, again, there
17 weren't really many to record, because I was no
18 longer a student.
19      Q.    Okay.  So sometime after you left being a
20 student at SWOCC, you recorded an interaction with
21 Tim Dailey that you may or may not have a copy of
22 anymore.  Correct?
23      A.    Correct.  I will double check for you.
24      Q.    Thank you.  Describe for me your meeting
25 with Tim Dailey prior to the Monday meeting.



113

1        A.    He was very kind, very sympathetic,
2  empathetic to what was happening.  He said that he
3  was getting pretty sick of the bullying in the
4  nursing program and that, obviously, if these
5  examples that I was providing were accurate and
6  correct, he would make sure that nothing bad happened
7  to me.
8        Q.    Did he ask for any additional information
9  from you?
10       A.    He just said have my classmates e-mail him
11 anything that might be useful.
12       Q.    Okay.  So in the April 30th meeting again
13 we have Tim Dailey, Francisco Saldivar, Melissa
14 Sperry, Susan Walker, yourself, and Daymon?
15       A.    And Robin Finney.
16       Q.    And Robin Finney.  Did they review the
17 student deficiency form and discuss what probation
18 meant?
19       A.    Yes.  Yes, I was -- they tried to go
20 through all the things I had done wrong, and I had
21 brought a tablet with a slideshow that showed
22 immediately after that plagiarism from Melissa and
23 plagiarism from my classmates word for word from the
24 textbooks.
25             I believe they explained that her

114

1  plagiarism, Melissa's plagiarism wasn't plagiarism
2  because she was a teacher, and so they don't have to
3  cite their sources.  I'm not sure where the truth
4  lies with that because I heard, you know, otherwise
5  in her deposition.  But I was told that is called
6  like a -- I can't remember, standing consent or
7  something, implied, implied consent on materials.
8  I'm not exactly sure how they phrased it.  So I said,
9  okay, that's -- that's dandy, but it doesn't change
10 the fact that my whole class is doing exactly what
11 I'm sitting here for.
12             And, you know, between the fake
13 assignment, between not letting me take my test
14 early, between having me spend so much time on a fake
15 assignment and it not counting for anything and
16 costing me this much in Robin's class, I feel like
17 I'm being targeted and harassed by Melissa and kind
18 of finally understanding what people were talking
19 about.  But there's -- I feel like there's a target
20 on my back, and I want to be treated fairly as any
21 other student would be.
22             Robin somewhere in there explained what
23 had happened.  And I want to be clear, I also
24 spoke -- Monday morning before this meeting was the
25 first time I spoke with a student named Victoria

115

1  Kalmycova who had been driven out of school by
2  Melissa and Susan the year before, and I guess had
3  played her cards right and took it well and was
4  allowed back in with my class.  Somebody, I believe
5  Stephanie Kyelberg, told me I need to speak with her
6  because our situations were so similar.
7             And so Monday before I went into this
8  meeting, she told me that, you know, it started with
9  Melissa picking at her work and when she tried to
10 stand up for herself, the school kind of circled the
11 wagons.  Susan accused her of being angry and unsafe
12 with her patients, and ultimately she was driven out
13 of the college.
14       Q.    And this is -- is this information you got
15 from Victoria directly --
16       A.    Directly.
17       Q.    -- prior to the Monday meeting?
18       A.    Yes.  And she said she would stand with me
19 and be 100 percent in my corner, because she wasn't
20 going to watch this happen to someone else.
21       Q.    Okay.  Are you still in contact with
22 Victoria?
23       A.    Yes.
24       Q.    When was the last time you spoke with
25 Victoria?

116

1        A.    I spoke with her directly, maybe more than
2  a year.  Commenting on photos or liking photos, like
3  "oh, so cute" or "congratulations" on Facebook maybe
4  once every few months.
5        Q.    Sure.  What other similarities did you and
6  Victoria discuss between her situation and your
7  situation?
8        A.    That's just what stood out, that it just
9  started with Melissa kind of zeroing in on her, and
10 then once that happened there was no hope.  And the
11 more you fight back, the more you're going to get
12 kind of warning.  But that she was in my corner.
13 That was pretty much the gist of the conversation.
14       Q.    And the examples of other instructors and
15 students engaging in plagiarism that you brought to
16 that meeting, those were all examples of people who
17 had copied from the textbook and included it in their
18 either assignments or presentations?
19       A.    Yes.  I'm sure there were others that
20 included online sources, too.  Again, I think this is
21 something that, you know, Brandon, our people who are
22 working with Grammarly and the textbooks right now
23 will have to speak to.  But if you run them through
24 the system, I'm sure you'll find a nice combination.
25       Q.    Okay.  Did you keep copies of what you



117

1  brought to that Monday morning meeting?
2      A.    Yeah.  It should have all been in
3  discovery.
4      Q.    Okay.  It sounds like it's a fair summary
5  to say that by the time of this Monday meeting you
6  were a firm believer that Ms. Sperry was targeting
7  you and treating you different than your classmates?
8      A.    Yes.
9      Q.    Did you feel that any other instructors
10 were doing something similar?
11     A.    No, not until the end of the meeting.
12     Q.    Okay.  And did you express in this meeting
13 an opinion as to why you were being singled out by
14 Ms. Sperry?
15     A.    I did not.
16     Q.    What was the outcome of the meeting?
17 How -- what was your understanding of where things
18 stood at that time?
19     A.    Francisco and Tim said, we're sorry we
20 weren't able to meet with people before the meeting,
21 you know, scheduling conflicts, but we -- we just
22 need you to sign this form about probation,
23 understanding that we're going to have this meeting
24 where we're going to review all of your classmates'
25 work, everything that was sent, anything else you can

118

1  provide, interview your classmates, and then we will
2  make sure this all goes away.  So just be patient
3  with us while we conduct an investigation.  Sign this
4  paperwork and just know that we'll take care of it.
5          And so that was where the meeting seemed
6  to end.  Everybody was just kind of like in cold
7  agreement -- fine, whatever, that works.  And they
8  all stood up but not Susan.  She was shaking and
9  mumbling under her breath.  She started with, Need to
10 call the nursing board.  I need to talk to Liz.  And
11 everyone's already standing and just kind of looking
12 at her weird, and just like, I'm sorry, what was
13 that?
14          And she looked at me, and she was very
15 visibly struggling emotionally.  Maybe anger, just so
16 angry she was shaking.  She almost was tearing up.
17 And she said, You're a very angry person, and I have
18 reasons to believe you're unsafe with your patients.
19          And then Daymon, my ex-husband, chimed in.
20 He's like, Oh, that's so weird.  We just talked to
21 Victoria Kalmycova, and you came up with that exact
22 wording for her last year after Melissa picked a
23 fight with her.
24          And as soon as he said that, Francisco
25 Saldivar basically yelled, shouted at Daymon and I to

119

1  wait in the hallway.  He slammed the door, and you
2  could hear him screaming at Susan.
3      Q.    What was -- you just described a pretty
4  animated demeanor that you and Daymon had, and you
5  described Susan's kind of demeanor, mumbling and
6  mentioning this.  Is that fair to say that you were
7  quite agitated at this point?
8          MR. MARK:  Misstates the testimony.
9      Q.    (By Mr. Reese)  Yeah, let me give you an
10 opportunity.  What was your demeanor during this
11 meeting when Ms. Walker said those things?
12     A.    First, before she said those things, I
13 was -- I was comforted.  I was comforted by Tim and
14 Francisco.  I felt that there was -- this was going
15 to end, that we were going to establish the whole
16 nursing program needed -- if they wanted us to do APA
17 standards, that we needed to make that clear and not
18 zero in.  And I just kind of felt like this is about
19 to end in a good way, and then maybe we can all just
20 get back on track and leave it all behind us.
21          So I was calm.  I was pretty happy with
22 the way the meeting had went.  I was pretty shocked.
23 Because, like I had described, Susan had a cold
24 demeanor when I went to her after class when my
25 grades were changed, when she said I couldn't bring

120

1  an attorney.  But overall, I still didn't think that
2  she was against me or anything.  I very much felt
3  that she was trying to figure out what was happening
4  in the same way I felt everyone else was.  It wasn't
5  until that moment he shouted.
6          So it was -- it's amusing to me to hear
7  her talk now about my emotions or tone of voice,
8  because I was genuinely taken back by that whole
9  outburst, and she was visibly very, very upset and in
10 a shocking way.  Like, I don't know really how to
11 explain it except it was pretty shocking.
12          And then, again, she was mumbling under
13 her breath a little bit wild.  Like, it was wild to
14 see.  She's just searching.  I can only explain what
15 I'm seeing.  I can't explain what she was
16 experiencing.  But it was pretty shocking.  And then
17 she's like, something about calling the nursing
18 board, she needs to interview or talk to Liz.
19          And then I'm like, Wait, what?  And
20 everyone is just kind of staring at her, and I'm
21 like, What are you saying, Susan?  Because she's
22 still sitting.  And then she just puts her fist down
23 and looks me in the eye and, I have reason to
24 believe -- you're a very new person.  I have reason
25 to believe that you're unsafe with your patients.

