Luke W. Reese, OSB No. 076129
lreese@ghrlawyers.com
GARRETT HEMANN ROBERTSON P.C.
PO Box 749
Salem, Oregon 97308-0749
Tel: (503) 581-1501
Fax: (503) 581-5891
            Of Attorneys for Defendants

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| NICOLE GILILLAND, an individual | No.     6:19-cv-00283-MK |
| Plaintiff, | |
| vs. | **DEFENDANTS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |
| SOUTHWESTERN OREGON COMMUNITY COLLEGE DISTRICT by and through its BOARD OF EDUCATION, an Oregon community college district and board; SOUTHWESTERN OREGON COMMUNITY COLLEGE, an Oregon community college; PATTY SCOTT, an individual; TIM DAILY, an individual; FRANCISCO SALDIVAR; an individual; SUSAN WALKER, an individual; MELISSA SPERRY, an individual; PAMELA WICK, an individual, | **Oral Argument Requested** |
| Defendants. | |

**REPLY**

Pursuant to Federal Rule of Civil Procedure ("FRCVP") 56 and Local Rule ("LR") 7(f)(2),

defendants, Southwestern Oregon Community College ("SWOCC"), Patty Scott, Tim Daily,

Francisco Salvidar, Susan Walker, Melissa Sperry,  and  Pamela  Wick  (collectively,  the

"defendants"),[1] respectfully submit this Reply in support of their motion for summary judgment on all of plaintiff's claims against them.  Plaintiff has conceded the motion as to her claims for negligent supervision and intentional interference with economic relations.  That leaves only plaintiff's federal claim under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX") (first claim for relief), and her state law claims for breach of contract (second claim for relief) and intentional infliction of emotional distress ("IIED") (fifth claim for relief).  This Reply is supported by the Supplemental Declaration of Luke W. Reese.

## INTRODUCTION

Plaintiff is trying to rewrite both law and history to fit her theory of the case.  First, it bears repeating that plaintiff is asking this Court for an unprecedented expansion of Title IX.  While discrimination on the basis of "sex" has been broadly and appropriately interpreted to cover biological sex, gender identity, and sexual orientation—and gender stereotypes based on the same—it has never before been extended to a presumptively heterosexual individual's employment history, in the adult industry or otherwise.

But even if such an extension were justified, there is no evidence that any of plaintiff's instructors were aware of her former career as an adult film model and actress when the decision was made to discipline her for plagiarism.  Nor is there any evidence that plaintiff ever informed defendants that she was the victim of discrimination on the basis of sex.  What plaintiff complained of—and what defendants investigated—was the college's allegedly inconsistent enforcement of its plagiarism policy.  Even if plaintiff did disclose her former career to an administrator in the course of that investigation, that disclosure did not bring her complaint within the scope of Title IX.

---

[1]      Following depositions, plaintiff agreed to dismiss her claims against defendants Patty Scott, Francisco Saldivar, and Pam Wick.  (*Pltf's Resp., p. 33, n. 8).*

In sum, plaintiff has failed to establish a *prima facie* case of discrimination and, even if that burden were met, she cannot rebut SWOCC's legitimate, nondiscriminatory basis for the discipline.  Defendants are entitled to summary judgment both on plaintiff's Title IX claim and on her related state law claims for breach of contract and IIED.

## ARGUMENT

**I.      Defendants are entitled to summary judgment on plaintiff's Title IX claim.[2]**

> A.  *Plaintiff has failed to establish a* prima facie *case of discrimination because she has presented no evidence that she was the victim of discrimination "on the basis of sex."*

In order to establish a *prima facie* case of discrimination under Title IX—regardless of particular legal theory—plaintiff must present evidence that she was targeted <u>on the basis of sex</u>. *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 946 (9th Cir. 2020).  It is well established that "sex," which is not defined by statute or regulation, encompasses not only the biological sex assigned at birth, but also other innate characteristics like a person's gender identity and sexual orientation.  Exec. Order No. 13988 (Jan. 21, 2021).[3]  It has never been held to extend to a presumptively heterosexual individual's employment history, in the adult industry or otherwise.

