UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

NICOLE GILILLAND, an individual,

                    Plaintiff,

      v.

SOUTHWESTERN OREGON
COMMUNITY COLLEGE DISTRICT, by
and through its Board of Education, an
Oregon community college district and
board, et al,

                    Defendants.

Case No. 6:19-cv-00283-MK

**OPINION AND
ORDER**

---

**KASUBHAI,** United States Magistrate Judge:

In this education discrimination action, Plaintiff Nicole Gililland ("Plaintiff") asserts three claims against Defendants Southwestern Oregon Community College District, Southwestern Oregon Community College ("SWOCC"), Patty Scott, Tim Daily, Francisco Saldivar, Susan Walker, Melissa Sperry, and Pamela Wick (collectively, "Defendants"): (1) a Title IX claim for sex discrimination under 20 U.S.C. § 1681(a) against all Defendants; (2) a state law claim for breach of contract against all Defendants; and (3) a state law claim for

intentional infliction of emotional distress against Defendants Scott, Daily, Saldivar, Walker, Sperry, and Wick.[1] Compl. ¶¶ 28–63, ECF No. 1. Defendants move for summary judgment as to all of Plaintiff's claims. Defs.' Mot. Summ. J., ECF No. 36 ("Defs.' Mot."). In addition, Plaintiff moves for sanctions for spoliation of evidence. Pl.'s Mot. Sanctions, ECF No. 50 ("Pl.'s Mot."). For the reasons that follow, Defendants' motion is GRANTED in part and DENIED in part and Plaintiff's motion is GRANTED in part and DENIED in part.

## FACTS

In Fall 2017, Plaintiff began her studies in Defendant SWOCC's nursing program. Compl. 4, ECF No. 1. In Spring 2018, Plaintiff enrolled in three nursing courses: NRS 112 (Foundations of Nursing in Acute I), NRS 231 (Clinical Pharmacology II), and NRS 233 (Pathophysiology Processes II). Reese Decl., Ex. 34, ECF No. 37 ("Reese Decl."). Defendant Sperry taught NRS 112, and Ms. Robin Finney taught NRS 233. Reese Decl., Ex. 36.

During the Spring 2018 semester, Plaintiff believes "an individual informed SWOCC that Plaintiff was a former adult model and actress" and that Defendant Sperry became aware of Plaintiff's former career. Compl. 4, ECF No. 1. Plaintiff shared with one of her fellow students, J.M., that she previously worked as an adult film actress. Gililland Dep. 156:17–158:6, ECF No. 41-1 ("Gililland Dep."). At the time, J.M. "was under threat of expulsion for reasons that had nothing to do with [Plaintiff]," but because J.M. "[became] erratic and accusatory toward [Plaintiff] as [J.M.'s] expulsion played out," Plaintiff wanted to "prepar[e]" and tell Defendant Sperry about her past. Pl.'s Resp. 7, ECF No. 41. Plaintiff told Defendant Sperry via email that Plaintiff confided in J.M. about "some things [in her] past that [she was] not proud of back when [she] was a teenager" and worried that J.M. "could really embarrass [her]." Sperry Dep. 21:19–

---

[1] Plaintiff withdraws her state law claims for negligent supervision and intentional interference with economic relations. *See* Pl.'s Resp. 35 n.9, ECF No. 41.

23:24, ECF No. 41-5 ("Sperry Dep."). After Plaintiff sent that email, Defendant Sperry started

acting "odd" toward Plaintiff. Gililland Dep. 80:4–81:10, 87:14–88:2. Defendant Sperry also

forwarded Plaintiff's email twice to Defendant Walker. Walker Dep. 15:15–18:8, ECF No. 41-4

("Walker Dep."); Sperry Dep. 24:13–16, 86:4–87:15.

In the months that followed, Defendant Sperry changed from being "superficially

friendly" to acting "odd" toward Plaintiff. Gililland Dep. 80:4–81:10, 87:14–88:2. When

Plaintiff fell ill in April 2018 and asked to take an exam early in NRS 112, Defendant Sperry told

her to complete an alternative assignment. Gililland Dep. 73:22–75:13. However, Defendant

Sperry sent Plaintiff the wrong assignment, claimed she assigned a different assignment, and

gave Plaintiff a zero on the wrong assignment Plaintiff submitted. Gililland Dep. 75:17–81:10.

When Plaintiff later completed her make-up test, the same one she asked to take early, Defendant

Sperry assessed a ten-percent late penalty. Gililland Dep. 88:3–90:10; Sperry Dep. 34:23–35:3.

Defendant Sperry permitted other students to take tests early to avoid a penalty. Kyelberg Decl.

8–9, ECF No. 43.

At some point in the semester, Plaintiff approached Defendant Sperry and asked her

"why she was doing" all this to Plaintiff. Gililland Dep. 91:9–21. Defendant Sperry responded

that "it takes a classy woman to be a nurse, and unclassy women"—"kind of pointing" at

Plaintiff—"shouldn't be nurses." Gililland Dep. 91:11–94:2. Defendant Sperry suggested

Plaintiff approach Defendant Walker regarding her grades. Gililland Dep. 91:9–21, 93:11–94:2.

Plaintiff did so, and Defendant Walker supported Defendant Sperry's decision on the late

penalty. Gililland Dep. 94:7–21.

In April 2018, Plaintiff completed an assignment for Ms. Finney's NRS 233 class in

which Plaintiff "copied descriptions of certain relevant health conditions of medical journal

articles she found online, which she had been told by [ ] SWOCC faculty was acceptable
practice." Pl.'s Resp. 9, ECF No. 41 (citing Gililland Dep. 96:22–97:6). Ms. Finney initially
graded the assignment on the merits, but later consulted with Ms. Sperry regarding possible
plagiarism. Reese Decl., Ex. 82 at 2–3. On April 25, 2018, Ms. Finney awarded Plaintiff zero
points. Reese Decl., Ex. 37 at 3. Defendant Sperry then examined Plaintiff's work submitted for
other classes and placed Plaintiff in deficiency based on plagiarism. Sperry Dep. 51:19–53:25;
Reese Decl., Ex. 41. Defendant Sperry also compiled the materials Plaintiff copied and sent them
to Defendant Walker. Sperry Dep. 42:2–44:1. However, Defendant Sperry did not check any of
Plaintiff's peers' assignments for plagiarism. Sperry Dep. 51:3–18, 47:18–25, 57:5–11.