121

1        And I was shocked.  I didn't say anything.
2   I didn't have a response because I was, like, more
3   shocked by her demeanor, still trying to catch up
4   with her words.  And immediately my ex-husband chimed
5   in.  He's like, We just talked to Victoria, same
6   exact line.  Like, that's --
7        And then Francisco, I guess before he --
8   I'm still processing while all these people are
9   responding at this point.  So Francisco immediately
10  told us to leave the meeting, slammed the door,
11  started screaming at Susan.
12       Q.    Okay.  You mentioned several times that
13  you weren't allowed to bring an attorney to this
14  meeting.  Did you want to bring an attorney to this
15  meeting?
16       A.    Absolutely, yes.
17       Q.    Why?
18       A.    Because I had already caught on that this
19  was not going to be a very fair or clear or concise
20  situation because of the fake assignment.  Again,
21  trying to take my test early.  It had already been so
22  discombobulated and just, it's kind of like
23  intentional chaos.  So I wanted to make sure that I
24  was being as protected as possible, because it
25  already had become clear to me that Melissa was very

122

1   good at what she was doing and I was making it harder
2   for her, but I needed to be very careful.
3        Q.    Had you hired an attorney to represent you
4   at this point?
5        A.    No.
6        Q.    When did you hire the attorney out of
7   Eugene to assist you?
8        A.    Pretty quickly.  I had spoken with him
9   probably the first week after this hearing or before
10  this hearing -- no, after.  It was after.  I didn't
11  retain him until much later when it was clear that
12  SWOCC wasn't going to do what they promised and that
13  they were never going to step up and protect me from
14  what was happening.
15       Q.    And is that Steve Baldwin you're talking
16  about?
17       A.    Yes.
18       Q.    Okay.  Let's take a look at the document
19  Bates labeled SWOCC 2787, which we'll mark as
20  Exhibit 53.
21             (EXHIBIT 53 WAS MARKED.)
22       Q.    This is an e-mail that you sent to
23  Ms. Finney on the 26th.  So this would have been the
24  Thursday before that Monday meeting, right?
25       A.    Let me just finish reading it before you

123

1   get to your question, please.
2        Q.    Sure.
3        A.    (Witness review the document.)
4             Okay.  Yes, I remember writing Robin this
5   e-mail.
6        Q.    And this was after you had had the series
7   of in-person discussions with Robin the day before?
8        A.    Yes.
9        Q.    What prompted you to send this?  Do you
10  recall?
11       A.    I wanted to apologize and explain myself.
12  I just wasn't getting a sense from Robin that there
13  was any ill will, and I respected her and I wanted
14  her to know that I was sorry for not being very on
15  point with her assignment, that I wasn't coming from
16  a place of malice.  I wasn't trying to cheat, that if
17  we're making an issue of citations that we need to
18  acknowledge it's program wide, et cetera.
19             But mostly I wanted to apologize.  And
20  I -- I just didn't feel like -- I felt like in a
21  sense I had put Robin in the middle and Melissa was
22  putting Robin in the middle, and I felt bad and I
23  wanted to apologize for my role in it.
24       Q.    Did you have any further communications
25  with Ms. Finney between sending this e-mail and the

124

1   meeting on Monday morning?
2        A.    No, not that I -- I mean, if I do, I don't
3   recall her ever even replying to this.
4        Q.    Sure.
5        A.    So -- yeah.
6        Q.    All right.
7        A.    I don't know if that was a response, or
8   was mine the last one?  I don't know if she responded
9   to that.  I don't recall.
10       Q.    Okay.  Let's take a look at SWOCC 564,
11  which will be Exhibit 54.
12             (EXHIBIT 54 WAS MARKED.)
13       Q.    So this appears to be an e-mail that you
14  sent to Dean Saldivar on May 2nd?  So after that
15  Monday meeting, correct?
16       A.    Yes.
17       Q.    And here you're directing Dean Saldivar to
18  look into Sperry's Rate My Professor website.  Is
19  that right?
20       A.    Yes.
21       Q.    What prompted you to send this e-mail?
22       A.    I'm not sure who told me to look at it,
23  but someone in the midst of all -- one of my
24  classmates mentioned that she had terrible reviews.
25  I looked and added to it myself.  But, yeah, there



---

125

1  was definitely a theme that matched the reputation
2  that I had already been made aware of.
3      Q.   Did you keep copies of any of the
4  information that you pulled off of Rate My Professor
5  at that time?
6      A.   I did not.
7      Q.   Did you keep a copy of whatever you posted
8  on Rate My Professor?
9      A.   No.  It should still be there.
10     Q.   I see here towards the middle of your
11 e-mail you write. "I am absolutely making it my
12 mission to bring change and protect the future
13 student nurses from this horrific experience."
14          What's the horrific experience you're
15 talking about?  Is it being treated differently than
16 your classmates with regard to the plagiarism issue?
17     A.   It is being targeted, you know, the same
18 way Victoria describes, the same thing that was
19 happening to me.  Whatever reason prompts it is, you
20 know, in Melissa's head alone, but she definitely has
21 a theme.  And once I was made aware and saw copies of
22 Victoria's complaints, I understood the reputation
23 that the nursing program had a lot better and why I
24 was given such sound and strong advice to keep my
25 head down, to take their punches, and let them have

---

126

1  their little power trips.
2          I decided at that point that that kind of
3  behavior and what they were trying to pull -- and
4  quite sloppily, I guess, in my eyes -- was not going
5  to -- it wasn't going to work with me, and that they
6  need to understand that you don't just get to decide
7  to destroy someone's life.
8      Q.   You've mentioned several times the fake
9  assignment that you were given that resulted in you
10 being rushed to turn in the assignment that had the
11 plagiarism.  Other than the e-mail exchange that we
12 reviewed, what information led you to believe that
13 the Kaplan remediation was a fake assignment?
14     A.   She told me it was a fake assignment.
15 She -- it's right there.  And she's like, that wasn't
16 the one I assigned to you, so -- and then gave me a
17 zero on it because it wasn't the assignment she
18 claims she assigned -- although, again, it's the only
19 one that showed up, and she pointed me directly where
20 to find the instructions for it.  There's no
21 instructions for a case study where she pointed me.
22 There's instructions for the Kaplan remediation.
23          So, again, I was assigned the Kaplan; I
24 was not assigned the case study.  So the Kaplan was
25 the fake assignment I spent all weekend on, that I --

---

127

1  was for no credit, and the case study was the one I
2  was never assigned that was for credit.
3      Q.   And all of the communications that you had
4  with Ms. Sperry regarding the Kaplan assignment are
5  the e-mail communications, correct?
6      A.   Yes, I believe that is the case.
7      Q.   Let's look at SWOCC 540, which will be
8  Exhibit 55.
9          (EXHIBIT 55 WAS MARKED.)
10     A.   Okay.  Are we just referring to the
11 bottom?  Because I wasn't done at the top.
12     Q.   Yeah.  Let's start with the earlier one in
13 time.
14     A.   (The witness reviews the document.)  Okay.
15     Q.   All right.  Do you recall sending this
16 e-mail to Dean Saldivar on May 7th?
17     A.   I don't recall specifically sending it,
18 but I -- it is from me to him on May 7th, yes.
19     Q.   So this is approximately a week after the
20 Monday meeting you were talking about?
21     A.   Correct.
22     Q.   And was it your understanding leaving that
23 Monday morning meeting that while the deans were
24 looking at your concerns about being treated
25 differently than your classmates, you were still a

---

128

1  student, you were still attending classes, you were
2  still working towards grades in those classes?
3      A.   It was supposed to be that way.  That's
4  not what was occurring.
5      Q.   How was it not occurring?
6      A.   I was no longer being taught in class.  I
7  could raise my hand and be ignored.  My tests were
8  being graded intentionally incorrectly.  I was being
9  harassed by teachers.  Specifically, that's where
10 Pamela Wick comes in.  None of my classmates felt
11 like they were safe talking to me anymore, except
12 maybe the ones that were dealing with their own
13 issues or had their own issues and were a little bit
14 more understanding.  But overall, a lot of my friends
15 said that they loved me and they're still there for
16 me from a distance, but they didn't want to put a
17 target on their back, because very clearly I was
18 being targeted.
19          So, yeah, I mean, ideally life would have
20 continued as it should have, but that's not at all
21 what was occurring.  And it was -- it was torture
22 every day.
23     Q.   Do you have a recollection of what
24 occurred in that first week between May 1st --
25 sorry -- April 31st and May 7th, or are you just