---

[2]      Plaintiff concedes that Title IX does not impose personal liability on individual defendants and agrees that dismissal is appropriate as to them only. (*Pltf's Resp., p. 31, n. 7*).

[3]      In addition to sex-based discrimination, Title IX also encompasses sexual harassment.  *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 649-50, 119 S. Ct. 1661, 143 L. Ed. 2d 839 (1999).  Defendants' motion for summary judgment represented that "[s]exual harassment is not clearly defined for purposes of Title IX." (*Def's MSJ, p. 18*).  In fact, new regulations went into effect in August 2020 that define the term as follows:

> "*Sexual harassment* means conduct on the basis of sex that satisfies one or more of the following:

> "(1)      An employee of the recipient conditioning the provision of an aid, benefit, or service of the recipient on an individual's participation in unwelcome sexual conduct;

> "(2)      Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity; or

Plaintiff notes that Title IX covers "differential treatment for failing to conform to socially-constructed gender expectations," and she suggests that plaintiff's experience at SWOCC falls within this category.  (*Pltf's Resp., p. 26*) (citing *Schwenk v. Hartford*, 204 F.3d 1187, 1202 (9th Cir. 2000)).  While plaintiff is correct that Title IX has been held to prohibit discrimination based on "gender stereotypes," this application has been limited in the Ninth Circuit to cases involving the rights of gay, lesbian, and transgender students.  *See Parents for Privacy v. Barr*, 949 F.3d 1210, 1232 n 19 (9th Cir. 2020) (observing that transgender students have right to be free from "discrimination based on gender stereotypes regarding the sex assigned to them at birth"); *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1160-61 (C.D. Cal. 2015) (plaintiffs stated a claim for discrimination based on gender stereotypes where they alleged that they were harassed and treated differently because of their perceived sexual orientation and stereotypes about lesbianism).  In fact, even *Schwenk*, the case on which plaintiff relies for the premise that gender-nonconformity is protected by Title IX, involved a transgender victim.  *See Schwenk*, 204 F.3d at 1202 (applying Title VII standards to claim brought by transgender inmate under Gender Motivated Violence Act).[4]

Plaintiff's briefing suggests that her claim fits neatly within the existing Title IX jurisprudence on gender stereotypes.  That could not be further from the truth.  In fact, a

---

"(3)      'Sexual assault' as defined in 20 U.S.C. 1092(f)(6)(A)(v), 'dating violence' as defined in 34 U.S.C. 12291(a)(10), 'domestic violence' as defined in 34 U.S.C. 12291(a)(8), or 'stalking' as defined in 34 U.S.C. 12291(a)(30)."

34 C.F.R. § 106.30(a).

[4]      The language that plaintiff cites comes from a discussion of the standard under Title VII of the Civil Rights Act of 1964, 42 U.S. Code § 2000e–2 ("Title VII"), not Title IX.  *See Schwenk*, 204 F.3d at 1201-02 ("Title VII barred not just discrimination based on the fact that [plaintiff] was a woman, but also discrimination based on the fact that she failed 'to act like a woman'—that is, to conform to socially constructed gender stereotypes.").  The Ninth Circuit has, however, held that the legislative history of Title IX "strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII."  *Emeldi v. Univ. of Oregon*, 698 F.3d 715, 724 (9th Cir. 2012).

judgment in favor of plaintiff would significantly extend the sweep of Title IX.  What plaintiff is asking this Court to do is to treat her employment history as a status entitled to the same legal protection as biological sex, gender identity, or sexual orientation—none of which appear to have had any bearing on her work—and which would be unprecedented, in this circuit and elsewhere.  For those reasons, plaintiff cannot establish a *prima facie* case of discrimination under Title IX, and defendants are entitled to summary judgment as a matter of law.

B. *Plaintiff cannot show that defendants used her plagiarism as a pretext for discrimination because she has presented no evidence that they were aware of her employment history at the time that she was disciplined.*

Even assuming that plaintiff can establish a *prima facie* case of discrimination, SWOCC has articulated a legitimate, nondiscriminatory basis for its discipline of plaintiff.  It is an undisputed fact that plaintiff submitted an assignment for academic credit in which she had quoted word-for-word from sources that she had failed to cite.  It is also an undisputed fact that plaintiff's action constituted plagiarism and an offense subject to discipline under SWOCC's Policy Regarding Academic Dishonesty.[5]  Because plaintiff cannot rebut that evidence, she can only proceed on her Title IX claim by demonstrating that it was merely pretext for unlawful discrimination.  Plaintiff has failed to meet that burden.