On April 25, Plaintiff told Defendant Walker that she felt targeted by Defendant Sperry
and that she believed copying from materials was an accepted practice at SWOCC. Walker Dep.
28:2–29:6. Defendant Walker then told Plaintiff that Defendants would hold an expulsion
hearing for her on Monday, April 30, 2018. Reese Decl., Ex. 42 at 1.

On April 26, Plaintiff emailed Ms. Finney:

> I can think of legitimate plagiarism committed by every single
> student. . . . This is absolutely a program wide issue. I think the
> fact that [Defendant Sperry] failed to see the plagiarism [by other
> students] on her case studies, but found it on mine in your class is
> just further evidence of her unethical behavior towards me because
> literally every student is guilty of this, all you have to do is look. I
> will not have my reputation and future destroyed over this simply
> because [Defendant Sperry] is abusing power[.]

Reese Decl., Ex. 43 at 1. Plaintiff then met with Defendant Daily, Vice President of Enrollment
and Student Services and SWOCC's Title IX Coordinator, to try to figure out "why she has been
singled out." Reese Decl., Ex. 44 at 3. At that meeting, Plaintiff asked "if she should have a
lawyer" for the expulsion hearing, and was told that there would not be an expulsion hearing if
she did obtain an attorney. *Id.*

On April 30, Defendants and Plaintiff attended her expulsion hearing. Defendant Saldivar informed Plaintiff that "she improperly cited a resource and was being placed on academic probation[.]" Compl. 6, ECF No. 1. Plaintiff raised the nursing program's "accepted practice and policy of allowing plagiarism and improper citations." *Id.* During the hearing, Defendants decided to start an investigation into Plaintiff's claims. Dailey Dep. 44:22-45:6, 49:15–22, ECF No. 41-8 ("Dailey Dep."); Gililland Dep. 117:16-118:3.

On May 7, Plaintiff emailed Defendant Saldivar, the Dean of Technical and Workforce Education:

> I still haven't heard back from you about my clinical tomorrow. I'm afraid I've given the college as much time as I can to act. I understand that you're an incredibly busy man, but I have to ensure that this blatant corruption (that you witnessed firsthand) will not go unanswered for. These women [Defendants Sperry and Walker] are so comfortable abusing their power that they have become incredibly sloppy about it, and luckily they've given me substantial evidence to move forward with a lawsuit. It's evident that the reason they're so comfortable with this behavior is because SWOCC has repeatedly allowed it to continue.
>
> I really just wanted to get through college, a lawsuit is the last thing I want to deal with, but if I cannot get the school to protect us then I'm going to take this as far as it needs to go. You have yet to interview anyone (including the student that will admit to plagiarism and tell you where to find loads of it). What we're looking at is defamation, harassment and discrimination based on age. I'm not sure if you've noticed, but all of the students that these women [Defendants Sperry and Walker] target are 30 or above, your non-traditional students- that makes this discrimination too. . . .

Reese Decl., Ex. 49. Plaintiff then cautioned that, if she did not hear back from Defendants, she would contact the "board of education, media, [her] attorney, . . . the nursing board, and anyone else that [she] believe[s] can help [her] and these other students." *Id.* Plaintiff listed the name of her attorney in that email. *Id.* A few hours later that same day, Plaintiff sent Defendant Saldivar

another email and reiterated that she intended to file a lawsuit. Reese Decl., Ex. 50. Plaintiff also

let Defendant Saldivar know that she contacted the Oregon State Board of Nursing ("OSBN")

and complained about "corrupt instructors . . . harassing students[.]" *Id.* In another email to

Defendant Wick the following week on May 15, Plaintiff clarified that she filed formal OSBN

complaints against Defendants Walker and Sperry. Reese Decl., Ex. 54.

On May 18, Plaintiff emailed Dean Saldivar stating that she had "repeatedly given

everyone the opportunity to make this go away by simply agreeing to stop harassing [her] and

just treat [her] fairly" and stated that she would "fight this all the way to the top." Reese Decl.,

Ex. 57. In the same email, Plaintiff reiterated that she was "being unfairly singled out when it

comes to plagiarism." *Id.*

On May 20, Plaintiff emailed Dean Saldivar the following:

> I have proven that I'm being singled out. I have proven that I
> didn't deserve the zero or the 10% deductions of those
> assignments. Tomorrow is the last day I will give SWOCC to do
> what already should've been done; my grades need to be
> reinstated, my record needs to be cleared, and my teachers need to
> stop harassing me. If this doesn't happen by the close of business
> tomorrow, [I] will give the interview to the [press] and move
> forward with a lawsuit. . . .

Reese Decl., Ex. 58. Three days later, Plaintiff emailed Defendant Walker, reiterated her intent to

file a lawsuit, asked Defendant Walker to "tell [the] staff to treat [Plaintiff] fairly ([Defendants

Wick and Sperry])," and wrote that Plaintiff was "as guilty of plagiarism as everyone else in this

program." Reese Decl., Ex. 64 at 1.

On May 24, Plaintiff submitted a formal complaint to SWOCC administrators. Defs.'

Mot. 12. Plaintiff also filed a complaint with the U.S. Department of Education. Reese Decl., Ex.