129

1  giving me a summary of your experience at SWOCC after
2  these issues had arisen?
3       A.   At that point, a summary.
4       Q.   Okay.  Do you have a memory of what was
5  going on between that Monday morning meeting and the
6  time that you sent this e-mail to Dean Saldivar?
7       A.   No.  To be more specific about dates and
8  events, I would have to look at e-mail chains and
9  dates at this point to pinpoint specifics for you.
10      Q.   That's fine.  And I don't want you to
11  guess.  I just wanted to see if I can get your best
12  summary of what was going on here.  If you don't
13  recall specifically what was going on that week, it's
14  okay.
15           You do say in this e-mail to Dean
16  Saldivar -- you can see kind of where my pointer is
17  here towards the middle of the second paragraph --
18  you write, "What we're looking at is defamation,
19  harassment and discrimination based on age."
20      A.   Yeah.  I was referring to Stephanie and
21  Victoria on that one.
22      Q.   Okay.  But you're referring to the way
23  you're being treated by Melissa Sperry?
24      A.   As well.  It was kind of all encompassing
25  as to what -- I wasn't initially going to be going at

130

1  this alone.  There were students with other
2  grievances that were brave at first.  And so when I
3  say this is what we're looking at, I'm not
4  necessarily specifying what we're looking at as far
5  as from my situation specifically, but as a whole
6  group that we were kind of approaching it as
7  initially.  So --
8       Q.   Okay.  At this time you were a member of a
9  group.  Let's make sure I know who that group is.
10  It's you, Victoria.  Who else?
11      A.   Stephanie.  Mostly Victoria.  As far as
12  like actually willing to fight fire was me and
13  Victoria.  Stephanie timidly was willing to talk and
14  express her grievances with what she had endured, but
15  yeah, there were people willing.  May, she didn't
16  really have any grievances per se but was willing to
17  discuss like the plagiarism aspect.  And so there
18  were a few people willing to step forward.  So at
19  that point it was just kind of like, I have a lot to
20  give you when you're ready to take it kind of thing.
21      Q.   Okay.  So at the time that you wrote this
22  e-mail, you and Victoria had grievances about being
23  singled out and bullied by Melissa Sperry, correct?
24      A.   Yes.
25      Q.   Stephanie had similar concerns about being

131

1  singled out and bullied but was less enthusiastic
2  about pursuing a complaint, correct?
3       A.   Yes.
4       Q.   And May didn't necessarily have concerns
5  about how she was being treated but agreed that
6  everyone was engaged in the same plagiarism that you
7  had been put on probation for?
8       A.   Correct.
9       Q.   Okay.  And you write to Dean Saldivar that
10  "what we're looking at is defamation, harassment and
11  discrimination based on age."  What are you referring
12  to in that statement to the dean?
13      A.   Again, it was just sort of an
14  all-compassing thing.  But specifically the
15  defamation came down to the claim that I was unsafe
16  with my patients.  That is very serious.  I mean,
17  obviously, one of the few things in this situation
18  that would be more serious than plagiarism, calling
19  me dangerous with patients.  And having spent almost
20  a decade already working closely with patients as an
21  EMT and a paramedic, I understand how important, you
22  know, being a safe provider is.  So that -- that
23  immediately ignited -- when I --
24           Like I said, in the moment I was so
25  shocked by it that I didn't even get to respond; but

132

1  boy, did that really cue me in that I needed to
2  get -- fight back.  I was not going to let someone
3  make me a plagiarist and then also make me unsafe
4  with my patients, because this was already my career.
5  It wasn't something I was just entering into, and I'm
6  not and nor have I ever been unsafe with patients.
7           I know she's very strongly back-pedaled on
8  that, but that's just called perjury.  So -- yeah,
9  but defamation for sure, making a completely false
10  and un -- yeah, that word.  But, yeah, it was -- it
11  was shocking.
12           So also this week, you said do I remember
13  anything specific.  I do remember one big thing that
14  really also kind of tuned up the -- I don't want to
15  say fight, because I was trying to prevent it from
16  being a fight the whole time -- but took things up a
17  notch was Susan not only making that claim, but then
18  she showed up the following Tuesday after that
19  meeting to my clinical location at Coquille Hospital,
20  which had never once occurred before.  Took Liz
21  Cooper away and interrogated her for almost two
22  hours, trying to prove or get Liz to back her up on
23  the claim that I wasn't safe with my patients.
24           So it wasn't just a passing, hey, Liz, is
25  Nicole safe with her patients?  She interrogated her



133

1  two hours straight.
2      Q.   How did you come to learn of this two-hour
3  interrogation?
4      A.   Liz came to me immediately after she was
5  done.  She was very upset.  She said that she really
6  didn't want to be put in the middle.  She was visibly
7  upset.  She said, not to worry, I told her the truth,
8  that you're great with your patients, that you have
9  an amazing bedside manner, and that you're very safe.
10  I'm not --
11      Q.   Let me understand the concern about being
12  accused of being unsafe with patients.  We have what
13  you heard Ms. Walker state in the Monday morning
14  meeting, correct?
15      A.   Correct.
16      Q.   Outside of hearing her say it there, have
17  you heard Ms. Walker accuse you of being unsafe with
18  patients at any time?
19      A.   Yes.
20      Q.   When?
21      A.   I had a meeting.  It was supposed to be,
22  my understanding, an advisory meeting with Susan
23  Walker.  I believe maybe I asked Francisco Saldivar
24  to be there, or she did.  But either way, it was
25  concluded that I definitely did not want to be alone

134

1  with any of my teachers, like I previously mentioned,
2  that I needed to protect myself moving forward.
3      So Francisco was there, but this is also
4  when I saw the shift with him, because at this
5  point -- I was still waiting at this point
6  impatiently for him to do what he had promised to do
7  all along but he kept putting off, and that was to
8  review the materials, speak to my classmates, and
9  clear me of any wrongdoing.
10      Instead, we had a meeting with him, Susan,
11  and myself, and they said in order to alleviate the
12  concerns that I am still unsafe with my parents, they
13  wanted me to submit to a practical exam, like with a
14  mannequin.  I believe she described it as a make-up
15  in her deposition.
16      That's completely false.  It was never
17  described as anything graded.  It was never described
18  as a make-up exam.  It was very clearly stated by her
19  and Francisco that to alleviate any concerns about
20  the claim that I am unsafe with my patients, I am to
21  submit to a practical exam to the person making the
22  claim -- Susan -- so that she can decide if she can
23  substantiate her own false claim or not.  And, of
24  course, I said I would not be doing that.
25      Q.   Okay, let's go back to Exhibit 55.  Here

135

1  you are saying that it's defamation, which you've
2  explained, harassment and discrimination based on
3  age.  You go on to point out that although he may not
4  have noticed, all of the students that these women
5  target are 30 and above.  So we're talking about you,
6  Victoria, and Stephanie all being students above the
7  age of 30?
8      A.   I believe Stephanie pointed out quite a
9  few more examples.  Stephanie is 50's, business owner
10  in Coos Bay, and born and raised, very much
11  intertwined with the community.  Her and her husband
12  are pretty well to do.  Pretty much know everybody,
13  know everything that happens in the town kind of
14  people.
15      So she -- she's the one who I believe
16  developed the pattern.  And I think she even quoted
17  as much into my story talking about feeling targeted
18  for her age and that I took the attention off of her,
19  and so on and so forth.  That was Stephanie's input
20  on that article.
21      Q.   Okay.  You go on to let Dean Saldivar know
22  that if this isn't resolved by lunch today, you'll be
23  forced to contact the board of education, the media,
24  your attorney, the nursing board, and anyone else
25  that you believe can help.  Did you in fact contact

136

1  the board of education at some point?
2      A.   Yes.
3      Q.   That's also the Department of Education?
4      A.   Yes.  I contacted everyone.
5      Q.   Okay.  Do you recall when you made a
6  complaint to the Department of Education?
7      A.   I don't recall the specific dates, no.
8      Q.   And you made a complaint to the nursing
9  board, correct?
10      A.   Correct.
11      Q.   What was the result of the complaint, your
12  complaint to the nursing board?
13      A.   They came and said they were investigating
14  rampant plagiarism and harassment.  Eventually --
15  well, Nancy Ireland was the first person.  She came
16  and said that -- I think her ending comment to
17  Victoria, this would be hearsay, but was that she's
18  shocked at what she found and that we have nothing to
19  worry about; these teachers aren't going to be there
20  anymore.
21      What actually ended up happening, through
22  a series of different people becoming involved and
23  certain things I can't speak about because of
24  client -- attorney-client privilege with Kevin Gregg,
25  but -- yeah.  Eventually, they said there was no