Plaintiff was required to submit evidence from which a factfinder could find or infer that defendants used plaintiff's plagiarism as a pretext to discipline her for her former career in the adult industry.  That, in turn, demands evidence that defendants were at least <u>aware of</u> plaintiff's employment history at the time that she was accused of, and disciplined for, plagiarism.  There is no such evidence.

---

[5] The policy provides, in pertinent part, "Students who plagiarize in any of their work at [SWOCC] are subject to student disciplinary action.  This might include but not be limited to receiving a '0' on an assignment or test after careful investigation." (*Reese Dec., Exhibit 12, p. 6*).  In accordance with that published policy, plaintiff

Plaintiff's briefing represents that she informed Ms. Sperry "about her embarrassing personal history" in March 2018. (*Pltf's Resp., p. 7*). That is true, as far as it goes. In plaintiff's March 14, 2018 email to Ms. Sperry, she did disclose that she had "confided in ["J.M.," a classmate] some things about [her] past that [she is] not proud of back when [she] was a teenager" and that she was afraid the classmate "could really embarrass" her. (*Pltf's Resp., p. 7*).

Critically, though, plaintiff never elaborated as to what those "things about her past" actually were. Plaintiff apparently intended to share the details of her former career with Ms. Sperry at a later date, but it is undisputed that the planned conversation never took place. In fact, plaintiff herself testified that she never shared her employment history with any SWOCC faculty, administrators, or students prior to being disciplined for plagiarism:

> "Q.    And is this the e-mail [of March 14, 2018] that you're referring to where you gave Ms. Sperry a heads up that you had had a falling out with [J.M.] and that she was aware of some things from your past that you weren't proud of?
>
> "A:    Yes.
>
> "Q:    And you confirmed earlier that this e-mail communication [on March 14, 2018] is the extent of your conversation with Ms. Sperry about that issue. You never had any in-person conversations with her about it?
>
> "A:    Correct.
>
> "Q.    And it's an accurate statement that the only person associated with SWOCC who you told about being in adult films as a teenager was [J.M.]. Correct?
>
> "A.    Not—when you say 'associated,' that's too much of a broad term.
>
> "Q.    Let's say you never told any faculty members about your history in adult films, correct?
>
> "A.    Correct.

received a zero on her case study assignment of NRS 233 and was also placed on academic probation. (*Exhibits 38 & 41*).

"Q.     You never told any administrators, correct?

"A.     Correct.

"Q.     Okay.  Now let's go with classmates.  Any other than [J.M.]?

"A.     No.  I know that I had written about modeling I think at some point in a paper in undergrad, but I was very careful not to say what type.  Just, it was in reference to traveling and things like that, or just my experience.  But it was a couple of years of my life that was eventful and—but getting into the specifics, no, you're correct, I did not.

"Q.     And the first time that you told anyone at SWOCC, any faculty member or administrator, is when you met with Mr. Dailey [on May 23, 2018]?

"A.     Correct."

(*Supp. Dec. of Reese, ¶ 2, Ex. 84, pp. 2-4.*)

Plaintiff theorizes that Ms. Sperry must nonetheless have become aware of those details from another source.  But when asked to identify that source in response to defendants' interrogatory ("Please identify the individual alleged in paragraph 14 of the Complaint to have 'informed SWOCC that plaintiff was a former adult model and actress'"), plaintiff was unable to do so.  Instead, she wrote:

"Coos Bay is a small, tight-knit community.  Defendant Sperry may have become aware from others associated with SWOCC—students, faculty, staff, or her or their social circles in the community—or she may have become aware on her own through other sources.

"Based on some information, Plaintiff believes the source may have been one of her estranged family members who live in the community.  Plaintiff is currently investigating the possibility that one or more of the following family members may have communicated with one or more individuals associated with SWOCC: Kristina Moon, Ryan Moon, Michelle Westfall, Amber Culp, Annmarie Cohen, Michael Cohen, and Cydnee Nathe.