65. On May 25, Defendant Saldivar sent Plaintiff a "Discrimination and Harassment form and

Policy" in response to Plaintiff's "reference [to] harassment by nursing faculty[.]" Reese Decl.,

Ex. 66. On May 26, Plaintiff wrote to Defendants Saldivar and Walker via email that she

continued "to be singled out" and would "not submit to anymore of this harassment without an

attorney present." Reese Decl., Ex. 67 at 3.

On June 13, Plaintiff emailed Defendant Dailey the following:

> It's the end of the year and I would like an update please. It
> appears that I will just barely fail one class, although [Defendant
> Walker] had to manipulate which assignments go with what class
> to ensure it. These grades that they changed (about 2 months ago
> now) make the difference between passing and failing. If this is
> going to be allowed I need to know now so I can file suit and get
> this court case going and hopefully resolved in time for fall.

Reese Decl., Ex. 70. On June 16, Plaintiff emailed Defendant Walker that Plaintiff had "emails

proving [she] asked [Defendant Sperry] to take her tests early" when Plaintiff was ill while two

weeks later another student "needed to take her son to the doctor for a cold, she had no problems

and didn't get her grades docked." Reese Decl., Ex. 73. Plaintiff added that "[t]here isn't a jury

in the world that won't find that wrong." *Id.*

Later that same month of June 2018, Plaintiff received a failing grade in her NRS 112

and NRS 233 classes. Reese Decl., Ex. 74. While her grade for NRS 231 appears to be a "C" on

MyLakerLink, *id.*, Plaintiff ultimately received a failing grade in that class as well, Defs.' Resp.

7, ECF No. 55. Plaintiff was dismissed from the nursing program. Compl. 6, ECF No. 1. On

August 1, 2018, Plaintiff's attorney sent Defendants a tort claim notice. Reese Decl., Ex. 78.

## STANDARD OF REVIEW

Summary judgment is appropriate if the pleadings, depositions, answers to

interrogatories, affidavits, and admissions on file, if any, show "that there is no genuine dispute

as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R.

Civ. P. 56(a). Substantive law on an issue determines the materiality of a fact. *T.W. Elec. Servs.,*

*Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987). Whether the evidence is such that a reasonable jury could return a verdict for the nonmoving party determines the authenticity of the dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324.

Special rules of construction apply when evaluating a summary judgment motion: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *T.W. Elec.*, 809 F.2d at 630.

## DISCUSSION

### I.    Summary Judgment

Defendants move for summary judgment on all of Plaintiff's claims. First, Defendants argue that summary judgment is appropriate as to Plaintiff's Title IX claims because: (1) those claims against individual Defendants fail as a matter of law; (2) Plaintiff's employment history is not a protected status; (3) Plaintiff's academic performance did not meet expectations; (4) similarly situated students were not treated more favorably; and (5) Plaintiff cannot rebut Defendants' non-discriminatory reason for the discipline. Defs.' Mot. 17–25. Second, Defendants assert that summary judgment is appropriate as to Plaintiff's claim for breach of contract because Plaintiff has not presented evidence that she was discriminated against or harassed on the basis of sex or another protected status. *Id.* at 25–26. Lastly, Defendants assert that summary judgment is appropriate as to Plaintiff's claim for intentional infliction of

emotional distress ("IIED") because: (1) Plaintiff has not alleged or offered evidence showing that Defendants acted intentionally; and (2) Plaintiff has not offered evidence that Defendants treated her differently than other students or that Defendants' acts were the cause of Plaintiff's severe emotional distress. *Id.* at 29–30.

Plaintiff disagrees and argues that: (1) Plaintiff has presented sufficient evidence to establish Defendants' selective enforcement of discipline based on Plaintiff's gender; (2) Plaintiff has presented sufficient evidence to establish her breach of contract claim; and (3) Plaintiff has presented sufficient evidence to establish her IIED claim. Pl.'s Resp. 25–35, ECF No. 41. Plaintiff withdraws her claims for negligent supervision and intentional interference with economic relations, and agrees that those two claims should be dismissed. *Id.* at 35 n.9.

The Court concludes that: (1) summary judgment is appropriate only as to Plaintiff's Title IX claims against Defendants Scott, Daily, Saldivar, Walker, Sperry, and Wick; (2) summary judgment is appropriate as to Plaintiff's IIED claim; (3) summary judgment is not appropriate as to Plaintiff's Title IX claims against Defendants SWOCC and Southwestern Oregon Community College District; (4) summary judgment is not appropriate as to Plaintiff's breach of contract claim.

**A. Title IX**

Plaintiff argues Defendants created a hostile educational environment for Plaintiff because she was: (1) subjected to sexual harassment based on her former career as an adult film model and actress; (2) subjected to harassment based on her sex; and (3) subjected to a hostile educational environment created by Defendant SWOCC's lack of policies and procedures, lack of training, and failure to investigate. Compl. 7–8, ECF No. 1.

Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]" 20 U.S.C. § 1681(a). Title IX "encompass[es] diverse forms of intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005). Among these forms of discrimination is "the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Schwake v. Arizona Bd. of Regents*, 967 F.3d 940, 947 (9th Cir. 2020) (quoting *Yusuf v. Vasser Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). Courts generally apply the principles of Title VII cases to Title IX claims. *Austin v. Univ. of Or.*, 925 F.3d 1133, 1138 (9th Cir. 2019); *see also Emeldi v. Univ. of Or.*, 698 F.3d 715, 724 (9th Cir. 2012) ("The legislative history of Title IX 'strongly suggests that Congress meant for similar substantive standards to apply under Title IX as had been developed under Title VII.'" (citing *Lipsett v. Univ. of P.R.*, 864 F.2d 881, 897 (1st Cir. 1988)).