137

1  wrongdoing.  I actually recently talked to the
2  nursing board and actually the manager of the
3  investigations department, and I've been contacted
4  about reopening the case.
5      Q.   Have you submitted any documentation with
6  the goal of getting the case submitted?
7      A.   I gave them the document from the school
8  admitting that I was cleared of -- that there was
9  rampant plagiarism, that I possibly was a victim of
10 harassment, although it was quoted as
11 misunderstanding as far as the fake assignment goes,
12 but that, yeah, I was being singled out and that I
13 should be returned to good standing.  But just, yeah,
14 from the horse's mouth.
15     Q.   Let me pull up here -- this is PL-0076,
16 which will be Exhibit 56.  This is a document I got
17 from your attorney in discovery.  And it looks to me
18 to be a printout of a communication between you and
19 Dave Bowman with the state.
20          (EXHIBIT 56 WAS MARKED.)
21     A.   Yes.
22     Q.   Is that right?
23     A.   Yes.
24     Q.   What is this?
25     A.   Well, as soon -- Leslie Kilborn was the

138

1  investigator running the show.  Her investigation was
2  taking a very long time.  But as soon as my prior
3  attorney and I decided to link Department of Human
4  Services and the social worker who took my children
5  to the case, I sent that information to the nursing
6  board.
7          Within an hour of receiving that
8  correspondence, Dave Bowman e-mailed me and said that
9  he was taking over the investigation for Leslie
10 Kilborn and that he specifically did not want me to
11 send any evidence about DHS or anything to him, and
12 that he would be in contact if he wanted anything
13 else, and then he found no wrongdoing.
14     Q.   (By Mr. Reese)  And here you're writing,
15 "I guess we now know how high the corruption goes."
16 Are you accusing Mr. Bowman of corruption?
17     A.   I'm saying that I have belief that once my
18 prior attorney linked DHS to the case against the
19 school that the case possibly could have been
20 interfered with on a state level, because now it
21 implicated really serious things like kidnapping
22 children to bury lawsuits.
23     Q.   What do you mean "kidnapping children to
24 bury lawsuits"?
25     A.   I mean that the social worker who took my

139

1  children, Lydia Casas, was friends with the
2  defendants.  I saw her meeting with Dean Saldivar
3  when I showed up too early one day.  She was a SWOCC
4  alumni.  Her office used to be on the SWOCC campus.
5  She was friends with a lot of people who worked at
6  SWOCC.  And then the case she, like, built up against
7  me immediately started with things that SWOCC was
8  looking for getting themselves, like a psych
9  evaluation and calling me crazy or -- you know, then
10 it went on to drug addict.
11          Yeah, "crazy" was a big theme.
12 Immediately wanting a psych evaluation, taking my
13 kids away.  And again, I saw things, like her meeting
14 with the dean himself.  And her investigation was
15 beyond far from ethical, and I can irrefutably prove
16 a lot of perjury from her.  Working with my ex,
17 Daymon, and telling him that she would help him cover
18 up abuse if you turn witness against me.  These are a
19 lot of things, too, that, like, Daymon won't have to
20 be deposed or things like that.  So --
21     Q.   So let me make sure I understand.  It's
22 your belief that representatives of SWOCC either
23 worked with or encouraged DHS employees to -- on how
24 they would evaluate your custody situation with
25 Daymon?

140

1      A.   He told me specifically that's what was
2  said.
3      Q.   Who told you that?
4      A.   Daymon.  That the social worker, Lydia
5  Casas, the SWOCC alumni person, specifically said
6  that she would overlook the violence against him and
7  make me out to be crazy as long as he became a
8  witness against me.
9      Q.   Okay.  But you're also -- your belief is
10 that somehow SWOCC employees, it sounds like
11 specifically Dean Saldivar, had some impact on your
12 DHS hearing?
13     A.   I believe that, yes.
14     Q.   What leads you to believe that, other than
15 what you just told me?
16     A.   Other than seeing them meeting, lying
17 about that meeting, all of the connections she had,
18 the way that she built her case, and just against --
19 it just made no sense.  Directly putting my children
20 in harm's way, sacrificing them, if anything, in
21 order to make a case against me.  There was just --
22 eventually my attorney said something along the lines
23 of nobody works as hard to discredit someone unless
24 there is an ulterior motive, and it's very clear that
25 the discrediting you is this person's top priority.



141

1        And my children had to be removed from
2  their situations specifically for being abused and
3  neglected and -- okay, I'm sorry.
4        Yeah.  So they had to remove my children
5  from the places that I said they were unsafe, because
6  it turns out they were unsafe.
7        Q.    And it sounds like the information you
8  have connecting SWOCC to your DHS matter is your
9  observation of Dean Saldivar and Lydia Casas being
10 together at some point?
11       A.    That was the first time that I -- I felt
12 it to be the case, yes.  When I saw them together and
13 their reaction, not just him being there, but their
14 reaction to them seeing me see them was very
15 startled.  He turned white as a ghost, very startled,
16 shaken.  And this is someone that I'd been talking to
17 on and off frequently.  So just seeing me, he had no
18 reason to be startled, but seeing him walking out of
19 her office and seeing him was enough to really throw
20 him for a loop, for sure.
21       Q.    But you observed Dean Saldivar walking out
22 of Lydia Casas's office with Lydia Casas?
23       A.    I saw her --
24             MR. MARK:  Can we get a time here?
25       Q.    (By Mr. Reese)  I'll ask the time, but I

142

1  understand this is one was occurrence.  Right?
2        A.    Yes.  It was on July 19th, my daughter's
3  second birthday.  I showed up at DHS probably
4  45 minutes early because I didn't live in town.  I
5  lived outside of town and I was in town running
6  errands.  And I finished the errands early, so I
7  decided I'd just wait in the office and read a book
8  until my appointment.
9             When I was walking in, Saldivar was
10 walking out.  He saw me first, I saw him first.  I
11 walked through the door.  There was Lydia like she
12 had just maybe walked him out.  I can't say for sure.
13 We subpoenaed the video footage, which apparently
14 doesn't exist, even though there's cameras all over
15 that place.
16       Q.    What building are we talking about?
17       A.    The Department of Human Services building,
18 child services.
19       Q.    In Coos Bay?
20       A.    Yes.
21       Q.    And July 19th, 2018?
22       A.    Yes.
23       Q.    Okay.  All right, let's get back to -- I
24 guess I should say -- well, no.
25             You also filed a complaint with the

143

1  Department of Education.  What's your understanding
2  of the outcome of that complaint?
3        A.    They never launched an investigation.
4        Q.    Did they ever explain why?
5        A.    I -- I don't recall.
6        Q.    And did you meet with representatives of
7  the nursing board as part of their investigation?
8  Ms. Ireland --
9        A.    Only -- only Nancy Ireland, only the
10 initial investigator.
11       Q.    Okay.
12       A.    They never interviewed me ever,
13 individually, or past her initial group interview of
14 myself and my classmates all together.
15             MR. REESE:  All right.  Let's take a
16 ten-minute break and come back at -- it'll be
17 three o'clock your time.
18             THE WITNESS:  Sounds good.
19             (Recess from 2:49 p.m. to 2:59 p.m.)
20       Q.    (By Mr. Reese)  All right, we'll share the
21 screen here.  Can you see the screen share here?
22       A.    Yeah.
23       Q.    Is it on the PDF?
24       A.    It's triggering my OCD just a bit.
25       Q.    Am I sharing the wrong screen?  Is it the

144

1  PDF you can see, or are you looking --
2        A.    No, I can see the screen share now.  I
3  just meant initially your desktop is very full.
4        Q.    Yeah.
5             MR. MARK:  What we can see is what you're
6  trying to share.
7             MR. REESE:  You can?
8             MR. MARK:  No.
9             MR. REESE:  Oh, that's what I was afraid
10 of.  One second.  Is that better?
11             MR. MARK:  Perfect.
12       Q.    (By Mr. Reese)  All right.  This is SWOCC
13 00480, which will be Exhibit 57.
14             (EXHIBIT 57 WAS MARKED.)
15       Q.    I understand that probably the day before
16 this e-mail, so May 15th, you had an exchange with
17 Pam Wick in class.  Is that right?
18       A.    Yeah -- no, it was not in class.
19       Q.    Where was it?
20       A.    In her office.
21       Q.    Okay.  And this is referring to that
22 interaction?
23       A.    Yes.  I felt like I sent the e-mail that
24 same day though, if I remember correctly.  So it
25 wasn't the day before, it would have been on this



145

1  day.  Which makes sense, because it was sent on
2  Wednesday and the lectures were Wednesday, and this
3  occurred -- the incident with her occurred after the
4  lecture on Wednesday.
5      Q.   Okay.  And in here you end the e-mail
6  with:  "The formal complaints I've filed with the
7  board of nursing are against Susan and Melissa.  I'm
8  happy to include you too if you don't stop skimming
9  my grades."  Is that what you wrote?
10      A.   Absolutely.
11      Q.   So the complaint with the nursing board
12  that had been issued sometime after that Monday
13  meeting and before this e-mail, you had only
14  complained about Melissa and Susan.  Right?
15      A.   Absolutely, yeah.  And I didn't -- I
16  actually really liked Pam.  I was very
17  disappointed -- like, you know how I said Robin kind
18  of -- Robin and Liz obviously were not okay being put
19  in the middle.  They really wanted nothing to do with
20  it.  Pam was, unfortunately, the opposite.  She
21  really, really wanted to get in with Susan and
22  Melissa's little club or however she chose to see
23  that, and was very excited to join the fight against
24  me, as she made clear before I sent her this e-mail.
25          I believe what Susan was referring to with