"Additionally, it is possible that others in the community with knowledge of Plaintiff's history may have been[sic] told someone associated with SWOCC and/or Defendant Sperry about Plaintiff's history.  Plaintiff is currently investigating the possibility that one or more of the following may have

communicated with one or more individuals associated with SWOCC: Jessica McCourt, Rachel Ellis, and Larry Ellis."

(*Dec. of Reese, ¶ 80, Ex. 79, p. 4*). All of that is, of course, pure speculation.

Nonetheless, in support of her theory that Ms. Sperry somehow became aware of her former career, plaintiff points to Ms. Sperry's perceived efforts to sabotage her academic performance and her comment regarding what constitutes a "classy woman." Specifically, plaintiff relies on the following facts: (1) in mid-April, Ms. Sperry declined plaintiff's request to take a test early due to illness and instead assessed a 10% penalty for late work; (2) around the same time, Ms. Sperry miscommunicated the nature of, and deadline for, an assignment; and (3) when confronted with her unfair treatment of plaintiff, Ms. Sperry responded that "it takes a classy woman to be a nurse, and unclassy women shouldn't be nurses." (*Pltf's Resp., pp. 10-11*). But even assuming the truth of those facts—which are in large part disputed—they do not show directly that Ms. Sperry had knowledge of plaintiff's former career in the adult industry. Therefore, the question is whether such knowledge can be rationally inferred from those facts.

It cannot. The conclusion that Ms. Sperry was made aware of plaintiff's former career is not a rational inference on this record, because it would require too many intermediate inferences and assumptions. *See Chapman v. Mayfield*, 263 Or. App. 528, 535-36, 329 P.3d 12 (2014), *aff'd*, 358 Or. 196, 361 P.3d 566 (2015) (applying federal standard to determine "whether a particular inference is a reasonable one or is, instead, impermissible speculation"). Specifically, a factfinder would have to infer that (1) the "thing[ ] about her past" that plaintiff had confided to J.M. was her former career in the adult industry; (2) J.M., or another unidentified person with knowledge of plaintiff's former career, desired to cause plaintiff harm; (3) one or both of those individuals decided to inflict that harm specifically by communicating the details of plaintiff's

former career to Ms. Sperry; and (4) Ms. Sperry was so offended by the disclosure that she initiated a campaign of harassment against plaintiff.

That would again be pure speculation.  This record contains no information regarding plaintiff's ongoing relationship with J.M., identifies no other persons affiliated with SWOCC to whom plaintiff disclosed her employment history prior to being disciplined, and offers no motivation for any other person with knowledge of plaintiff's past to make that disclosure to SWOCC in general or to Ms. Sperry in particular.  Without those necessary linkages, it would not be a rational inference to conclude that Ms. Sperry was made aware of plaintiff's former career in or around the time of the plagiarism charge in April 2018.  Accordingly, plaintiff cannot rebut SWOCC's nondiscriminatory basis for the resulting discipline, and defendants are entitled to summary judgment as a matter of law.

C. *Plaintiff initiated an investigation into a grade dispute, not Title IX, and she cannot challenge the sufficiency of that process in federal court.*

Plaintiff argues that SWOCC failed to conduct a minimally adequate Title IX investigation into her complaint.  But plaintiff did not bring a Title IX complaint.  Her grievances neither alleged nor implied discrimination on the basis of sex, and there is no evidence that defendants were even aware of plaintiff's employment history at the time the complaint was initiated.  Even assuming that plaintiff later disclosed that history to VP Dailey, the disclosure should not have converted the ongoing grade investigation into an investigation of sex-based discrimination under Title IX.

Plaintiff's initial complaint to SWOCC administrators did not fall under Title IX.  A generic claim of "selective enforcement" of academic standards, without more, does not trigger the protection of any federal civil rights law.  Rather, the claim must be that the applicable standard is being selectively enforced on the basis of the claimant's membership in a protected

class.  In the case of Title IX, the claimant must allege, or the circumstances must otherwise demonstrate, that the initiation or extent of the discipline was affected by the student's sex. *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019).