To state a hostile environment claim under Title IX, a plaintiff must allege that a school: "(1) had actual knowledge of; (2) and was deliberately indifferent to; (3) harassment because of sex that was; (4) 'so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school.'" *Parents for Privacy v. Barr*, 949 F.3d 1210, 1226 (9th Cir. 2020) (citing *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999)). In determining whether a school was deliberately indifferent, a court "must decide whether a reasonable fact-finder could conclude that the [school's] response was 'clearly unreasonable in light of the known circumstances.'" *Oden v. Northern Marianas Coll.*, 440 F.3d 1085, 1089 (9th Cir. 2006) (quoting *Davis*, 526 U.S. at 648). In other words, a court "must decide whether, on [the] record, one could find that the

[school] made 'an official decision . . . not to remedy the violation.'" *Id.* (quoting *Gebser v. Lago Vista Independent Sch. Dist.*, 524 U.S. 274, 290 (1998)). In addition, "[w]hether gender-oriented conduct rises to the level of actionable Title IX harassment depends on a constellation of surrounding circumstances, expectations, and relationships, including, but not limited to, the ages of the harasser and the victim and the number of individuals involved." *Davis*, 526 U.S. at 651 (internal citations and quotations omitted).

 1. <u>Protected Status</u>

 Defendants assert that summary judgment is appropriate as to Plaintiff's Title IX claims because Plaintiff's employment history is not a protected status. Defs.' Mot. 21. Specifically, Defendants argue that, "because [P]laintiff's employment history is not dependent on her biological sex, gender identity, or sexual orientation, it does not qualify as a protected class under the statute." *Id.* Plaintiff argues that she is covered under Title IX protections against discrimination based on gender stereotypes. Pl.'s Resp. 26, ECF No. 41. Neither party has addressed the standard for a Title IX hostile environment claim laid out in *Parents for Privacy*. *See* 949 F.3d at 1226.

 To the extent Defendants urge this court to conclude that gender stereotypes are either not appropriately considered under Title IX discrimination analysis, or that such gender stereotypes should be narrowly framed, they are mistaken. "It is undisputed that Title IX forbids discrimination on the basis of gender stereotypes." *Videckis v. Pepperdine Univ.*, 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1989) (holding that discrimination on the basis of gender stereotypes constitutes sex discrimination under Title VII). "Gender stereotyping is a concept that sweeps broadly." *Id.* (citing *Price Waterhouse*, 490 U.S. at 251). Because such stereotypes "stem from a person's

views about the proper roles of men and women[,] . . . [d]iscrimination based on a perceived failure to conform to a stereotype constitutes actionable discrimination under Title IX." *Id.*

Defendants ask the Court to find that the Title IX prohibition on discrimination based on gender stereotypes is limited to cases involving the rights of LGBTQ students. Defs.' Reply 4, ECF No. 47. In essence, Defendants invite the Court to adopt an approach that would bar people who identify as heterosexual or cisgender from bringing Title IX claims based on gender stereotypes. There is no reasonable reading of the statute and caselaw that would support such a narrow construction. The Court declines to accept Defendants' invitation.

Defendants further urge this Court to frame Plaintiff's claim as that of one for discrimination on the basis of her employment history. Defendants' proposition is a red herring. Plaintiff has offered sufficient evidence to support a sex discrimination claim based on gender stereotypes where such gender stereotypes are intrinsically connected to Plaintiff's employment history. Plaintiff shared with a fellow student that Plaintiff formerly worked as an adult film actress. Gililland Dep. 156:17–158:6. Plaintiff told Defendant Sperry via email that Plaintiff confided in that fellow student about "some things [in her] past that [she was] not proud of back when [she] was a teenager" and worried her fellow student "could really embarrass [her]." Sperry Dep. 21:19–23:24. Defendant Sperry then started acting "odd" toward Plaintiff. Gililland Dep. 54:1–55:9; 80:4–81:10, 87:14–88:2. Defendant Sperry also forwarded Plaintiff's email twice to Defendant Walker. Walker Dep. 15:15–18:8; Sperry Dep. 86:4–87:15. When Plaintiff later asked Defendant Sperry why she had turned cold toward Plaintiff, Defendant Sperry replied that "it takes a classy woman to be a nurse, and unclassy women"—while Defendant Sperry "kind of point[ed]" at Plaintiff—"shouldn't be nurses." Gililland Dep. 91:1–21, 93:11–94:2.

Taken together, these facts demonstrate that a genuine issue of material fact remains as to whether Defendant discriminated against Plaintiff on the basis of her sex. Defendant Sperry's comment about "unclassy women" advanced a stereotype about the kind of woman appropriate for the nursing profession. Viewing the evidence in the light most favorable to Plaintiff and drawing all reasonable inferences in her favor, a jury could determine that Defendant Sperry relied on Plaintiff's prior employment as an adult film actress to conclude that Plaintiff was an "unclassy" woman unfit to be a nurse. The heart of this analysis is not Plaintiff's employment history, but rather the kind of *woman*—an "unclassy" woman unfit to be a nurse—that Defendant Sperry perceived Plaintiff to be *because* of her employment history. *See Videckis*, 150 F. Supp. 3d at 1160 ("Discrimination based on a perceived failure to conform to a stereotype constitutes actionable discrimination under Title IX."); *see also Tingley-Kelley v. Trustees of Univ. of Pa.*, 677 F. Supp. 2d 764, 778 (E.D. Pa. 2010) (holding that comments about a woman not being able to juggle her professional and childcare responsibilities, without evidence of how similarly situated male applicants were treated, is sufficient evidence to support an inference of gender discrimination under Title IX). As such, a genuine issue of material fact remains as to whether Defendants discriminated against Plaintiff on the basis of her sex. Defendants' motion is DENIED as to Plaintiff's Title IX claim.

    2.  <u>Individual Defendants</u>

Defendants argue that summary judgment is appropriate as to Plaintiff's Title IX claims against Defendants Scott, Daily, Saldivar, Walker, Sperry, and Wick because individuals are not subject to liability under Title IX. Defs.' Mot. 20.