146

1  emotional outbursts was a little bit more deflecting.
2  The only two people to yell in this entire time were
3  Susan and Pam.  And as far as standing over someone,
4  she's referring to this incident.  I know that Susan
5  is referring to this incident, because they really
6  tried to twist what Pam did to me into being my
7  problem.  Gaslighting pretty much has been the name
8  of the game.
9          But yeah, Pam, this incident, she -- I
10  noticed my grades were going down with her very
11  quickly, and I never once asked to review a test.
12  You can't -- you don't get your tests back.  You
13  don't get to see your tests after they're graded
14  unless you go in right after lecture and review the
15  test in person with the teacher.
16          Knowing that there is no explanation for
17  my grades to suddenly drop, if anything, I was
18  working that much harder to come back from the
19  deficit from the zeroes and the docking and
20  everything that was happening, so I was studying
21  harder.  So to see my grades going down clued me that
22  something might be wrong with Pam, and I asked my
23  classmate Joseph Nielson to accompany me to Pam's
24  office.
25          I reviewed the tests, and there were

147

1  several, several, several answers marked wrong that
2  were correct.  So she would mark it wrong and then
3  put C as the correct answer right next to where I
4  marked C, and she had marked it wrong and minus one
5  point and minus one point.
6          And at first when I was -- I mean, I was
7  being pretty friendly and casual, just kind of like,
8  oh, Pam, I think you made a mistake.  And she just
9  went (indicating) -- okay.  And just kind of annoyed.
10  And I finally get to the end of the test, and I think
11  there were five or six or seven answers marked wrong
12  that were incorrectly marked wrong.  And so I said
13  something like, "So you're going to fix this?"  She's
14  like, "I'll put it in the book."  And I said, "Are
15  you going to fix it in the computer, too?"  You know,
16  because doesn't make any sense.  It doesn't actually
17  change my grade if you're not fixing it in the
18  computer.
19          And she said, "Yeah," just exasperated and
20  just like, "Okay, that should help."  And then she
21  got -- she did this little cackle.  She's like,
22  "Ah-hah-hah, that's not going to help you nearly
23  enough."
24          And I'm like -- like nothing can help you,
25  nobody can help you.  I'm like, the dean's going to

148

1  help me.  The dean and the vice president are going
2  to help me.  And she's like, "We have what's called
3  freedom.  They can't change our grade.  We only
4  answer to the nursing board."
5          And at this point I'm walking.  I had
6  stood up when she did the cackle.  I was making my
7  exit, because I wasn't about to be a part of that.
8  It very quickly turned into, you know, making fun of
9  me, and no one's going to help me, no one can help
10  me.
11          So as I was exiting the office, pretty
12  far, maybe like seven or eight feet from the desk in
13  front of her, or the chair in front of her desk was
14  were I was sitting.  Got up, did not walk towards
15  her, walked to the door.  She said, "We only answer
16  to the nursing board."  I turned around in the
17  doorway and said, "It's a good thing I got them
18  involved, too," and then continued down the hallway.
19          That was turned into I stood over her, I
20  yelled, I screamed.  And there are just witnesses
21  that can absolutely debunk that.  So we're good.
22      Q.   Okay.  Did you ever contact the nursing
23  board to include a complaint that Pam Wick was also
24  singling you out and harassing you?
25      A.   Immediately this night of this encounter I



149

1  e-mailed Pam, I e-mailed the nursing board, I
2  e-mailed Dean Saldivar and Tim Dailey. I'm pretty
3  sure I just covered bases of all the people who were
4  involved in the encounter, because she had chosen to
5  insert herself into this without anyone asking her,
6  too. I mean, at least to my knowledge, no one asked
7  her to.
8       Q.   Did you keep the e-mails that you have
9  sent to the nursing board over the years?
10      A.   They're in the files, my files. I haven't
11 viewed them in years. So, I mean, I just know that a
12 summary of what happened was included in the e-mail
13 to the nursing board, yes, immediately following this
14 incident.
15      Q.   Okay. I don't believe I received any
16 e-mails from you to the nursing board, so I'll want
17 to make sure you get those to your attorney, please.
18      A.   He has -- we have them. That was sent.
19 It should have been sent with Kevin's stuff, because
20 it's in the initial round. Yeah, you definitely
21 should have that, but we will -- we will -- it should
22 have been in your first batch of discovery right with
23 the first file. Pretty sure.
24      Q.   It's certainly possible I missed it.
25 There was a lot of paper that was provided.

150

1       A.   Let me add it to the list. So I have
2  transcripts, possible video with Tim, and you want
3  e-mail to nursing board regarding Pam. Got it.
4       Q.   Now, after this interaction and for the
5  remainder of May, I understand you remained in e-mail
6  communication with Dean Saldivar and Tim Dailey.
7  Correct?
8       A.   Yes. It was pretty much I would show up
9  to our meeting, our scheduled meeting where we were
10 finally going to review everything and clear my name,
11 and one of them would not be there and there would be
12 some lame excuse. And that happened maybe three or
13 four times. We scheduled a meeting, it didn't
14 happen; scheduled a meeting, didn't happen.
15      I went to Tim and an impromptu meeting
16 after that meeting I had with Saldivar and Walker
17 where they tried to get me to submit to a practical
18 exam at -- again, specifically inferring that it was
19 to ease -- ease the concern that I was unsafe with my
20 patients. I refused to do it.
21      I also went to Tim Dailey on that occasion
22 and told him. Elaborated more on what Melissa had
23 said about the classy women, confided in him about my
24 past and told him, look, this is why I think this is
25 happening; and I didn't want to out myself, but I've

151

1  been trying to do things the right way, but things
2  aren't being done the right way, and I believe this
3  is why this is happening. And I -- I still --
4       I mean, like I said, until that point I
5  thought Saldivar was on my side, too, and to have him
6  in a meeting with Susan Walker, somebody he screamed
7  at for making that claim, and now he's sitting there
8  with her saying that I should submit to an exam with
9  her to satisfy this bogus claim was shocking to me
10 that he participated.
11      So at that point, I guess I still hoped
12 that Tim Dailey was someone to be counted on, maybe.
13 So I went to him after that meeting and had a
14 conversation about -- more details about what was
15 happening.
16      Q.   So that meeting between you, Ms. Walker,
17 and Dean Saldivar, that occurred on May 23rd, right?
18      A.   I'd have to look at the e-mails to be
19 sure, like I mentioned before. I can compare it to
20 an e-mail --
21      Q.   Let me pull up what's Bates SWOCC 00120,
22 and we'll mark it as Exhibit 58.
23      (EXHIBIT 58 WAS MARKED.)
24      A.   (The witness reviews the exhibit.)
25      I don't know that that happened. The

152

1  e-mail that I can relate to the meeting with Walker
2  and Saldivar was specifically to Saldivar later in
3  the day about my surprise, I guess, about I thought
4  this was an advisory meeting, I feel like subjecting
5  to a practical examination would be further
6  harassment to a derogatory claim that has no merit,
7  something along those lines.
8       Whatever date that says is the day that
9  Walker and Saldivar met me -- with me and also the
10 day that I went to talk to Tim Dailey.
11      Q.   When you met with Tim Dailey, you
12 disclosed to him that you believed Ms. Sperry was
13 singling you out because of your past, you said?
14      A.   I -- I -- something I had suspected pretty
15 much from the moment she made that comment about it
16 takes a classy woman to be a nurse, unclassy women
17 shouldn't be nurses; but I had chosen to keep very
18 quiet about it because if that were not the case, it
19 was obviously something I was very embarrassed about
20 and wanted to keep quiet. So I wasn't going to go
21 saying, yes, this is what I think when I didn't have
22 any evidence that that was the case. But when
23 Saldivar joined Walker in -- in making such a bold
24 request when he had specifically said that he wasn't
25 going to give that accusation the time of day.