Here, no such showing was made.  Instead, by her own admission, plaintiff claimed simply that she was "being treated differently than the other students" and requested an investigation into what she perceived as the "selective enforcement of the [college's] plagiarism standards."  (*Pltf's Resp., pp. 13-14*).  She did not allege, and the circumstances did not otherwise demonstrate, that the standard was being selectively enforced on the basis of sex or another protected status.  Even if plaintiff's status as a former adult film actress and model would otherwise qualify as a protected status under Title IX, there is no evidence that SWOCC administrators or faculty had knowledge of that status at the time plaintiff's complaint was made.

Eventually, after the investigation was already underway, plaintiff claims that she disclosed her employment history to VP Dailey, along with Ms. Sperry's alleged remark regarding "unclassy women."  But even assuming the truth of those disputed facts, plaintiff's disclosure was not enough to put SWOCC on notice that she was claiming discrimination on the basis of sex.  As discussed above, there was—and is—no precedent for treating a person's status as a former adult film actress and model as a protected status under Title IX.  As such, there was nothing about plaintiff's belated disclosure that should have converted SWOCCS's ongoing grade investigation into an investigation under Title IX.  The deficiencies in that investigation, if any, are not within the purview of the federal courts, and defendants are entitled to summary judgment as a matter of law.

**II.     Defendants are entitled to summary judgment on plaintiff's breach-of-contract claim.**

In her briefing, plaintiff relies on two policies that are alleged to form the basis for her breach-of-contract claim:   (1) SWOCC's Discrimination and Harassment Policy, and (2) the portion of SWOCC's Nursing Student Handbook that governs "Academic Plagiarism."  But the latter policy is not even identified in plaintiff's complaint.  And neither can form the basis for a breach-of-contract claim on this record.

First, defendants are entitled to summary judgment on plaintiff's breach-of-contract claim to the extent it is premised on SWOCC's plagiarism policy.  In order to succeed on a claim for breach of contract, a plaintiff must allege, at a minimum, "the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff."  *See Precision Seed Cleaners v. Country Mut. Ins. Co.*, 2013 U.S. Dist. LEXIS 33116, *51-52, 2013 WL 943571 (D. Or. 2013) (quoting *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570, 927 P.2d 1098 (1996)).  Here, plaintiff's Complaint identifies four potential sources of her contract claim—including SWOCC's "Catalog," SWOCC's non-discrimination policy, SWOCC's education records policy, and SWOCC's policy on unlawful harassment—but it does <u>not</u> identify SWOCC's plagiarism policy.  The omission of the operative contract falls short even of "the liberal notice pleading standards allowed in federal court," *id.*, and plaintiff should not be permitted to proceed on the theory that SWOCC breached its plagiarism policy.

In   addition,   defendants   are   entitled   to   summary   judgment   on   plaintiff's breach-of-contract claim—whether based on the anti-discrimination policy <u>or</u> the plagiarism policy—because it is dependent on the resolution of her Title IX claim.  As the contract claim has been framed by plaintiff, it is predicated on the theory that SWOCC breached its contractual

obligations to "stop any form of discrimination or harassment" and to apply its plagiarism policy "equally, fairly, and free of illegal bias and discrimination." (*Pltf's Resp., p. 32*). Therefore, plaintiff was required to present evidence that she was the victim of discrimination based on sex (or some other protected status) in order to proceed not only on her Title IX claim but also on her breach-of-contract claim.[6] Because plaintiff has failed to do so, summary judgment should be granted in favor of defendants.

**III.    Defendants are entitled to summary judgment on plaintiff's IIED claim.**

In order to proceed on her claim for IIED, plaintiff was required to produce evidence that (1) defendants acted with the intent to cause her severe emotional distress, (2) their acts did in fact cause such distress, and (3) those acts "constituted an extraordinary transgression of the bounds of socially tolerable conduct." *McGanty v. Staudenraus*, 321 Or. 532, 535, 901 P.2d 841 (1995). That is an exceptionally high standard. In the employment context, Oregon courts have allowed an IIED claim to proceed to a jury only where the employer engaged in conduct that was "not only aggravating, insensitive, petty, irritating, perhaps unlawful, and mean—it also contained some further and more serious aspect" such as unwanted sexual contact, the use of derogatory slurs, or exposure to actual physical danger. *Clemente v. State*, 227 Or. App. 434, 442-443, 206 P.3d 249 (2009) (emphasis added).