Although the Ninth Circuit has not addressed the question, courts have "consistently held that Title IX does not subject school officials to liability in their individual capacities." *G.C. ex*

*rel. Counts v. North Clackamas Sch. Dist.*, 654 F. Supp. 2d 1226, 1237 (D. Or. 2009) (citing

*Sherez v. State of Haw. Dep't of Educ.*, 396 F. Supp. 2d 1138, 1145 (D. Haw. 2005) (collecting

authorities from the First, Sixth, Seventh, Eighth, and Eleventh Circuits)). Educational

institutions that receive federal funding, not individual school officials, may be sued for Title IX

violations. *See, e.g.*, *Doe v. Petaluma City Sch. Dist.*, 830 F. Supp. 1560, 1576 (N.D. Cal. 1993),

*motion for reconsideration granted on other grounds*, 949 F. Supp. 1415 (N.D. Cal. 1996). This

Court has recognized that, in light of the "overwhelming authority" from other circuits,

"individuals are not subject to liability under Title IX." *North Clackamas*, 654 F. Supp. 2d at

1237 (citation omitted); *see also Brady v. Portland State Univ.*, No. 3:18-cv-01251-HZ, 2019

WL 1460870 (D. Or. Apr. 1, 2019) (holding that school officials who are not individual

recipients of federal funding are not liable in their individual capacities under Title IX).

Here, Plaintiff's Title IX claims against the individual school officials fail as a matter of

law. *See North Clackamas*, 654 F. Supp. 2d at 1237 ("Title IX does not subject school officials

to liability in their individual capacities."). As such, Defendants' motion should be GRANTED

as to Plaintiff's Title IX claim against Defendants Scott, Daily, Saldivar, Walker, Sperry, and

Wick.

## B. State Law Claims

### 1. Breach of Contract

Defendants argue that summary judgment is appropriate as to Plaintiff's breach of

contract claim because: (1) Plaintiff has not presented evidence to support a sex discrimination

claim under Title IX, and (2) Plaintiff has not presented evidence that her educational records

were ever disclosed or otherwise compromised in violation of federal or state law or institutional

policy. Defs.' Br. 25–26. Plaintiff responds that Defendants violated their promises to: (1) not

discriminate against students and rectify the consequences of any discrimination through specific steps, and (2) equally and fairly enforce its plagiarism policy to all students. Pl.'s Resp. 31–33, ECF No. 41. Plaintiff cites to Defendant SWOCC's Discrimination and Harassment Policy as well as the SWOCC Nursing Student Handbook in support of her arguments. *Id.* at 32. Plaintiff also cites the implied covenant of good faith and fair dealing and argues Defendant SWOCC had a duty to apply the plagiarism policy equally to all students. *Id.*

To prevail on a breach of contract claim, a plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance of the contract and lack of breach, and defendant's breach resulting in damages to plaintiff. *Matchniff v. Great Nw. Ins. Co.*, 224 F. Supp. 3d 1119, 1124 (D. Or. 2016) (citing *Slover v. Or. State Bd. of Clinical Soc. Workers*, 144 Or. App. 565, 570 (Or. Ct. App. 1996)). "Under Oregon law, '[a] breach is material if it goes to the very substance of the contract and defeats the object of the parties entering into the contract.'" *Woods v. Wells Fargo Bank, N.A.*, No. 6:13-cv-00457-AA, 2014 WL 334253, at *4 (D. Or. Jan. 28, 2014) (quoting *Bisio v. Madenwald*, 33 Or. App. 325, 331 (Or. Ct. App. 1978)). In addition, plaintiffs must plead and prove their own substantial performance of the contract's terms. *Strasser v. BAC Home Loan Serv.*, 3:11-cv-01432-JE, 2014 WL 6686717, at *6 (D. Or. Nov. 24, 2014).

In Oregon, the relationship between a student and a college, "which involves the payment of tuition for educational services, is essentially contractual in nature." *Vejo v. Portland Pub. Sch.*, 204 F. Supp. 3d 1149, 1175 (D. Or. 2016), *rev'd in part on other grounds*, 737 Fed. App'x 309 (9th Cir. 2018) (citations omitted). Statements in course catalogs, student handbooks, and similar documents can establish the terms of a contractual agreement. *Id.* (citations omitted). Whether such materials give rise to liability for breach of contract is a fact-sensitive inquiry. *See,*

*e.g.*, *Gibson v. Walden Univ., LLC*, 66 F. Supp. 3d 1322, 1324–26 (D. Or. 2014) (collecting

cases). To plausibly allege the existence of an enforceable contract, a plaintiff must present facts

showing that the college's "communications and overt acts suggest it manifested intent to be

bound by the statements and policies in its written documents." *Gallagher v. Capella Educ. Co.*,

No. 3:19-cv-01342-JR, 2019 WL 8333532, at *5 (D. Or. Dec. 23, 2019) (citation omitted). In

other words, "the plaintiff must pinpoint 'an identifiable contractual promise that the defendant

failed to honor.'" *Id.* (citing *Gibson*, 66 F. Supp. 3d at 1324).

      Here, Defendant SWOCC's Discrimination and Harassment Policy as well as the Nursing

Student Handbook indicate the terms of a contract between Plaintiff and Defendant SWOCC. *See*

*Vejo*, 204 F. Supp. 3d at 1175. Because Plaintiff has presented sufficient evidence to give rise to

a genuine issue of material fact in her Title IX sex discrimination claim, Plaintiff has therefore

also presented sufficient evidence that give rise to a genuine issue of material fact in her breach

of contract claim. As such, Defendants' motion is DENIED as to Plaintiff's breach of contract

claim.

      2.  <u>Intentional Infliction of Emotional Distress</u>

      Plaintiff asserts that Defendants Scott, Daily, Saldivar, Walker, Sperry, and Wick

intentionally "caused Plaintiff severe emotional distress culminating in her attempted suicide."