153

1        After that -- let me rewind a little
2   bit -- meeting where Susan made that claim, after the
3   hearing, I guess you could say, Tim Dailey and
4   Francisco Saldivar took Daymon and I back to Tim's
5   office, and we had a big discussion about what Susan
6   had just said.  And he made it clear that that was
7   the last time it would be spoken about.  She had no
8   right to make that claim, so on and so forth.
9        So he's now basically joining her and
10  wanting me to submit to her, the person lying about
11  this and the ability to grade me on a practical
12  examination, one that I had just passed at the end of
13  every term just like everybody else, and I wasn't
14  going to do that.
15       So that's when I started being like, okay,
16  there's just no rhyme or reason to what's happening
17  here.  First it was plagiarism, then it's something
18  with patients.  And it's anything to make this my
19  fault, anything -- anything to just get me out.  And
20  somehow more and more people are climbing on board
21  with that, you know, when it should just be an easy
22  resolution.
23       I'm offering here to sign a nondisclosure
24  agreement.  I'm offering to never discuss what they
25  were doing to me.  I'm making it as easy as possible

154

1   while still letting them know that I will fight tooth
2   and nail, that they're not going to just take my life
3   from me.  I worked too hard to get there.
4        So that -- it's at that point I really had
5   nothing to lose.  I saw where this was going, that
6   they were going to get me out no matter what after
7   that meeting, and I had nothing to lose by sharing my
8   concerns with Tim Dailey about why I thought this was
9   happening.
10      Q.   Okay.  And where did this meeting take
11  place?
12      A.   In his office.
13      Q.   And you don't remember exactly what day it
14  was, but you remember it was shortly after the
15  meeting with Saldivar and Walker?
16      A.   I'm pretty sure it was the same day as
17  that meeting with Saldivar and Walker.
18      Q.   Okay.  And it's at that meeting that the
19  light turned on in your head and you thought, "I'm
20  being singled out because of my past in adult films"?
21      A.   No, it wasn't that day that the light
22  turned on in my head.  Again, my first inclination or
23  suspicion that that is what Melissa was referring to
24  was when she said it in her office to me when she
25  called me unclassy.

155

1       Q.   Okay.
2       A.   That was my first hint.  I didn't share
3   that with anyone at the school until it became clear
4   that by any means necessary they were going to
5   destroy my academic future.  That is when -- that
6   realization came -- that's when the light came on
7   on that that was going to be the case when Francisco
8   Saldivar completely flipped his position.  He still
9   hadn't tried to clear me.  He'd very much stated to
10  Daymon and myself that he was never going to give an
11  accusation of me being unsafe with my patients the
12  time of day, she said it out of turn, I had nothing
13  to worry about; and now here he is sitting in front
14  of me to ease that concern that isn't actually a
15  concern, as my lab instructor already very much made
16  clear that I'm completely safe with my patients.
17       Now he's sitting here asking me to submit
18  a practical to Susan.  Like, let her, this woman who
19  is on the warpath and making such a bold and false
20  accusation, submit a test to her.  And I said, that's
21  not happening.
22       So to see him flip, and it's just -- and
23  to see the -- just amount of dedication that these
24  people were showing in coming after me and not -- not
25  following through and just adding and stacking and

156

1   adding and stacking, and things were getting worse
2   and worse instead of better and better.  At that
3   point it's like, yeah, you need to just go talk to
4   Dailey.  You have nothing left to lose.  You're
5   basically going to be out either way, it's looking
6   like, so you need to share your concerns, you need to
7   vocalize why you think this is happening so that, you
8   know, they can hopefully look into it and understand
9   that they don't want to be a part of it.
10      Q.   So you go and you talk to Mr. Dailey; you
11  disclose to Mr. Dailey that you as a teenager had
12  worked in adult films and that you believed the
13  reason you were being singled out and treated
14  differently than your classmates was Ms. Sperry's
15  feeling about that past?
16      A.   Yes.
17      Q.   And did you ever tell Ms. Sperry yourself
18  about your history in adult films?
19      A.   Only the fear when I had the falling out
20  with Jessica, because Jessica is the only one at the
21  college that I told.  And she turned out to be a bit
22  more vindictive or gossipy than maybe I originally
23  gave her credit for when we first became friends, I
24  guess weaker character than I initially anticipated
25  from her.  And we lived -- like, we lived together,



157

1  basically.  We lived trailer by trailer.  We drove --
2  we both were in Coquille, so we carpooled -- we were
3  very, very close, but there were just cracks in her
4  facade and we ended up having a big falling out.
5        And I tried to I guess prepare Melissa in
6  case Jessica decided to throw out that huge kind of
7  curve ball, so my e-mails to Melissa were me being
8  very not wanting to discuss it, but also maybe trying
9  to prepare her or the nursing program that something
10 might be coming.  It never got that far, and I never
11 ended up having a specific discussion with Melissa
12 about adult films or anything specifically.  Just
13 what you saw in those e-mails.
14       Q.    I'm going to try to clarify some things,
15 and I'm going to do this with hopefully yes-or-no
16 questions, just to keep us on the same page.  I've
17 put up on the screen what we previously marked as
18 Exhibit 30, and it's an e-mail from you to Ms. Sperry
19 dated March 14th, 2018.  Do you see that?
20       A.    Yes.
21       Q.    And is this the e-mail that you're
22 referring to where you gave Ms. Sperry a heads up
23 that you had had a falling out with Jessica and that
24 she was aware of some things from your past that you
25 weren't proud of?

158

1        A.    Yes.
2        Q.    And you confirmed earlier that this e-mail
3  communication is the extent of your conversation with
4  Ms. Sperry about that issue.  You never had any
5  in-person conversations with her about it?
6        A.    Correct.
7        Q.    And it's an accurate statement that the
8  only person associated with SWOCC who you told about
9  being in adult films as a teenager was Jessica.
10 Correct?
11       A.    Not -- when you say "associated," that's
12 too much of a broad term.
13       Q.    Let's say you never told any faculty
14 members about your history in adult films, correct?
15       A.    Correct.
16       Q.    You never told any administrators,
17 correct?
18       A.    Correct.
19       Q.    Okay.  Now let's go with classmates.  Any
20 other than Jessica?
21       A.    No.  I know that I had written about
22 modeling I think at some point in a paper in
23 undergrad, but I was very careful not to say what
24 type.  Just, it was in reference to traveling and
25 things like that, or just my experience.  But it was

159

1  a couple years of my life that was eventful and --
2  but getting into the specifics, no, you're correct, I
3  did not.
4        Q.    And the first time that you told anyone at
5  SWOCC, any faculty member or administrator, is when
6  you met with Mr. Dailey in this meeting we were just
7  talking about.  Correct?
8        A.    Correct.
9        Q.    Now, earlier in this litigation process I
10 had sent you some interrogatories asking about why
11 you believe Ms. Sperry was motivated by your past in
12 adult films and how she treated you with regard to
13 your grades and your assignments, and the response I
14 got was that you believed an estranged family member
15 must have passed along that information or could have
16 passed along that information.  Do you recall that?
17       A.    Yes.  My -- I specifically heard my
18 brother-in-law admit to doing so.
19       Q.    Who's your brother-in-law?
20       A.    Allen Ryan Moon.
21       Q.    What did Ryan Moon admit?  Did he tell
22 someone at SWOCC?
23       A.    He said that he bribed my niece into
24 telling the nursing program.  He didn't elaborate on
25 who she told or anything like that.  But as we went

160

1  back to press him later, as my legal counsel and
2  himself, he denies having any involvement.  So
3  whether he was -- I, again, heard it firsthand, but
4  whether he actually did it or was just -- he's not
5  exactly an honest person, he's a con artist, so
6  there's a possibility he was making it up.  I don't
7  know.
8        Q.    Okay.  And I guess that's the important
9  thing for your testimony today.  You don't know if
10 anyone who was aware of your past told any
11 administrator or instructor at SWOCC about it before
12 you talked to Tim Dailey about it, correct?
13       A.    I only -- I only know that he confessed to
14 it, but I don't know that that would be the truth
15 because he's saying something else now, so I'm not
16 sure which one's true.
17       Q.    Sure.  Mr. Moon, the con artist, told you
18 that he bribed your niece -- is that Cindy Nathe?
19       A.    Nathe.
20       Q.    N-a-t-h-e, to disclose this to someone at
21 the nursing department; but you have no idea if
22 that's true or not, right?
23       A.    Correct.  And he didn't tell me -- he was
24 on speakerphone.  He didn't know he was on
25 speakerphone.  He told Daymon.  First, my family told



161

1  me that Daymon had done it, then once Daymon -- once
2  I got custody of Piper and Daymon and I had to start
3  co-parenting again, I specifically told him I would
4  never forgive him for telling the school about my
5  past.  And he's like, That doesn't even make sense.
6  Why would I sabotage you?  We were basically a family
7  unit when all of this occurred; why would I hurt you?
8  It doesn't make sense.  Think about it.  It was your
9  family.  They admitted to me that they did it.
10              I'm like, okay, I don't even care.  I
11  just -- I don't even care.  You both are pointing
12  fingers at each other.  Basically you can both F off
13  on the subject.  Just forget it.
14              He was like, no, really, I need you to
15  believe me so we can co-parent without there being
16  this tension.  What can I do?
17              And I said, You can call Ryan on
18  speakerphone right now and let me hear him confess to
19  it.  And he did.  He's like, Why is Niki under the
20  impression that I told the school that she had a past
21  in porn?  And he's like, Whatever, dude.  I told her
22  that we did it.  I told her -- you know, you know.
23  It was in retaliation for turning me in to Sause
24  Brothers.  I told her everything.  It's okay.  I
25  never threw you under the bus.