The conduct of which plaintiff complains did not rise to that level. In support of her claim for IIED, plaintiff points to the disputed facts that Ms. Sperry gave her "fake" assignments, "treated her differently with regard to late work," and interfered in the plagiarism investigation;[7]

---

[6]    SWOCC's anti-discrimination policy defines "harassment" as conduct based on a person's "race, color, religion, and ethnicity, national origin, sex, sexual orientation, marital status, disability, veteran status, gender identity or age." (*Dec. of Reese, Ex. 83, p. 1*).

[7]    There is no evidence that Ms. Sperry "manufactured" the plagiarism charge or "refused [a] direct order" to restore plaintiff's points on that assignment. (*Pltf's Resp., p. 33*).

Ms. Walker "told falsehoods to [plaintiff]'s clinical instructor" and "fabricated concern about [plaintiff]'s safety with patients"; and VP Dailey failed to intervene in the grade dispute between plaintiff and her nursing instructors.  (*Pltf's Resp., pp. 33-34*).

Those disputed facts, if true, are not "extraordinarily outrageous" for purposes of the tort of IIED.  Plaintiff, like the plaintiff in *Clemente*, was not "verbally, sexually, or physically abused or harassed;" the victim of derogatory slurs; exposed to violence or physical danger; or "repeatedly and viciously ridiculed."  *Id.*  She was, at most, singled out for otherwise appropriate discipline by one or more "mean-spirited" instructors.  *Id.*  Because that treatment "by itself did not amount to aggravated acts of persecution that a jury could find beyond all tolerable bounds of civilized behavior," defendants are entitled to summary judgment of plaintiff's claim for IIED.

## CONCLUSION

Academic freedom can and should have its limits.  The principle is crucial to foster the free exchange of ideas and protect the instructor's classroom methods from arbitrary interference by administrators.  But, of course, no instructor is permitted to conduct their classroom in a manner that violates the civil rights of students.

The problem for plaintiff is that this is not, in fact, a civil rights case.  This was and remains a grade dispute.  Plaintiff is glossing over both the law and the facts in an effort to bootstrap her claims into federal court.  Not only is there no legal precedent for treating a plaintiff's status as a former adult film actress and model as a protected class under Title IX, but there is also no evidence that any of this plaintiff's instructors were aware of her employment history when the decision was made to discipline her for plagiarism.  Nor is there any evidence that defendants ever understood, or should have understood, plaintiff to be complaining of discrimination on the basis of sex.

For those and the reasons outlined above, defendants are entitled to summary judgment both on plaintiff's Title IX claim and on her related state law claims for breach of contract and IIED.

DATED this 15th day of July 2021.

GARRETT HEMANN ROBERTSON P.C.


*s/ Luke W. Reese*
Luke W. Reese (OSB No. 076129)
lreese@ghrlawyers.com
Phone:  503-581-1501
Fax:  503-581-5891
Of Attorneys for Defendants

## CERTIFICATE OF SERVICE

I hereby certify that I caused to be served the foregoing **Defendants' Reply in Support of Motion for Summary Judgment** on the date indicated below,

[X]    Via First-Class Mail with postage prepaid
[X]    Via Electronic Filing
[  ]    Via Facsimile Transmission
[  ]    Via Hand Delivery
[  ]    Via Overnight Delivery

to the following person(s) a true copy thereof, contained in a sealed envelope (if other than by facsimile transmission), addressed to said person(s) at their last known addresses indicated below:

Brandon J. Mark
Parsons Behle & Latimer
201 South Main Street, Suite 1800
Salt Lake City UT  84111
Phone:  801-532-1234
Fax:  801-536-6111
Email: bmark@parsonsbehle.com
        ecf@parsonsbehle.com

DATED July 15, 2021.

GARRETT HEMANN ROBERTSON P.C.

*s/ Luke W. Reese*
Luke W. Reese (OSB No. 076129)
lreese@ghrlawyers.com
Phone:  503-581-1501
Fax:  503-581-5891
Of Attorneys for Defendants

4829-5574-0657, v. 1