Compl. 13, ECF No. 1. Specifically, Plaintiff argues that Defendant Sperry "singled out and

targeted" her, "gave her fake assignments . . . , treated her differently with regard to late work,

manufactured the plagiarism charge . . . , and refused . . . direct orders to restore" Plaintiff's

grades. Pl.'s Resp. 34, ECF No. 41. Plaintiff also asserts that Defendant Walker "told

falsehoods" about her and that Defendant Daily "failed to protect [Plaintiff] from continued

mistreatment." *Id.* Defendants argue summary judgment is appropriate because Plaintiff has not

presented evidence showing that Defendants intended to cause Plaintiff severe emotional distress

or any evidence showing that Defendants' conduct was outrageous. *See* Defs.' Mot. 29–30; *see*

*also* Defs.' Reply 12–13, ECF No. 47.

In an IIED claim, a plaintiff must prove:

> (1) that defendants intended to cause plaintiff severe emotional
> distress or knew with substantial certainty that their conduct would
> cause such distress; (2) that defendants engaged in outrageous
> conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially
> tolerable behavior; and (3) that defendants' conduct in fact caused
> plaintiff severe emotional distress.

*House v. Hicks*, 218 Or. App. 348, 357–58 (2008) (citing *McGanty v. Staudenraus*, 321 Or. 532,

543–50 (1995)). The first requirement of intent is satisfied when a plaintiff shows that a

defendant "desires to inflict severe emotional distress" or "knows that such distress is certain, or

substantially certain, to result from his conduct." *McGanty*, 321 Or. at 550. The second

requirement is satisfied "only where the conduct has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as

atrocious, and utterly intolerable in a civilized community." *House*, 218 Or. App. at 358 (internal

citation omitted). Conduct that is merely "rude, boorish, tyrannical, churlish and mean does not

satisfy that standard, nor do insults, harsh or intimidating words, or rude behavior ordinarily

result in liability even when intended to cause distress." *Watte v. Edgar Maeyens, Jr., M.D.,*

*P.C.*, 112 Or. App. 234, 239 (1992) (citations and internal quotations omitted).

Whether the alleged behavior satisfies the second requirement is a question of law for the

court. *See House*, 218 Or. App. at 358 ("A trial court plays a gatekeeper role in evaluating the

viability of an IIED claim by assessing the allegedly tortious conduct to determine whether it

goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on

liability."); *see also Pakos v. Clark*, 253 Or. 113, 132 (1969) ("It was for the trial court to

determine, in the first instance, whether the defendants' conduct may reasonably be regarded as so extreme and outrageous as to permit recovery."). In making this determination, a court may consider the existence of a special relationship between the parties, the setting in which the conduct occurred, and whether the conduct was undertaken with an ulterior motive or to take advantage of an unusually vulnerable individual. *House*, 218 Or. App. at 360.

Here, Plaintiff argues that Defendants' conduct "was an extraordinary transgression of the bounds of socially tolerable behavior[.]" Compl. 13, ECF No. 1. The Court disagrees. While the Court has left the door open on Plaintiff's Title IX claim, as a matter of law the conduct alleged does not rise to the level of an extraordinary transgression beyond the bounds of socially tolerable behavior. *See McGanty*, 321 Or. at 543. As such, Defendants' motion is GRANTED as to Plaintiff's IIED claim.

## II.    Failure to Preserve Evidence

Plaintiff argues that sanctions are appropriate for Defendants' failure to preserve evidence after litigation was reasonably foreseeable. Pl.'s Mot. 2. Specifically, Plaintiff argues Defendants failed to preserve electronically stored information ("ESI") consisting of: (1) a "gradebook" or electronic grade sheet; (2) Plaintiffs' peers' previous assignments; (3) the Learning Management System's ("LMS") audit trail; and (4) a "Grammarly" account used to check Plaintiff's assignment for plagiarism. *Id.* at 2–3. Plaintiff requests that the Court: (1) instruct the jury about Defendants' duty to preserve the lost materials and their failure to uphold those duties; (2) permit Plaintiff's counsel to make appropriate arguments concerning such issues; (3) prevent Defendants from introducing any evidence, testimony or otherwise, that suggests the contents of the lost materials in any way; and (4) order Defendants to pay Plaintiff's reasonable costs, expenses, and fees in bringing the motion. Pl.'s Mot. 17.

In response, Defendants argue that: (1) a gradebook for the class Plaintiff failed never existed on the LMS; (2) Defendant SWOCC produced all student work it has in its possession and control but does not routinely retain copies of assignments submitted outside of the LMS; (3) Defendant SWOCC was unaware that an audit trail existed for the LMS until Plaintiff's counsel requested it in 2020; and (4) Defendant SWOCC deleted the Grammarly account in question when the account's owner, a graduate student, finished her academic program. Defs.' Resp. 6–9, ECF No. 55. In the alternative, even if deficient with respect to preservation efforts, Defendants argue that neither a preemptive jury instruction nor an award of fees is appropriate because such measures are premature. *Id.* at 11–12.

The Court concludes that sanctions are appropriate as to Defendants' failure to preserve the gradebook, Plaintiffs' peers' assignments, and the Grammarly account. The Court will permit Plaintiff's counsel to make appropriate arguments about the lost evidence and prevent Defendants from introducing evidence that suggests the contents of the lost evidence. The Court does not find further sanctions necessary. In addition, the Court concludes sanctions are not appropriate as to Defendants' failure to preserve the LMS audit trail.

### A.  **Legal Standard**

#### 1.  Spoliation

A court can derive its authority to sanction a party that has failed to preserve evidence from two sources: "the inherent power of federal courts to levy sanctions in response to abusive litigation practices, and the availability of sanctions under Rule 37 against a party who fails to obey an order to provide or permit discovery." *Leon v. IDX Systems Corp.*, 464 F.3d 951, 958 (9th Cir. 2006) (citation and internal quotations omitted).