162

1              So I was listening in to him say that.
2      Q.    You heard Ms. Sperry testify earlier this
3  week that -- well, I don't know if you heard or not.
4  Is it your understanding that Ms. Sperry has denied
5  knowledge of your past in porn?
6      A.    Yeah.  I caught her denying a lot, yes.
7      Q.    Other than what you heard from Mr. Moon,
8  do you have any reason to believe that someone told
9  her about your history?
10      A.    Other than that confession, I have no
11  specific hard anything, no.
12      Q.    So I'm putting up on the screen now what's
13  Bates labeled SWOCC 289.  Do you recognize this as
14  the complaint e-mail that you sent to Dean Saldivar?
15      A.    Actually, that was the complaint e-mail
16  that I sent to the state board of nursing.  That's
17  who the intended party was; but yeah, it got sent to
18  Saldivar, too.
19      Q.    Do you recall when you sent it to Dean
20  Saldivar?
21      A.    I don't recall when I sent it to him.
22  Probably right around the same time I sent it to the
23  state board of nursing.
24              MR. REESE:  Let's go off the record for
25  one second.

163

1              (A discussion was held off the record.)
2      Q.    (By Mr. Reese)  Ms. Gililland, I
3  apologize.  I don't have it ready to pull up here,
4  but I do have an e-mail from you to Dean Saldivar.
5  Subject line is "Copy of a complaint."  The
6  attachment is "SWOCC complaint," and I believe this
7  document was sent Thursday, May 24th, 2018.  Does
8  that help refresh your memory as to when you may have
9  sent this to Dean Saldivar?
10      A.    I will absolutely take your word that that
11  is when I sent it to Dean Saldivar, if that's the
12  timestamp on the e-mail.
13      Q.    Great.  Appreciate that.  And was this
14  after your meeting with Tim Dailey where you
15  disclosed your suspicion as to Ms. Sperry's
16  motivations?
17      A.    Again, I'd have to see the e-mail that I
18  sent to Francisco Saldivar immediately following that
19  meeting or sometime that day of the meeting, and then
20  I could tell you if it came before or after.  So if
21  we can find the e-mail that I sent to Dean Saldivar
22  about that meeting and how, I guess, inappropriate I
23  thought it was, then I can say, okay, that's the same
24  day I met with him, and then that may or may not have
25  come before or after the date you just mentioned.

164

1  So --
2      Q.    Okay.  Is it fair to say that this was all
3  occurring within a couple days of each other, one way
4  or another, at the end of May 2018?
5      A.    Very close to each other, yes.
6      Q.    Okay.  I ask that because in this
7  complaint I don't see any reference to concerns that
8  Ms. Sperry was treating you differently because of
9  what you did as a profession when you were a
10  teenager.  Was it omitted for some specific reason?
11  Do you recall why that wasn't brought up here,
12  although you raised it with Mr. Dailey?
13      A.    Again, I was very careful not to bring it
14  up, and I know that this was at least typed before my
15  meeting with him.  I believe if we look back at the
16  e-mails with the nursing board specifically, we'll
17  find out exactly when it was sent, and it was typed
18  maybe a week before that, so -- or it says when it
19  ended -- it says it is now whatever date.  So --
20      Q.    Did you type this on a computer that you
21  still have access to?
22      A.    I don't have access to the computer, but I
23  still have the file saved.  Today is May 24th, so it
24  says in there.  I'm not sure what day I sent it to
25  Saldivar.  Was it the same day?



165

1    Q.    So is it -- it's a fair assumption,
2   though, that although you don't mention the concern
3   about Ms. Sperry's motivations, you had those
4   concerns at the time that you prepared this document?
5       A.    I had those concerns; but yeah, I was
6   definitely trying to keep it on the facts and what
7   was happening, because I felt like that was more than
8   enough for sure.
9       Q.    That last one, which would have been
10  SWOCC 289, I don't believe I gave you an exhibit to.
11  Let's see.  That is Exhibit --
12      MR. MARK:  59.
13      MR. REESE:  -- 59.  This next one is going
14  to be SWOCC 551, which will be Exhibit 60.
15      (EXHIBITS 59 AND 60 WERE MARKED.)
16      Q.    (By Mr. Reese)  So this is the next day,
17  the 25th.  You got an e-mail from Tim Dailey.  Do you
18  remember receiving this e-mail, Exhibit 60?
19      A.    No.
20      Q.    Go ahead and take a look at it.  It looks
21  like it has attachments, Discrimination and
22  Harassment Complaint and Discrimination and
23  Harassment Policy.  Do you recall being provided
24  those forms by Mr. Dailey at any time?
25      A.    Yeah.  He also gave me an official

166

1   complaint form to fill out and return, and I did that
2   as well.
3       Q.    Okay.  And this was after your meeting
4   where you discussed with him your concerns about
5   Ms. Sperry's motivation?
6       A.    Again, it would really have to be compared
7   to the date that I sent that e-mail to Francisco.  So
8   if we need to take a quick break and find that
9   e-mail, then I can say for sure if it came before or
10  after.
11      Q.    In your complaint letter you had
12  referenced a complaint to ACCSC.  Here Mr. Dailey is
13  saying he's not familiar with that organization and
14  asking what it stands for.  Do you recall what those
15  initials stand for?
16      A.    I think it was like an accreditation, like
17  a school accreditation.  I was literally finding and
18  just filing a complaint with anybody relating to
19  colleges, their funding, their accreditation --
20  anybody.  So --
21      Q.    What was your intent in complaining to
22  anyone and everyone?
23      A.    To let them know exactly what was
24  happening at the college, since the college
25  themselves were refusing to do anything about what

167

1   was happening and it was getting worse every day.
2       Like, I know we're getting pretty close to
3   that point.  Like, that I -- it was -- it was -- it
4   was taking everything out of me, like, to hang on
5   through everything that was happening.  Every day on
6   campus was like a year of torture all crammed into
7   one day.  So I was fading.  I was -- yeah, I was
8   looking for help from anyone.  I was sending out an
9   SOS.  I wanted help desperately.
10      Q.    And I know from what I've had a chance to
11  review that in addition to everything that was going
12  on that we're talking about, you also had events
13  going on with your ex-husband.  Correct?
14      A.    Yes.  Daymon is good as long as everything
15  is kept calm for him.  Like, he basically needs a
16  mother at all times where he -- he functions just
17  fine, he co-parents just fine.  He's okay, just fine,
18  as long as there's nothing upsetting happening.  He
19  can't handle stress, and when he is stressed out he
20  will get angry and lash out, and that's usually where
21  violence will occur.
22      I couldn't coddle him during this time
23  because I was barely hanging on myself.  So on top of
24  everything that was happening at school, I was also
25  getting pushed around at home again.

168

1       Q.    And all of these events led to you having
2   a suicide attempt on June 8th, right?
3       A.    Yes.
4       Q.    After that experience, did you receive
5   mental health counseling?
6       A.    I actually received it -- I was in therapy
7   while this was happening.  You should have those
8   records.  What was happening at school was obviously
9   the focal point of every session, trying to maintain,
10  like I said, and stay afloat while all of these
11  events were occurring.  I know I saw her records
12  somewhere.  I believe those were provided by Kevin
13  Gregg again.
14      So, yeah, therapy.  A week before my
15  suicide attempt, however, my therapist moved away.
16  Right before I committed suicide, or tried to commit
17  suicide I went to the counseling office at SWOCC
18  because the thoughts were there; the intent was
19  there.  I could feel myself seeing that more and more
20  a solution, and so I went to the counseling office at
21  SWOCC and met with Susan Stuntzner.
22      I called the suicide hotline the night
23  before my attempt.  I was trying pretty hard to find
24  something to hold on to without telling people that I
25  was suicidal, because I knew that would set me up for



169

1  a psych hold and give them what they wanted.  And so
2  trying to get help while navigating the gaslighting
3  and what they were trying to do was particularly
4  tricky.
5       Q.   I'm afraid -- I don't think I've received
6  any counseling records either before your suicide
7  attempt or after, which is important for me to be
8  able to see.  So I'll follow up.
9            MR. MARK:  Yeah, I'm pretty sure that
10  that's -- you should definitely look again, but we'll
11  get you everything.
12           THE WITNESS:  It's with Lisa Brauer,
13  B-r-a-u-e-r, I think.
14      Q.   (By Mr. Reese)  Yeah.  I'm not giving any
15  motivation behind this.  I just -- I truly don't
16  think I have them.  So it could have been some
17  confusion between the switch of attorneys.
18      A.   I'm definitely keeping a list for you,
19  everything that you say.  So --
20      Q.   Well, let's complete that list while we're
21  on it.  I had asked for any applications for
22  financial aid for additional schooling.  I understand
23  from your interrogatory responses that there's
24  concern that the way that your time ended at SWOCC is
25  impacting your ability to get financial aid.  So --

170

1       A.   Yeah.
2       Q.   -- if that's the case, I'd like to see the
3  financial aid applications.
4       A.   The only concern with the way things ended
5  at SWOCC was, of course, for law school
6  consideration.  And so I had a telephone meeting with
7  some people very high up on the law school admissions
8  council when I explained the case, what Melissa did;
9  and they absolutely agreed that my transcripts from
10  SWOCC should have no bearing on my acceptance to law
11  school.  So I was thankfully able to include them,
12  without including them, and make all the law schools
13  aware that they're in active litigation for faulty
14  grades.
15           MR. REESE:  Okay.  I asked for medical
16  records for this time frame, and I have them through
17  April of 2018, but I don't see any for May, June, or
18  July 2018.  So this is more of a statement to
19  Brandon.  I'd like some follow-up on those.
20           MR. MARK:  We can follow up on
21  that.  I think if you want -- you know, if you need a
22  HIPAA release or something, you want a list of
23  providers.  I'm not sure that she has them is the
24  problem.
25           MR. REESE:  Okay.  Okay.