The "'Ninth Circuit has . . . not set forth a precise standard for determining when [spoliation] sanctions are appropriate,' but the majority of trial courts have adopted the following test: (1) 'the party having control over the evidence had an obligation to preserve it at the time it was destroyed;' (2) 'the records were destroyed with a culpable state of mind;' and (3) 'the evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Justice v. Rockwell Collins, Inc.*, 117 F. Supp. 3d 1119, 1130–31 (D. Or. 2015), *aff'd*, 2017 WL 6559788 (9th Cir. 2017) (quoting *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 985 (N.D. Cal. 2012)); *see also UMG Recordings, Inc. v. Hummer Winblad Venture Partners*, 462 F. Supp. 2d 1060, 1078 (N.D. Cal. 2006) ("In re Napster") (applying the same standard to a party seeking an adverse inference instruction). The party seeking spoliation sanctions bears the burden of establishing each element. *Id.*

Ultimately, the imposition of spoliation sanctions must be determined on a case-by-case basis, and should be commensurate to the spoliating party's level of culpability, motive, or degree of fault in destroying the evidence. *See, e.g.*, *Erlandson v. Ford Motor Co.*, No. 08-cv-1137-BR, 2009 WL 3672898, at *3 (D. Or. Oct. 30, 2009) (finding dismissal sanction appropriate); *In re Napster*, 462 F. Supp. 2d at 1078 (finding preclusion order and adverse inference instruction warranted); *BTO Logging Inc. v. Deere & Co.*, 174 F.R.D. 690, 692–93 (D. Or. 1997) (excluding expert testimony); *Glover v. BIC Corp.*, 6 F.3d 1318, 1329 (9th Cir. 1993) (imposing adverse inference instruction).

In addition to its inherent powers, a court may impose sanctions under Fed. R. Civ. P. 37(b). "If a party . . . fails to obey an order to provide or permit discovery," a court may, among other options: (1) "direct[ ] that the matters embraced in the order or other designated facts be taken as established for purposes of the action, as the prevailing party claims;" or (2) "prohibit[ ]

the disobedient party from supporting or opposing designated claims or defenses, or from

introducing designated matters in evidence[.]" Fed. R. Civ. P. 37(b).

    2.  <u>Electronically Stored Information</u>

Under Fed. R. Civ. P. 37(e), a court may impose sanctions "[i]f electronically stored

information that should have been preserved in the anticipation or conduct of litigation is lost

because a party failed to take reasonable steps to preserve it, and it cannot be restored or replaced

through additional discovery." Fed. R. Civ. P. 37(e). If such loss of information results in

prejudice to another party, the court may "order measures no greater than necessary to cure the

prejudice." Fed. R. Civ. P. 37(e)(1). Additionally, if the court finds a party "acted with the intent

to deprive another party of the information's use in the litigation," the court may: "(A) presume

the lost information was unfavorable to the party; (B) instruct the jury that it may or must

presume the information was unfavorable to the party; or (C) dismiss the action or enter a default

judgment." Fed. R. Civ. P. 37(e)(2).

To determine whether the loss of information is prejudicial to a party, a court "looks to

whether the [spoiling party's] actions impaired [non-spoiling party's] ability to go to trial or

threatened to interfere with the rightful decision of the case." *Leon*, 464 F.3d at 959 (citation

omitted). The Ninth Circuit has found prejudice "when a party's refusal to provide certain

documents forced [the non-spoiling party] to rely on incomplete and spotty evidence at trial." *Id.*

(citation and internal quotations omitted).

A party's destruction of evidence qualifies as willful if the party has "some notice that the

documents were potentially relevant to the litigation before they were destroyed." *United States*

*v. Kitsap Physicians Serv.*, 314 F.3d 995, 1001 (9th Cir. 2002) (citation and internal quotations

omitted); *see also Ryan v. Editions Ltd. W., Inc.*, 786 F.3d 754, 766 (9th Cir. 2015) (holding that

the party moving for sanctions bears the burden of "demonstrating that [the spoiling party] destroyed documents and has some notice that the documents were potentially relevant to the litigation before they were destroyed" (citation and internal quotations omitted)). In addition, since "the relevance of destroyed documents cannot be clearly ascertained because the documents no longer exist, a party can hardly assert any presumption of irrelevance as to the destroyed documents." *Leon*, 464 F.3d at 959 (quoting *Alexander v. Nat'l Farmers Org.*, 687 F.2d 1173, 1205 (8th Cir. 1982)) (internal quotations and bracketing omitted).

## B. Lost ESI

Defendants assert that, "[b]eginning with receipt of [P]laintiff's tort claim notice" on August 1, 2018, "SWOCC immediately began to work with the applicable departments and personnel to identify and preserve relevant materials." Defs.' Resp. 4, ECF No. 55. Plaintiff emphasizes that Defendants' expert in his deposition indicated that he "believe[d] when we were actually served the complaint" in late February or early March 2019 "is when we started to formalize gathering all the information on it." Pl.'s Reply, ECF No. 62.

### 1. Gradebook

Plaintiff argues that sanctions are appropriate because Defendants failed to preserve an electronic gradebook for one of Plaintiff's classes in which she received a failing grade. Pl.'s Mot. 5. Plaintiff asserts that the gradebook could answer the "hotly contested factual issue[ ]" of what exactly caused Plaintiff to fail the course. *Id.* Defendants argue the gradebook in question "never existed" in electronic format and "there was simply no ESI to preserve." Defs.' Resp. 7, ECF No. 55. Defendants also acknowledge a discrepancy between Plaintiff's failing grade on her final grade report and her passing grade of 78.01% on the LMS. *Id.*

Even if the gradebook was not electronically stored, Defendants' failure to preserve the gradebook for Plaintiff's classes merits sanctions. The gradebook is at the very heart of the dispute between Plaintiff and Defendants. Plaintiff had threatened litigation relating to her grades since May 7, 2018, telling Defendants that she had "substantial evidence to move forward with a lawsuit" based on "defamation, harassment and discrimination." Reese Decl., Ex. 49 at 1. Over the next month, Plaintiff repeatedly told Defendants that she intended to bring a lawsuit if her grades were not corrected. Here, Defendants had a duty to preserve the gradebook during the semester, failed to preserve that evidence, and the evidence was relevant to Plaintiff's claims such that a reasonable trier of fact could find that it would support her claims. *See Rockwell*, 117 F. Supp. 3d at 1130–31. Defendants received more than enough notice that the gradebook was potentially relevant to litigation before the end of the semester. *See Kitsap Physicians*, 314 F.3d at 1001. As such, Plaintiff's motion is GRANTED as to Defendants' failure to preserve the gradebook. The Court will permit Plaintiff's counsel to make appropriate arguments about the gradebook and prevent Defendants from introducing evidence that suggests the gradebook's contents. The Court does not find further sanctions necessary.