171

1       Q.   (By Mr. Reese)  So, Ms. Gililland, this is
2  what we previously marked as Exhibit 13.
3       A.   Okay.
4       Q.   And this is the e-mail you're referring to
5  as the "I don't feel like this was an advisory
6  appointment"?
7       A.   Yes.
8       Q.   Okay.  So this was sent on Tuesday,
9  May 29th.  Does that refresh your recollection that
10  that meeting likely occurred on May 29th?
11      A.   That's what I was talking about, but it's
12  saying last week.  So this is a Tuesday; so, I mean,
13  it could or could not have been pretty much right the
14  exact same time we're discussing, the May 25th.  So
15  if we have -- if we have the e-mail to Saldivar, I
16  wrote it that day.  So that would be the exact date
17  that I went to meet with Tim Dailey.
18      Q.   Okay.  As we're going through the May and
19  June 2018 deadline, I understand that you did not
20  turn in assignments in your classes, and I'll use
21  that term to apply to all three of the courses that
22  you were in.  Did you miss any assignments during
23  that time frame?
24      A.   I did not.  When the term ended I was
25  passing patho and pharmacology, and I had gotten

172

1  Nursing 112 up to a 71 percent.  More than a month
2  after the term had ended, they had gone in and
3  changed I believe the patho grade to failing as well.
4           So had the -- the Nursing 112 been
5  remedied like this was promised, I would have more
6  than passed all of my classes.  And, again, there was
7  no missing assignments.
8           I believe what she's probably referring to
9  now is a retrospective plan to cover up the grading
10  and changing the grades like they did.  But I was
11  never once told that that practical examination,
12  which is the only thing I didn't do, I was never once
13  told that that was for grading or for makeup reasons.
14  I was told that was to prove I was safe for my
15  patients again.
16      Q.   Okay.
17      A.   So nothing -- I didn't miss anything.  I
18  didn't --
19      Q.   Let's see if this refreshes your memory.
20  This is an e-mail from Melissa.  Well, let's start
21  with this one that's on the screen now, a May 21st
22  e-mail from you to Melissa Sperry.  It is SWOCC 519,
23  and we'll mark it as Exhibit 61.
24           (EXHIBIT 61 WAS MARKED.)
25      Q.   It looks like on May 21st Ms. Sperry wrote



173

1  in your Pathophysiology Processes II course, you
2  got -- I'll go down -- you got the feedback saying,
3  "Hi, Nicole. I did not receive your endocrine
4  assignment here or in an e-mail. Did you submit it
5  in a different area?"
6         Do you remember getting that e-mail --
7    A.   I don't remember.
8    Q.   -- on May 21st?
9         Okay. It looks like you responded, "No, I
10  didn't. I spent about four to five hours on it and
11  then decided to forego the assignment due to how much
12  time it was taking me and I needed as much time as I
13  could to study because I found endocrine to be very
14  challenging. I apologize, but considering my current
15  predicament, I had to choose which was more important
16  grade-wise. I am happy to submit what I did or
17  complete it tomorrow if you would like."
18    A.   I -- I don't remember this.
19    Q.   Okay.
20    A.   But yeah, the -- being conscience of
21  points and everything was absolutely an obsession at
22  this point, so if I chose to forego a very
23  small-pointed assignment to do extraordinarily well
24  on a bigger-pointed assignment, that would make a lot
25  of sense.

174

1         I was working maybe 20 hours a day to
2  bring my grades up at this point. Probably not good
3  for where it all ended up or maybe a factor, but I
4  absolutely was working 20 hours a day to get caught
5  up. And not only did I rebound my grades completely
6  in two of the classes from F's all the way up to
7  passing, I came very close with the third class. So
8  I would say I did okay.
9         And that, again, was before any grades
10  being changed or fixed, because they never were
11  changed back or fixed. This is still coming back up
12  to passing in spite of all the grades that were
13  manipulated and changed.
14    Q.   Okay. But with the benefit of this
15  e-mail, would you like to change your answer to my
16  question of whether or not you were unable to turn in
17  some assignments in the May and June 2018 time frame?
18    A.   I don't -- again, I do not remember this.
19  If I chose a small assignment to forego to do good on
20  a big assignment, that would make sense. But I don't
21  recall this, no.
22    Q.   Okay. Let's put up SWOCC 521, which will
23  be Exhibit 62.
24         (EXHIBIT 62 WAS MARKED.)
25    Q.   So this looks like --

175

1    A.   Okay, slow down. Yeah, this is, again,
2  explaining something that was sprung on us that
3  I didn't complete, I guess.
4    Q.   So you don't remember them as you sit here
5  today, but it's certainly possible that you did not
6  turn in all the assignments that you were asked to
7  turn in during the May and June 2018 time frame?
8    A.   It is very possible that I forewent very
9  small-pointed assignments in lieu of, like I said,
10  effort towards much bigger.
11         MR. REESE: Let me take a five-minute
12  break, get organized, and then we'll wrap up.
13         (Recess from 3:43 p.m. to 3:49 p.m.)
14         MR. REESE: I don't have any more
15  questions, Ms. Gililland. I appreciate your time,
16  and I appreciate you following up on those documents.
17  And I know Brandon will point me in the right
18  direction if I've just misplaced them someplace.
19         THE WITNESS: Yeah, we'll make sure you
20  get them.
21         MR. MARK: All right.
22         MR. REESE: Brandon, that's it for the
23  day.
24         (The deposition concluded at 3:50 p.m.)
25               * * *

176

1            REPORTER'S CERTIFICATE
2
3         I, Vicky McDaniel, Registered Professional
   Reporter and Certified Shorthand Reporter in and for
4  the State of Utah, do hereby certify:
5         That prior to being examined, the witness,
   NICOLE GILILLAND, was remotely by me duly sworn to
6  tell the truth, the whole truth, and nothing but the
   truth;
7
         That said deposition was taken down by me
8  in stenotype on March 12, 2021 through a Zoom
   videoconference and was thereafter transcribed, and
9  that a true and correct transcription of said
   testimony is set forth in the preceding pages,
10  according to my ability to understand through Zoom.
11         I further certify that, a request having
   been made to review the transcript, a reading copy
12  was sent to Mr. Mark for the witness to read and sign
   and then return to me for filing with Mr. Reese.
13
         I further certify that I am not of kin or
14  otherwise associated with any of the parties to said
   cause of action and that I am not interested in the
15  outcome thereof.
16         WITNESS MY HAND this 20th day of March,
   2021.
17
18           Vicky McDaniel
19
20
21           Vicky McDaniel, CSR, RMR
22
23
24
25

```
                                                    177
 1   Case:  Gililland v. SWOCC
     Case No.:  6:19-cv-00283-MK
 2   Reporter:  Vicky McDaniel
     Date taken:  March 12, 2021
 3
 4              WITNESS CERTIFICATE
 5          I, NICOLE GILILLAND, HEREBY DECLARE:
 6          That I am the witness in the foregoing
     transcript; that I have read the transcript and know
 7   the contents thereof; that with these corrections I
     have noted, this transcript truly and accurately
 8   reflects my testimony.
 9   PAGE/LINE       CHANGE/CORRECTION           REASON
10   _____   _____   _____
     _____   _____   _____
11   _____   _____   _____
     _____   _____   _____
12   _____   _____   _____
     _____   _____   _____
13   _____   _____   _____
     _____   _____   _____
14   _____   _____   _____
     _____   _____   _____
15   _____   _____   _____
     _____   _____   _____
16   _____   _____   _____
     _____   _____   _____
17   _____   _____   _____
18
     ____No corrections were made.
19
20
         I, NICOLE GILILLAND, HEREBY DECLARE UNDER THE
21   PENALTIES OF PERJURY OF THE LAWS OF THE UNITED STATES
     OF AMERICA AND THE LAWS OF THE STATE OF
22   THAT THE FOREGOING IS TRUE AND CORRECT.
23
24   DATE                    NICOLE GILILLAND
25
```