2.  Peers' Assignments

Plaintiff next argues that Defendants failed to preserve her peers' previous assignments that would have shown that plagiarism was widespread. Pl.'s Mot. 6. Defendants argue that all assignments submitted electronically have been produced. Defs.' Resp. 8, ECF No. 55. However, Defendants did not retain any assignments submitted outside of the LMS because "SWOCC does not routinely retain copies of those documents." *Id.*

Similar to the gradebook, even if the peers' assignments were not electronically stored, Defendants' failure to preserve them merits sanctions. Defendants received notice from Plaintiff

that she believed copying from materials was an accepted practice at SWOCC as early as April

25, 2018. *See* Walker Dep. 28:2–29:6. Plaintiff urged her instructors to look at other students'

assignments because "the fact that [Defendant Sperry] failed to see the plagiarism [by other

students] on [Defendant Sperry's] case studies, but found it on [Plaintiff's assignment] in [Ms.

Finney's] class is just further evidence of [Defendant Sperry's] unethical behavior towards

[Plaintiff] because literally every student is guilty of this." Reese Decl., Ex. 42 at 1. As

explained, Defendants received sufficient notice from Plaintiff that the peers' assignments were

potentially relevant to litigation before semester ended. *See Kitsap Physicians*, 314 F.3d at 1001.

As such, Plaintiff's motion is GRANTED as to Defendants' failure to preserve her peers'

assignments not submitted in electronic format. The Court will permit Plaintiff's counsel to make

appropriate arguments about these assignments and prevent Defendants from introducing

evidence that suggests the contents of those assignments. The Court does not find further

sanctions necessary.

      3.  <u>Audit Trail</u>

      Plaintiff asserts that Defendants failed to preserve the LMS audit trail, which would have

shown who improperly uploaded into the plagiarism investigation folder the exact internet

sources Plaintiff copied. Pl.'s Mot. 7. Defendants argue that they were unaware the LMS

contained an audit function or that the audit function had an expiration date. Defs.' Resp. 8–9,

ECF No. 55.

      Here, Defendants' failure to preserve the LMS audit trail does not merit sanctions.

Because Defendants were unaware the audit function existed, the Court cannot say they were

under a duty to preserve the LMS audit trail. As such, Plaintiff's motion is DENIED as to

Defendants' failure to preserve the LMS audit trail.

4. <u>Grammarly Account</u>

Lastly, Plaintiff asserts that sanctions are appropriate because Defendants failed to preserve any of the information relating to Ms. Finney's Grammarly account. Pl.'s Mot. 8–9. Plaintiff explains that the Grammarly account would have identified exactly what parts of Plaintiff's assignment were submitted into the plagiarism checker tool to obtain the overall plagiarism score Defendants used to justify giving Plaintiff a zero on the assignment. *Id.* Defendants did not preserve Ms. Finney's Grammarly account after Ms. Finney lost her access to it following her completion of her academic program. Defs.' Resp. 8–9, ECF No. 55. Defendants argue they were under no obligation to do so because Plaintiff has changed her legal theory over time and Defendants did not have adequate notice. *Id.* at 9.

Here, Defendants' failure to preserve the Grammarly account merits sanctions. First, Defendants received ample notice that the Grammarly account was potentially relevant to the litigation before the semester ended. *See Kitsap Physicians*, 314 F.3d at 1001. For example, and as previously explained, Plaintiff had threatened litigation since May 7, 2018. Reese Decl., Ex. 49. Plaintiff also filed formal complaints with both the OSBN and the U.S. Department of Education. Reese Decl., Ex. 50, Ex. 65. In May 2018, Plaintiff filed a formal complaint to SWOCC administrators, Defs.' Mot. 12, and was given a "Discrimination and Harassment form and Policy" to fill out, Reese Decl., Ex. 66. All of these events occurred well before the semester concluded.

Second, the Court finds unconvincing Defendants' argument that they were under no obligation to preserve the Grammarly account because Plaintiff changed her legal theory. Because Plaintiff alleged unequal treatment with respect to her grades since April 2018, Defendants were on notice about the potential of litigation well before the semester ended. That

Plaintiff's allegations were merely about unequal treatment or at the time about age discrimination does not diminish Defendants' knowledge of the Grammarly account's relevance to either theory. In other words, Defendants received sufficient notice of a grade dispute in which Plaintiff alleged unequal treatment but Defendants failed to preserve relevant evidence.

As such, Plaintiff's motion is GRANTED as to Defendants' failure to preserve the Grammarly account. The Court will permit Plaintiff's counsel to make appropriate arguments about the Grammarly account and prevent Defendants from introducing evidence that suggests the contents of the Grammarly account. The Court does not find further sanctions necessary.

## CONCLUSION

For the reasons above, Defendants' motion for summary judgment (ECF No. 36) is GRANTED in part and DENIED in part and Plaintiff's motion for sanctions (ECF No. 50) is GRANTED in part and DENIED in part.

DATED this <u>3rd</u> day of December 2021.

<u>s/ Mustafa T. Kasubhai</u>
MUSTAFA T. KASUBHAI (He / Him)
United States Magistrate Judge